**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

|  |  |  |
|---|---|---|
| CENTRIC PIPE LLC, | ) | |
| Plaintiff, | ) | |
| LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, and KANA ENERGY SERVICES, INC., | ) | |
| Consolidated- Plaintiffs, | ) | Consol. Ct. No. 25-00182 |
| v. | ) | |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| U.S. OCTG MANUFACTURERS ASSOCIATION, | ) | |
| Defendant-Intervenor. | ) | |

## <u>ORDER</u>

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Plaintiff Centric Pipe LLC's Memorandum of Points and Authorities in Support of its Rule 56.2 Motion for Judgment on the Agency Record, and all other papers and proceedings herein, it is hereby

**ORDERED** that said motion is GRANTED, and it is further

**ORDERED** that this case is remanded to U.S. Customs and Border Protection ("CBP") with instructions that CBP redetermine aspects of its investigation as instructed by this Court in its accompanying slip opinion.

**ORDERED**, that CBP shall provide the Court and parties with revised redetermination within 60 days of this order. Parties shall have 30 days to submit comments on the revised redetermination to the Court. Responses to those comments shall be filed within 15 days.

Dated: _____ , 2026
New York, New York

_____
Hon. Joseph A. Laroski, Jr., Judge

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

|  |  |
|---|---|
| CENTRIC PIPE LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, and KANA ENERGY SERVICES, INC., | ) |
| | ) |
| Consolidated- Plaintiffs, | ) |
| | ) Consol. Ct. No. 25-00182 |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| U.S. OCTG MANUFACTURERS ASSOCIATION, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

## RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFF CENTRIC PIPE LLC

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Centric Pipe LLC ("Centric Pipe") hereby moves this Court for judgment on the agency record. Centric Pipe seeks judicial review of the initiation of the Enforce and Protect Act ("EAPA") investigation into Centric Pipe and other U.S. importers of oil country tubular goods ("OCTG"), EAPA Case Number 7890 by U.S. Customs and Border Protection ("CBP"), as well as certain aspects of the determination of evasion made by CBP's Office of Trade ("OT"), Trade Remedy & Law Enforcement Directorate ("TRLED") pursuant to 19 U.S.C. § 1517(c) and the de novo administrative review of that determination conducted by CBP, OT, Regulations and Rulings

("ORR") pursuant to 19 U.S.C. § 1517(f). <u>See</u> Letter from Victoria Cho, Director, Enforcement Operations Division, TRLED, CBP OT re: Notice of Initiation of Investigation and Interim Measures - EAPA Cons. Case 7890 (May 31, 2024) (Public Version) (P.R. 90); Letter from Victoria Cho, Director, Enforcement Operations Division, TRLED, CBP OT re: Notice of Determination as to Evasion (February 24, 2025) (Public Version) ("Final Determination") (P.R. 522); Letter from Alice Kippel, Executive Director, ORR, OT, CBP re: Enforce and Protect Act ("EAPA") Consol. Case Number 7890; <u>Certain Oil Country Tubular Goods From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order</u>, 75 Fed. Reg. 3,203 (Dep't of Commerce Jan. 20, 2010); <u>Certain Oil Country Tubular Goods From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order</u>, 75 Fed. Reg. 28,551 (Dep't of Commerce May 21, 2010); 19 U.S.C. § 1517 (July 2, 2025) (Public Version) ("ORR Determination") (P.R. 612). Specifically, as discussed in the Memorandum of Points and Authorities in Support of its Rule 56.2 Motion for Judgment on the Agency Record, Centric Pipe seeks judgment on the agency record because TRLED's final determination, as affirmed by ORR's <u>de novo</u> administrative review, was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law for five reasons.

First, TRLED violated Centric Pipe's due process rights by not providing Centric Pipe with a meaningful opportunity to comment on information contained in the allegation prior to initiation and imposing interim measures. Centric Pipe had a protected property interest in procedural due process in an EAPA proceeding. 19 C.F.R. § 165.15(d)(1) does not disclose the information contained in the allegation nor allow for a party to submit any evidence or argument on this information prior to initiation and the imposition of interim measures. Centric Pipe had a

significant interest in the disclosure of the information contained in the allegation as it had to participate in a costly investigation and suffered business reputational harm because of CBP's initiation of the contested EAPA investigation. The appropriate remedy to address TRLED's procedural due process violation is a reversal of CBP's affirmative determination of evasion because the investigation would never have been initiated if Centric Pipe had received sufficient procedural due process.

Second, TRLED violated its statutory mandate under 19 U.S.C. § 1517(b)(1) by initiating its investigation later than 15 business days after receiving an EAPA allegation against Centric Pipe. The definition of "date of receipt" under 19 C.F.R. § 165.12 allows TRLED to delay initiating an investigation by an unlimited timeframe pending its confirmation of receipt of an allegation. The legislative history of the statute confirms that Congress intended for the deadlines in the statute to be mandatory. The appropriate remedy to address this violation is a remand with instructions to TRLED to reverse its affirmative finding of evasion. Without a strict sanction, CBP will continue to untimely initiate EAPA investigations substantially prejudicing importers like Centric Pipe, who rely on timely guidance from CBP to dictate their shipments of merchandise.

Third, TRLED and ORR unlawfully found that hollow steel billets are covered by the scope of the AD/CVD Orders. The plain language of the scope, as confirmed by determinations by the International Trade Commission and rulings by CBP, only applies to "certain OCTG" and not raw materials such as steel billets. Commerce's recent affirmative circumvention determination that imports of OCTG completed in Thailand using steel billets from China confirms that steel billets fall outside the scope of the Orders. Further, TRLED unlawfully and arbitrarily failed to submit a covered merchandise referral to Commerce on the issue of whether steel billets fall within the scope given that TRLED made such a referral on identical merchandise in a later case. Finally,

steel billets are substantially transformed into OCTG in Thailand such that they no longer have a country-of-origin of China.

Fourth, TRLED unlawfully initiated the contested EAPA investigation given that the information submitted in the allegation did not reasonably suggest that Centric Pipe evaded the Orders. The information contained in the allegation, on both an individual and collective basis, represented mere "conjecture or supposition" as opposed to "particularized {or} objective" evidence of evasion. Had Centric Pipe received an opportunity to comment on the information contained in the allegation, it could have proven that much of the "conjecture or supposition" was false.

Fifth, TRLED and ORR unlawfully ignored substantial record evidence that detracted from the weight of their determination that the record contained substantial evidence of evasion by Centric Pipe. Specifically, TRLED and ORR unlawfully ignored facility photos and an audit report by API demonstrating that PET accurately described its production process and had the capacity to produce OCTG.

Centric Pipe, therefore, respectfully requests that this Court:

1. Find that TRLED's determination, as affirmed by ORR was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law;

2. Declare that the record lacked substantial evidence of evasion;

3. Remand this matter to TRLED for disposition consistent with the Court's final opinion and order;

4. Order CBP to issue corrected instructions and liquidate Centric Pipe's entries of OCTG imported from PET in Thailand without antidumping and countervailing duties; and,

5. Provide such other relief as this Court deems proper.

4

WHEREFORE, for the reasons described in this Motion and the accompanying memorandum of points and authorities in support, Centric Pipe respectfully requests that this Court enter judgment in its favor. A proposed order is attached for this Court's consideration.

Respectfully submitted,

Dated: April 10, 2026

/s/ Bryan P. Cenko
Bryan P. Cenko
Kristin H. Mowry
Jeffrey S. Grimson
Kavita Mohan
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
bpc@mowrygrimson.com
*Counsel to Centric Pipe LLC*

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| CENTRIC PIPE LLC,<br><br>Plaintiff,<br><br>LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, and KANA ENERGY SERVICES, INC.,<br><br>Consolidated- Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>U.S. OCTG MANUFACTURERS ASSOCIATION,<br><br>Defendant-Intervenor. | Consol. Ct. No. 25-00182<br>Nonconfidential Version |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFF CENTRIC PIPE LLC

Bryan P. Cenko
Kristin H. Mowry
Jeffrey S. Grimson
Kavita Mohan
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
trade@mowrygrimson.com
*Counsel to Centric Pipe LLC*

April 10, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................ii

ADMINISTRATIVE DETERMINATION UNDER REVIEW ..................................................... 1

ISSUES PRESENTED ...................................................................................................... 1

STATEMENT OF FACTS................................................................................................... 3

STANDARD OF REVIEW................................................................................................... 7

SUMMARY OF THE ARGUMENT....................................................................................... 8

ARGUMENT ................................................................................................................... 10

I. CBP'S AFFIRMATIVE DETERMINATION OF EVASION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE CBP VIOLATED CENTRIC PIPE'S DUE PROCESS RIGHTS......................................................................................... 10

II. CBP'S AFFIRMATIVE DETERMINATION OF EVASION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE TRLED FAILED TO TIMELY INITIATE ITS INVESTIGATION......................................................................................... 15

III. CBP'S AFFIRMATIVE DETERMINATION OF EVASION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE STEEL BILLETS ARE NOT COVERED BY THE SCOPE OF THE ORDERS.................................................................... 21

    A. Hollow Steel Billets and Solid Round Billets Are Not Within the Scope of the Orders ............................................................................................. 22

    B. Commerce's Recent Circumvention Determination Confirms that Hollow and Solid Round Steel Billets Are Not Within the Scope of the Orders...................... 24

    C. CBP Arbitrarily Failed to Refer the Scope Issues in this Case to Commerce........ 27

    D. Hollow and Solid Billets from China Were Substantially Transformed into OCTG in Thailand................................................................................................ 29

IV. CBP'S AFFIRMATIVE DETERMINATION OF EVASION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE TRLED UNLAWFULLY INITIATED ITS INVESTIGATION......................................................................................... 34

V. CBP'S AFFIRMATIVE DETERMINATION OF EVASION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE TRLED AND ORR IGNORED RECORD EVIDENCE THAT DETRACTED FROM THE WEIGHT OF THEIR CONCLUSIONS....................................................................................... 40

CONCLUSION ............................................................................................................... 44

# TABLE OF AUTHORITIES

**Cases**

Al Tech Specialty Steel Corp. v. United States,
6 CIT 245, 575 F. Supp. 1277 (1983) ...................................................................... 34

Am. Pac. Plywood, Inc. v. United States,
No. 20-03914, 2023 Ct. Intl. Trade LEXIS 98 (June 22, 2023)................................. 12

AMS Assocs. v. United States,
737 F.3d 1338 (Fed. Cir. 2013)................................................................................. 26

Arnold P'ship v. Dudas,
362 F.3d 1338 (Fed. Cir. 2004)............................................................................ 8, 40

Asia Wheel Co., Ltd. v. United States,
762 F. Supp. 3d 1289 (Ct Int'l Trade 2025)............................................................. 33

Barnhart v. Peabody Coal Co.,
537 U.S. 149 (2003) .................................................................................................. 19

Barnhart v. Sigmon Coal Co.,
534 U.S. 438 (2002) .................................................................................................. 15

Bell Supply Co., LLC v. United States,
393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) ........................................................... 24

Bell Supply Co., LLC v. United States,
888 F.3d 1222 (Fed. Cir. 2018)................................................................................ 24

Bestfoods v. United States,
165 F.3d 1371 (Fed. Cir. 1999)................................................................................ 33

Brock v. Pierce County,
476 U.S. 253 (1986) ...................................................................................... 14, 17, 19

Brock v. Roadway Express, Inc.,
481 U.S. 252 (1987) ............................................................................................ 12, 13

CEK Grp. LLC v. United States,
633 F. Supp. 3d 1369 (Ct. Int'l Trade May 2, 2023) .......................................... 34, 39

Changzhou Trina Solar Energy Co. v. United States,
975 F.3d 1318 (Fed. Cir. 2020) ................................................................................ 41

Changzhou Wujin Fine Chem. Factory Co. v. United States,
701 F.3d 1367 (Fed. Cir. 2012) .................................................................................. 7

CS Wind Vietnam Co. v. United States,
832 F.3d 1367 (Fed. Cir. 2016) .................................................................................. 7

Diamond Tools Tech. v. United States,
545 F. Supp. 3d 1324 (Ct. Int'l Trade 2021) .............................................. 12, 17, 18

Dixon Ticonderoga Co. v. United States,
468 F.3d 1353 (Fed. Cir. 2006) ........................................................................ 15, 19

Ferrostaal Metals Corp. v. United States,
11 CIT 470, 664 F. Supp. 535 (1987) .......................................................... 30, 31, 32

Kingdomware Techs., Inc. v. United States,
579 U.S. 162 (2016) .................................................................................................. 17

Logan v. Zimmerman Brush Co.,
455 U.S. 422 (1982) .................................................................................................. 10

Magnum Magnetics Corp. v. United States,
No. 2024-1164, 2026 U.S. App. LEXIS 4589 (Fed. Cir. Feb. 17, 2026) ................. 22

Mathews v. Eldridge,
424 U.S. 319 (1976) ............................................................................................ 10, 12

Me. Cmty. Health Options v. United States,
590 U.S. 296 (2020) .................................................................................................. 17

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) ................................................................................ 7, 33, 35, 37

NEC Corp. v. United States,
151 F.3d 1361 (Fed. Cir. 1998) ................................................................................ 11

Phoenix Metal Co., Ltd. v. United States,
No. 23-00048, 2024 Ct. Intl. Trade LEXIS 69 (Ct. Int'l Trade June 10, 2024) ....... 42

RHP Bearings v. United States,
288 F.3d 1334 (Fed. Cir. 2002) ................................................................................ 27

Royal Brush Mfg. v. United States,
   75 F.4th 1250 (Fed. Cir. 2023) ................................................................. 11, 13

SKF USA, Inc. v. United States,
   254 F.3d 1022 (Fed. Cir. 2001) ....................................................................... 7

Superior Commercial Sols., LLC v. United States,
   No. 24-00052, 2025 Ct. Intl. Trade LEXIS 153 (Ct. Int'l Trade Nov. 26, 2025) .............. passim

Terry v. Ohio,
   392 U.S. 1 (1968) .......................................................................................... 34

Vanguard Trading Co. LLC v. United States,
   788 F. Supp. 3d 1277 (Ct Int'l Trade 2025) ................................................. 28

Yangzhou Bestpak Gifts & Crafts Co. v. United States,
   716 F.3d 1370 (Fed. Cir. 2013) ..................................................................... 36

**Statutes**

19 U.S.C. § 1517 ............................................................................................ passim

19 U.S.C. § 1677j .................................................................................................. 26

5 U.S.C. § 706 ......................................................................................................... 7

**Regulations**

19 C.F.R. § 165.12 .......................................................................................... 8, 16, 20

19 C.F.R. § 165.15 ................................................................................................ passim

19 C.F.R. § 165.16 ...................................................................................................... 27

19 C.F.R. § 165.24 ...................................................................................................... 13

19 C.F.R. § 351.203 ................................................................................................... 14

19 C.F.R. § 351.225 ................................................................................................... 22

**Other Authorities**

CBP, EAPA Investigation 8143: JOL Tubular, Inc. and Commercial Steel Products LLC (Notice
   of Covered Merchandise Referral, December 1, 2025) (Dec. 3, 2025) ................................... 28

Certain Oil Country Tubular Goods From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 75 Fed. Reg. 28,551 (Dep't of Commerce May 21, 2010) .................................................................................. 22

Country Tubular Goods From the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders, 91 Fed. Reg. 9,811 (Dep't Commerce Feb. 27, 2026) ............................................................................. 24, 25

Customs Ruling N351850 (Aug. 12, 2025) .................................................................. 23

Customs Ruling NY 881770 (Jan. 22, 1993) ............................................................... 23

Customs Ruling NY J81670 (Mar. 28, 2003) .............................................................. 23

H.R. Rep. No. 114-114 (2015) .................................................................................... 17

Investigation of Claims of Evasion of Antidumping and Countervailing Duties, 89 Fed. Reg. 19,239 (CBP Mar. 18, 2025) ..................................................................................... 20

Oil Country Tubular Goods from China, Inv. Nos. 701-TA-463 and 731-TA-1159 (Second Review), USITC Pub. 5136 (Nov. 2020) (Public Document), .................................... 23, 31, 32

Oil Country Tubular Goods From the People's Republic of China: Notice of Covered Merchandise Referral and Initiation of Covered Merchandise Inquiry, 90 Fed. Reg. 61,375 (Dec. 31, 2025) ............................................................................................................................. 28

**ADMINISTRATIVE DETERMINATION UNDER REVIEW**

Plaintiff Centric Pipe LLC ("Centric Pipe") seeks judicial review of the initiation of the Enforce and Protect Act ("EAPA") investigation into Centric Pipe and other U.S. importers of oil country tubular goods ("OCTG"), EAPA Case Number 7890 by U.S. Customs and Border Protection ("CBP"), as well as certain aspects of the determination of evasion made by CBP's Office of Trade ("OT"), Trade Remedy & Law Enforcement Directorate ("TRLED") pursuant to 19 U.S.C. § 1517(c) and the de novo administrative review of that determination conducted by CBP, OT, Regulations and Rulings ("ORR") pursuant to 19 U.S.C. § 1517(f).  See Letter from Victoria Cho, Director, Enforcement Operations Division, TRLED, CBP OT re:  Notice of Initiation of Investigation and Interim Measures - EAPA Cons. Case 7890 (May 31, 2024) (Public Version) (P.R. 90) ("Notice of Interim Measures"); Letter from Victoria Cho, Director, Enforcement Operations Division, TRLED, CBP OT re: Notice of Determination as to Evasion (February 24, 2025) (Public Version) (P.R. 522) ("Final Determination"); Letter from Alice Kippel, Executive Director, ORR, OT, CBP re: Enforce and Protect Act ("EAPA") Consol. Case Number 7890; Certain Oil Country Tubular Goods From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 75 Fed. Reg. 3,203 (Dep't of Commerce Jan. 20, 2010); Certain Oil Country Tubular Goods From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 75 Fed. Reg. 28,551 (Dep't of Commerce May 21, 2010); 19 U.S.C. § 1517 (July 2, 2025) (Public Version)  (P.R. 612) ("ORR Determination").

## ISSUES PRESENTED

1. Whether TRLED's determination, as affirmed by ORR's administrative review, that substantial evidence of evasion existed for Centric Pipe was arbitrary, capricious, an abuse

of discretion and otherwise not in accordance with law where TRLED violated Centric Pipe's due process rights by not providing it with a meaningful opportunity to comment prior to initiation and imposing interim measures.

2. Whether TRLED's determination, as affirmed by ORR's administrative review, that substantial evidence of evasion existed for Centric Pipe was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law when TRLED violated its statutory mandate by initiating its investigation later than 15 business days after receiving an allegation against Centric Pipe.

3. Whether TRLED's determination, as affirmed by ORR's administrative review, that substantial evidence of evasion existed for Centric Pipe was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law when steel billets are not covered by the scope of the antidumping ("AD") and countervailing duty ("CVD") Orders on OCTG from China (the "Orders"), TRLED failed to submit a covered merchandise referral to the U.S. Department of Commerce ("Commerce") and steel billets are substantially transformed in Thailand.

4. Whether TRLED's determination, as affirmed by ORR's administrative review, to initiate this EAPA investigation was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law when the allegation did not reasonably suggest evasion of the Orders by Centric Pipe.

5. Whether TRLED's determination, as affirmed by ORR's administrative review, that substantial evidence of evasion existed for Centric Pipe was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law where TRLED and ORR unlawfully ignored evidence that detracted from the weight of their conclusions.

**STATEMENT OF FACTS**

The statute defines evasion as "entering covered merchandise into . . . the United States by means . . . that is material and false . . . and that results in any cash deposit or . . . applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise." 19 U.S.C. § 1517(a)(5)(A).

On January 18, 2024, the U.S. OCTG Manufacturers Association ("Alleger") filed an allegation against Centric Pipe claiming that Centric Pipe evaded the Orders by transshipping Chinese-origin OCTG through one company in Thailand, Petroleum Equipment (Thailand) Co., Ltd. ("PET"). See Mem. from Kristina Horgan to Victoria Cho re: Initiation of Investigation for EAPA 7890-7898 and 7954 (Consolidated Case 7890) at 1-2 (Feb. 23, 2024) (Public Version) (P.R. 42) ("Initiation Mem.").

On February 1, 2024, TRLED formally acknowledged receipt of the allegation. See id. at 2. On February 23, 2024, pursuant to 19 U.S.C. § 1517(b)(1), TRLED initiated an EAPA investigation finding that the sparce information submitted by the Alleger nonetheless reasonably suggested that Centric Pipe evaded the Orders. See id. at 9-10.

In initiating its investigation, TLRED cited to shipment data showing an increase in exports from PET to the United States between 2021 and 2023 and specious claims in declarations that PET lacked the production capacity to produce the OCTG that it exported to the United States. See id. at 6-7. Further, TRLED found that PET received a certification from the American Petroleum Institute ("API") on August 5, 2022, but that license was deactivated on February 1, 2023. See id. at 7. Finally, TRLED relied on information showing a business relationship between Centric Pipe and shipment data showing that Centric Pipe imported OCTG from PET. See id. at 7-8. TRLED concluded that this mere scintilla of evidence reasonably suggested that "PET does

not have production in Thailand but instead transshipped Chinese-origin OCTG to Centric {Pipe} . . . ." Id. at 10.

On May 31, 2024, TRLED imposed interim measures against Centric Pipe based on TRLED's conclusion that there is "reasonable suspicion that {Centric Pipe} entered merchandise covered by the AD/CVD orders into the customs territory of the United States through evasion." Notice of Interim Measures at 2 (Public Version) (emphasis added) (P.R. 90); see also 19 U.S.C. § 1517(e). TRLED's investigation covered entries "from February 1, 2023, through the pendency of {TRLED}'s investigation." Id. Consistent with its regulation, 19 C.F.R. § 165.15(d)(1), TRLED did not provide Centric Pipe with an opportunity to submit factual information or written arguments prior to initiation and the imposition of interim measures. See id.

After initiating the investigation, TRLED issued Form 28 ("CF-28") requests for information to the U.S. importers including Centric Pipe. Centric Pipe submitted a response to the CF-28 providing "the entries' purchase order, commercial invoice, and the importer's proof of payment." Id. at 17. TRLED found that these entry documents corroborated other record evidence contributing to a reasonable suspicion that PET exported Chinese-origin OCTG to the United States. See id. at 19. Centric Pipe also submitted "equipment descriptions, mill certificates, and production records" for PET. Id. at 19. Without seeking a formal scope ruling from Commerce, TRLED determined that Centric Pipe "entered merchandise considered OCTG under the scope of the AD/CVD orders." Id. at 18.

Following the initiation of its investigation, TRLED issued initial and supplemental requests for information ("RFI") that both PET and Centric Pipe responded to in a timely manner. See Final Determination at 5 (Public Version) (P.R. 522); see also ORR Determination at 5 (Public

4

Version) (P.R. 612). CBP conducted verification of PET's facilities in Thailand between October 28, 2024, and November 1, 2024. See Final Determination at 6 (Public Version) (P.R. 522).

Between December 2024 and January 2025, Centric Pipe submitted written arguments and responses to written arguments by the Alleger to TRLED. See id. at 6.

On February 24, 2024, TRLED released its determination that the record contained substantial evidence that Centric Pipe imported OCTG from China into the United by transshipment through Thailand without declaring that the merchandise was subject to Orders. See id. at 2; see also 19 U.S.C. § 1517(c)(1)(A).

In reaching its affirmative determination of evasion, TRLED rejected Centric Pipe's arguments that it should never have initiated this investigation as the declarations in the allegation contained false statements. See Final Determination at 41 n. 393 (Public Version) (P.R. 522).

In determining that Centric Pipe's imports fell under the scope of the Orders, TRLED stated that PET reported that its OCTG production in Thailand began from either hollow steel billets from China or from solid round billets. See id. at 20. TRLED found that hollow steel billets are within the scope of the Orders because they are a steel product of circular cross-section that are hollow in the middle, and because they do not meet any of the exclusion criteria listed in the scope. See id. at 20. TRLED also found that PET's production in Thailand using hollow steel billets or solid round billets did not substantially transform the products such that the country of origin of the merchandise covered by the scope of the AD/CVD Orders remained the same. See id. at 21-22.

Pursuant to 19 U.S.C. § 1517(a)(5)(A), TRLED concluded that PET had made various false statements to CBP regarding its production process without considering record evidence that detracted from the weight of its conclusion. See id. at 22-25. As a result of these alleged

5

misrepresentations, TRLED found that PET failed to cooperate to the best of its ability with CBP's requests for information. See id. at 38. Applying an adverse inference, TRLED concluded that "substantial evidence exists that PET's hollow steel billets from China are Chinese-origin OCTG covered by the AD/CVD Orders," and that "the record does not contain any reliable evidence indicating which OCTG began from solid round billets." Id. at 26; see also id. at 39. TRLED clarified that although it was applying an adverse inference, in the alternative, there was substantial evidence that that PET engaged in evasion without such an inference. See id. at 39.

On April 14, 2025, Centric Pipe submitted a timely request for administrative review contesting TRLED's determination of evasion to ORR. See Letter on Behalf of Centric Pipe to U.S. Customs and Border Protection re: Revised Request for Administrative Review (April 14, 2025) (Public Version) (Public Version) (P.R. 583) ("Centric Pipe Rev. Req.").

On July 2, 2025, ORR affirmed TRLED's finding that substantial evidence on the record demonstrated that Centric Pipe entered Chinese-origin OCTG into the United States through evasion. See ORR Determination at 18 (Public Version) (P.R. 612).

ORR rejected Centric Pipe's arguments in its determination upon review, finding, among other things, that substantial evidence supported CBP's determinations that (1) hollow steel billets from China that PET used to manufacture finished OCTG in Thailand are subject merchandise under the Orders and PET's operations in Thailand did not render the products out-of-scope; and (2) PET did not have the production capability or capacity to manufacture finished OCTG in Thailand and instead transshipped finished OCTG from China through Thailand. See id. at 18-22. ORR also found that TRLED was not required to refer any scope questions to Commerce because in this case, the plain scope language was clear that the scope of the Orders covered hollow billets. See id. at 26-27.

**STANDARD OF REVIEW**

The EAPA statute provides for the standard of judicial review in 19 U.S.C. § 1517(g)(2). The Court reviews CBP's evasion determination for compliance with all procedures under 19 U.S.C. §§ 1517(c) and (f) and will hold unlawful "any determination, finding, or conclusion {that} is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2). Federal courts have recognized that the standard of review for international trade cases also encompasses the standards established under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2). See Changzhou Wujin Fine Chem. Factory Co. v. United States, 701 F.3d 1367, 1374 (Fed. Cir. 2012) ("We review Commerce's decision under the {APA} and any other applicable law." (citing SKF USA, Inc. v. United States, 254 F.3d 1022, 1028 (Fed. Cir. 2001))).

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citations omitted). Internal inconsistency and self-contradiction do not satisfy this requirement and instead there must be "a rational connection between facts found and the choice made." Id. (citation omitted).

Further, the agency's rationale must address the parties' principal arguments. See CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1375-1381 (Fed. Cir. 2016) (analyzing in detail an agency's obligation to set forth a comprehensible and satisfactory justification for its determinations "as a reasonable implementation of statutory directives supported by substantial

evidence"). Finally, "{a}n abuse of discretion occurs if a decision is based on an erroneous interpretation of law, if a factual finding is not supported by substantial evidence, or if the decision represents an unreasonable judgment in weighing relevant factors." Arnold P'ship v. Dudas, 362 F.3d 1338, 1340 (Fed. Cir. 2004).

## SUMMARY OF THE ARGUMENT

TRLED's final determination, as affirmed by ORR's administrative review, was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law for five reasons.

First, TRLED violated Centric Pipe's due process rights by not providing Centric Pipe with a meaningful opportunity to comment on information contained in the allegation prior to initiation and imposing interim measures. Centric Pipe had a protected property interest in procedural due process in an EAPA proceeding. 19 C.F.R. § 165.15(d)(1) does not disclose the information contained in the allegation nor allow for a party to submit any evidence or argument on this information prior to initiation and the imposition of interim measures. Centric Pipe had a significant interest in the disclosure of the information contained in the allegation as it had to participate in a costly investigation and suffered business reputational harm because of CBP's initiation of the contested EAPA investigation. The appropriate remedy to address TRLED's procedural due process violation is a reversal of CBP's affirmative determination of evasion because the investigation would never have been initiated if Centric Pipe had received sufficient procedural due process.

Second, TRLED violated its statutory mandate under 19 U.S.C. § 1517(b)(1) by initiating its investigation later than 15 business days after receiving an EAPA allegation against Centric Pipe. The definition of "date of receipt" under 19 C.F.R. § 165.12 allows TRLED to delay initiating an investigation by an unlimited timeframe pending its confirmation of receipt of an

8

allegation.  The legislative history of the statute confirms that Congress intended for the deadlines in the statute to be mandatory.  The appropriate remedy to address this violation is a remand with instructions to TRLED to reverse its affirmative finding of evasion.  Without a strict sanction, CBP will continue to untimely initiate EAPA investigations substantially prejudicing importers like Centric Pipe, who rely on timely guidance from CBP to dictate their shipments of merchandise.

Third, TRLED and ORR unlawfully found that hollow steel billets are covered by the scope of the AD/CVD Orders.  The plain language of the scope, as confirmed by determinations by the International Trade Commission ("ITC") and rulings by CBP, only applies to "certain OCTG" and not raw materials such as steel billets.  Commerce's recent affirmative circumvention determination that imports of OCTG completed in Thailand using steel billets from China confirms that steel billets fall outside the scope of the Orders.  Further, TRLED unlawfully and arbitrarily failed to submit a covered merchandise referral to Commerce on the issue of whether steel billets fall within the scope given that TRLED made such a referral on identical merchandise in a later case.  Finally, steel billets are substantially transformed into OCTG in Thailand such that they no longer have a country-of-origin of China.

Fourth, TRLED unlawfully initiated the contested EAPA investigation given that the information submitted in the allegation did not reasonably suggest that Centric Pipe evaded the Orders.  The information contained in the allegation, on both an individual and collective basis, represented mere "conjecture or supposition" as opposed to "particularized {or} objective" evidence of evasion.  Had Centric Pipe received an opportunity to comment on the information contained in the allegation, it could have proven that much of the "conjecture or supposition" was false.

9

Fifth, TRLED and ORR unlawfully ignored substantial record evidence that detracted from the weight of their determination that the record contained substantial evidence of evasion by Centric Pipe. Specifically, TRLED and ORR unlawfully ignored facility photos and an audit report by API demonstrating that PET accurately described its production process and had the capacity to produce OCTG.

## ARGUMENT

**I. CBP'S AFFIRMATIVE DETERMINATION OF EVASION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE CBP VIOLATED CENTRIC PIPE'S DUE PROCESS RIGHTS**

TRLED's determination, as affirmed by ORR, that Centric Pipe evaded the Orders was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law as TRLED violated Centric Pipe's due process rights. The "fundamental requirement of due process" protected under the Fifth Amendment to the Constitution "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests" and requires "the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 332-33 (1976) (internal quotation marks and citation omitted). Due process claims necessitate a two-step analysis: (1) whether there was a deprivation of a protected interest, and (2) what process is due before this property interest can be taken. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982). Here, both requirements are met. Centric Pipe: (1) had a protected interest in receiving procedural due process during TRLED's EAPA investigation and (2) TRLED failed to provide Centric Pipe with sufficient procedural due process by not informing Centric Pipe of the information contained in the allegation nor allowing Centric Pipe to comment on this information prior to TRLED's initiation of the contested EAPA investigation and imposition of interim measures.

10

Concerning the first question, the U.S. Court of Appeals for Federal Circuit has recognized the existence of a protected property interest for importers facing a deprivation of their property by the federal government.  See NEC Corp. v. United States, 151 F.3d 1361, 1370-71 (Fed. Cir. 1998).  In NEC Corporation, recognizing that due process claims are often rejected solely on the basis that engaging in foreign commerce is not a "fundamental right protected by notions of substantive due process," the Federal Circuit explained that an importer may nonetheless be entitled to "procedural due process . . . 'requir{ing} a hearing of some kind . . . when government deprives an individual of 'life, liberty, or property' based on resolution of contested factual issues concerning that individual . . . .'" NEC Corp, 151 F.3d at 1369-70 (citation omitted).  The Federal Circuit concluded that "{t}here can be no doubt that arbitrary administration of law is subject to judicial intervention" and that parties are "due a fair and honest process." Id. at 1371.  Importers are entitled to procedural due process in proceedings before the federal government.

The Federal Circuit has specifically held that importers have a protected property interest warranting procedural due process during an EAPA investigation.  Specifically, in Royal Brush Mfg. v. United States, 75 F.4th 1250 (Fed. Cir. 2023), the Federal Circuit explained that it had "previously held that importers in antidumping proceedings are entitled to procedural due process" and "{t}he government agrees that importers in evasion proceedings enjoy rights to procedural due process." Royal Brush, 75 F.4th at 1257; see also Superior Commercial Sols., LLC v. United States, No. 24-00052, 2025 Ct. Intl. Trade LEXIS 153, at *27 (Ct. Int'l Trade Nov. 26, 2025).  The Federal Circuit in Royal Brush proceeded to hold that "the law is clear that, in adjudicative administrative proceedings, due process 'includes the right to know what evidence is being used against one.'" Royal Brush, 75 F.4th at 1258 (citation omitted).  Prior holdings by the Court that a protected interest may not exist with respect to the imposition of interim measures in an EAPA

proceeding are no longer valid law following the holding in <u>Royal Brush</u>.  <u>See</u> <u>Am. Pac. Plywood, Inc. v. United States</u>, No. 20-03914, 2023 Ct. Intl. Trade LEXIS 98, at *21 (June 22, 2023); <u>Diamond Tools Tech. v. United States</u>, 545 F. Supp. 3d 1324, 1341 (Ct. Int'l Trade 2021).[1]  Centric Pipe, therefore, had a procedural due process right to know what evidence TRLED used against it during the contested EAPA investigation.

Turning to the second question, determining whether the administrative procedures implemented by an agency are constitutionally sufficient "requires analysis of the governmental and private interests that are affected."  <u>Mathews</u>, 424 U.S. at 334.  "{T}he constitutional requirement of a meaningful opportunity to respond before a temporary deprivation may take effect entails, at a minimum, the right to be informed not only of the nature of the charges but also of the substance of the relevant supporting evidence."  <u>Brock v. Roadway Express, Inc.</u>, 481 U.S. 252, 264-65 (1987).  "{A} meaningful opportunity to respond should happen before a temporary deprivation takes effect, not afterwards."  <u>Superior Commercial</u>, 2025 Ct. Intl. Trade LEXIS 153, at *27 (citing <u>Brock</u>, 481 U.S. at 264-65).

CBP's current regulation on its face does not provide importers with a meaningful opportunity to comment.  19 C.F.R. § 165.15(d)(1) provides that:

> CBP will issue a notice of its decision to initiate an investigation to all parties to the investigation no later than five business days after day 90 of the investigation, and the actual date of initiation of the investigation will be specified therein. In cases where interim measures are taken pursuant to § 165.24, notice to all parties to the investigation will occur no later than five business days after day 90 of the investigation.

---

[1] In both <u>Diamond Tools</u> and <u>American Pacific Plywood</u>, the Court acknowledged the holding in <u>Royal Brush</u> as persuasive precedent. <u>See</u> <u>Diamond Tools</u>, 545 F. Supp. 3d at 1342; <u>Am. Pac. Plywood</u>, 2023 Ct. Intl. Trade LEXIS 98, at *28-29.  The Federal Circuit, however, had not yet issued its judgment.

19 C.F.R. § 165.15(d)(1). "{The regulation} by definition does not allow for a party under investigation to submit any evidence or offer any administrative arguments in its defense <u>prior to</u> when the temporary deprivation takes effect {through initiation and interim measures}." <u>Superior Commercial</u>, 2025 Ct. Intl. Trade LEXIS 153, at *28-29. CBP's regulation, therefore, on its face is arbitrary and capricious because it does inform an importer of the "nature of the charges" against it nor the "substance of the relevant supporting evidence" relied on by TRLED to initiate an EAPA investigation and impose interim measures. <u>Brock</u>, 481 U.S. at 264-65. Further, the regulation does not allow an importer to comment on this information.

The Federal Circuit's holding in <u>Royal Brush</u> controls this appeal. In <u>Royal Brush</u>, the Federal Circuit held that CBP violated an importer's procedural due process rights when it did not disclose certain redacted information. <u>See Royal Brush</u>, 75 F.4th at 1259. Here, like <u>Royal Brush</u>, TRLED did not disclose information that it relied on in making its determination to initiate the contested EAPA investigation and impose interim measures. <u>See</u> Notice of Interim Measures at 2-12, 17-27 (Public Version) (P.R. 90). Centric Pipe had significant interest in the disclosure of this information. The initiation of an EAPA investigation imposes a hardship on importers as they are required to participate in a costly investigation that harms their business reputation. Interim measures similarly impose a hardship on importers because they must maintain collateral on their bonds while their entries remain suspended. <u>See</u> 15 U.S.C. § 1517(e)(1)-(3); <u>see also</u> 19 C.F.R. § 165.24. Further, sufficient due process requires "the right to be informed not only of the nature of the charges but also of the substance of the relevant supporting evidence" because otherwise there was an "unacceptable risk of {an} erroneous decision{}." <u>Brock</u>, 481 U.S. at 264-65. Such an erroneous decision occurred here. TRLED, as discussed in Section IV, would not have initiated the contested EAPA investigation if Centric Pipe had an opportunity to comment on the allegation

13

prior to initiation. By contrast, the burden on TRLED was minimal as TRLED had 90 days to provide Centric Pipe with an opportunity to comment on the allegation. Such procedures exist in the context of antidumping and countervailing duty investigations before Commerce where interested parties can submit comments on industry support prior to the initiation of an investigation. See 19 C.F.R. § 351.203. Given Centric Pipe's significant interest in the disclosure of the information contained in the allegation, and the minimum burden on TRLED to provide a meaningful opportunity to comment on this information, TRLED failed to provide Centric Pipe with constitutionally sufficient procedural due process prior to initiating its investigation and imposing interim measures. TRLED's affirmative determination of evasion, as affirmed by ORR, was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law because TRLED violated Centric Pipe's due process rights.

The appropriate remedy to address TRLED's procedural due process violation is a reversal of CBP's affirmative determination of evasion. In Superior Commercial, after finding that CBP deprived an importer of notice and a meaningful opportunity to be heard, the Court ordered that the equitable remedy was that any entries entered after the date of initiation under the statutory deadline would not be subject to cash deposits or final measures. See 2025 Ct. Intl. Trade LEXIS 153, at *29-30. In ordering this remedy, the court relied on the Supreme Court's analysis in Brock v. Pierce County, 476 U.S. 253 (1986). See id. In Pierce County, the Supreme Court explained that courts are "reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action" when "there are less drastic remedies available." Pierce Country, 476 U.S. at 260 (quotations and citations omitted); id. n.7 (explaining that a party could still bring a separate suit in district court to enforce the statutory deadline). Here, there is no less drastic remedy. TRLED's failure to provide Centric Pipe with constitutionally sufficient

14

procedural due process substantially prejudiced Centric Pipe by tainting TRLED's investigation from the very initiation.  See <u>Dixon Ticonderoga Co. v. United States</u>, 468 F.3d 1353, 1355 (Fed. Cir. 2006) (holding that a Plaintiff must show that it was "substantially prejudiced" by an agency's failure to follow a procedural requirement to void that agency action).  In other words, there is no way to unscramble the egg resulting from TRLED's violation as this case should have never been initiated as detailed in Section IV.  The only equitable remedy that can sufficiently address TRLED's procedural due process violation is for this Court to remand with instructions for TRLED to reverse its affirmative determination of evasion against Centric Pipe.

**II. CBP'S AFFIRMATIVE DETERMINATION OF EVASION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE TRLED FAILED TO TIMELY INITIATE ITS INVESTIGATION**

TRLED's determination, as affirmed by ORR, that substantial evidence of evasion existed for Centric Pipe was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law as TRLED violated its statutory mandate by initiating its investigation later than 15 business days after receiving an allegation against Centric Pipe.

 "{C}ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  <u>Barnhart v. Sigmon Coal Co.</u>, 534 U.S. 438, 461-62 (2002) (citation omitted).  19 U.S.C. § 1517(b)(1) state that:

> <u>Not later than 15 business days</u> after receiving an allegation described in paragraph (2) or a referral described in paragraph (3), the Commissioner <u>shall</u> initiate an investigation if the Commissioner determines that the information provided in the allegation or the referral, as the case may be, reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion.

19 U.S.C. § 1517(b)(1) (emphasis added).[2] The plain language of the statute is clear that TRLED "shall" initiate an EAPA investigation "not later than" 15 business days after it receives an allegation from an interested party.

CBP's regulation unlawfully grants unlimited flexibility for TRLED to extend its statutory deadline to initiate an investigation. 19 C.F.R. § 165.12 defines "date of receipt" of an allegation as "the date on which CBP provides an acknowledgment of receipt of an allegation containing all the information and certifications required . . . to the party that filed the allegation." Id. The regulation then states that TRLED "has 15 business days from the date of receipt to determine whether to initiate an investigation under EAPA." Id. In other words, 19 C.F.R. § 165.12 allows TRLED to delay initiating an investigation by an unlimited timeframe pending its confirmation of receipt of an allegation.

The Court has previously held that 19 C.F.R. § 165.12 is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law because it "allows Customs to extend and alter Congress' 15-day statutory deadline for an unlimited period of time, which is inconsistent with 19 U.S.C. § 1517(b) that reflects Congress' intent for Customs to initiate EAPA investigations quickly within 15 days of receiving an allegation." Superior Commercial, 2025 Ct. Intl. Trade LEXIS 153, at *20. This Court should find the holding in Superior Commercial to be persuasive given that the only permissible reading of the statute is that TRLED is required to initiate an investigation within 15 business days. The statute refers to "shall" which is "'{t}he first sign that

---

[2] A properly filed allegation requires limited information and is instantly received by CBP as it is filed online. See Superior Commercial, 2025 Ct. Intl. Trade LEXIS 153, at *19, 21 (noting that "{t}he information necessary to support an EAPA allegation is minimal" and that "{i}n reality, EAPA allegations are all filed electronically with {TRLED} . . . . Therefore, once an EAPA allegation is filed with {TRLED}, it is received by {TRLED} instantly") (internal quotation marks omitted).

the statute imposed an obligation.'" <u>Id.</u> at *16 (quoting <u>Me. Cmty. Health Options v. United States,</u> 590 U.S. 296, 310 (2020)); <u>see also</u> <u>Kingdomware Techs., Inc. v. United States</u>, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").[3] The statute's use of "shall" limits TRLED to a 15 business day timeframe to initiate an EAPA investigation after receiving an allegation. CBP's regulation on its face, therefore, is not in accordance with law.

The legislative history of the statute further demonstrates that Congress intended for the deadlines in the statute to be mandatory. <u>See</u> <u>Pierce County,</u> 476 U.S. at 266 (examining the legislative history of a statute to determine if a statute's use of "shall" divested an agency of its authority to act beyond a statutory timeframe). In discussing legislation that would eventually lead to the current EAPA statute, Congress emphasized that "<u>timely collection</u> of the antidumping and countervailing duties owed on evading imports is as important or even more important than having the parties involved in evasion subject to penalties or criminal liability." H.R. Rep. No. 114-114, at 85 (2015) (emphasis added). Similarly, Congress stated that EAPA procedures provided for in the statute ensure that "{the agency} conducts these investigations subject to <u>strict deadlines</u> so that delay in collecting antidumping and countervailing duties on evading imports is limited." <u>Id.</u> at 86 (emphasis added). Congress clearly intended for the deadlines in the EAPA statute to be mandatory by emphasizing that it designed the statute to ensure "timely collection" of duties by imposing "strict deadlines."

---

[3] In <u>Diamond Tools,</u> the Court held that the use of "shall" did not limit agency action outside of a statutory timeframe where the statute did not identify a specific consequence if the deadline was not met. <u>See</u> 545 F. Supp. 3d at 1334. The holding in <u>Diamond Tools,</u> however, is distinguishable as the Court in that case examined a different section of the EAPA statute and the Court even noted that it has previously "interpreted 'shall' as precatory." <u>Id.</u> at 1334-35.

The Court in <u>Diamond Tools</u> incorrectly interpreted the above legislative history with regard to "U.S. companies" such that there was "no specific indication that Congress aimed to avoid prejudicing importers with drawn-out investigations." 545 F. Supp. at 1336. Centric Pipe is a <u>U.S. company</u>. Like many importers, Centric Pipe employs many individuals in the United States. <u>See generally</u> Letter on Behalf of Centric Pipe to TRLED re: EAPA Investigation #7890; Request for Information Response at 2-3 (July 9, 2024) (Public Version) (P.R. 300) ("Centric Pipe RFI") (detailing that Centric Pipe has four facilities in the United States). Centric Pipe complies with U.S. trade laws. Congress designed the EAPA statute with strict deadlines such that duties can be timely collected. U.S. importers need timely guidance to ensure that the underlying goal of the EAPA statute can be accomplished.

Here, in following the unlawful flexibility provided for in its regulation, TRLED initiated its investigation beyond the 15 business day window. The Alleger filed its EAPA allegation against Centric Pipe with TRLED on January 18, 2024. <u>See</u> Initiation Mem. at 2 (P.R. 42). The 15 business day deadline for TRLED to initiate its investigation fell on February 8, 2023. TRLED, however, did not acknowledge receipt of the allegation until February 1, 2024, and then did not initiate the investigation until February 23, 2024. <u>See id.</u> at 1-2. TRLED noted that allegation was properly filed such that there was no reason for delay in initiation. <u>See id.</u> at 2. TRLED's affirmative finding of evasion for Centric Pipe, as affirmed by ORR, was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law as TRLED initiated its investigation later than 15 business days after receiving the allegation against Centric Pipe.

The appropriate remedy to address this violation is a remand with instructions to TRLED to reverse its affirmative finding of evasion. In determining that TRLED acted unlawfully in initiating an EAPA investigation outside of the 15 business day window, the Court in <u>Superior</u>

Commercial concluded that "precluding an EAPA investigation altogether for Customs' failure to meet the statutory deadline is too strict a remedy." Superior Commercial, 2025 Ct. Intl. Trade LEXIS 153, at *22. The Court in Superior Commercial reasoned that the Supreme Court has "declined to overturn statutorily untimely agency actions in cases when an agency failed to act within a specified time period that the statute mandated it 'shall' act." Id. (citing Pierce County, 476 U.S. at 260 and Barnhart v. Peabody Coal Co., 537 U.S. 149, 160 (2003)). The circumstances surrounding the remedial remedies in Pierce County and Barnhardt are, however, distinguishable from this action.

As discussed above, in Pierce County, the Supreme Court declined to overturn an agency action due to the agency's failure to meet a statutory deadline because there were less drastic remedies available. Pierce County, 476 U.S. at 259-60. Here, there are no less drastic remedies. TRLED's failure to initiate its investigation "substantially prejudiced" Centric Pipe. Dixon, 468 F.3d at 1355. TRLED will "issue a notice of its decision to initiate an investigation to all parties to the investigation no later than five business days after day 90 of the investigation." 19 C.F.R. § 165.15(d)(1). Thus, by delaying the initiation, CBP delayed the notice of the investigation to importers. This delay deprived Centric Pipe of its protected interest to be promptly informed of an ongoing government investigation that could result in substantial legal and economic obligations, and to take action to mitigate the potential risks from such investigations. There is no remedy that can turn back the clock to provide Centric Pipe with proper notice. Centric Pipe required timely initiation of an investigation to dictate its shipments.

In Barnhardt, the Supreme Court held that "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." Barnhardt, 537 U.S. at 159 (quotation and citation omitted)

19

(emphasis added).  This appeal is outside of the "ordinary course" such that a corrective sanction is appropriate.  In adopting 19 C.F.R. § 165.12, CBP rejected comments that the definition of "date receipt" provided too much flexibility reasoning that "the statute and interim regulations provide CBP the flexibility to properly examine the allegations as resources allow."  Investigation of Claims of Evasion of Antidumping and Countervailing Duties, 89 Fed. Reg. 19,239, 19,244 (CBP Mar. 18, 2025).  Since the Court issued its ruling in Commercial Superior, TRLED has continued to initiate EAPA investigations beyond the 15 business day window.  See, e.g., Letter from TRLED to Zoomlion Heavy Industry, NA Inc. and the Coalition of American Manufacturers of Mobile Access Equipment re: Enforce and Protect Act Case Number 8245: Notice of Initiation of Investigation and Interim Measures at 2, 5 (Feb. 11, 2026), https://www.cbp.gov/sites/default/files/2026-02/02-11-2026_-_trled_-_notice_of_investigation_and_interim_measures_508_compliant_-_8245_-_pv.pdf (noting that the Alleger submitted its allegation on October 10, 2025, TRLED acknowledged receipt on October 16, 2025 and TRLED initiated an investigation November 6, 2025).  Given that CBP has stated that it believes it has the authority to initiate an investigation beyond the 15 business day window and indeed has continued to do after the Court deemed such action to be unlawful, it is reasonable to assume that TRLED will continue to follow this practice.  Without a stricter sanction outside of the "ordinary course{,}" importers like Centric Pipe will continue to be substantially prejudiced without timely initiation by CBP.  This Court, thus, should remand with instructions for TRLED to reverse its affirmative evasion finding against Centric Pipe.

III. **CBP'S AFFIRMATIVE DETERMINATION OF EVASION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE STEEL BILLETS ARE NOT COVERED BY THE SCOPE OF THE ORDERS**

TRLED can only make an affirmative determination against "covered merchandise." 19 U.S.C. §1517(a)(5)(A). TRLED explained that PET reported that its OCTG production in Thailand "began from either hollow steel billets from China or from solid round billets." Final Determination at 20 (Public Version) (P.R. 522). TRLED's scope analysis, however, was limited to hollow steel billets.[4] See id. at 20-26. TRLED concluded that the "the physical characteristics of the hollow steel pipes demonstrate that they are Chinese-origin OCTG covered by the AD/CVD Orders" and that "the record indicates that PET's purported production in Thailand did not change the country of origin of the merchandise covered by the scope of the AD/CVD Orders." Id. at 20-21. TRLED's affirmative determination of evasion against Centric Pipe, as affirmed by ORR, was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law because: (1) steel billets (either hollow or solid) do not fall within the scope of the Orders; (2) Commerce's recent affirmative scope determination demonstrates that steel billets fall outside the scope of the Orders; (3) TRLED unlawfully did not submit a covered merchandise referral concerning these scope issues to Commerce and (4) the billets were substantially transformed in Thailand.

---

[4] TRLED does not address whether solid steel billets fall within the scope of the Orders. The reason is obvious because solid steel billets clearly do not fall within the scope as they are not "hollow steel products." Although TRLED acknowledged that "[  ] percent of PET's OCTG ostensibly began from solid round billets{,}" TRLED found that "the record does not contain any reliable evidence indicating which OCTG began from solid round billets." Final Determination 28 (Business Confidential Version) (C.R. 374). Based on this alleged lack of evidence distinguishing between PET's use of hollow versus solid steel billets, and TRLED's conclusion that hollow steel billets fall within the scope of the Orders, TRLED determined "that all of the OCTG PET exported to the United States during the POI was Chinese-origin." Id. at 26 (Public Version) (P.R. 522).

### A. Hollow Steel Billets and Solid Round Billets Are Not Within the Scope of the Orders

Steel billets (either hollow or solid) do not fall within the scope of the Orders and, accordingly, cannot constitute covered merchandise subject to an affirmative finding of evasion.

The plain language of the scope is dipositive. See generally 19 C.F.R. § 351.225(k)(1). (laying out that Commerce may determine whether a product is covered by the scope based on the "language of the scope . . . alone if the language of the scope . . . is dispositive"); see also Magnum Magnetics Corp. v. United States, No. 2024-1164, 2026 U.S. App. LEXIS 4589, *9-10 (Fed. Cir. Feb. 17, 2026). The plain language of the scope can be interpreted by referring to numerous secondary sources (known as the k(1) factors) including determinations by the ITC and prior rulings by CBP. See 19 C.F.R. § 351.225(k)(1).

The scope of the Orders on OCTG from China state, consists of:

> certain OCTG, which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute ("API") or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the order also covers OCTG coupling stock. Excluded from the scope of the order are casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

See Certain Oil Country Tubular Goods From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 75 Fed. Reg. 28,551, 28,553 (Dep't of Commerce May 21, 2010) ("AD Order").

TRLED unlawfully found that hollow steel billets fall within the scope because they are: (1) "a steel product{,}" (2) the billets "are of a circular cross-section and are hollow in the middle" and (3) the billets are "essentially tubes or casing that were [          ] . . . in China." Final

Determination at 22 (Business Confidential Version) (C.R. 374). Hollow steel billets, however, are not "essentially tubes or casing" and are instead a raw material of steel that can be further processed into various products. See Letter on Behalf of PET to TRLED re: Response to Request for Information dated May 31, 2024 at 21 (July 9, 2024) (Public Version) (P.R. 321) ("PET RFI") (detailing the steps that the billets undergo in the production of OCTG). A billet cannot constitute "certain OCTG" covered by the scope as a billet is instead a raw material that is neither a "casing" nor "tubing" and that must be further processed into OCTG.

Past determinations by the ITC and rulings by CBP confirm that steel billets are not covered by the scope of the Orders because steel billets are a raw material as opposed to OCTG and steel billets are not classified under a HTSUS subheading listed as covered by the scope. The ITC has found that "{r}ound or or square billets serve as the input serve as the input for seamless tubing." Oil Country Tubular Goods from China, Inv. Nos. 701-TA-463 and 731-TA-1159 (Second Review), USITC Pub. 5136 at I-15 (Nov. 2020) (Public Document), https://www.usitc.gov/sites/default/files/publications/701_731/pub5136.pdf. Further, the ITC defined the domestic like product as coextensive with Commerce's scope. See id. at 6-7. The ITC then compiled data for U.S imports using U.S. Harmonized Tariff Schedule ("HTSUS") subheading 7304.29 and data for Chinese exports under HTSUS subheadings 7304.29, 7305.20 and 7306.29. See id. at I-30, I-32. All of these HTSUS subheadings are listed as covered by the scope. See, e.g., AD Order, 75 Fed. Reg. at 28,553. CBP, however, has consistently classified steel billets under Chapter 72 of the HTSUS, which is not listed within the scope. See, e.g., Customs Ruling N351850 (Aug. 12, 2025), https://rulings.cbp.gov/ruling/N351850; Customs Ruling NY J81670 (Mar. 28, 2003), https://rulings.cbp.gov/ruling/J81670; Customs Ruling NY 881770 (Jan. 22, 1993), https://rulings.cbp.gov/ruling/881770.

Finally, steel billets are distinguishable from the types of unfinished OCTG, such as green tube, that Commerce has previously found to fall within the scope of the Orders. <u>See</u> ORR Determination at 19-20 (Public Version) (P.R. 612) (citing <u>Bell Supply Co., LLC v. United States</u>, 393 F. Supp. 3d 1229, 1234 (Ct. Int'l Trade 2019)). The court in <u>Bell Supply</u> sustained Commerce's determination that unfinished OCTG (such as green tube) from China that is further processed in a third country falls within the scope of the Orders on OCTG from China. <u>Bell Supply</u>, 393 F. Supp. 3d at 1234, 1244. Unlike green tubes, which are expressly included within the scope as unfinished OCTG, steel billets are not a "casing" or "tubing" and instead are the initial steel raw material used to produce both unfinished and finished OCTG. <u>See</u> <u>Bell Supply Co., LLC v. United States</u>, 888 F.3d 1222, 1225 (Fed. Cir. 2018) (explaining that steel is first "steel is first made into 'green tube,' which is a steel <u>tube</u>" (emphasis added)).

For these reasons, TRLED's affirmative determination of evasion, as affirmed by ORR, was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law given that steel billets are not covered by the scope.

**B. Commerce's Recent Circumvention Determination Confirms that Hollow and Solid Round Steel Billets Are Not Within the Scope of the Orders**

Commerce's recent determination that "imports of seamless {OCTG} completed in Thailand using steel billets produced in {China} are circumventing the orders on OCTG from China{,}" firmly establishes that steel billets do not fall within the scope of the Orders. <u>Oil Country Tubular Goods From the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders</u>, 91 Fed. Reg. 9,811 (Dep't Commerce Feb. 27, 2026) ("<u>Circumvention Determination</u>"). Commerce's circumvention inquiry covered all of 2023 and examined "OCTG produced from all steel billets that are used by PET . . . 'regardless of whether it starts from solid steel billets or hollow steel billets.'" <u>See</u> <u>id.</u>

and accompanying Issues and Dec. Mem. at 3, 7 ("Steel Billet Cir. IDM"). As a result of Commerce's affirmative circumvention finding, Commerce instructed CBP to suspend liquidation and require a cash deposit on entries on or after December 18, 2024, the date of publication of initiation of Commerce's circumvention inquiry in the Federal Register. Circumvention Determination, 91 Fed. Reg. at 9,813. Commerce, thus, found that cash deposits are only required on imports of OCTG that are processed in Thailand using steel billets from China beginning on December 18, 2024 – well after the cash deposit requirement resulting CBP's affirmative finding of evasion in this case.

In making its affirmative circumvention determination, Commerce stated it "disagree{d} with the domestic interested parties regarding whether it should find the hollow steel billets used by PET in its production of seamless OCTG to be within the scope of the Orders." Steel Billet Circ. IDM at 5. Instead, Commerce found that "there is no evidence on the record that the scope of the Orders specifically includes OCTG produced in third countries from hollow billets from China." Id. at 6-7. Commerce also rejected "the argument that hollow billets used as inputs by PET are conclusively covered by the scope of the Orders." Id. at 7. Commerce ultimately found that it "cannot determine that hollow billets further processed into OCTG in a third country are within the scope of the Orders without doing a substantial transformation and country-of-origin analysis … and . . . no party made such a request in this proceeding." Id. Although Commerce did not make an explicit ruling on whether hollow steel billets fell within the scope of the Orders, Commerce nevertheless made clear that the scope of the Orders does not expressly cover steel billets. At a minimum, a referral to Commerce was necessary in this case as Commerce itself found that the hollow steel billets are not expressly covered by the scope.

Commerce's affirmative circumvention determination firmly establishes that steel billets further processed into OCTG in Thailand cannot fall within the scope. As part of a circumvention inquiry, Commerce "may include {merchandise that is completed or assembled in foreign country from merchandise subject to an order} within the scope of such order." 19 U.S.C. § 1677j(b) (emphasis added); see also 19 C.F.R. § 351.226(a) ("Section 781 of the Act allows the Secretary to apply antidumping and countervailing duty orders in such a way as to prevent circumvention by including within the scope of the order four distinct categories of merchandise." (emphasis added)). In other words, a circumvention inquiry allows "Commerce to expand the scope of existing AD and CVD orders to reach products that are not covered by the existing scope and to suspend liquidation through formal anti-circumvention inquiries." AMS Assocs. v. United States, 737 F.3d 1338, 1343 (Fed. Cir. 2013) (emphasis added). Commerce's affirmative circumvention finding, therefore, establishes that steel billets (whether hollow or solid) are not covered by the scope as Commerce would not have decided that it was necessary to include steel billets further processed into OCTG in Thailand within the scope to prevent alleged circumvention.

TRLED's affirmative determination, as affirmed by ORR, was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law because Commerce later found that the steel billets used by PET to assemble OCTG in Thailand fell outside the scope of the Orders by making an affirmative circumvention. As a result, CBP can lawfully only suspend and require cash deposits on PET's exports of OCTG beginning on December 18, 2024, the date of initiation of Commerce's circumvention investigation. Prior to this date, importers exercised reasonable

care in importing steel billets that were further processed into OCTG in Thailand without paying duties.[5]

### C. CBP Arbitrarily Failed to Refer the Scope Issues in this Case to Commerce

TRLED failed to comply with all its statutory and regulatory mandated procedures by not referring to Commerce the question of whether steel billets (whether solid or hollow) fall within the scope of the Orders.

If CBP "is unable to determine whether the merchandise at issue is covered merchandise, {CBP} shall . . . refer the matter to {Commerce} to determine whether the merchandise is covered merchandise . . . ." 19 U.S.C. § 1517(b)(4)(A) (emphasis added); see also 19 C.F.R. § 165.16 ("{a} referral is required if at any point after receipt of an allegation, CBP cannot determine whether the merchandise described in an allegation is properly within the scope of an antidumping or countervailing duty order" (emphasis added)). The statute and implementing regulation are clear that CBP "shall" or "is required" to refer scope issues to Commerce if it cannot determine whether merchandise is subject to an Order.

TRLED and ORR's determinations to not make a covered merchandise referral to Commerce conflict with a later action taken by TRLED. See Final Determination at 22 (Public Version) (P.R. 522); ORR Determination at 26 (Public Version) (P.R. 612). An agency action "is arbitrary when the agency offers insufficient reasons for treating similar situations differently." RHP Bearings v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002). In its EAPA investigation examining steel billets used by Boly Pipe Co., Ltd. ("Boly Pipe") to produce OCTG for exportation

---

[5] This is especially the case for Centric Pipe given that its [
                                                    ]. Letter on Behalf of Centric Pipe to TRLED re: CF-28 Resp. at PDF p. 54 (July 30, 2024) (Business Confidential Document) (C.R. 284) ("Centric Pipe CF-28).

to the United States, TRLED found that it was "unable to determine whether the OCTG Boly Pipe produce in Thailand out of steel billets from China is covered merchandise." CBP, EAPA Investigation 8143: JOL Tubular, Inc. and Commercial Steel Products LLC (Notice of Covered Merchandise Referral, December 1, 2025) (Dec. 3, 2025), www.cbp.gov/sites/default/files/2025-12/eapa_8143_-_covered_merchandise_referral_blurb_-_508_compliant_1.pdf. Accordingly, CBP referred to Commerce the question of "whether the steel billets Boly Pipe imported from China are covered by the AD and CVD orders." Id. In making this referral, CBP noted that the scope "{does} not address whether unfinished products such as steel billets are included or excluded from the AD and CVD orders." Id. Further, CBP recognized that Commerce "preliminarily determined on August 15, 2025 that imports of seamless OCTG that were completed in Thailand using steel billets from China were circumventing the AD and CVD orders." Id. Commerce has not yet issued a determination in this referral proceeding. See Oil Country Tubular Goods From the People's Republic of China: Notice of Covered Merchandise Referral and Initiation of Covered Merchandise Inquiry, 90 Fed. Reg. 61,375 (Dec. 31, 2025). TRLED and ORR acted arbitrarily by determining that the scope covered steel billets in the instant case but then later determining that a referral to Commerce was necessary on the exact same merchandise.

ORR's reliance on the holding in Vanguard Trading Co. LLC v. United States, 788 F. Supp. 3d 1277 (Ct Int'l Trade 2025) to support TRLED's determination to not make a covered merchandise referral to Commerce is misplaced. See ORR Determination at 26-27 (Public Version) (P.R. 612). In Vanguard, the Court merely concluded that CBP's decision not to make a covered merchandise referral to Commerce was in accordance with law because the statute grants CBP with the authority to determine "whether it is appropriate to make a covered merchandise referral to Commerce." Vanguard, 788 F. Supp. 3d at 1289. While CBP may have the authority to

determine whether a covered merchandise referral is necessary, that does not mean that CBP can arbitrarily decline to make such a referral in one instance covering steel billets but not another.

In sum, TRLED's failure to make a covered merchandise referral to Commerce, when TRLED made a later referral on same merchandise, thereby rendered TRLED's affirmative determination of evasion, as affirmed by ORR, as arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

### D. Hollow and Solid Billets from China Were Substantially Transformed into OCTG in Thailand

TRLED's affirmative determination of evasion against Centric Pipe, as affirmed by ORR's administrative review, was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law because TRLED and ORR failed to consider substantial record evidence that the production process performed at PET's facility in Thailand substantially transformed hollow and solid steel billets into OCTG, thereby changing the country of origin of the OCTG to Thailand.

In its Final Determination, ORR stated that "PET's purported production in Thailand did not change the country of origin of the merchandise covered by the scope of the AD/CVD Orders" despite recognizing that PET's OCTG production process "beginning with solid round billets has [    ] steps and that its OCTG process beginning with hollow steel billets has [    ] steps." Final Determination at 22 (Business Confidential Version) (C.R. 374). TRLED additionally recognized that PET's production had "[        ] production steps on its hollow steel billets from China that TOP did not perform on its mother pipes from China." Id. at 23. For the reasons discussed below, however, TRLED wrongfully concluded that "PET did not perform any production steps in Thailand that would have affected their country of origin." See id.

"{A} product cannot be said to originate in the country of exportation if it is not manufactured there. The question, therefore, is whether operations performed on products in the

country of exportation are of such a substantial nature to justify the conclusion that the resulting product is a manufacture of that country." See Ferrostaal Metals Corp. v. United States, 11 CIT 470, 473, 664 F. Supp. 535, 537 (1987). The Court has held that "{t}he criteria of name, character and use . . . determine when substantial transformation has occurred, and the prior cases of this court and our predecessor and appellate courts provide guidance in the application of this test." Id.

The facts of this case are like prior cases in which the Court found that a substantial transformation has occurred because of changes to the name, character and use. For example, in Ferrostaal Metals, the Court found that imported steel underwent a substantial transformation by operations performed in New Zealand. See id. at 473-80, 644 F. Supp. at 537-42. The Court found in that case that cold-rolled steel sheets from Japan that were annealed and galvanized in New Zealand were substantially transformed. See id. Specifically, the Court found that annealing altered the product's mechanical properties "by dedicating the sheet to uses compatible with the strength and ductility of the steel," and galvanizing "chang{ed} its chemical composition" and "provid{ed} corrosion resistance." Id. at 476, 644 F. Supp. at 540. Second, the Court found that the process changed the utility of the product because "it transform{ed} a strong, brittle product which cannot be formed {and thus requires some form of heat treatment in order to be put to end uses} into a durable, corrosion-resistant product which is . . . formable for a range of commercial applications." Id. at 477, 644 F. Supp. at 540. It noted that, as a result, hot-dip galvanized steel is not commercially interchangeable with cold-rolled steel. See id. Third, the court found that the process resulted in a change in the name (i.e., from hard cold-rolled steel sheet to hot-dipped galvanized steel sheet) and tariff classification of the product. See id. at 478, 644 F. Supp. at 541 ("Change in tariff classification may be considered as a factor in the substantial transformation analysis."). Ultimately, the Court held that because of the change in name, character, and use, the

30

steel sheet was substantially transformed in New Zealand into a new and different article of commerce. See id. at 480, 644 F. Supp. at 542.

Centric Pipe argued that TRLED failed to consider evidence that the production in Thailand resulted in a change of name, character and use from the hollow and steel billets produced in China to the OCTG produced in Thailand. See Centric Pipe Rev. Req. at 11-13 (Public Version) (P.R. 583). First, [

], are all critical to changing the character of hollow steel billets into OCTG. TRLED entirely failed to address this evidence, claiming only that PET did not perform [

] on its hollow steel billets. See Final Determination at 25 (Confidential Version) (C.R. 374). Contrary to CBP's unsupported assertions, however, as discussed in Sections III and IV, record evidence demonstrates that [

], which included evidence that PET had [                                                                    ]. There is also no basis to TRLED's claim that heat treatment is not a mandatory step in the production of OCTG simply because J55 and K55 steel grade OCTG do not undergo heat treatment. See Final Determination at 21-22 (P.R. 522). These steps are mandatory for the other grades of OCTG and even if TRLED could claim that there is no substantial transformation for certain steel grades, it may not automatically apply that to all other steel grades. See PET RFI at 21 (P.R. 321) ("The heat treatment is applied to the hollow billets after straightening. The tensile strength and yield strength are improved to a higher level to meet customer requirements. Otherwise pipe cannot be used in oil industry."); see also Oil Country Tubular Goods from China, USITC Pub. 5136 at I-18 - 19 (noting that API standards specify a documented heat-treatment procedure for every particular grade and type of pipe). Indeed, the processes converting billets to OCTG in Thailand, which involve multiple steps, are

even more substantial than the annealing and galvanizing at issue in <u>Ferrostaal Metals</u>.  <u>See</u> <u>Oil Country Tubular Goods from China</u>, USITC Pub. 5136 at I-18 - 19 (Public Document) (noting that annealing is merely "a single heat treatment process that prepares the steel for fabrication or service.").

Second, record evidence demonstrates that PET's facility in Thailand results in a new use of the product.  "A change in the end uses of products . . . <u>is itself</u> indicative of a change in the character of the product." <u>Ferrostaal Metals</u>, 11 C.I.T. at 476, 664 F. Supp. at 540 (emphasis added).  Hollow and solid steel billets cannot be used to extract oil and gas in the form in which they are imported from China.  <u>See</u> Centric Pipe Rev. Req at 13 (Public Version) (P.R. 583); <u>see</u> also PET RFI at 21 (P.R. 321).  It is only once these raw materials undergo the production processes that take place in Thailand that they can be used as a vehicle for gas and oil extraction.  In addition, as discussed in Section III.A, hollow and solid steel billets are not simply unfinished, in-scope OCTG.  Rather, these are raw materials that are not commercially interchangeable with unfinished or finished OCTG.  <u>See</u> Centric Pipe Rev. Req at 13 (Public Version) (P.R. 583); <u>see</u> <u>also</u> <u>Ferrostaal Metals</u>, 11 CIT at 477, 664 F. Supp. at 540 (noting the lack of interchangeability between the original and transformed products).

Finally, the substantial transformation results in a new name from "billets" to OCTG, as well as a new HTSUS classification heading.  <u>See</u> <u>supra</u> Section III.A.  The manufacturing processes in Thailand transform steel billets classified under 7207 into OCTG, classified under HTSUS heading 7304.  <u>See</u> Centric Pipe Rev. Req at 13 (Public Version) (P.R. 583).

ORR improperly affirmed TRLED's determination, cursorily dismissing Centric Pipe's arguments relating to "country of origin" and "substantial transformation" because "{i}t is well-settled law that the country of origin of a good from a customs law perspective is not the same as

whether the good falls within the scope of an AD or CVD order with respect to a certain country." ORR Determination at 20 (P.R. 612). To the extent that ORR believes that a different test is applicable to Commerce's AD/CVD country of origin determinations, this is exactly why CBP should have referred this matter to Commerce, as Commerce – not CBP – is the authority that determines what products are covered by its AD/CVD orders. Additionally, the Court has found that the name, character and use test is relevant to Commerce's country of origin determinations for AD/CVD purposes. See, e.g., Asia Wheel Co., Ltd. v. United States, 762 F. Supp. 3d 1289, 1297-98, 1309 (Ct Int'l Trade 2025) ("{u}ltimately, in conducting a substantial transformation analysis, Commerce asks whether 'as a result of manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character{,} and use.'" (quoting Bestfoods v. United States, 165 F.3d 1371, 1373 (Fed. Cir. 1999)) (holding that Commerce's five-factor test is "not divorced" from the "fundamental question" relating to name, character, and use)).

ORR also incorrectly stated that the "plain language of the AD/CVD Orders clearly states that hollow steel products of circular cross-section, whether finished or unfinished, are covered, and remain covered, where the merchandise is subsequently finished in at third country such as Thailand." ORR Determination at 20 (P.R. 612). As discussed in Section III.B, Commerce's recent determination that that imports of seamless OCTG completed in Thailand using steel billets produced in China are circumventing the orders on OCTG from China firmly establishes that steel billets do not fall within the scope of the Orders. In that case, Commerce unequivocally found no evidence that "the scope of the Orders specifically includes OCTG produced in third countries from hollow billets from China." Steel Billet Circ. IDM at 6-7.

An agency action is arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem . . . ." Motor Vehicle, 463 U.S. at 43 (emphasis added). In this

33

instance, both TRLED and ORR entirely failed to consider the substantial transformation of billets into pipe that occurred in Thailand.

**IV. CBP'S AFFIRMATIVE DETERMINATION OF EVASION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE TRLED UNLAWFULLY INITIATED ITS INVESTIGATION**

TRLED's determination, as affirmed by ORR, to initiate this EAPA investigation was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law because the information submitted in allegation did not reasonably suggest that Centric Pipe evaded the Orders.

TRLED can only initiate an investigation if the information submitted in the allegation "reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(b)(1) (emphasis added); see also 19 C.F.R. § 165.15(b)(2). The statute does not define "reasonably suggests." See 19 U.S.C. § 1517(b)(1); see also CEK Grp. LLC v. United States, 633 F. Supp. 3d 1369, 1374 (Ct. Int'l Trade May 2, 2023). The Court, however, has previously interpreted similar language ("reasonable ground to believe or suspect") as requiring "'a particularized and objective basis for suspecting' the existence of the certain proscribed behavior, taking into account the totality of the circumstances -- the whole picture." Al Tech Specialty Steel Corp. v. United States, 6 CIT 245, 247, 575 F. Supp. 1277, 1280 (1983) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)); see also Terry v. Ohio, 392 U.S. 1, 21, n.18 (1968) (noting that "this demand for specificity in the information upon which . . . action is predicated is {this Court's central teaching}"). TRLED, thus, can only initiate an investigation where there is "a particularized and objective basis for suspecting the existence" of evasion by Centric Pipe.

TRLED wrongfully initiated the EAPA against Centric Pipe based on four sets of information contained in the allegation:

1. Shipment data showing increased shipments of OCTG by PET.

2. Declarations allegedly "cast{ing} doubt on {the} assumption" that PET "produc{ed} substantial quantities of OCTG."

   a. One declarant noted that [

   ].

   b. Another declarant stated that [

   ] and "PET's facility [             ] closed with no operations occurring."

3. Screenshots of API's website allegedly showing that PET deactivated its API license in early 2023.

4. Screenshots of PET's website detailing a business relationship with Centric Pipe.

Initiation Mem. at 6-8 (Business Confidential Version) (C.R. 21) (citing to and quoting Letter from Alleger to TRLED re: Request for an Investigation under the Enforce and Protect Act at 8-9, and Exs. 4, 5, 7, 8 and 11 (Jan. 18, 2024) (Business Confidential Document) (C.R. 1) ("Allegation Letter")); see also Notice of Interim Measures at 7-11 (Business Confidential Version) (C.R. 33). It was implausible for TRLED, and for ORR to affirm, that this information, both individually and when considered as a whole, represented "a particularized and objective basis" for suspecting that Centric Pipe evaded the Orders. See generally Motor Vehicle, 463 U.S. at 43 (noting that there should be a "rational connection between the facts found and the choice made.").

Concerning shipment data relied on by TLRED in initiating its investigation, there are numerous reasons that exports could have increased during this period. Indeed, had Centric Pipe been provided an opportunity to respond to the allegation prior to initiation, TRLED could have considered Centric Pipe's explanation that "{t}here was a significant increase in 2022 and 2023 in importation because of shortage of supply in the United States." Centric Pipe RFI at 24 (Public Version) (P.R. 300). It was implausible, therefore, for TRLED to find that increased exports by

PET represented "particularized {or} objective" evidence of evasion where there are many other reasons that exports could have increased other than PET evading the Orders.

Further, the statements in the declarations submitted in the allegation are "mere conjecture or supposition." Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (citation omitted) (holding that an agency "may not base {a} determination 'on the basis of mere conjecture or supposition'"). For example, [

]. See

Allegation Letter at 10, Ex. 8 (Business Confidential Document) (C.R. 1). [

] cannot represent an "objective basis" for suggesting evasion. Further, even taking the [                              ] in the declaration as true, [                    ] can be easily dismissed. Final Determination at 45 (Business Confidential Version) (C.R. 374). Specifically, [                                                    ]. See Allegation Letter at Ex. 8 (Business Confidential Document) (C.R. 1). There are many reasons that the facility [                              ] especially where the declarant [

]. Id. As the statements in the declarations are "mere conjecture or supposition{,}" it was implausible for TRLED to find that such information represents "particularized {or} objective" evidence of evasion.

The reason that "mere conjecture and supposition" cannot represent "particularized {or} objective" evidence of evasion is because such statements are often proven false. Had Centric Pipe been able to comment on declarations prior to initiation, consistent with its due process rights, Centric Pipe could have rebutted the alleged claims that PET's facility had no operations. Centric Pipe submitted an audit report conducted by API of PET's facility between December 26-28, 2023. See Centric Pipe RFI at 25 (Public Version) (P.R. 300). API found that [

].  See id. at Ex. V-3b(d) (Business

Confidential Document) (C.R. 220).[6]  Further, API noted that [



].  Id.  Most importantly, API found that [



].  Id.  In sum, the API audit

report [

] thereby rebutting the "mere conjecture and supposition" in the declarations.

TRLED also failed to "consider an important aspect of the problem{,}" Motor Vehicle,

463 US. at 43, in finding the declarations to be credible because they were made under the penalty

of perjury.  See Final Determination at 41 (Public Version) (P.R. 522).  TRLED unlawfully ignored

that [

].

See Centric Pipe Rev. Req. at 7 (Business Confidential Document) (C.R. 389); see also Letter on

Behalf of Centric Pipe to TRLED re: Voluntary Factual Information Submission at Ex. 2 (Oct. 8,

2024) (Public Document) (P.R. 440).  Again, Centric Pipe could have presented this information

had CBP provided Centric Pipe with an opportunity to comment on the allegation prior to initiation.

Addressing the screenshots of API's website showing that PET allegedly deactivated its

API license in February 2023, there are numerous explanations for why PET's license may have

been briefly deactivated such as a failure to pay the relevant licensing fees.  TRLED recognized

that it relied on mere conjecture or supposition when it found that PET's "API license was

---

[6] This exhibit is labeled as Ex. V-3b(d) instead of Exhibit V-3d(d).

deactivated in 2023 . . . <u>purportedly</u> because API certifiers tried to perform an actual site visit as part of an annual audit of the certification." Initiation Mem. at 10 (Public Version) (emphasis added) (P.R. 42). CBP's statutory mandate provides for an initiation threshold beyond "purported" as such speculation is often proven to be false. <u>See</u> 19 U.S.C. § 1517(b)(1). That once again would have been the case here had TRLED allowed Centric Pipe to comment on the information submitted in the allegation. API conducted its audit of PET between December 26-28, 2023. <u>See</u> Centric Pipe RFI at 25 (Public Version) (P.R. 300). During this audit, [

]. <u>Id.</u> at Ex. V-3b(d) (Business Confidential Document) (C.R. 220). It was implausible for TRLED to have found that PET allegedly deactivated its API license when auditors tried to conduct a site visit as such information is mere conjecture that was proven false on the record.

Finally, regarding the information showing a business relationship between Centric Pipe and PET, Centric Pipe has never denied that it purchased OCTG from PET. It is implausible to assume that the mere purchase of OCTG from PET reasonably suggests evasion especially where [

]. <u>See</u> Centric Pipe CF-28 Pt. 2 at 54 (Business Confidential Document) (C.R. 284). Nor was it plausible for TRLED to find that the description of PET's sales relationship with Centric Pipe on PET's website "may indicate" affiliation between the two companies. Initiation Mem. at 8 (Public Version) (P.R. 42). Not only is a mere "indication" insufficient to represent "a particularized and objective basis" of evasion but TRLED recognized that "Centric {Pipe}'s website does not mention PET." <u>Id.</u> Centric Pipe, once given the opportunity to comment on the information in the allegation, explained:

> Centric Pipe was unaware that PET had placed information regarding Centric Pipe on its website. Centric Pipe did not authorize the use of its name in PET's website marketing, and when Centric Pipe became aware of this usage it immediately requested that PET remove any reference to Centric Pipe from its website.

Centric Pipe RFI at 3 (Public Version) (P.R. 300). Centric Pipe then explained that it "is in no way affiliated with PET" and provided detailed information on its actual corporate structure. Id. at 3-11.

It was also implausible for TRLED to conclude that this information on a collective basis reasonably suggested evasion by Centric Pipe. The facts in this case are distinguishable from CEK Group, which demonstrates the type of information that the Court has found sufficient as reasonably suggesting evasion. In CEK Group, the allegation included actual documentation from the exporter and manufacturer under investigation showing that the company was unlikely to be producer of covered merchandise. See CEK Grp., 633 F. Supp. 3d at 1375. Here, the allegation lacked any such documentation from PET itself indicating that it was incapable of producing OCTG. Further, in CEK Group, the allegation included actual photos showing little activity at the warehouse of the exporter and manufacturer. See id. By contrast, here, the record did not contain any "particularized" photos [                                          ] statements in a declaration that PET allegedly had no operations. The significantly greater evidence of evasion contained in the allegation under appeal in CEK Group, which the Court sustained as reasonably suggesting evasion, illustrates how that it was "implausible" for TRLED to find that the allegation reasonably suggested evasion by Centric Pipe.

TRLED's determination, as affirmed by ORR, to initiate this EAPA investigation was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law allegation lacked "particularized {or} objective" information suggesting evasion by Centric Pipe. This Court

should remand with instructions for TRLED to reverse its affirmative finding of evasion given that TRLED unlawfully initiated this case.

**V.  CBP'S AFFIRMATIVE DETERMINATION OF EVASION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE TRLED AND ORR IGNORED RECORD EVIDENCE THAT DETRACTED FROM THE WEIGHT OF THEIR CONCLUSIONS**

Central to TRLED's conclusion that the record contained substantial evidence of evasion by Centric Pipe was TRLED's finding based on an adverse inference[7] that "all of the OCTG that {PET} exported into the United States during the {period of investigation} was Chinese-origin OCTG."  Final Determination at 39 (Public Version) (P.R. 522); see also 19 U.S.C. §1517(c)(1)(A) (setting forth that an affirmative EAPA finding requires "substantial evidence . . . {that} covered merchandise was entered into . . . the United States through evasion").[8]  TRLED applied an adverse inference against PET primarily on the basis that PET allegedly submitted false information regarding its capacity and production process of OCTG.  See Final Determination at 20-26 (Public Version) (P.R. 522); see also ORR Determination at 20-22 (Public Version) (P.R. 612).  An agency abuses its discretion "if a factual finding is not supported by substantial evidence."  Arnold, 362 F.3d at 1340.  Substantial evidence supporting an agency determination must be based on the whole record, and the Court shall consider not only the information that supports the agency's decision but also whatever in the "record... fairly detracts from {its weight}."  Changzhou Trina

---

[7] TRLED can make an adverse inference where it determines that a party "has failed to cooperate by not acting to the best of the party{'s} . . . ability to comply with a request for information."  19 U.S.C. § 1517(c)(3)(A).

[8] TRLED made this finding based on an adverse inference but also clarified that "enough evidence cists on the record to determine that there is evasion without its use."  Final Determination at 43 (Public Version) (P.R. 522).  ORR found the "use of adverse inferences is unnecessary to find substantial evidence of evasion in this case . . . ."  ORR Determination at 27 (Public Version) (P.R. 612).

<u>Solar Energy Co. v. United States</u>, 975 F.3d 1318, 1326 (Fed. Cir. 2020) (citation and quotation omitted). TRLED's determination, as affirmed by ORR, that substantial evidence of evasion existed for Centric Pipe was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law where both TRLED and ORR unlawfully ignored: (1) record evidence demonstrating that PET had the capacity to produce OCTG; and (2) record evidence showing that PET accurately reported the productions steps that it employed to produce OCTG.

On the first point, both TRLED and ORR unlawfully found that substantial evidence did not support the capacity figures reported by PET. <u>See</u> Final Determination at 47-48 (Public Version) (P.R. 522); <u>see also</u> ORR Determination at 20-21 (Public Version) (P.R. 612). Both TRLED and ORR failed to address evidence submitted by Centric Pipe demonstrating that PET had the capability to produce the OCTG that it exported to the United States. Centric Pipe reported that it visited PET on three occasions: September 24, 2022, December 7, 2022 and October 15, 2023. Centric Pipe RFI at 26 (Public Version) (P.R. 300); <u>see also</u> <u>id.</u> at Ex. V-3d(a). Centric Pipe submitted photos of PET's fully operational manufacturing facility from these visits. <u>See</u> <u>id.</u> at Ex. V-3d(a). Centric Pipe also submitted a step-by-step production chart of OTCG with photos of the machinery used in each production step by PET. <u>See</u> <u>id.</u> at Ex. V-3d(b). Centric Pipe also submitted an affidavit summarizing its counsel's visit to PET's facility on June 25, 2024. <u>See</u> <u>id.</u> at Ex. V-3b(c).[9] Centric Pipe's counsel "witnessed the production of OCTG starting from raw, unprocessed and uncut steel billets, and ending with finished OCTG ready shipment {sic} to customers." <u>Id.</u> To support these statements, unlike the mere declarations contained in the allegation, Centric Pipe submitted a video demonstrating that PET's facility was fully operational.

---

[9] This exhibit is labeled as Ex. V-3b(c) instead of Exhibit V-3d(c).

See id. at Ex. V-3d(b) (Business Confidential Document) (C.R. 409-413); see also id. at 24 (Public Version) (P.R. 300). Further, neither TRLED nor ORR discussed API's audit report, which [

]. See id. at Ex. V-3b(d) (Business Confidential Document) (C.R. 220). In sum, this evidence fully rebuts TRLED's and ORR's conclusions that PET did not have an operational facility capable of producing the OCTG that PET exported to the United States.

Both TRLED and ORR failed to address the above evidence submitted by Centric Pipe. For example, TRLED concluded that "the capacity to produce OCTG does not necessarily indicate that evasion did not occur." Final Determination at 48 (Public Version) (P.R. 522) (citing Phoenix Metal Co., Ltd. v. United States, No. 23-00048, 2024 Ct. Intl. Trade LEXIS 69, at *14 (Ct. Int'l Trade June 10, 2024). In Phoenix Metal, the Court held that "a demonstration of some production capacity, particularly during a period of production set up solely for the purposes of verification, does not prove that transshipment did not occur." Phoenix Metal, 2024 Ct. Intl. Trade LEXIS 69, at *14 (emphasis added). The holding in Phoenix Metal is distinguishable from this case. Here, PET's capacity was not "set up solely for the purposes of verification" but instead [

]. Regarding ORR, Centric Pipe stated that "multiple of the Importers have shared photos and videos of PET's production facility on the record, taken on different dates by different people." Centric Pipe Rev. Req. at 6 (Public Version) (P.R. 583). API's 2023 audit report supports the argument that "{s}ubstantial evidence available on the record demonstrates that PET had an operating facility and the necessary production capacity to account for the quantities of OCTG shipped to the importers." Id. Despite these arguments, ORR does not address this evidence in its determination. See ORR Determination at 20-22, 25-27 (Public Version) (P.R. 612). TRLED and

ORR, thus, abused their discretion in finding that PET lacked sufficient capacity to produce OCTG because both TRLED and ORR failed to consider evidence that detracted from the weight of their conclusions.

Turning to the second point, beyond questioning the capacity figures submitted by PET, TRLED and ORR both concluded that record evidence contradicted the production processes reported by PET to produce OCTG.  The only reference made by TRLED or ORR to any of the above information submitted by Centric Pipe was TRLED and ORR's conclusion that PET did not [

] despite PET claiming that it purchased the [

].  See Final Determination at 42-43 (Business Confidential Version) (C.R. 374); see also ORR Determination at 21 (Business Confidential Version) (C.R. 395).  TRLED and ORR failed to address the findings from API's audit report, which [

].  The auditor from API [

].  Verification Exhibits at PDF p. 380 (Nov. 10, 2024) (Business Confidential Document) (C.R. 321).  The auditor reported that [

].  Id. at 384. The auditor [                                    ] and [

].  See id. at PDF p. 380, 383; see also id. at PDF p. 384 ([

]).  It was implausible for TRLED to conclude that PET made "a false statement concerning the purchase date of its [                    ]{,}" Final Determination at 42-43 (Business Confidential Version) (C.R. 374), or for ORR to find that "PET would not have been able to utilize its claimed production process."  ORR Determination at 21 (Public Version) (P.R.

612).  The only reasonable reading of the record was that PET [

] based on the findings in the API report and that the [

].  At a minimum, TRLED and ORR had to address the evidence contained in the API audit report that conflicted with their conclusions.  TRLED's and ORR's failure to do so rendered their findings as unsupported by substantial evidence and not in accordance with law.

### CONCLUSION

Centric Pipe incorporates the arguments of the other Consolidated Plaintiffs to the extent that they do not conflict with arguments presented here.  For the foregoing reasons, this Court should grant Centric Pipe's Motion for Judgment on the Agency Record because CBP's affirmative determination of evasion against Centric Pipe was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law.

Respectfully submitted,

Dated: April 10, 2026

/s/ Bryan P. Cenko
Bryan P. Cenko
Kristin H. Mowry
Jeffrey S. Grimson
Kavita Mohan
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
bpc@mowrygrimson.com
*Counsel to Centric Pipe LLC*

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Bryan P. Cenko, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures and Scheduling Order. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 13,989 words. This brief thus complies with the Standard Chambers Procedures and Scheduling Order, which permits briefs of 14,000 words or fewer.

Respectfully submitted,

Dated: April 10, 2026

/s/ Bryan P. Cenko
Bryan P. Cenko
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
bpc@mowrygrimson.com
*Counsel to Centric Pipe LLC*