**PUBLIC VERSION**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

CENTRIC PIPE LLC,

     Plaintiff,

LE COMMODITIES, LLC, TREK
METALS, INC., ENERGY PIPE &
EQUIPMENT RENTALS, LLC, AND
KANA ENERGY SERVICES, INC.,

     Consolidated-Plaintiffs,

v.

UNITED STATES,

     Defendant,

and

U.S. OCTG MANUFACTURERS
ASSOCIATION,

     Defendant-Intervenor.

Consol. Court No. 1:25-cv-00182

**PROPOSED ORDER**

Upon consideration of the Rule 56.2 motion for judgment on the agency record of

Plaintiff Energy Pipe & Equipment Rentals, LLC ("Energy Pipe"), all responses thereto, and all

other relevant papers and proceedings herein, it is hereby:

**ORDERED** that Energy Pipe's motion is GRANTED; and it is further

**ORDERED** that U.S. Customs and Border Protection's ("CBP") evasion determination

in Evasion and Protect Act ("EAPA") Consolidated Case No. 7890 is arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law; and it is further

Consol. Court No. 1:25-cv-00182
Page 2

**ORDERED** that CBP shall issue a revised determination on remand that is in accordance with law and otherwise consistent with all aspects of this Court's order and opinion in this matter.

**SO ORDERED.**

_____

Hon. Joseph A. Laroski, Jr., Judge

Dated: _____, 2026
        New York, New York

**PUBLIC VERSION**

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| CENTRIC PIPE LLC, <br><br>     Plaintiff, <br><br> LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, AND KANA ENERGY SERVICES, INC., <br><br>     Consolidated-Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>     Defendant, <br><br> and <br><br> U.S. OCTG MANUFACTURERS ASSOCIATION, <br><br>     Defendant-Intervenor. | Consol. Court No. 1:25-cv-00182 <br><br> **<ins>PUBLIC VERSION</ins>** |

### PLAINTIFF ENERGY PIPE & EQUIPMENT RENTALS, LLC'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Plaintiff Energy Pipe & Equipment Rentals, LLC ("Energy Pipe") respectfully moves this Court for judgment on the agency record with respect to the evasion determination against it made by U.S. Customs and Border Protection ("CBP") in Enforce and Protect Act ("EAPA") Consolidated Case No. 7890.

For the reasons discussed in the accompanying memorandum, Energy Pipe respectfully requests the Court to hold that CBP's determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Accordingly, Energy Pipe respectfully requests that the

**PUBLIC VERSION**

Court grant its motion for judgment and remand this matter to CBP with instructions to undertake

further proceedings consistent with the disposition and order of the Court.

Respectfully submitted,

*/s/ Lydia C. Pardini*
Lydia C. Pardini
Deanna Tanner Okun
Dominic L. Bianchi
Jane C. Dempsey
Alissa M. Chase
Joonho Hwang
**Polsinelli PC**
1401 I ("Eye") Street, NW, Suite 800
Washington, DC 20005
Tel: 202-626-8344
Email: lpardini@polsinelli.com

*Counsel to Energy Pipe & Equipment
Rentals, LLC*

Date:  April 10, 2026

PUBLIC VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| CENTRIC PIPE LLC,<br><br>    Plaintiff,<br><br>LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, AND KANA ENERGY SERVICES, INC.,<br><br>    Consolidated-Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>and<br><br>U.S. OCTG MANUFACTURERS ASSOCIATION,<br><br>    Defendant-Intervenor. | Consol. Court No. 1:25-cv-00182<br><br>**PUBLIC VERSION** |

## PLAINTIFF ENERGY PIPE & EQUIPMENT RENTALS, LLC'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Lydia C. Pardini
Deanna Tanner Okun
Dominic L. Bianchi
Jane C. Dempsey
Alissa M. Chase
Joonho Hwang
**Polsinelli PC**
1401 I ("Eye") Street, NW
Suite 800
Washington, DC 20005
Tel: 202-626-8329
Email: dtokun@polsinelli.com

*Counsel to Plaintiff Energy Pipe*

Date:  April 10, 2026

**TABLE OF CONTENTS**

I.     STATEMENT PURSUANT TO RULE 56.2 ..................................................................... 1

       A.     Administrative Determination Under Appeal ............................................................ 1

       B.     Issues Presented for Review ...................................................................................... 1

              1.     Whether CBP's evasion determination with respect to Energy Pipe is
                     arbitrary, capricious, an abuse of discretion, or otherwise not in
                     accordance with law because it rests on an erroneous premise that mother
                     pipe falls within the literal scope of the OCTG Orders. ............................. 1

              2.     Whether CBP's evasion determination with respect to Energy Pipe is
                     arbitrary, capricious, an abuse of discretion, or otherwise not in
                     accordance with law because it is based upon an adverse inference drawn
                     against TOP, a non-cooperating exporter. ................................................... 1

              3.     Whether CBP acted arbitrarily and capriciously by failing to address the
                     substantial record evidence that detracted from a finding of evasion. ......... 2

              4.     Whether CBP violated the law when it failed to initiate the EAPA
                     investigation within the 15-business day statutory deadline following
                     receipt of an allegation. ............................................................................... 2

              5.     Whether CBP violated Energy Pipe's due process rights when it failed to
                     give notice prior to its imposition of interim measures. ............................. 2

II.    STATEMENT OF FACTS ............................................................................................... 2

       A.     Energy Pipe's Imports of OCTG from Thailand ...................................................... 2

       B.     CBP's EAPA Investigation ....................................................................................... 4

       C.     TRLED Determination ............................................................................................... 7

       D.     ORR Final Determination .......................................................................................... 8

III.   ARGUMENT .................................................................................................................. 10

       A.     Statutory Framework ............................................................................................... 10

       B.     Standard of Review .................................................................................................. 11

       C.     CBP's Evasion Determination is Arbitrary and Capricious, an Abuse of
              Discretion, or Otherwise Not in Accordance with Law Because it Rests on an

**PUBLIC VERSION**

Erroneous Premise that Chinese-Origin Mother Pipe Falls Within the Literal Scope of the OCTG Orders .................................................................................. 13

1.    TRLED's Decision ................................................................................ 14

2.    ORR's Decision .................................................................................. 14

3.    Commerce's Determination ................................................................. 15

D.    CBP Erred in Using an Adverse Inference Drawn Against TOP to Reach an Evasion Determination with Respect to Energy Pipe ........................................... 17

1.    CBP Misinterpreted the Statute ........................................................... 18

2.    CBP's Broad Reliance on an Adverse Inference Against TOP to Find Evasion Against Energy Pipe was Unreasonable ..................................... 20

3.    Substantial Evidence Requires CBP to Consider The Record as a Whole, including Detracting Evidence .............................................................. 21

4.    Substantial Contradictory Evidence Undermines CBP's Evasion Finding as to Energy Pipe ................................................................................ 22

E.    CBP Violated the Law By Failing to Initiate the EAPA Investigation within the Mandatory 15-Business Day Statutory Timeframe After Receipt of an Allegation .......................................................................................................... 27

F.    CBP Violated Energy Pipe's Due Process Right to Notice of Investigation Prior to Imposition of Interim Measures ........................................................... 29

IV.    CONCLUSION .................................................................................................. 31

## TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Enforcement Committee v. United States*,
  578 F. Supp.3d 1310 (Ct. Int'l Trade 2022) ............................................................... 16

*Ad Hoc Shrimp Trade Enforcement Committee v. United States*,
  632 F. Supp.3d 1359 (Ct. Int'l Trade 2023) ............................................................... 26

*Ala. Aircraft Indus., Inc. v. United States*,
  586 F.3d 1372 (Fed. Cir. 2009) ................................................................................... 12

*All in God Faith, Inc. v. United States*,
  589 F. Supp.3d 1238 (Ct. Int'l Trade 2022) ......................................................... 22, 26

*AMS Assocs. v. United States*,
  737 F.3d 1338 (Fed. Cir. 2013) ................................................................................... 16

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ..................................................................................................... 14

*Changzhou Trina Solar Energy Co. v. United States*,
  195 F. Supp.3d 1334 (Ct. Int'l Trade 2016) ............................................................... 21

*Fuentes v. Shevin*,
  407 U.S. 67 (1972) ....................................................................................................... 30

*Gulf States Tube Div. of Quanex Corp. v. United States*,
  981 F. Supp. 630 (1997) .............................................................................................. 30

*H&E Home, Inc. v. United States*,
  714 F. Supp.3d 1353 (Ct. Int'l Trade 2024) ......................................................... 19, 20

*Kingdomware Techs., Inc. v. United States*,
  579 U.S. 162 (2016) ..................................................................................................... 28

*Lashify, Inc. v. Int'l Trade Comm'n*,
  130 F.4th 948 (Fed. Cir. 2025) .................................................................................... 12

*Leco Supply, Inc. v. United States*,
  619 F. Supp.3d 1287 (Ct. Int'l Trade 2023) ......................................................... 22, 26

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998) ....................................................................................................... 28

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024) ..................................................................................................... 12

*Maine Cmty. Health Options v. United States*,
590 U.S. 296 (2020)..................................................................................................... 28

*Mathews v. Eldridge*,
424 U.S. 319 (1976)...................................................................................................... 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................................................. 11, 12

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015)....................................................................................... 21

*Royal Brush Mfg., Inc. v. United States*,
483 F. Supp.3d 1294 (Ct. Int'l Trade 2020) ................................................................. 31

*Royal Brush Mfg., Inc. v. United States*,
75 F.4th 1250 (Fed. Cir. 2023) ..................................................................................... 30

*Securities & Exchange Comm'n v. Chenery Corp.*,
332 U.S. 194 (1947)...................................................................................................... 14

*SKF USA Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001)..................................................................................... 22

*Skyview Cabinet USA, Inc. v. United States*,
2023 WL 4073781 (Ct. Int'l Trade 2023).............................................................. 21, 26

*Star Fruits S.N.C. v. United States*,
393 F.3d 1277 (Fed. Cir. 2005)..................................................................................... 12

*Sunpreme, Inc. v. United States*,
946 F.3d 1300 (Fed. Cir. 2020)..................................................................................... 13

*Superior Commercial Solutions v. United States*,
811 F.Supp.3d 1363 (Ct. Int'l Trade 2025) ................................................. 21, 28, 29, 31

*Tenaris Bay City, Inc. v. United States*, No. 22-00344,
2025 WL 1720173 (Ct. Int'l ......................................................................................... 12

*Transcom, Inc. v. United States*,
121 F. Supp.2d 690 (Ct. Int'l Trade 2000) ................................................................... 31

*Transcom, Inc. v. United States*, 294 F.3d 1371 (Fed. Cir. 2002) ................................. 31

*U.K. Carbon and Graphite Co., Ltd. v. United States*,
931 F. Supp.2d 1322 (Ct. Int'l Trade 2013) ................................................................. 15

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ........................................................................................................ 21

**Statutes**
19 U.S.C. § 1517 ..................................................................................................... 1, 10

19 U.S.C § 1517(a) ....................................................................................................... 10

19 U.S.C. § 1517(a)(5)(A) ........................................................................................... 17

19 U.S.C. § 1517(b) ..................................................................................................... 10

19 U.S.C. § 1517(b)(1) ...................................................................................... 11, 27, 28

19 U.S.C. § 1517(c)(1) .................................................................................................. 21

19 U.S.C § 1517(c)(1)(A) ............................................................................................. 11

19 U.S.C. § 1517(c)(3) .................................................................................................. 19

19 U.S.C. § 1517(c)(3)(A) ....................................................................................... 18, 20

19 U.S.C. § 1517(c)(3)(B) ....................................................................................... 18, 19

19 U.S.C. § 1517(c)(4) .................................................................................................. 30

19 U.S.C § 1517(e) ....................................................................................................... 11

19 U.S.C. § 1517(f) ....................................................................................................... 11

19 U.S.C. § 1517(g)(1) ................................................................................................. 11

19 U.S.C. § 1517(g)(1)-(2) ........................................................................................... 11

19 U.S.C. § 1517(g)(2) ................................................................................................. 12

19 U.S.C. § 1677e(a)-(c) .............................................................................................. 21

19 U.S.C. § 4371(a)(3) .................................................................................................. 11

**Other Authorities**
*Certain Oil Country Tubular Goods from the People's Republic of China:  Amended Final
  Affirmative Countervailing Duty Determination and Countervailing Duty Order*,
  75 Fed. Reg. 3202 (Jan. 20, 2010) ............................................................................... 4

*Certain Oil Country Tubular Goods from the People's Republic of China:  Amended Final Determination of Sales at Less than Fair Value and Antidumping Duty Order*, 75 Fed. Reg. 28, 551 (May 21, 2010) ...................................................................................... 4

H. Rep. No. 114-114 (May 14, 2015) .......................................................................... 19

*Oil Country Tubular Goods From the People's Republic of China*, 91 Fed. Reg. 9,811 (Dep't Commerce Feb. 27, 2026)........................................................ 15, 16

**Regulations**

19 C.F.R. § 165.0 ....................................................................................................... 10

19 C.F.R. § 165.11 ..................................................................................................... 10

19 C.F.R. § 165.12 ................................................................................................ 28, 29

19 C.F.R. § 165.15(d)(1).............................................................................................. 31

19 C.F.R. § 351.226(l) ................................................................................................ 16

Plaintiff, Energy Pipe & Equipment Rentals, LLC ("Energy Pipe") respectfully submits this memorandum in support of its Rule 56.2 motion for judgment on the agency record. As set forth below, U.S. Customs and Border Protection's ("CBP") acted arbitrarily, capriciously, and erroneously in concluding that Energy Pipe imported oil country tubular goods ("OCTG") by means of evasion under the Enforce and Protect Act ("EAPA"), 19 U.S.C. § 1517.

## I.    STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Determination Under Appeal

Plaintiff Energy Pipe is a U.S. importer of OCTG from Thailand. In this appeal, Energy Pipe seeks judicial review of the following decisions that CBP issued in EAPA Consolidated Case No. 789: (a) CBP's Notice of Initiation and Interim Measures issued by the Trade Remedy & Law Enforcement Directorate ("TRLED") (May 31, 2024) ("Initiation Notice"), P.R.77, C.R.33;[1] (2) CBP's TRLED Determination of Evasion (Feb. 24, 2025) ("TRLED Determination"), P.R.522, C.R.374; and (3) CBP's Final Administrative Review Determination issued by the Office of Trade, Regulations, and Rulings ("ORR") (July 2, 2025) ("ORR Final Determination"), P.R.612, C.R.395.

### B.    Issues Presented for Review

1.    Whether CBP's evasion determination with respect to Energy Pipe is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because it rests on an erroneous premise that mother pipe falls within the literal scope of the OCTG Orders.

2.    Whether CBP's evasion determination with respect to Energy Pipe is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because it is based upon an adverse inference drawn against TOP, a non-cooperating exporter.

---

[1] Citations to the confidential administrative record are to the public and confidential record document numbers, "P.R.__" and "C.R.__," respectively.

3.      Whether CBP acted arbitrarily and capriciously by failing to address the substantial record evidence that detracted from a finding of evasion.

4.      Whether CBP violated the law when it failed to initiate the EAPA investigation within the 15-business day statutory deadline following receipt of an allegation.

5.      Whether CBP violated Energy Pipe's due process rights when it failed to give notice prior to its imposition of interim measures.

## II.      STATEMENT OF FACTS

### A.  Energy Pipe's Imports of OCTG from Thailand

Energy Pipe is a small, family-owned company with limited staff located in southern Louisiana.  The company focuses exclusively on the sale and rental of pipe and certain oilfield equipment.  Energy Pipe RFI Response at 3-4, C.R.238, P.R.317.  Before it began to import OCTG from Thai producer Thai Oil Pipe Co., Ltd ("TOP"), Energy Pipe never imported any merchandise, sourcing pipe exclusively from domestic sources.  *See id.* at 8, 18-19.[2]

Historically, Energy Pipe purchased most of its pipe from local oilfield companies and online auctions.  Energy Pipe RFI Response at 16-20, C.R.238, P.R.312.  When domestic pipe supply became difficult to obtain because of high demand, Energy Pipe began to import pipe.  *See id.* at 16, 19, 27.  Energy Pipe first imported material directly from TOP in April 2022 after it had earlier purchased TOP-manufactured pipes domestically from another U.S. company.  Energy Pipe Voluntary Factual Submission at 5, C.R.317, P.R.434; Energy Pipe RFI Response at Attachment 152, C.R.308, P.R.431; Energy Pipe RFI Response at Attachment 153, C.R.309, P.R.432.

---

[2] CBP consolidated its investigation of importers of OCTG from TOP with its investigation of importers of OCTG from Thai producer Petroleum Equipment (Thailand) Co., Ltd. ("PET"). TRLED Determination at 2-3, C.R.374, P.R.522.  Energy Pipe imported OCTG from TOP only, and not PET.  Energy Pipe RFI Response at 16, C.R.238, P.R.317; Energy Pipe Supplemental RFI Response at Attachment 66a (revised imports list), C.R. 311, P.R. 420.  Energy Pipe's brief therefore focuses on CBP's findings with respect to TOP and Energy Pipe.

Before importing, Energy Pipe took multiple steps to ensure that its entries of OCTG from TOP originated in Thailand and complied with all Customs laws and procedures. The company's principal Dean Angelle visited TOP's plant twice in 2019. Energy Pipe RFI Response at Attachment 143 (credit card statement) at 4 and 13, C.R.304, P.R.422; Energy Pipe RFI Response at Attachment 76 (Thailand trip), C.R.150, P.R.227. During those visits, Mr. Angelle personally confirmed that TOP had the capacity to manufacture OCTG in the size, strength, and quantities Energy Pipe required. Energy Pipe RFI Response at 17-18, C.R.238, P.R.317. He also verified that TOP had an American Petroleum Institute ("API") license to produce OCTG. *See id.*; *see also* Energy Pipe RFI Response at Attachments 73-76 (API certificates), C.R.147-149, P.R.224-226. All pipe received by Energy Pipe underwent full length, drift, and visual thread inspection per API Standards by Deep Water Inspection using an EMI unit. *See, e.g.*, Energy Pipe RFI Response at Attachment 117 (inspection report relating to Entry Number [          ]6826), C.R.64, P.R.266.

Energy Pipe also retained a licensed Customs broker, Aries Worldwide Logistics ("Aries"), to process its imports. Energy Pipe RFI Response at 29-31, C.R.238, P.R.317. Aries appeared on CBP's Permitted Customs Brokers Listing, and it maintained a compliance team that advised whether shipments were subject to AD/CVD orders. Before transmission to Customs, a supervisor or manager reviewed each file. Energy Pipe RFI Response at Attachment 125 (Aries email, pt. 1), C.R.72, P.R.274; Energy Pipe RFI Response at Attachment 127 (Aries email, pt. 2), C.R.74, P.R.276; Energy Pipe RFI Response at Attachment 137 at 187-89, C.R.233, P.R.312.

Upon receiving each shipment of OCTG from TOP, Energy Pipe inspected the complete package of accompanying documents, which included an Official Country of Origin Certificate issued by the Thai Chamber of Commerce and the stamp of approval from the country's department of foreign trade. Energy Pipe RFI Response at 30-31, C.R.238, P.R.317; Energy Pipe

3

RFI Response at Attachment 67 (shipping documents), C.R.140, P.R.218. It compared those certificates against the shipment documentation and the product received. Energy Pipe RFI Response at 30-31, C.R.238, P.R.317; Energy Pipe RFI Response at Attachment 67 (shipping documents), C.R.140 and P.R. 218. For all the entries, Aries also separately reviewed the paperwork. Energy Pipe RFI Response at Attachment 127 (Aries email, pt. 2), C.R.74, P.R.276. Aries confirmed the country of origin to be Thailand and the manufacturer to be TOP. Energy Pipe RFI Response at Attachment 126 (ISF forms) C.R.73, P.R.275.

## B.    CBP's EAPA Investigation

Notwithstanding the foregoing, on January 18, 2024, the U.S. OCTG Manufacturers Association ("USOMA" or the "Alleger"), a trade association of domestic producers of OCTG, submitted allegations to CBP that certain importers, including Energy Pipe, were evading the antidumping and countervailing duty orders on OCTG from China. TRLED Determination at 2, C.R.374, P.R.522; EAPA Allegation, C.R.5, P.R.5. The scope of the OCTG orders covered:

> OCTG, "which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute ("API") or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached.

*Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 3202 (Jan. 20, 2010); *see also Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Determination of Sales at Less than Fair Value and Antidumping Duty Order*, 75 Fed. Reg. 28, 551 (May 21, 2010) (collective, the "OCTG Orders"). USOMA alleged

4

that Energy Pipe was importing Chinese-origin OCTG that was transshipped through Thailand. TRLED Determination at 2-3, C.R.374, P.R.522.

On February 1, 2024, Customs acknowledged receipt of the Allegations, and completely unbeknownst to Energy Pipe, initiated an action against the company beginning February 23, 2024. TRLED Determination at 3, C.R.374, P.R.522; EAPA Receipt Report, C.R.15, P.R.16; Internal Email Initiation of EAPA Investigation, C.R.22, P.R.25.

On March 7, 2024, without any mention of an ongoing EAPA investigation, CBP issued a CF-28 to Energy Pipe, requesting within 30 days voluminous documentation regarding complete production records, including those that did not even originate with Energy Pipe. It requested amongst other things: (1) a list of all raw materials that went into producing Energy Pipe's OCTG; (2) purchase orders, commercial invoices, and proofs of payment for all raw materials used to produce the OCTG; (3) foreign Customs documentation for all imported raw materials; (4) factory production records, including stamped timecards and work orders; (5) a description of all equipment used in the production of OCTG; (6) a photo of each piece of equipment; (7) a description of the production capacity of all equipment used to manufacture OCTG; (8) all packaging costs and information; and (9) a mill certificate. Energy Pipe CF-28 Response, C.R.24, P.R.45. On April 3, 2024, Energy Pipe timely submitted documents that were within its possession, including entry summary documents and commercial documents normally included in the entry package, and any information that it was able to obtain from TOP within the short period of time allotted to respond. *See id.*

It was not until May 31, 2024, that CBP first announced to Energy Pipe via email that it was formally investigating whether Energy Pipe was evading the OCTG Orders. At the same time, CBP informed that it was imposing interim measures. CBP's Initiation Notice, C.R.33, P.R.77.

5

CBP subsequently issued requests for information ("RFI") to Energy Pipe and TOP followed by a supplemental RFI, and Energy Pipe and TOP timely responded. TRLED Determination at 5 n.18, C.R.374, P.R.522. Energy Pipe also submitted voluntary factual information. Energy Pipe Voluntary Factual Information, C.R.317, P.R.442.

CBP officials then conducted a verification visit at TOP's facility in Thailand from November 4, 2024 to November 8, 2024. Verification Report, C.R.352, P.R.457. During this visit, the verification team confirmed that TOP's facility was an active, functioning pipe mill and a legitimate producer of OCTG in Thailand. *See id.* at 21-24. The verification team observed the factory producing OCTG from a [          ] billet in a [     ]-step of production process that began with [

          ]. *See id.* at 20-22 and Attachment VII (photos). They further observed that TOP's factory workers were "actively participating in various production processes" during the factory tour, that the workers operating machinery who were interviewed "were able to demonstrate their knowledge of the machinery and showed example records that were produced from their test," and that "the factory was covered in steel debris and dust, which is indicative of a factory that operates regularly." *Id*. at 22-23.

CBP's verification team also reviewed TOP's recordkeeping during its visit and found "{n}o major discrepancies in value, weight, and quantity" in the documents provided. Verification Report at 24-27, C.R.352, P.R.457. TOP provided CBP all relevant documents, including information pertaining to the raw material used (*i.e.*, [          ] billets) to produce OCTG that was imported by Energy Pipe. TOP Verification Exhibit 23, C.R.337, P.R.453. Specifically, TOP provided [

6

], as well as documents detailing the transformation of those [          ] billets into OCTG by TOP in Thailand, which were then imported by Energy Pipe.  TOP Verification Exhibit 3 at 1, C.R.340, P.R.453; *see also* TOP Verification Exhibit 19, C.R.332, P.R.453; TOP Verification Exhibit 23, C.R.337 and P.R.453.  In addition, as the verification team noted, although TOP produced certain OCTG from hollow pipe ("mother pipe") for other importers, TOP emphasized that Energy Pipe and one other importer purchased OCTG produced only from [          ] billets.  Verification Report at 19-20, and 26, C.R.352, P.R.457.

On December 19, 2024, Energy Pipe, submitted written arguments, and on January 6, 2025, it submitted responses to the Alleger's written arguments.  Energy Pipe Written Arguments, C.R.353, P.R.476; Energy Pipe Response to Alleger's Written Arguments, C.R.372, P.R.517.  In those submissions, Energy Pipe urged CBP to issue a negative evasion determination because it did not make any material false statements, acts, or omissions in entering OCTG from Thailand.  In particular, it emphasized that its OCTG imports from Thailand were produced from [

] billets purchased by TOP, which were then substantially transformed into OCTG by TOP in Thailand, and that the total quantity of OCTG purchased from TOP fell well within TOP's production capacity as personally observed by Mr. Angelle in his visits to TOP's facility.  *See id.*

C.    **TRLED Determination**

On February 24, 2025, CBP made an affirmative determination of evasion.  TRLED Determination, C.R.374, P.R.522.

TRLED found that the production documents submitted by Energy Pipe indicated that the OCTG that it imported from TOP originated from [          ] billets.  *See id.* at 12.  But TRLED nevertheless concluded that "no reliable evidence exists to indicate which of the importers' OCTG entries were produced from [          ] billets or from Chinese-origin mother pipe."  *Id.* at 12, 43.  That conclusion did not rest on its consideration of Energy Pipe's documents, but rather

7

stemmed from its review of the raw material documents provided for one entry by an entirely different U.S. importer, Trek Metals.  TRLED found that Trek Metals and TOP submitted [

], but  from  [                                                                ].

According to TRLED, TOP likely "created one or both sets of the [



]."  *Id*. at 12.

TRLED then applied an adverse inference that it drew against TOP to reach an evasion determination.  *Id*. at 43.  Specifically, because it found that TOP failed to cooperate to the best of its ability in responding to CBP's RFIs, TRLED drew an adverse inference that all of TOP's OCTG – including those imported by Energy Pipe – were produced using Chinese-origin mother pipe which, according to TRLED, itself was covered by the physical description of the OCTG Orders. *See id.* at 43.

On April 7, 2025, Energy Pipe, along with five other importers, submitted requests for administrative review.  Energy Pipe Request for Administrative Review, C.R.379 and P.R.542.

### D.    ORR Final Determination

On July 2, 2025, CBP's Office of Trade, Regulations and Ruling ("ORR") issued its administrative review determination affirming TRLED's evasion determination.  ORR Final Determination, C.R.395, P.R.612.

ORR found that Energy Pipe "shipped OCTG from China, through Thailand, and then into the United States" without properly identifying the merchandise as originating from China and omitting the relevant AD/CVD numbers from the entry summary documentation. *See id.* at 18.  In reaching this determination, ORR relied on the following subsidiary findings:  (1) TOP used mother pipe from China to produce [      ] percent of its OCTG in Thailand; (2) mother pipe

8

"was OCTG in all but name;" (3) and the administrative record did not contain sufficient information allowing CBP to trace whether each specific order of finished OCTG that TOP produced for Energy Pipe used [        ] billets instead of in-scope mother pipe. *See id.* at 22-23.

According to ORR, while TRLED identified [   ] steps that were required to manufacture finished OCTG from [         ] billets, TOP only provided documents reflecting step 1 ([         ]); step 6 ([                ]); step 16 ([                ]) and step 20 ([                        ] ).  In particular, ORR stated that TOP did not provide documentation regarding [

], and explained that "{w}ithout a document showing that a [            ] occurred, it was impossible to confirm whether TOP used [

] to produce finished OCTG to fulfill particular purchase orders. *Id*. at 23.

ORR stated that it did not rely on an adverse inference against TOP to find evasion. *See id.* at 27.  Yet, ORR identified no record evidence and made no factual findings establishing that the OCTG imported by Energy Pipe was actually produced from Chinese-origin mother pipe. Rather, as noted above, ORR relied on the absence of documentation for a particular production step.  To fill this purported evidentiary gap, ORR necessarily had to have adopted the same adverse inference invoked by TRLED against TOP, that all of its OCTG were produced using mother pipe. Absent that inference, ORR would have no basis for concluding that "the administrative record contains substantial evidence of evasion." *Id*.  at 27.

On August 14, 2025, Energy Pipe filed a summons and complaint, initiating this action challenging CBP's evasion determination.  ECF Nos. 1, 2.

9

### III.    ARGUMENT

#### A.  Statutory Framework

EAPA was signed into law in 2016, establishing a new CBP administrative procedure for investigating allegations of evasion of AD/CVD orders as part of the agency's efforts to level the playing field for domestic industries injured by unfairly traded imports.  Under EAPA, CBP must "make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the {U.S.} through evasion."  19 U.S.C. § 1517.  The statute defines "covered merchandise" as merchandise that is subject to an AD/CVD order and "evasion" as:

> entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.

*Id*. at § 1517(a).  CBP promulgated regulations addressing the requirements for filing allegations of evasion, investigation procedures, and administrative review of determinations as to evasion of AD/CVD orders.  *See* 19 C.F.R. §§ 165.0-165.47.

Under EAPA, federal agencies and interested parties may submit allegations to CBP that merchandise covered by an AD/CVD order has entered the United States through evasion.  19 U.S.C. § 1517(b).  An allegation need include only the following information:  the alleger's name and email address; an explanation of how the alleger qualifies as an interested party; name and address of the importer against whom the allegation is brought; description of the covered merchandise; applicable AD/CVD orders; and information reasonably available to the alleger that supports its allegation.  19 C.F.R. § 165.11.

10

TRLED, located within Customs' Office of Trade, investigates allegations of evasion and makes an evasion determination. 19 U.S.C. § 4371(a)(3). To begin, if an allegation reasonably suggests that evasion is occurring, TRLED "shall initiate an investigation" no later than "15 business days after receiving an allegation." 19 U.S.C. § 1517(b)(1). After initiating an investigation, TRLED must make an initial determination within 90 calendar days of whether there is reasonable suspicion of evasion and, if so, it must issue interim measures, which includes the suspension and extension of liquidation for certain entries. *Id*. at § 1517(e). No later than 300 calendar days after the investigation's initiation, TRLED is required to make a determination, based on substantial evidence, whether evasion occurred. *Id*. at § 1517(c)(1)(A).

Once TRLED has concluded its investigation, and should it make an affirmative evasion determination, EAPA permits interested parties to seek *de novo* administrative review of that determination. ORR, also within Customs' Office of Trade, conducts this review and must issue an administrative review determination within 60 business days. 19 U.S.C. § 1517(f).

Thereafter, parties may seek judicial review in this Court of TRLED's evasion determination and ORR's review of that determination in this Court. *Id*. at § 1517(g)(1).

**B.    Standard of Review**

This Court's review entails whether CBP's "determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(1)-(2).

To survive review under the arbitrary and capricious standard, CBP's determination must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency acts arbitrarily and capriciously when it fails to "consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or {the decision} is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *State Farm*, 463 U.S. at 43. "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing the relevant factors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).

Following *Loper Bright*, agency interpretations of statutory provisions are no longer entitled to any presumption of deference. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Instead, "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," and when reviewing an agency's statutory construction, must ask whether that interpretation reflects "the best reading of the statute." *Id.* at 412, 400; *see also Lashify, Inc. v. Int'l Trade Comm'n*, 130 F.4th 948, 957 (Fed. Cir. 2025).

This change applies with full force to this Court's review under EAPA, which directs the Court to examine, amongst other things, whether CBP's determination, finding or conclusion is "otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2). As this Court recently explained:

> Previously, under *Chevron* deference, "ambiguous" statutes were treated as "implicit" delegations of authority to agencies, which had authority to "fill any gap{s}" in the statute with "reasonable" interpretations. *Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778 (quotation omitted). However, *Loper Bright* held that statutory ambiguity "is not a delegation to anybody," and courts should not "defer" to an agency's interpretation when faced with an unclear statute.

*Tenaris Bay City, Inc. v. United States*, 789 F.Supp.3d 1352, 1364 (Ct. Int'l Trade June 20, 2025) (citing *Loper Bright*, 603 U.S. at 400). The statutory language is the starting point for any analysis

12

and typically controls the outcome. *See id.* The Court must "use{} every tool at their disposal to determine the best reading of the statute and resolve the ambiguity {in the statute}." *Id.*

### C. CBP's Evasion Determination is Arbitrary and Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law Because it Rests on an Erroneous Premise that Chinese-Origin Mother Pipe Falls Within the Literal Scope of the OCTG Orders

At the outset, CBP's evasion determination must be remanded as it rests upon an erroneous premise: that Chinese-origin hollow billet used to produce OCTG is itself covered by the physical scope description of the OCTG orders. In a recent circumvention inquiry of certain OCTG from Thailand, the Department of Commerce ("Commerce") unequivocally found otherwise, that **hollow billets are not in-scope OCTG**. Because Commerce is the administering authority with respect to determining the scope of AD/CVD orders, its finding on this issue controls. *See Sunpreme, Inc. v. United States*, 946 F.3d 1300 (Fed. Cir. 2020).

Here, as discussed below, CBP's evasion determination was clearly grounded upon findings that: (1) Energy Pipe imported OCTG from TOP that was produced using hollow billets (*i.e.,* "mother pipe"); and (2) the hollow billets used by TOP to produce OCTG matched the written physical description of the OCTG Orders. TRLED Determination at 50, C.R.374, P.R.522; ORR Final Determination at 23, C.R.395, P.R.612. Because this Court's review is strictly confined to the rationale set forth by the agency in its decision, it cannot sustain CBP's erroneous determination. The Supreme Court has made clear:

> {A} simple but fundamental rule of administrative law . . . is . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action.

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962) (citing *Securities & Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

### 1.    TRLED's Decision

Specifically, TRLED, while acknowledging that TOP may have produced some OCTG from [            ] billets, drew an adverse inference against TOP due to its failure to cooperate. In doing so, CBP inferred that all the OCTG TOP exported into the United States, including OCTG imported by Energy Pipe, were produced using Chinese-origin mother pipe. TRLED Determination at 43, C.R.374, P.R.522. CBP found that because mother pipe "are pipes, and as such, are hollow and circular by definition" and "meet the description of covered merchandise based on the plain language of the scope of OCTG when they entered Thailand," *id.* at 7-8, all of Energy Pipe's entries of OCTG into the United States from TOP during the POI were Chinese-origin OCTG transshipped through Thailand. *Id.* at 66.

### 2.    ORR's Decision

ORR affirmed TRLED's determination. While ORR claimed that its determination was not based on an adverse inference against TOP, its affirmance was nevertheless based upon the same flawed premise relied upon by TRLED. Specifically, finding that there was a lack of "sufficient information that would allow CBP to trace whether each specific order of finished OCTG that TOP produced for Energy Pipe . . . used [            ] billets instead of in-scope 'mother pipe,'" including whether a [            ] occurred, ORR concluded that "there is substantial evidence that the 'mother pipe' from China and the finished OCTG produced therefore by TOP in Thailand and subsequently shipped to the United States and imported by Energy Pipe . . . are covered by the scope of the AD/CVD Orders." ORR Final Determination at 23-24, C.R.395, P.R.612.

14

### 3.    Commerce's Determination

CBP's position that hollow billet from China is itself in-scope OCTG is erroneous. Commerce squarely rejected that proposition in its recently issued final circumvention determination involving OCTG from Thailand, finding that "**there is no evidence on the record that the scope of the Orders specifically includes OCTG produced in third countries from hollow billets from China.**" *Oil Country Tubular Goods From the People's Republic of China*, 91 Fed. Reg. 9,811 (Dep't Commerce Feb. 27, 2026) (affirmative determination of circumvention) (hereinafter *OCTG from China*) and accompanying Issues & Decision Memorandum at 6 (hereinafter "OCTG Circumvention IDM").

To be sure, in a circumvention inquiry, Commerce analyzes whether a product outside an order's literal scope should nevertheless be included within the scope to prevent circumvention of antidumping and countervailing duty orders. *See U.K. Carbon and Graphite Co., Ltd. v. United States*, 931 F. Supp.2d 1322, 1300 (Ct. Int'l Trade 2013). Because it would be unnecessary to conduct such an inquiry on product falling within the literal scope of the orders, the domestic interested parties, who were represented by same counsel as the Alleger in the underlying EAPA investigation, argued that hollow steel billets should be excluded from Commerce's circumvention inquiry. Commerce, however, found the domestic interested parties' arguments on this issue to be unpersuasive:

> We therefore find the argument that hollow billets used as inputs by PET are conclusively covered by the scope of the Orders based on HTSUS subheadings to be unavailing. Further we cannot determine that hollow billets further processed into OCTG in a third country are within the scope of the Orders without doing a substantial transformation and country-of-origin analysis under 19 CFR 351.225(j), and as explained above, no party made such a request in this proceeding.

15

OCTG Circumvention IDM at 7.  In other words, as Commerce found, **neither hollow nor solid billets are expressly included in the OCTG Orders**.

It is worth noting that although Commerce ultimately concluded that Chinese-origin steel billets are circumventing the orders through minor or insignificant processing in Thailand, CBP cannot rely on this conclusion to salvage its evasion determination against Energy Pipe.  *See id.* at 12.  That is because circumvention was not the ground invoked by CBP in reaching its evasion determination in the first instance and it cannot now rely upon Commerce's determination as a basis for its determination during this litigation.  *Ad Hoc Shrimp Trade Enforcement Committee v. United States*, 578 F. Supp.3d 1310, 1321 (Ct. Int'l Trade 2022) (post hoc rationalization of agency action is insufficient when CB fails to address how its action complies with the applicable regulations).

In any event, Energy Pipe's entries would not be subject to Commerce's circumvention determination.  Commerce's circumvention determination applies only prospectively to OCTG entered after Commerce provided notice of its initiation of this inquiry, *i.e.*, December 18, 2024.  *See OCTG from China*, 91 Fed. Reg. at 9,811 ("Commerce will direct CBP to suspend liquidation and to require a cash deposit of estimated duties on unliquidated entries of inquiry merchandise that were entered, or withdrawn from warehouse, for consumption, on or after December 18, 2024, the date of publication of the initiation of this circumvention inquiry in the Federal Register"); 19 C.F.R. § 351.226(l); *AMS Assocs. v. United States*, 737 F.3d 1338, 1344 (Fed. Cir. 2013) ("when Commerce 'clarifies' the scope of an existing antidumping duty order that has an unclear scope, the suspension of liquidation and imposition of antidumping cash deposits may not be *retroactive* but can only take effect 'on or after the date or the initiation of the scope inquiry'").  Energy Pipe ceased importing OCTG from Thailand prior to Commerce's December 18, 2024 notice of

16

initiation.  CBP therefore cannot establish (through Commerce's circumvention determination) that Energy Pipe avoided payment of applicable AD/CVD cash deposits at the time its subject entries were made, a requisite element for an affirmative finding of evasion under EAPA.  19 U.S.C. § 1517(a)(5)(A).

### D.     CBP Erred in Using an Adverse Inference Drawn Against TOP to Reach an Evasion Determination with Respect to Energy Pipe

Even apart from the scope error, the Court should remand CBP's evasion determination because it relied upon an adverse inference that it drew against TOP – that its OCTG production used only hollow billets – to reach its evasion decision with respect to Energy Pipe, a fully cooperating U.S. importer.  CBP's application of an adverse inference in this manner does not withstand scrutiny.

*First*, as discussed below, the statute clearly indicates that application of an adverse inference is person-specific.  It does not allow for a sweeping use of that adverse inference against cooperating importers.  *Second*, even if permissible, CBP's application of that adverse inference was unreasonable given the substantial contradictory record evidence showing that Energy Pipe did not evade the OCTG orders.  As the record clearly showed, the OCTG imported by Energy Pipe was produced by TOP in Thailand using **Chinese-origin [              ] billets,  not mother pipe as CBP inferred**.  CBP failed to identify any record information demonstrating an opposite conclusion, and importantly, unlike its view that mother pipe was in-scope OCTG, it neither considered nor found that OCTG produced from [              ] billets were covered by the literal scope of the OCTG Orders.  *See generally* TRLED Determination, C.R.374, P.R.522; ORR Final Determination, C.R.395, P.R.612.  For both of the foregoing reasons, CBP's reliance upon its adverse inference against TOP cannot be sustained.

17

### 1. CBP Misinterpreted the Statute

CBP's determination, which is based upon an adverse inference drawn against TOP, runs afoul of the plain language of the statute. EAPA's adverse inference provision states:

> If the Commissioner finds that party or person . . . has failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information, the Commissioner may, in making a determination . . . use an inference that is adverse to the interests of that party or person in selecting from among the facts otherwise available to make the determination.

19 U.S.C. § 1517(c)(3)(A). The statute further allows CBP to use an inference that is adverse to that non-cooperating person "without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought." *Id*. at § 1517(c)(3)(B).

It is unquestioned that Energy Pipe provided "full cooperation" in CBP's investigation: both TRLED and ORR found as much. TRLED Determination at 65-66, P.R.522; ORR Final Determination at 27, C.R.395, P.R.612. However, citing to section 1517(c)(3)(B), CBP attempts to extrapolate the statute's "without regard to. . ." language to authorize collateral consequences of an adverse inference to a foreign producer or exporter to cooperating importers. Specifically, TRLED stated that "the importer's full cooperation and provision of those documents do not affect CBP's application of an adverse inference against the interests of the foreign manufacturer or exporter or the consequences of that inference." TRLED Determination at 65-66, P.R.522. ORR, in affirming TRLED's determination, agreed that the "EAPA statute and the regulations promulgated thereunder do not require CBP to ensure that a cooperative party will not experience collateral consequences for another party's failure to cooperate." ORR Final Determination at 27, C.R.395, P.R.612.

18

**PUBLIC VERSION**

The express scope of the provision, however, does not authorize application of an adverse inference in such a sweeping manner. Rather, it is limited to specific persons – only to those that do not cooperate. 19 U.S.C. § 1517(c)(3). CBP's reliance upon section 1517(c)(3)(B) to find otherwise is unavailing. That subsection does not expand the use of an adverse inference in such a broad manner that would impact a cooperating importer. Rather, it simply permits CBP to draw an adverse inference to the non-cooperating person even when another person provided the required information. In other words, the language makes clear that instead of operating as a gap-filling tool, CBP's adverse inference provision is a person-specific mechanism to address a person's non-cooperation. *See H&E Home, Inc. v. United States*, 714 F. Supp.3d 1353, 1358 (Ct. Int'l Trade 2024).

The statute's legislative history confirms a narrow application of adverse inferences to address non-cooperation that hinders CBP from rendering an evasion determination:

> CBP is also specifically authorized to issue questionnaires to collect information on alleged evasion because there has been uncertainty about whether it currently has such authority. The Committee expects CBP to fully use this authority. To ensure that persons provide requested information, CBP is given the authority to make an adverse inference against a person that fails to cooperate in providing requested information regarding evasion.

H. Rep. No. 114-114 at 81 (May 14, 2015). This deterrent purpose is defeated when the consequence of the adverse inference is not borne by TOP, the non-cooperating party, but rather entirely by Energy Pipe, a cooperating importer. Indeed, Energy Pipe alone bears the burden of paying retroactive duties for its OCTG entries from TOP made during the period of investigation. Had Congress intended the adverse inference to operate broadly such that it could collaterally impact any party to the investigation as CBP claims, it would have clearly indicated as such within the statute's text, but it did not do so.

19

Notably, Energy Pipe stands in stark contrast to certain other importers in the underlying consolidated EAPA investigation, which unlike Energy Pipe, were found by CBP to have withheld information or undervalued or misclassified their entries. CBP applied adverse inferences to those importers in addition to the adverse inferences it applied to TOP and the other non-cooperating Thai producer, Petroleum Equipment (Thailand) Co., Ltd. ("PET"). TRLED Determination at 28-30, 35-41, P.R.522. While CBP's use of adverse inferences to reach affirmative evasion determinations against those importers it found to have been non-cooperative may well have been lawful, doing so in reaching an evasion determination against cooperating importers like Energy Pipe was an impermissible construction of the statute.

### 2. CBP's Broad Reliance on an Adverse Inference Against TOP to Find Evasion Against Energy Pipe was Unreasonable

In addition to misapplying the statute, CBP acted unreasonably in relying on the adverse inference drawn against TOP that all of its OCTG were produced using mother pipe to reach its evasion determination against Energy Pipe. Substantial contradictory record evidence demonstrates that Energy Pipe's imports of OCTG from TOP were produced from [          ] billets, not mother pipe. CBP's failure to address this contradictory evidence renders its determination arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

The decision to apply an adverse inference is discretionary, not mandatory. 19 U.S.C. § 1517(c)(3)(A) ("the Commissioner may . . . use an inference that is adverse"). But "may" however does not give Customs carte blanche. *H&E*, 714 F. Supp.3d at 1380. In exercising this discretion, CBP may not "bypass{} the prerequisite factual findings to reach a legal conclusion," as it remains obligated "to make determinations that are supported by a reasonable reading of the record, including consideration of relevant evidence that 'fairly detract[s]' from the reasonableness of its

conclusions." *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp.3d 1334, 1350 (Ct. Int'l Trade 2016) (interpreting Commerce's similar adverse facts available provision, 19 U.S.C. § 1677e(a)-(c)).

### 3. Substantial Evidence Requires CBP to Consider The Record as a Whole, including Detracting Evidence

EAPA, in fact, requires CBP to base an evasion determination on "substantial evidence." 19 U.S.C. § 1517(c)(1). Substantial evidence "requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015)). Thus, even when it elects to apply an adverse inference against a non-cooperating foreign producer or exporter, it must still address material record evidence in its analysis that detracts from its finding in reaching its evasion determination. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (the substantiality of evidence "must take into account whatever in the record fairly detracts from its weight").

Notably, in similar cases where it has applied an adverse inference against a non-cooperating foreign producer or exporter, CBP examined the record as a whole and made independent findings that supported its finding of evasion as to the specific importer. *See, e.g., Superior Commercial Solutions v. United States*, 811 F.Supp.3d 1363 (Ct. Int'l Trade 2025) (observing that the importer conceded that approximately one-third of the shipments it received from the foreign producer contained covered Chinese quartz slabs); *Skyview Cabinet USA, Inc. v. United States*, 2023 WL 4073781 (Ct. Int'l Trade 2023) ("the existence of various discrepancies and omissions with respect to the RFI responses {of U.S. importer Skyview} . . . also called into question the accuracy of information provided" and "Skyview does not point to specific information on the record that it provided that might lessen any collateral consequences to *Skyview*

21

of Customs' decision to draw an adverse inference against Rowanda"); *Leco Supply, Inc. v. United States*, 619 F. Supp.3d 1287 (Ct. Int'l Trade 2023) (plaintiff importers' documents contained inconsistencies regarding production capabilities and the certificates of origin, Customs declarations, and trucking and payment records, appeared on their face to be counterfeit); *All in God Faith, Inc. v. United States*, 589 F. Supp.3d 1238, 1251 (Ct. Int'l Trade 2022) (plaintiff importers knew that their imports were xanthan gum produced in China rather than India).

CBP should have done the same here.  It acted arbitrarily by disregarding the substantial contrary record evidence regarding Energy Pipe's entries.  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (an agency action is arbitrary when the agency fails to provide sufficient reasons in treating similar situations differently).

### 4.      Substantial Contradictory Evidence Undermines CBP's Evasion Finding as to Energy Pipe

During the underlying administrative proceedings, Energy Pipe identified substantial record evidence demonstrating that the OCTG it imported from TOP were produced from [

] billets, not mother pipe.  *See* Energy Pipe Response to Written Argument at 8-13 (Jan. 6, 2025), C.R.372, P.R.517; Energy Pipe Request for Administrative Review at 16-22 (Apr. 7, 2025), C.R.379, P.R.542.  CBP never questioned that [              ] billets fall outside the literal scope of the OCTG orders and undergo a substantial transformation into finished OCTG.  Nor did it find otherwise.  Consequently, the critical question in CBP's evasion determination was whether Energy Pipe's OCTG was produced from [              ] billets or mother pipe.

Here, substantial record evidence, including CBP's own on-site verification of TOP's production facilities, supported that Energy Pipe's OCTG imports were produced from [

] billets.  *See* Verification Report, C.R.352, P.R.457.  During verification, CBP confirmed TOP's production of OCTG from [              ] billets in a [     ]-step process beginning with

22

[                                    ], proceeding to [                                    ], and followed by [                                    ].   Verification Report at 21-23, Attachment VII, C.R.352, P.R.457.  CBP observed factory workers "actively participating in various production processes" converting [            ] billet into OCTG.  Moreover, as CBP noted, the workers operating the machinery "were able to demonstrate their knowledge of the machinery and showed example records that were produced from their tests." *Id*. at 22-23.  CBP further observed that "the factory was covered in steel debris and dust, which is indicative of a factory that operates regularly." *Id*. at 23.

CBP also verified TOP's record-keeping process.  *See id.* at 25.  TOP provided all relevant information including [

                                    ].  As CBP observed, TOP's records generally included [      ] categories of information beginning with:  [

                                                                                    ].

*See id.* at 24-25.  CBP found no "major discrepancies" in value, weight, and quantities in the documents provided.  *See id.* at 26.

These records showed that TOP purchased a sufficient quantity of [                ] billet to produce OCTG for both Energy Pipe and Trek Metals, the two importers TOP confirmed purchased pipe produced from [                ] billets.  Specifically, as demonstrated by the documents, TOP purchased [            ] MT of [                ] billet in 2023. TOP Verification Exhibit 3, C.R.340, P.R. 453.  Also that year, Energy Pipe imported [                ] MT of OCTG

23

**PUBLIC VERSION**

from TOP, and Trek Metals imported [          ] MT of OCTG produced by TOP – for a total

of [          ] MT of OCTG – well below the amount of [          ] billet purchased by TOP

to produce OCTG.  Energy Pipe Supplemental RFI Response at Attachment 66A (revised import

list), C.R.311, P.R.420; Trek Metals Written Arguments at 8 and Exhibit 2, C.R.358, P.R.481.

Moreover, the records demonstrated that TOP carefully tracked its production of OCTG

from these [          ] billets.  It signed separate contracts with [

] to purchase [          ] billet and Chinese mother pipe.  *Compare* TOP Verification

Exhibit 19 at 3-4, 36-37, and 77-78 ([                    ]), C.R.332, P.R.453 *with*

TOP Verification Exhibit 21 at 37-38 ([                    ]), C.R.335, P.R.453.  It also

used different product codes in its inventory records for [          ] billets ([

]) and mother pipe ([          ]).  TOP Verification Exhibit 18, C.R.331,

P.R.453; TOP Verification Exhibit 22 at 53, C.R.338, P.R.453.

Finally, the records indicated that each [          ] billet was assigned a [          ]

and corresponding [                    ], allowing for direct traceability of

the [          ] billets used by TOP to produce OCTG that were then imported by Energy Pipe.

Indeed, Energy Pipe had ten entries of OCTG from TOP during the POI, and for each entry, the

record contained the following document trail linking the [          ] billet inputs to finished

OCTG that was then imported by Energy Pipe:

| Document Description | Significance | |
|---|---|---|
| [ | | ] |
| [ | | ] |

24



*Source*:  TOP's Verification Exhibit 23, C.R.347, P.R.453; Energy Pipe Initial RFI Response at Attachments 81, 89, 97, 99, 105, 107, 130, 133, 135, 137, & 139, C.R.52, 54, 155, 163, 172, 174, 226, 229, 231, 233, & 235.

The nature of TOP's documented production steps further corroborates that the OCTG imported by Energy Pipe were made from [          ] billets.  Those steps include [

], which CBP expressly recognized was unnecessary for mother pipe in its verification report:  "**{M}other pipes have already been heat-treated and do not undergo any additional heat treatment.**" Verification Report at 20, 25, C.R.352, P.R.457.  If TOP had used mother pipe from China as CBP inferred, the [            ] would not have included the additional [

] steps for the OCTG it produced for Energy Pipe.  Instead, the record, which contains [

] processes for each of Energy Pipe's entries aligns with the fact that Energy Pipe's OCTG were produced from [        ] billets.

### a.    TRLED's Decision

TRLED itself conceded that "TOP may have a relatively [      ] degree of OCTG production that **uses [           ] billets in Thailand and qualifies as Thai-origin OCTG**," but then unreasonably found that no reliable evidence exists to indicate which of the importers' OCTG entries from TOP were produced from [          ] billets or from Chinese-origin mother pipe." TRLED Determination at 43, C.R.374, P.R.522 (emphasis added).  TRLED's finding of

"unreliability," however, was based only on documents related to an import entry by a completely different importer, Trek Metals, finding that Trek Metals and TOP provided [

] from [                                                  ] for the same entry.  Based on this one transaction between TOP and Trek Metals, TRLED assumed that "not all of TOP's documents were valid." *Id*. at 12, 57.

That reasoning cannot serve as substantial evidence of evasion by Energy Pipe, a completely different and unrelated importer to that flagged transaction.  *See, e.g., Ad Hoc Shrimp Trade Enforcement Committee v. United States*, 632 F. Supp.3d 1359, 1381 (Ct. Int'l Trade 2023) (finding TRLED's evasion determination to be unreasonable because it was based on a finding of evasion on one shipment, when substantial other record evidence demonstrated that the foreign producer had a product tracing system to ensure the shrimp covered by the orders were not shipped to the United States).  At a minimum, CBP was required to consider and address the specific record evidence pertaining to Energy Pipe's transactions, as it did in *Superior Commercial Solutions*, 2025 WL 3296054; *Skyview*, 2023 WL 4073781; *Leco Supply*, 619 F. Supp.3d 1287; and *All in God Faith*, 589 F. Supp.3d 1238.  CBP's failure to do so was unreasonable and warrants a remand.

### b.    ORR's Decision

Like TRLED, ORR failed to address detracting record evidence reviewed above demonstrating clear traceability of the [              ] billet that was transformed by TOP into OCTG and imported by Energy Pipe.  Instead, ORR faults TOP for not providing documentation for all the production steps, including [

].    ORR Final Determination at 23, C.R.395, P.R.612.    According to ORR, "{w}ithout a document showing that a [                ] occurred, it is impossible to confirm whether TOP used [                                        ] to produce finished OCTG to fulfill particular purchase orders." *Id*.  ORR's concerns are unfounded.

26

As an initial matter, the record did contain documents showing that a [                    ] occurred to transform the [                ] billets into the OCTG imported by Energy Pipe. *See, e.g.,* Energy Pipe CF28 Response Part 7, C.R.24, P.R.45; TOP Initial RFI Response at Ex 51, C.R.245, P.R.324.  Moreover, regardless of whether the record contained documents for each of the [     ] steps in TOP's production processes, the essential documents were produced that clearly linked each [             ] billet by [                                    ] to Energy Pipe's entries of OCTG.

Instead of confronting this detracting evidence, ORR informed that if some entries did not contain subject merchandise, the "proper recourse to challenge CBP's assignment of duties on an entry-by-entry basis {is} via protest."  ORR Final Determination at 23-24, C.R.395, P.R.612.  CBP misses the point. Notwithstanding that TOP produced a proportion of its OCTG using mother pipe for other importers, the record contained a clear document trail providing dispositive evidence that *all* of Energy Pipe's OCTG were produced using [             ] billets, and that substantial evidence therefore demonstrated that Energy Pipe did not evade the orders.

E.     **CBP Violated the Law By Failing to Initiate the EAPA Investigation within the Mandatory 15-Business Day Statutory Timeframe After Receipt of an Allegation**

In addition to the aforementioned errors, CBP also violated the law by failing to initiate this EAPA investigation within the 15-business day timeframe after receipt of an allegation as required under the statute.  Section 1517(b)(1) states:

> Not later than 15 business days after receiving an allegation described in paragraph (2) or a referral described in paragraph (3), the Commissioner **shall initiate** an investigation if the Commissioner determines that the information provided in the allegation or the referral, as the case may be, reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion.

27

19 U.S.C. § 1517(b)(1) (emphasis added).  The statute is clear that CBP must act within the strict time period set forth in the statute, 15 business days after receiving an allegation, either determining that the allegation reasonably suggests evasion and initiating an investigation or declining to do so.

This Court in *Superior Commercial Solutions* recently confirmed the mandatory nature of the statute's 15-business day time limitation, emphasizing that "shall" means "shall," and "shall" is a mandatory statutory obligation.[3]  *Superior Commercial Solutions,* 811 F.Supp.3d at 1372.  As the Court recognized, the U.S. Supreme Court has repeatedly held that "{t}he first sign that the statute imposed an obligation is its mandatory language: 'shall.'"  *Id.* (quoting *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020)).  "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."  *Id.* (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) and *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)).  Consistent with this precedent, this Court held that the 15 business-day deadline set forth in the statute "is mandatory, not optional."  *Id.*

Notwithstanding the statute's clear mandatory language, CBP promulgated EAPA regulation 19 C.F.R. § 165.12, which provides it wide latitude to initiate an EAPA investigation 15 business days after it *acknowledges receipt*:

> The 'date of receipt' of a properly filed allegation is the date on which {Customs} provides an acknowledgement of receipt of an allegation containing all the information and certifications required in § 165.11, together with a {Customs}-assigned control number, to the party that filed the allegation.  {Customs} has 15 business days from the date of receipt to determine whether to initiate an investigation under the EAPA.

---

[3] The government appealed *Superior Commercial Solutions* to the U.S. Court of Appeals for the Federal Circuit.  *See* CAFC Case No. 26-1376.  The appeal was docketed on January 26, 2026, and the parties have yet to file briefs.

19 C.F.R. § 165.12. This Court explained in *Superior Commercial Solutions* that CBP's regulation permits it "unfettered flexibility" to "acknowledge" receipt of the allegation, thus potentially delaying initiation of an EAPA investigation past the 15-business day after receipt of an allegation timeframe set forth in the statute. The Court therefore held that, to the extent that it allows Customs to extend and alter Congress' mandatory 15-business day deadline for an unlimited time, CBP's regulation is unlawful. *Superior Commercial Solutions,* 811 F.Supp.3d at 1371-73.

Here, CBP relied upon its unlawful regulation to permit it to start the clock to initiate the investigation from the time it "acknowledged receipt" of the allegation rather than when it actually received the allegation, thus violating the statutory timeframe to initiate. Specifically, CBP received the U.S. OCTG Manufacturers Association's EAPA allegation against Energy Pipe on January 18, 2024. *See* EAPA Allegation, C.R.5, P.R.5. CBP was required to initiate an EAPA investigation 15-business days after receipt of that allegation, by February 8, 2024. CBP, however, did not even acknowledge "receipt" of this allegation until four days past the deadline, on February 12, 2024, and then initiated the EAPA investigation on February 23, 2024. *See* EAPA Receipt Report, C.R.15, P.R.16; Internal Email Initiation of the EAPA Investigation, C.R.22, P.R.25.

CBP did not provide any justification on the administrative record for the delay in acknowledging receipt of the allegation or in initiating the EAPA investigation. There is, in any event, no tolling of the 15-business day deadline. By belatedly acknowledging receipt and initiating the EAPA investigation out of time on February 23, 2024, CBP acted unlawfully by extending the resolution of the EAPA case by more than two weeks.

**F.     CBP Violated Energy Pipe's Due Process Right to Notice of Investigation Prior to Imposition of Interim Measures**

CBP also violated Energy Pipe's due process right to timely notice of the EAPA investigation. CBP withheld notice of the investigation for *98 days* after its belated initiation of

the investigation, failing to provide notice until May 31, 2024, when it assessed interim measures. These interim measure entailed: (1) suspension of liquidation of each unliquidated entry that entered on or after February 23, 2024; (2) extension of the liquidation period for each unliquidated covered entry made before February 23, 2024; (3) additional revenue-protection measures, including a single-transaction bond, additional security, or a cash deposit as it deems necessary; (4) live entry, rejection of entry summaries that do not comply, and refiling where still within the rejection period; and (5) potential addition enforcement action.  *See* Initiation Notice, C.R.33, P.R.77.

Under the Due Process Clause of the Fifth Amendment, however, "{n}o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.  The purpose of ensuring fair decision making "is to protect {the individual's} use and possession of property from arbitrary encroachment to minimize substantively unfair or mistaken deprivations of property." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).  It is "well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation.'" *Id*. at 85.

The Due Process Clause generally guarantees those procedures set forth in the statute and the agency's regulations. *Gulf States Tube Div. of Quanex Corp. v. United States*, 981 F. Supp. 630, 652 (1997).  Here, the EAPA statute is silent regarding notice to the importer that is the target of the EAPA investigation until TRLED's determination is issued.  19 U.S.C. § 1517(c)(4).  But that silence does not mean that no notice is required.  Indeed, "{t}he right to due process does not depend on whether statutes and regulations provide for what is required by the {C}onstitution." *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1260 (Fed. Cir. 2023).

As precedent dictates, participants in antidumping proceedings are entitled to the due process right to notice and a meaningful opportunity to be heard, which may extend beyond

Commerce's statutory and regulatory obligations. *See Transcom, Inc. v. United States*, 121 F. Supp.2d 690 (Ct. Int'l Trade 2000), *aff'd* 294 F.3d 1371 (Fed. Cir. 2002). Notice is constitutionally sufficient only if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Transcom*, 294 F.3d at 1380. And the opportunity to be heard must be afforded "at a meaningful time and in a meaningful manner." *Royal Brush Mfg., Inc. v. United States*, 483 F. Supp.3d 1294 (Ct. Int'l Trade 2020) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

Here, meaningful and prompt notice apprising interested parties of the investigation would have been at the time CBP initiated the investigation, and certainly before CBP's imposition of interim measures. *See Superior Commercial Solutions*, 811 F.Supp.3d at 1376 (a meaningful opportunity to respond should happen before a temporary deprivation takes effect, not afterwards). Instead, CBP relied on its regulation, 19 C.F.R. § 165.15(d)(1), which permits notice only "five business days after day 90 of the investigation" in cases where interim measures are taken. The regulation, however, is unlawful to the extent that it denies the party under investigation the opportunity to submit any evidence or offer any administrative arguments in its defense prior before the temporary deprivation takes effect. *Superior Commercial Solutions*, 2025 WL 3296054 at *10.

Because CBP failed to provide prompt notice of the investigation and imposed interim measures before informing Energy Pipe of the allegations or giving it any meaningful opportunity to be heard, CBP acted contrary to law and violated Energy Pipe's due process rights.

IV.    **CONCLUSION**

For the foregoing reasons, Energy Pipe respectfully requests that this Court find that CBP's evasion determination was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law. Accordingly, Energy Pipe asks that this Court to grant its motion for

31

judgment and remand CBP's determination for further proceedings consistent with the Court's

order and opinion in this matter.


Date: April 10, 2026

*/s/ Lydia C. Pardini__          _____*
Lydia C. Pardini
Deanna Tanner Okun
Dominic L. Bianchi
Jane C. Dempsey
Alissa M. Chase
Joonho Hwang
**Polsinelli PC**
1401 I ("Eye") Street, NW
Suite 800
Washington, DC 20005
Tel: 202-626-8329
Email: dtokun@polsinelli.com

*Counsel to Energy Pipe & Equipment
Rentals, LLC*

**PUBLIC VERSION**

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Chambers Procedures of this Court, that this brief complies with the word count limitation.  Specifically, excluding those exempted portions of the brief as set forth in 2(B)(1) of the Chambers Procedures (*i.e.,* the table of contents, table of authorities, and counsel's signature block), this brief contains 9,626 words, as calculated by the word processing system (Microsoft Word) used to prepare this brief.

*/s/ Lydia C. Pardini*_____ _____
Lydia C. Pardini
**Polsinelli PC**
*Counsel to Counsel to Energy Pipe*
*& Equipment Rentals, LLC*