**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

|  |  |
|---|---|
| CENTRIC PIPE LLC, <br><br> *Plaintiff,* <br><br> LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, and KANA ENERGY SERVICES, INC. <br><br> *Consolidated-Plaintiffs,* <br><br> v. <br><br> THE UNITED STATES, <br><br> *Defendant,* <br><br> U.S. OCTG MANUFACTURERS ASSOCIATION, <br><br> *Defendant-Intervenor.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Consol Ct. No. 25-00182 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFF KANA ENERGY SERVICES, INC.

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Kana Energy Services, Inc. ("Kana" or "Plaintiff") hereby moves this Court for judgment on the agency record. Kana seeks judicial review of the following decisions that U.S. Customs and Border Protection ("CBP") issued in the underlying administrative proceeding, Enforce and Protect Act ("EAPA") Consolidated Case Number 7890: CBP's Trade Remedy & Law Enforcement Directorate ("TRLED") Notice of Final Determination as to Evasion (Feb. 24, 2025) ("February TRLED Determination") and CBP's Office of Trade, Regulations & Rulings ("RR") Final Administrative Review Determination, Case Number H346715 (July 2, 2025), affirming the February TRLED Determination. *See* Letter from TRLED, Notice of Final Determination as to

Evasion, in EAPA Consolidated Case Number 7890 (Feb. 24, 2025) ("*TRLED Det.*"), C.R. 374, P.R. 522; *see also* Letter from RR, Final Administrative Determination, Case Number H346715, EAPA Consolidated Case Number 7890 (July 2, 2025) ("*RR Decision*"), C.R. 395, P.R. 612. These determinations cover the allegation of evasion of the antidumping ("AD") duty and countervailing duty ("CVD") order on oil country tubular goods ("OCTG"). *Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 20335 (Dep't Commerce Apr. 19, 2010) (final affirm. LTFV determ. & final affirm. determ. of critical circum. and targeting dumping), as amended in *Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 28551 (Dep't Commerce May 21, 2010); *Certain Oil Country Tubular Goods from the People's Republic of China*, 74 Fed. Reg. 64045 (Dep't Commerce Dec. 7, 2009) (final affirm. CVD determ. & final negative determ. of critical circum.), as amended in *Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 3203 (Dep't Commerce Jan. 20, 2010) (collectively, the "*AD/CVD Orders*"). As discussed in the Rule 56.2 Memorandum in Support of Motion for Judgment on the Agency Record, Kana seeks judgment on the agency record because the February TRLED Determination and *RR Decision* is not supported by substantial evidence and was arbitrary, capricious and not accordance with the law for the following reasons.

First, the record does not support CBP's finding that Kana imported "covered merchandise" within the meaning of the February TRLED Determination and *RR Decision*. Even if CBP's record contains evidence that Thai Oil Pipe Co., Ltd. ("TOP") used Chinese-origin "mother pipe" to produce some of its OCTG, the record does not demonstrate that the specific OCTG sold to Kana was produced from that mother pipe rather than from billets. TOP's facility was verified by CBP to be an active, operational manufacturing facility capable of producing

OCTG from billets, and the on-site verification report confirms that TOP demonstrated its production capabilities. CBP's conclusion that all OCTG produced by TOP should be treated as covered merchandise is a blanket inference unsupported by the record and contrary to the requirement that any evasion determination be based on substantial evidence.

Second, CBP failed to make the required finding that Kana made a material false statement or act, or a material omission, as required by the second element of the statutory definition of evasion. Kana relied on government-issued certificates of origin from the Thai Chamber of Commerce, API certifications, verifications, audits, and certifications from its U.S. customer who had visited TOP's facilities, and other documentation to determine that the OCTG was produced in Thailand. Kana exercised the reasonable care required of importers under 19 C.F.R. pt. 171, app. B(D)(6).

Third, CBP's application of adverse inferences against Kana was arbitrary and capricious. Kana cooperated fully and to the best of its ability throughout the investigation, responding to all Request for Information ("RFI") and supplemental RFI questionnaires and participating in all proceedings. CBP's alleged basis for adverse inferences, that Kana made material false statements, is itself unsupported by the record.

Fourth, CBP violated its statutory mandate under 19 U.S.C. § 1517(b)(1) by failing to initiate the investigation within 15 business days of receiving the allegation. This Court has held that this deadline is mandatory and that CBP's regulation at 19 C.F.R. § 165.12 is contrary to law to the extent it allows CBP to extend and alter the statutory deadline indefinitely.

Fifth, CBP violated Kana's due process rights under the Fifth Amendment by imposing interim measures without providing Kana an opportunity to submit factual information or written arguments beforehand.

Kana, therefore, respectfully requests that this Court:

1.  Hold that TRLED's and RR's final determinations are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

2.  Declare TRLED's and RR's final determinations unsupported by substantial evidence;

3.  Order CBP to liquidate Kana's entries of OCTG imported from TOP in Thailand without the addition of antidumping or countervailing duties;

4.  In the alternative, remand this matter to CBP with instructions to reconsider its evasion determination consistent with the Court's opinion;

5.  Grant such additional relief as the Court may deem just and proper.

For the reasons described in this Motion and the accompanying Rule 56.2 Memorandum in Support of Motion for Judgment on the Agency Record, Kana respectfully requests that this Court enter judgment in its favor. A proposed order is attached for this Court's consideration.

Respectfully submitted,

**/s/ John M. Gurley**
John M. Gurley
Katherine R. Afzal

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6479
Email: john.gurley@afslaw.com

*Counsel to Kana Energy Services, Inc.*

Dated: April 10, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | |
|---|---|
| CENTRIC PIPE LLC, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| | ) |
| LE COMMODITIES, LLC, TREK METALS, INC., | ) |
| ENERGY PIPE & EQUIPMENT RENTALS, LLC, | ) **NON-CONFIDENTIAL VERSION** |
| and KANA ENERGY SERVICES, INC. | ) |
| | ) Consol Ct. No. 25-00182 |
| *Consolidated-Plaintiffs*, | ) |
| | ) Confidential Business Proprietary |
| v. | ) Information Deleted from Pages 1, |
| | ) 10-12, 16, and 18. |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| U.S. OCTG MANUFACTURERS ASSOCIATION, | ) |
| | ) |
| *Defendant-Intervenor*. | ) |
| | ) |

**RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE
AGENCY RECORD OF PLAINTIFF KANA ENERGY SERVICES, INC.**

John M. Gurley
Katherine R. Afzal

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6479
Email: john.gurley@afslaw.com

*Counsel to Kana Energy Services, Inc.*

April 10, 2026

**TABLE OF CONTENTS**

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................................... 1

II.    STATEMENT PURSUANT TO CIT RULE 56.2 ................................................... 3

    A.     Administrative Determinations Subject to Judicial Review ................................. 3

    B.     Issues Presented ................................................................................ 3

III.   STATEMENT OF FACTS ................................................................................ 4

IV.    STANDARD OF REVIEW .............................................................................. 8

V.     ARGUMENT ............................................................................................. 9

    A.     CBP's Determination That the OCTG Imported by Kana Constitutes
    "Covered Merchandise" Is Not Supported by Substantial Evidence ..................... 9

        1.     The Record Does Not Demonstrate That the OCTG Sold to Kana
            Was Chinese-Origin Merchandise ............................................................ 10

        2.     TOP's Use of Both Billets and Mother Pipe Does Not Establish
            That Kana's Specific Purchases Were Covered Merchandise ................. 11

    B.     CBP Failed to Establish That Kana Made a Material False Statement, Act,
    or Material Omission as Required Under the EAPA Statute .............................. 14

        1.     The EAPA Requires a Showing of Culpability, and EAPA Is Not a
            Strict Liability Statute ................................................................... 14

        2.     Kana Exercised Reasonable Care in Determining That Its OCTG
            Was a Product of Thailand ........................................................... 16

        3.     CBP's Findings of False Statements Regarding Kana's Corporate
            Structure Are Unsupported and Immaterial ........................................... 18

    C.     CBP's Application of Adverse Inferences Against Kana Was Arbitrary,
    Capricious, and an Abuse of Discretion .............................................. 19

    D.     CBP Violated Its Statutory Mandate by Failing to Initiate the Investigation
    Within 15 Business Days of Receiving the Allegation ...................................... 21

    E.     CBP Violated Kana's Due Process Rights by Imposing Interim Measures
    Without Prior Notice or Opportunity to Be Heard .............................................. 23

VI.    CONCLUSION .......................................................................................... 25

VII.   PRAYER FOR RELIEF ............................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Enf't Comm. v. United States*,
632 F. Supp. 3d 1369 (Ct. Int'l Trade 2023) ...........................................................................13

*Ala. Aircraft Indus., Inc.-Birmingham v. United States*,
586 F.3d 1372 (Fed. Cir. 2009)...................................................................................................8

*Altx, Inc. v. United States*,
370 F.3d 1108 (Fed. Cir. 2004)...................................................................................................8

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984)...............................................................................................8, 9

*Brock v. Roadway Express, Inc.*,
481 U.S. 252 (1987).............................................................................................................23, 24

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*,
701 F.3d 1367 (Fed. Cir. 2012)................................................................................................21

*Coal. v. United States*,
415 F. Supp. 3d 1365 (Ct. Int'l Trade 2019) ...........................................................................19

*Consol. Bearings Co. v. United States*,
412 F.3d 1266 (Fed. Cir. 2005)...................................................................................................8

*Diamond Tools Tech. LLC v. United States*,
545 F. Supp. 3d 1324 (Ct. Int'l Trade 2021) ........................................................2, 14, 15, 16

*Diamond Tools Tech. LLC v. United States*,
609 F. Supp. 3d 1378 (Ct. Int'l Trade 2022) .............................................................2, 14, 15

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997).....................................................................................................9

*Grannis v. Ordean*,
234 U.S. 385 (1914).....................................................................................................................23

*Huaiyin Foreign Trade Corp. (30) v. United States*,
322 F.3d 1369 (Fed. Cir. 2003)...................................................................................................9

*Ikadan Sys. USA, Inc. v. United States*,
639 F. Supp. 3d 1339 (Ct. Int'l Trade 2023) ....................................................................12, 15

*Kingdomware Techs., Inc. v. United States*,
  579 U.S. 162 (2016)......................................................................................21

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..................................................................................15, 22

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)......................................................................................23

*Matsushita Elec. Indus. Co. v. United States*,
  750 F.2d 927 (Fed. Cir. 1984).........................................................................8

*Me. Cmty. Health Options v. United States*,
  590 U.S. 296 (2020)......................................................................................21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).........................................................................................8

*NEC Corp. v. United States*,
  151 F.3d 1361 (Fed. Cir. 1998).....................................................................23

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003).....................................................................19

*Royal Brush Mfg., Inc. v. United States*,
  483 F. Supp. 3d 1294 (Ct. Int'l Trade 2020) ...................................................8

*Royal Brush Mfg., Inc. v. United States*,
  75 F.4th 1250 (Fed. Cir. 2023) .....................................................................23

*Superior Commercial Sols., LLC v. United States*,
  811 F. Supp. 3d 1363 (Ct. Int'l Trade 2025) ................................................ *passim*

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
  44 F.3d 978 (Fed. Cir. 1994)...........................................................................9

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951).......................................................................................9

*USX Corp. v. United States*,
  655 F. Supp. 487 (Ct. Int'l Trade 1987) .........................................................9

**Statutes**

18 U.S.C. § 1001...............................................................................................19

19 U.S.C. § 1517(a)(3).......................................................................................9

19 U.S.C. § 1517(a)(5)(A) ...........................................................................3, 14

19 U.S.C. § 1517(b)(1) ............................................................................................2, 4, 21, 22

19 U.S.C. § 1517(c)(1)(A) ...................................................................................................9

19 U.S.C. § 1517(c)(3)(A) .................................................................................................19

19 U.S.C. § 1517(c)(3)(B) .................................................................................................20

19 U.S.C. § 1517(e)(1)–(3) .................................................................................................5

19 U.S.C. § 1517(g)(2) ........................................................................................................8

**Regulations**

19 C.F.R. pt. 171, Appendix B(D)(6) ...........................................................................2, 18

19 C.F.R. § 165.1 ..............................................................................................................14

19 C.F.R. § 165.6 ..............................................................................................................19

19 C.F.R. § 165.12 ..........................................................................................................2, 22

19 C.F.R. § 165.15(d)(1).................................................................................................2, 23

**Other Authorities**

*Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed.
     Reg. 20335 (Dep't Commerce Apr. 19, 2010)............................................................1

*Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed.
     Reg. 28551 (Dep't Commerce May 21, 2010) ........................................................1, 9

*Certain Oil Country Tubular Goods from the People's Republic of China*, 74 Fed.
     Reg. 64045 (Dep't Commerce Dec. 7, 2009) .............................................................1

*Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed.
     Reg. 3203 (Dep't Commerce Jan. 20, 2010) ..........................................................1, 9

I.   **INTRODUCTION AND SUMMARY OF THE ARGUMENT**

First, the record does not support U.S. Customs and Border Protection's ("CBP") finding that Kana Energy Services, Inc. ("Kana" or "Plaintiff") imported "covered merchandise" within the meaning of the determinations that cover the allegation of evasion of the antidumping ("AD") duty and countervailing duty ("CVD") order on oil country tubular goods ("OCTG"). *Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 20335 (Dep't Commerce Apr. 19, 2010) (final affirm. LTFV determ. & final affirm. determ. of critical circum. and targeting dumping), as amended in *Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 28551 (Dep't Commerce May 21, 2010); *Certain Oil Country Tubular Goods from the People's Republic of China*, 74 Fed. Reg. 64045 (Dep't Commerce Dec. 7, 2009) (final affirm. CVD determ. & final negative determ. of critical circum.), as amended in *Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 3203 (Dep't Commerce Jan. 20, 2010) (collectively, the "*AD/CVD Orders*"). Even if CBP's record contains evidence that Thai Oil Pipe Co., Ltd. ("TOP") used Chinese-origin "mother pipe" to produce some of its OCTG, the record does not demonstrate that the specific OCTG sold to Kana was produced from that mother pipe rather than from [

] billets. TOP's facility was verified by CBP to be an active, operational manufacturing facility capable of producing OCTG from billets, and the on-site verification report confirms that TOP demonstrated its production capabilities. CBP's conclusion that all OCTG produced by TOP should be treated as covered merchandise is a blanket inference unsupported by the record and contrary to the requirement that any evasion determination be based on substantial evidence.

Second, CBP failed to make the required finding that Kana made a material false statement or act, or a material omission, as required by the second element of the statutory definition of evasion. This Court has held that the Enforce and Protect Act ("EAPA") requires a

1

degree of culpability and is not necessarily a strict liability statute. *See Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1355 (Ct. Int'l Trade 2021) ("*Diamond Tools I*"); *see also Diamond Tools Tech. LLC v. United States*, 609 F. Supp. 3d 1378, 1388 n.10 (Ct. Int'l Trade 2022) ("*Diamond Tools II*").  Kana relied on government-issued certificates of origin from the Thai Chamber of Commerce, API certifications, verifications, audits, and certifications from its U.S. customer who had visited TOP's facilities, and other documentation to determine that the OCTG was produced in Thailand. Kana exercised the reasonable care required of importers under 19 C.F.R. pt. 171, app. B(D)(6).

Third, CBP's application of adverse inferences against Kana was arbitrary and capricious. Kana cooperated fully and to the best of its ability throughout the investigation, responding to all Request for Information ("RFI") and supplemental RFI questionnaires and participating in all proceedings. CBP's alleged basis for adverse inferences, that Kana made material false statements, is itself unsupported by the record.

Fourth, CBP violated its statutory mandate under 19 U.S.C. § 1517(b)(1) by failing to initiate the investigation within 15 business days of receiving the allegation. This Court has held that this deadline is mandatory and that CBP's regulation at 19 C.F.R. § 165.12 is contrary to law to the extent it allows CBP to extend and alter the statutory deadline indefinitely. *See Superior Commercial Sols., LLC v. United States*, 811 F. Supp. 3d 1363, 1374 (Ct. Int'l Trade 2025) ("*Superior Commercial*").

Fifth, CBP violated Kana's due process rights under the Fifth Amendment by imposing interim measures without providing Kana an opportunity to submit factual information or written arguments beforehand. This Court has held that 19 C.F.R. § 165.15(d)(1) is "arbitrary, capricious, and not in accordance with law" because it does not provide importers with the

2

procedural due process right to notice and a meaningful opportunity to be heard before temporary deprivation occurs. *See Superior Commercial*, 811 F. Supp. 3d at 1377.

## II.    STATEMENT PURSUANT TO CIT RULE 56.2

Pursuant to Rule 56.2(c)(1) of the Rules of the U.S. Court of International Trade, Plaintiff hereby states the administrative decisions subject to appeal and the issues of law presented.

### A.    Administrative Determinations Subject to Judicial Review

Kana is a U.S. importer of OCTG from Thailand. In this appeal, Plaintiff seeks judicial review of the following decisions that CBP issued in the underlying administrative proceeding, EAPA Consolidated Case Number 7890: CBP's Trade Remedy & Law Enforcement Directorate ("TRLED") Notice of Final Determination as to Evasion (Feb. 24, 2025) ("February TRLED Determination") and CBP's Office of Trade, Regulations & Rulings ("RR") Final Administrative Review Determination, Case Number H346715 (July 2, 2025), affirming the February TRLED Determination. *See* Letter from TRLED, Notice of Final Determination as to Evasion, in EAPA Consolidated Case Number 7890 (Feb. 24, 2025) ("*TRLED Det.*"), C.R. 374, P.R. 522; *see also* Letter from RR, Final Administrative Determination, Case Number H346715, EAPA Consolidated Case Number 7890 (July 2, 2025) ("*RR Decision*"), C.R. 395, P.R. 612.

### B.    Issues Presented

1. Whether CBP's determination that the OCTG imported by Kana from TOP constitutes "covered merchandise" under the antidumping and countervailing duty orders on OCTG from the People's Republic of China ("China") is supported by substantial evidence, where the record does not demonstrate that Kana specifically imported Chinese-origin OCTG.

2. Whether CBP erred in finding that Kana made a material false statement, act, or material omission sufficient to constitute "evasion" under 19 U.S.C. § 1517(a)(5)(A) when the

3

record evidence establishes that Kana exercised reasonable care and relied on government-issued certificates of origin and other trusted documentation.

3. Whether CBP's application of adverse inferences against Kana was arbitrary, capricious, and an abuse of discretion where Kana cooperated fully and to the best of its ability throughout the investigation.

4. Whether CBP violated its statutory mandate under 19 U.S.C. § 1517(b)(1) by failing to initiate the investigation within 15 business days of receiving the allegation.

5. Whether CBP's imposition of interim measures without providing Kana prior notice or opportunity to submit factual information or written arguments violated Kana's due process rights under the Fifth Amendment.

## III.    STATEMENT OF FACTS

On January 18, 2024 and February 1, 2024, the U.S. OCTG Manufacturers Association (the "USOMA" or "Alleger"), a trade association of domestic producers of OCTG, submitted allegations to CBP that Kana and other importers were evading the *AD/CVD Orders* on OCTG from China. *See* Letter from the Alleger, Oil Country Tubular Goods from China: Request for an Investigation under the Enforce and Protect Act (Jan. 18, 2024) ("*Kana Allegation*"), C.R. 6, P.R. 6; *see also TRLED Det.* at 2 n.3, C.R. 374, P.R. 522 (collectively, the "*Allegations*"); *see also AD/CVD Orders*.  The Alleger claimed that Kana, along with the other importers, were importing Chinese-origin OCTG that was transshipped through Thailand by TOP.  On February 1, 2024, CBP acknowledged receipt of the *Allegations*. *TRLED Det.* at 3, C.R. 374, P.R. 522.

Subsequently, February 23, 2024, TRLED initiated the EAPA investigation against Kana and the other importers, consolidating the investigation into EAPA Consolidated Case Number 7890.  TRLED Memorandum, Initiation of Investigation for EAPA 7890-7898 and 7954 (Consolidated Case 7890) (Feb. 23, 2024) ("*EAPA 7890 Initiation*"), C.R. 21, P.R. 42.  After the

4

initiation of the investigation, TRLED issued CBP Form 28 questionnaires to Kana and each of the importers concerning the entries of OCTG and requested supporting documentation.  Kana submitted its CF-28 response on April 4, 2024. *TRLED Det.* at 3 n.9, C.R. 374, P.R. 522.

On May 31, 2024, TRLED determined that reasonable suspicion existed that Kana and the other importers imported Chinese-origin OCTG into the U.S. that had been transshipped through Thailand.  Letter from CBP, Notice of Initiation of Investigation and Interim Measures - EAPA Cons. Case 7890 (May 31, 2024) ("*NOI*"), C.R. 33, P.R. 90.  As part of interim measures, CBP suspended the importers' entries that entered after the initiation of the investigation pursuant to its authority under 19 U.S.C. § 1517(e)(1)–(3).  *NOI* at 27, C.R. 33, P.R. 90. TRLED did not provide Kana with an opportunity to submit factual information or written arguments prior to imposing interim measures.

TRLED then issued RFIs to Kana, the other importers, and to the Thai producers, Petroleum Equipment (Thailand) Co., Ltd. ("PET") and TOP, to which all parties responded except for two importers.  *TRLED Det.* at 5, C.R. 374, P.R. 522.  On July 26, 2024, TRLED extended the final determination regarding evasion until February 17, 2025.  Letter from TRLED, Notice of Extension of Final Determination, in EAPA Consolidated Case Number 7890 at 2 (July 26, 2024), P.R. 361a.  On August 26, 2024, CBP issued a supplemental request for information to Kana, and Kana filed a robust response on September 16, 2024.  Kana's Response to Supplemental Request for Information (Sep. 16, 2024) ("*Kana Supplemental RFI Response*"), C.R. 300, P.R. 416.

CBP officials conducted an on-site verification in Thailand at PET's facility from October 28, 2024, to November 1, 2024, and at TOP's facility from November 4, 2024, to November 7, 2024.  Trade Regulatory Audit, On-Site Verification Report, in EAPA

Consolidated Case Number 7890 at 1 (Dec. 5, 2024) ("*Verification Report*"), C.R. 352, P.R. 457.

In the verification report for TOP, CBP noted that the factory workers at TOP were "actively

participating in various production processes" during the factory tour, that workers operating

machinery "were able to demonstrate their knowledge of the machinery and showed example

records that were produced from their tests," and that "the factory was covered in steel debris

and dust, which is indicative of a factory that operates regularly." *Verification Report* at 22–23,

C.R. 352, P.R. 457. CBP also observed both mechanical and other testing conducted on the

OCTG being produced by TOP during the factory tour, and both the sample and the pipe passed

the product testing — confirming TOP's capabilities to produce OCTG.  *Verification Report* at

24, C.R. 352, P.R. 457. CBP was also provided access to TOP's production records, accounting

system, and sales ledger, which "showed all sales to the importers." *Verification Report* at 24–

27, C.R. 352, P.R. 457.

TRLED also added two memoranda to the record with additional documentation.  *See*

TRLED Memorandum, Adding Information to the Administrative Record of EAPA 7890 (Nov.

25, 2024), C.R. 348–350, P.R. 455; *see also* TRLED Memorandum, Adding Information to the

Administrative Record of EAPA 7890 (Nov. 27, 2024), C.R. 351, P.R. 456.  On December 19,

2024, and December 26, 2024, Kana, the Alleger, and the other importers additionally submitted

written arguments, and on January 3, 2025, January 6, 2025, January 11, 2025, and January 14,

2025, parties submitted responses to the written arguments. *TRLED Det.* at 6, n.23, C.R. 374,

P.R. 522.  Kana presented the following arguments before TRLED: (1) TOP's submissions and

the *Verification Report* did not demonstrate that the OCTG sold to Kana was specifically

Chinese-origin OCTG; (2) Kana showed reasonable care through rigorous review of

documentation that the OCTG it imported was produced in Thailand; (3) there was no evidence

6

that Kana presented any material or false statement, act, or omission that would result in EAPA liability; and (4) CBP's EAPA procedures violated due process by listing Kana's name in a public pleading when such references constituted business confidential information.  Kana's Written Arguments (Dec. 19, 2024) ("*Kana's Written Arguments*"), C.R. 354–355, P.R. 477–478.

On February 24, 2025, TRLED issued its Notice of Determination, finding that substantial evidence on the record indicated that Kana and the other importers entered Chinese-origin OCTG through evasion.  *See generally TRLED Det.*, C.R. 374, P.R. 522.  In reaching its determination, TRLED concluded that the "mother pipe" TOP imported from China "was OCTG in all but name" and that the finished OCTG containing Chinese mother pipe imported by Kana constituted covered merchandise. *See TRLED Det.* at 7–8, C.R. 374, P.R. 522; *see also RR Decision* at 22–23, C.R. 395, P.R. 612. TRLED also applied adverse inferences against TOP and Kana, finding that each failed to cooperate and comply to the best of its ability.  *See TRLED Det.* at 35, C.R. 374, P.R. 522; *see also RR Decision* at 5, C.R. 395, P.R. 612.

On April 7, 2025, Kana timely filed a request for administrative review with RR.  Kana's Request for Administrative Review (Apr. 7, 2025), C.R. 380–381, P.R. 543–545.  On July 2, 2025, RR issued its decision affirming the February TRLED Determination, finding that there was substantial evidence that Kana entered covered merchandise through evasion.  *RR Decision* at 28, C.R. 395, P.R. 612.  In its decision, RR notably stated that "the use of adverse inferences is unnecessary to find substantial evidence of evasion in this case, and RR relies herein solely on the record and not on adverse inferences." *RR Decision* at 27, C.R. 395, P.R. 612.  Despite this statement, RR nevertheless found that Kana entered covered merchandise by means of material and false documents because the "merchandise was entered on type '01' consumption entries

7

instead of type '03' AD/CVD entries" and because Kana omitted the relevant AD/CVD case numbers from the entry summary documentation. *RR Decision* at 24–25, C.R. 395, P.R. 612.

## IV.    STANDARD OF REVIEW

The EAPA statute provides for the standard of judicial review in 19 U.S.C. § 1517(g)(2). The statute directs this Court to examine: (A) "whether the Commissioner fully complied with all procedures under subsections (c) and (f)"; and (B) "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2).

The Court of Appeals for the Federal Circuit has explained that "{c}ourts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or {the decision} is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An "'abuse of discretion occurs {when} the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors.'" *Royal Brush Mfg., Inc. v. United States*, 483 F. Supp. 3d 1294, 1302 (Ct. Int'l Trade 2020) (quoting *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005)).

"Substantial evidence" requires "'more than a mere scintilla'" but may be "'satisfied by 'something less than the weight of the evidence.'" *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)). However, in determining whether substantial evidence exists, "the record as a whole, including

8

evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence'" must be considered. *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The agency's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987). The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951))).

## V.    ARGUMENT

### A.    CBP's Determination That the OCTG Imported by Kana Constitutes "Covered Merchandise" Is Not Supported by Substantial Evidence

Under 19 U.S.C. § 1517(c)(1)(A), CBP must "make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(c)(1)(A). "Covered merchandise" refers to "merchandise that is subject to" an antidumping or countervailing duty order. 19 U.S.C. § 1517(a)(3). The *AD/CVD Orders* on OCTG from China define the scope to include "hollow steel products of circular cross-section, including oil well casing and tubing," whether finished or unfinished. *See AD/CVD Orders* at 75 Fed. Reg. at 3203–04; *see also AD/CVD Orders* at 75 Fed. Reg. at 28553.

9

*Non-Confidential Document*
*Confidential Information Removed*

The central question is whether the OCTG that Kana imported from TOP was in fact Chinese-origin covered merchandise. CBP's affirmative answer to this question is not supported by substantial evidence when the record is considered as a whole.

       1.    The Record Does Not Demonstrate That the OCTG Sold to Kana Was Chinese-Origin Merchandise

Even assuming *arguendo* that CBP properly found that TOP used Chinese-origin mother pipe to produce a portion of its OCTG, the record does not demonstrate that the *specific* OCTG sold to Kana was produced from that mother pipe. As the *RR Decision* acknowledged, TOP produced OCTG from both [      ] billets and mother pipe. *See RR Decision* at 22, C.R. 395, P.R. 612; *see also Verification Report* at 20, C.R. 352, P.R. 457. TOP stated that approximately [    ] percent of its production during the period of investigation ("POI") began from [     ] billets purchased from China, while the remaining [    ] percent began from mother pipe. *Verification Report* at 20, C.R. 352, P.R. 457. However, CBP's *Verification Report* indicates that by 2024, TOP's purchasing ratio had shifted to approximately [  ] percent [     ] billets and [  ] percent mother pipe — a near reversal of the earlier ratio. *Verification Report* at 20, C.R. 352, P.R. 457.

The record contains no direct evidence linking any specific Kana purchase to Chinese-origin mother pipe. CBP's *Verification Report* states only that mother pipe was found in TOP's records and that certain manufactured pipes at TOP's facility had been produced for Kana. *Verification Report* at 25, C.R. 352, P.R. 457. The report's statement that "{t}he final product was sold to Kana" was offered without supporting documentation or further corroboration. *Verification Report* at 25, C.R. 352, P.R. 457. In its final determination, CBP acknowledged only that it is "likely" that TOP used Chinese-origin mother pipe in its exports to Kana — a

10

speculative conclusion that falls short of the *substantial evidence* standard. *TRLED Det.* at 51, C.R. 374, P.R. 522.

During verification, CBP confirmed that TOP had the capacity to produce the volume of OCTG exported by Kana in 2023 and witnessed an active and functioning manufacturing facility. *Verification Report* at 20–23, C.R. 352, P.R. 457. CBP observed TOP produce L80-1 steel grade OCTG beginning from a [          ] billet using steps [          ] of the manufacturing process, and the sample passed both mechanical testing and hydrostatic testing. *Verification Report* at 22–24, C.R. 352, P.R. 457. These observations affirmatively demonstrate that TOP possessed the manufacturing capability to produce the OCTG it sold to Kana from billets — a process that would not result in covered merchandise.

Moreover, TOP's own documentation shows that its purchases from China included both [          ] billets and mother pipe, and that not all of TOP's production involved covered merchandise. *Verification Report* at 20, C.R. 352, P.R. 457. TOP's submissions also do not demonstrate that Kana's purchases were anything other than certified as Thailand origin by the Thai Chamber of Commerce, which reviewed the commercial documents for each export shipment through the Thai Department of Commerce's electronic system. TOP's RFI Response at 33–35 (July 9, 2024) ("*TOP RFI Response*"), C.R. 244, P.R. 324.

> 2.   TOP's Use of Both Billets and Mother Pipe Does Not Establish That Kana's Specific Purchases Were Covered Merchandise

RR concluded that because TOP used mother pipe to produce the "vast majority" of its OCTG during the POI, all finished OCTG that Kana imported must be treated as covered merchandise. *RR Decision* at 22–24, 26, C.R. 395, P.R. 612. This reasoning is flawed for several reasons.

First, CBP cannot logically infer from the *aggregate* percentage of mother pipe usage that *any particular shipment* to Kana contained mother pipe rather than billet-produced OCTG. The record shows that TOP processed both inputs simultaneously, and that different shipments could have used different raw materials. *Verification Report* at 20, C.R. 352, P.R. 457. TOP specifically stated that Energy Pipe and Trek Metals "only purchased products produced from [                    ] billets." *Verification Report* at 26, C.R. 352, P.R. 457. If TOP maintained the ability to distinguish between billet-produced and mother-pipe-produced OCTG for certain importers, the same tracing should have been available for Kana's purchases. CBP's decision not to audit Kana's purchases should not be held against Kana.

Second, during verification, TRLED identified 20 steps required to manufacture finished OCTG from [                    ] billets. The production documents TOP provided for the shipments examined at verification showed "{n}o major discrepancies in value, weight, and quantity." *Verification Report* at 25, C.R. 352, P.R. 457. While RR noted that TOP's production documents "correspond to only a handful of those steps," this observation applies generally to TOP's recordkeeping and does not specifically demonstrate that Kana's shipments contained covered merchandise. *RR Decision* at 23–24, C.R. 395, P.R. 612.

Third, all OCTG imported by Kana was sized [                    ] or less.  TOP explained that its [          ], hot rolling, and straightening machines could only produce up to [                    ] — meaning that Kana's imports fell within the range that TOP demonstrably could produce from billets in Thailand. *Verification Report* at 20, C.R. 352, P.R. 457. This is significant evidence that detracts from CBP's blanket inference.

CBP, relying on *Ikadan Sys. USA, Inc. v. United States*, 639 F. Supp. 3d 1339, 1354 (Ct. Int'l Trade 2023) ("*Ikadan*"), concluded that it was not required to conduct an entry-by-entry

12

review to determine whether evasion occurred. *RR Decision* at 24, C.R. 395, P.R. 612. RR stated that the "issue of entry-by-entry duty assignment is not the proper subject of an EAPA administrative review as to whether substantial evidence of evasion exists." *RR Decision* at 24, C.R. 395, P.R. 612. However, this Court has recognized that CBP's failure to consider the specifics of individual entries can render an evasion determination arbitrary. In *Ad Hoc Shrimp Trade Enf't Comm. v. United States*, 632 F. Supp. 3d 1369, 1379 (Ct. Int'l Trade 2023), the Court found that "TRLED's determination of evasion is not reasonable on this record . . . and arbitrarily transforms a single instance of evasion into a finding of evasion for an entire year of entries."

Here, CBP's determination suffers from a similar flaw. The record contains evidence that TOP produced OCTG from both billets and mother pipe, and that the percentage of billet usage was increasing. CBP's refusal to examine whether specific shipments to Kana could be traced to billet production — particularly where the *Verification Report* itself contains production tracing documents — is arbitrary and inconsistent with the *substantial evidence* standard.

Moreover, RR's own statement that "{i}f, indeed, some entries are ultimately proven not to contain subject merchandise, . . . the proper recourse to challenge CBP's assignment of duties on an entry-by-entry basis is via a protest pursuant to 19 U.S.C. § 1514" underscores the fundamental unfairness of CBP's approach. *RR Decision* at 24, C.R. 395, P.R. 612. RR essentially acknowledged that its determination may sweep in non-covered merchandise but relegated Kana to a post-determination protest process. This is inconsistent with the EAPA's requirement that CBP base its evasion determination on *substantial evidence* — not mere probability — that covered merchandise was entered.

13

**B.      CBP Failed to Establish That Kana Made a Material False Statement, Act, or Material Omission as Required Under the EAPA Statute**

The EAPA defines "evasion" as entering covered merchandise "by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise." *See* 19 U.S.C. § 1517(a)(5)(A); *see also* 19 C.F.R. § 165.1.  The statute thus requires three elements: (1) the entries are covered merchandise; (2) entry was made by a material false statement, act, or material omission; and (3) there was a resulting reduction or avoidance of applicable duties.

As demonstrated above, CBP has not established the first element with *substantial evidence*. CBP has also failed to satisfy the second element.

1.      The EAPA Requires a Showing of Culpability, and EAPA Is Not a Strict Liability Statute

This Court has squarely held that a degree of culpability is required for a finding that an importer made a material "false" statement or material omission under the EAPA. In *Diamond Tools I*, this Court held that "neither the text of the EAPA statute nor 19 C.F.R. {§} 165.1 supports Customs' statement that it does not need to establish 'any level of culpability'" to find a material false statement or omission. 545 F. Supp. 3d at 1355. In *Diamond Tools II*, this Court reiterated that the EAPA does not "contain the term strict liability and the statute's legislative history does not indicate the application of that concept." 609 F. Supp. 3d at 1388 n.10.

As the *Diamond Tools II* Court explained, CBP's interpretation of the EAPA would improperly permit an affirmative determination of evasion based only on findings that the target importer entered covered merchandise without paying applicable AD/CVD duties (first and third elements), without also finding that the importer made a material false statement or omission

14

(second element). *Diamond Tools II*, 609 F. Supp. 3d at 1388–89. Under CBP's approach, the second element of evasion — the material false statement or omission requirement — would be rendered a nullity every time CBP found the first element satisfied, a result that "violates a core maxim of statutory construction." *Diamond Tools II*, 609 F. Supp. 3d at 1386.

RR's determination in this case illustrates precisely the error that the *Diamond Tools I* and *Diamond Tools II* decisions warned against. RR's analysis of the "material false statement" element consists entirely of the observation that Kana entered the merchandise on type "01" consumption entries instead of type "03" AD/CVD entries and omitted the relevant AD/CVD case numbers from the entry summary documentation. *RR Decision* at 24–25, C.R. 395, P.R. 612. This is a tautology: if the merchandise is covered merchandise, then by definition the entry type and case number declarations were incorrect. Under RR's reasoning, the second element of evasion is automatically satisfied whenever the first element is found — the very result the *Diamond Tools II* Court rejected.

RR cited *Ikadan* for the proposition that "EAPA read as a whole supports CBP's strict liability interpretation of the definition of evasion." 639 F. Supp. 3d at 1349. *RR Decision* at 26, C.R. 395, P.R. 612. However, *Ikadan*'s reasoning relied heavily on *Chevron* deference, which has since been overruled by the Supreme Court in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ("*Loper Bright*"). Post-*Loper Bright*, this Court owes no deference to CBP's interpretation of the EAPA statute on this pure question of statutory construction. Indeed, as the *Diamond Tools I* and *Diamond Tools II* decisions demonstrate, the plain text of the EAPA statute requires CBP to establish a material false statement or omission — not merely that the entry declarations were inconsistent with a subsequent evasion finding.

15

      2.      Kana Exercised Reasonable Care in Determining That Its OCTG Was a Product of Thailand

Even if the Court were to adopt CBP's strict liability interpretation (which Kana contests), the record demonstrates that Kana did not make any "false" statements within the ordinary meaning of the term. A statement cannot be considered "false" where an importer relies on a "clearly stated conclusion," as the U.S. Court of International Trade held in *Diamond Tools I*. 545 F. Supp. 3d at 1353.

Kana's exercise of reasonable care in determining that its OCTG was a product of Thailand was comprehensive, multi-layered, and well-documented on the record.

First, prior to beginning any OCTG imports, Kana's president, Mr. Gavin Liu, sought information regarding imports of OCTG. Mr. Liu had known TOP's operator, Mr. [        ], since approximately 2016 and was aware of his good reputation in the industry and his experience operating a pipe processing facility in Midland, Texas. Kana's RFI Response at 28 (July 16, 2024) ("*Kana's RFI Response*"), C.R. 250, P.R. 328.  Kana also communicated with [       ], the Chief Operating Officer of one of the largest and most prestigious steel companies in the United States, who represented that he and his customers had personally visited TOP's facilities and had verified that TOP's OCTG production facilities were legitimate.  *Kana's Written Arguments* at 7, C.R. 354–355, P.R. 477–478.

Second, Kana relied on documentation verifying that TOP's OCTG was produced in Thailand. Kana reviewed TOP brochures that highlighted TOP's certifications in Thailand and advertised approval by the American Petroleum Institute ("API"). *Kana's RFI Response* at 27–28, C.R. 250, P.R. 328.   Kana monitored and relied on TOP's continuing and uninterrupted eligibility, since June 11, 2013, to carry the API Monogram and API 5CT-1548 designation — conferred by the API based on on-site audits of TOP's manufacturing facility. *See Kana's RFI*

*Response* at 27, C.R. 250, P.R. 328; *see also Kana's Written Arguments* at 8–9, C.R. 354–355, P.R. 477–478.

Third, for each shipment received from TOP, Kana reviewed the full package of accompanying documents, which included an official Country of Origin Certificate issued by the Thai Chamber of Commerce. *Kana's RFI Response* at 43, C.R. 250, P.R. 328. All of these certificates were compared with the documentation and the product received in each shipment. *Kana's RFI Response* at 43, C.R. 250, P.R. 328. Kana submitted multiple examples of these certificates as part of its RFI response, demonstrating that its purchases from TOP had undergone review by the Thai Chamber of Commerce. *Kana's RFI Response* at Exhibit 10, C.R. 252, P.R. 338.

Fourth, when Kana received Census "Improbable Country" flags on two earlier entries of TOP OCTG products — both well prior to the entry at issue in EAPA Investigation 7890 — Kana immediately contacted TOP to verify the relevant facts. *Kana's Written Arguments* at 8, C.R. 354–355, P.R. 477–478.  TOP responded that the product was not subject to the AD/CVD cases and provided a video showing the active production of an OCTG tube on its hot rolling mill, including the loading of a red-hot billet followed by the piercing of the billet and the hot rolling of the tube using a mandrel. *See Kana's RFI Response* at 42, C.R. 250, P.R. 328; *see also Kana's Written Arguments* at 8–9, C.R. 354–355, P.R. 477–478.  Kana received no reply from CBP in response to its questioning or inquiry into the declared Thailand production and origin, and Kana took those facts as effectively confirmed.

In light of this record, Kana acted reasonably and in good faith in relying on government-issued certificates of origin, API certifications, representations of its U.S. customer, and its due diligence to determine that the OCTG it imported was produced in Thailand. CBP's regulations

17

require importers to "exercise reasonable care in fulfilling their responsibilities involving entry of merchandise." 19 C.F.R. pt. 171, app. B(D)(6). Kana's actions far exceed the minimum standard of reasonable care.

>### 3. CBP's Findings of False Statements Regarding Kana's Corporate Structure Are Unsupported and Immaterial

In addition to the tautological finding that Kana's entry type was incorrect, TRLED's determination included findings that Kana provided false information regarding its corporate structure, including allegations related to the relationship between Kana and an entity called [          ], and information derived from Kana's tax returns. *TRLED Det.* at 38–40, C.R. 374, P.R. 522. These findings are unsupported by the record and, in any event, are immaterial to the question of evasion.

With respect to [          ], CBP's conclusion about Kana's claim that "[

          ] is false" was based on uncorroborated and outdated public information from platforms such as LinkedIn and [                    ] — sources that are not official repositories of corporate ownership information and that are not consistently updated or verified. *TRLED Det.* at 38, C.R. 374, P.R. 522. Kana submitted an internal stock ledger that accurately reflected the company's ownership structure at the relevant time. *Kana Supplemental RFI Response* at 9, Exhibit 4, C.R. 300, P.R. 416. Kana did not include the corresponding stock purchase agreements because there was nothing to imply CBP required that level of supporting documentation — not as an attempt to withhold information. Had CBP provided clearer guidance or simply requested additional confirmation, Kana would have promptly submitted the full stock purchase agreements, which show that Mr. Liu purchased all shares in the company and is the sole U.S. owner.

With respect to the tax return issue, CBP relied on a discrepancy in Kana's tax return concerning a former shareholder's continued listing in a director position to conclude that Kana made false statements. *TRLED Det.* at 38–39, C.R. 374, P.R. 522. As Kana explained, this was an inadvertent accounting error, not an intentional misrepresentation. CBP had ample time to review the documentation and follow up with Kana in a supplemental questionnaire but failed to do so. More fundamentally, CBP did not provide explanation as to how this inadvertent error by Kana in its tax returns demonstrates a materially false statement that results in evasion of an antidumping duty order.

The submission of an accurate internal record that happened to differ from non-binding, outdated, and unofficial online listings does not constitute a false statement, a material omission, or an attempt to conceal material facts under 19 C.F.R. § 165.6 or 18 U.S.C. § 1001. To characterize Kana's submissions as "material false statements" is inconsistent with the spirit of the regulation, which is designed to deter fraud and willful misrepresentation — neither of which occurred here. *TRLED Det*. at 66, C.R. 374, P.R. 522.

### C.      CBP's Application of Adverse Inferences Against Kana Was Arbitrary, Capricious, and an Abuse of Discretion

Under 19 U.S.C. § 1517(c)(3)(A), CBP may apply adverse inferences only when it finds that a party "has failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information." *See* 19 U.S.C. § 1517(c)(3)(A); *see also* 19 C.F.R. § 165.6(a) (2026). The "best of its ability" standard "compels respondents to take reasonable steps to keep and maintain complete records that they would reasonably be called upon to produce in an antidumping investigation." *Diamond Sawblades Mfrs.' Coal. v. United States*, 415 F. Supp. 3d 1365, 1372 (Ct. Int'l Trade 2019) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382–84 (Fed. Cir. 2003)).

19

The record establishes that Kana cooperated fully with CBP throughout the investigation. Kana timely responded to the CF-28 questionnaire on April 4, 2024, the RFI questionnaire, and the supplemental RFI on September 16, 2024. *TRLED Det.* at 3 n.9, 5 n.19, C.R. 374, P.R. 522. Kana submitted written arguments on December 19, 2024, and a response to written arguments on January 14, 2025. *TRLED Det.* at 6 n.23, n.24, C.R. 374, P.R. 522. Kana then filed a timely request for administrative review on April 7, 2025. *RR Decision* at 2, C.R. 395, P.R. 612. At no point did Kana refuse to respond to CBP's inquiries, withhold requested documents, or obstruct the investigation in any way.

CBP's basis for applying adverse inferences against Kana rested on its findings regarding alleged false statements about Kana's corporate structure. As demonstrated in Section B.3 above, these findings are unsupported by the record. The submission of an internal stock ledger that was accurate at the time, and an inadvertent discrepancy in a tax return, do not constitute a failure to cooperate to the "best of its ability."

Moreover, the adverse inferences provision, as applied by CBP against Kana, deprived the investigated party of notice as to what information is missing and opportunity to redress the missing information before a final determination is reached, violating the party's right to a meaningful and fair proceeding. CBP never informed Kana that it considered the stock ledger insufficient or that it required stock purchase agreements before issuing its final determination. Had CBP communicated its concerns, Kana would have immediately provided the requested documentation.

Even if adverse inferences were properly applied against TOP for its alleged failures to cooperate, those inferences should not have been deployed against Kana — a cooperating party — without limitation. Although the EAPA statute at 19 U.S.C. § 1517(c)(3)(B) provides that

20

adverse inferences may be drawn "without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought," this statutory language does not require CBP to disregard a cooperating party's own evidence. Courts in the antidumping context have emphasized that "there was no need or justification" for an AFA rate based in deterrence where the rate would affect only the cooperating party. *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1379 (Fed. Cir. 2012).

RR's decision notably stated that "the use of adverse inferences is unnecessary to find substantial evidence of evasion in this case, and RR relies herein solely on the record and not on adverse inferences." *RR Decision* at 27, C.R. 395, P.R. 612.  If this is so, then CBP's application of adverse inferences against Kana was superfluous at best and prejudicial at worst. RR cannot simultaneously disclaim reliance on adverse inferences and maintain a determination that was pervasively shaped by adverse inferences drawn against TOP. The factual record, stripped of adverse inferences, does not contain substantial evidence that *Kana specifically* imported Chinese-origin covered merchandise.

### D.     CBP Violated Its Statutory Mandate by Failing to Initiate the Investigation Within 15 Business Days of Receiving the Allegation

The EAPA statute provides that "not later than 15 business days after receiving an allegation . . . , the Commissioner shall initiate an investigation if the Commissioner determines that the information provided in the allegation . . . reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(b)(1).

The word "shall" imposes a mandatory statutory obligation. *See Me. Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'"); *see also Kingdomware Techs., Inc. v. United*

*States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."). The U.S. Court of International Trade has squarely held that the 15-day deadline is mandatory:

> This Court holds that the 15-day deadline set forth in 19 U.S.C. § 1517(b) is mandatory, not optional. . . . {The regulation at 19 C.F.R. § 165.12} is not in accordance with law to the extent that the regulation allows Customs to extend and alter Congress' 15-day statutory deadline for an unlimited period of time, which is inconsistent with 19 U.S.C. § 1517(b) that reflects Congress' intent for Customs to initiate EAPA investigations quickly within 15 days of receiving an allegation.

*Superior Commercial*, 811 F. Supp. 3d at 1372–74.

In this case, the Alleger filed its EAPA allegation against Kana with TRLED on January 18, 2024. *Kana Allegation* at 1, C.R. 6, P.R. 6. TRLED did not acknowledge receipt until February 1, 2024, and did not initiate the investigation until February 23, 2024 — approximately 25 business days after receiving the allegation. *EAPA 7890 Initiation* at 1–2, C.R. 21, P.R. 42. By using the regulatory concept of "date of receipt" to extend the statutory deadline, CBP violated the plain language of 19 U.S.C. § 1517(b)(1).

This violation substantially prejudiced Kana. Entries that were unliquidated during the period between the statutory deadline for initiation and the actual initiation date became subject to interim measures and ultimately to the affirmative evasion determination. Had CBP complied with the 15-day statutory mandate, the universe of covered entries would have been different. Moreover, the delay in initiation cascaded through the investigation, compressing the timeline for Kana's responses and CBP's review.

As this Court recognized in *Superior Commercial*, CBP's regulation at 19 C.F.R. § 165.12 is contrary to law because it "allows Customs to extend and alter Congress' 15-day statutory deadline for an unlimited period of time." 811 F. Supp. 3d at 1374. Post-*Loper Bright*, this Court owes no deference to CBP's self-serving interpretation of when an allegation is

22

"received." The allegation was filed electronically and was in CBP's possession on January 18, 2024. Under the plain language of the statute, CBP was required to initiate the investigation by no later than 15 business days thereafter.

**E.      CBP Violated Kana's Due Process Rights by Imposing Interim Measures Without Prior Notice or Opportunity to Be Heard**

The Fifth Amendment to the Constitution "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The Federal Circuit has repeatedly recognized that importers are entitled to procedural due process rights under the Fifth Amendment in EAPA investigations. *See Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1257 (Fed. Cir. 2023) ("We have previously held that importers in antidumping proceedings are entitled to procedural due process. The government agrees that importers in evasion proceedings enjoy rights to procedural due process." (footnotes omitted)); *see also NEC Corp. v. United States*, 151 F.3d 1361, 1370–71 (Fed. Cir. 1998).

"The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). More specifically, "{t}he constitutional requirement of a meaningful opportunity to respond before a temporary deprivation may take effect entails, at a minimum, the right to be informed not only of the nature of the charges but also of the substance of the relevant supporting evidence." *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 264–65 (1987).

The U.S. Court of International Trade has directly addressed this issue in the EAPA context and held that 19 C.F.R. § 165.15(d)(1) is arbitrary, capricious, and not in accordance with law:

> As written, 19 C.F.R. § 165.15(d)(1) provides notice to all parties to the investigation no later than 95 days after the decision has been made and no later

than five business days after interim measures have been imposed, which by definition does not allow for a party under investigation to submit any evidence or offer any administrative arguments in its defense prior to when the temporary deprivation takes effect as described by the Supreme Court in *Brock v. Roadway Express, Inc.*, 481 U.S. at 264–65, 107 S.Ct. 1740.

*Superior Commercial*, 811 F. Supp. 3d at 1377 (emphasis omitted).

In this case, TRLED initiated the EAPA investigation on February 23, 2024, but did not notify Kana or provide Kana with an opportunity to submit factual information or written arguments until interim measures were imposed on May 31, 2024 — approximately 90 days later. *See NOI*, C.R. 33, P.R. 90.  As a result of interim measures, CBP suspended Kana's entries and imposed antidumping and countervailing duty cash deposit requirements retroactively on all unliquidated entries dating back to the beginning of the POI on February 1, 2023.  *NOI* at 27, C.R. 33, P.R. 90.

Kana was substantially prejudiced by CBP's failure to provide timely notice. Had Kana been informed of the EAPA investigation at the time of initiation, Kana would have immediately ceased importing from TOP and would have been able to submit evidence and arguments before interim measures were imposed. Instead, Kana continued to import OCTG from TOP for approximately three months after the investigation was initiated, accumulating entries that were then retroactively subjected to interim measures and ultimately to CBP's affirmative evasion determination. Moreover, Kana was deprived of the opportunity to present its evidence — including certificates of origin, API certifications, customer representations, and due diligence documentation — before being subjected to the significant financial deprivation of having its entries suspended and duty deposits imposed.

Kana's inability to meaningfully challenge the EAPA 7890 interim measures authorizing CBP to cancel pending entries, demand refiled entries revised as ordered by CBP, and paying the

consequential AD/CVD put it between a rock (the EAPA interim measures) and a hard place (its importer bond obligation to file a timely entry and pay the duties indicated) resulting in a breach of its importer bond respecting each of the four involved entries.

As this Court held in *Superior Commercial*, CBP's regulation "does not provide an importer participating in an administrative proceeding with a procedural due process right to notice and a meaningful opportunity to be heard." 811 F. Supp. 3d at 1377. Because CBP's affirmative determination as to evasion for Kana was made pursuant to procedures that violated Kana's due process rights, the determination should be declared unlawful and set aside.

## VI.    CONCLUSION

In sum, CBP's determination that Kana evaded AD and CVD duties on OCTG from China is not supported by substantial evidence. The record does not establish that the specific OCTG Kana imported from TOP was Chinese-origin covered merchandise, and CBP's blanket inference that all of TOP's production should be treated as covered merchandise ignores evidence that TOP produced OCTG from both billets and mother pipe and that Kana's purchases could have originated from billet production. CBP further failed to satisfy the statutory requirement of a material false statement or omission, instead conflating an incorrect entry type with culpable conduct—a tautology that renders the second element of evasion a nullity. Kana exercised reasonable care by relying on government-issued certificates of origin, API certifications, customer representations, and comprehensive due diligence, all of which supported a good-faith belief that its OCTG was produced in Thailand. CBP's application of adverse inferences was arbitrary where Kana cooperated fully throughout the investigation, and CBP violated its mandatory statutory deadline to initiate the investigation within 15 business days of receiving the allegation. Finally, CBP violated Kana's Fifth Amendment due process rights by imposing interim measures without providing prior notice or a meaningful opportunity

25

to be heard. Accordingly, this Court should vacate CBP's final determinations as arbitrary, capricious, and not in accordance with law, and grant the relief requested herein.  Further, Kana incorporates the arguments of the other Consolidated Plaintiffs to the extent  that they do not conflict with arguments presented here.

## VII.    PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that this Court:

1.  Hold that TRLED's and RR's final determinations are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

2.  Declare TRLED's and RR's final determinations unsupported by substantial evidence;

3.  Order CBP to liquidate Kana's entries of OCTG imported from TOP in Thailand without the addition of antidumping or countervailing duties;

4.  In the alternative, remand this matter to CBP with instructions to reconsider its evasion determination consistent with the Court's opinion;

5.  Grant such additional relief as the Court may deem just and proper.

Respectfully submitted,

**/s/ John M. Gurley**
John M. Gurley
Katherine R. Afzal

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6479
Email: john.gurley@afslaw.com

*Counsel to Kana Energy Services, Inc.*

Dated: April 10, 2026

26

**CERTIFICATE OF COMPLIANCE**

Pursuant to the Paragraph 2(B)(2) of the Standard Chambers Procedures of the U.S. Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in Paragraph 2(B)(1) of the Standard Chamber Procedures and Scheduling Order. Excluding the table of contents, table of authorities, signature block and certificate of counsel, the word count for the brief is 7,901. This brief thus complies with the Standard Chambers Procedures and Scheduling Order, which permits briefs of 14,000 words or fewer.

Respectfully submitted,

**/s/ John M. Gurley**
John M. Gurley

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6479
Email: john.gurley@afslaw.com

*Counsel to Kana Energy Services, Inc.*

Dated: April 10, 2026