# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

|  |  |
|---|---|
| _____x | |
| : | |
| CENTRIC PIPE LLC, : | |
| : | |
| *Plaintiff*, : | |
| : | |
| LE COMMODITIES, LLC, TREK METALS, INC., : | |
| ENERGEY PIPE & EQUIPMENT RENTALS, LLC,: | |
| and KANA ENERGY SERVICES, INC., : | |
| : | |
| *Consolidated-Plaintiffs,* : | |
| : | Consol. Court No. 25-00182 |
| v. : | |
| : | |
| UNITED STATES, : | |
| : | |
| *Defendant*, : | |
| : | |
| and : | |
| : | |
| U.S. OCTG MANUFACTURERS ASSOCIATION, : | |
| : | |
| *Defendant-Intervenor*. : | |
| _____x | |

## CORRECTED CONSOLIDATED PLAINTIFF LE COMMODITIES' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Consolidated

Plaintiff LE Commodities, LLC ("LE Commodities") respectfully moves for judgment on the

administrative record. For the reasons set forth in the accompanying Memorandum of Law in

support of its motion as well as that of Plaintiff Centric Pipe LLC, LE Commodities requests that

this Court find that the following administrative decisions that U.S. Customs and Border

Protection ("Customs" or "CBP") issued in the administrative proceeding, Enforce and Protect

Act Consolidated Case Number 7890, are not supported by substantial evidence on the record

and are otherwise not in accordance with the law: (1) Customs' Trade Remedy & Law

Enforcement Directorate ("TRLED") Notice of Determination as to Evasion, issued under 19 U.S.C. § 1517(f), including its initial determination issued under 19 U.S.C. § 1517(c) ("TRLED Determination"); and (2) CBP's subsequent affirmation of the TRLED Determination issued by Customs' Office of Trade, Regulations & Rulings. The TRLED Determination involved allegations of evasion of the antidumping and countervailing duty Orders on certain Oil Country Tubular Goods from the People's Republic of China. *Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 3203 (Jan. 20, 2010); *Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 75 Fed. Reg. 28,551 (May 21, 2010).

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/ Jordan C. Kahn*
Erik D. Smithweiss
Jordan C. Kahn*

707 Wilshire Boulevard
Suite 4150
Los Angeles, CA 90017-3720
(213) 452-0863
**
*1201 New York Ave., NW Ste 650
Washington, DC 20005
(202) 783-6881

*Counsel for Consolidated Plaintiff
LE Commodities, LLC*

Dated: April 13, 2026

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

```
                                                    x
                                                    :
CENTRIC PIPE LLC,                                   :
                                                    :
            Plaintiff,                              :
                                                    :
LE COMMODITIES, LLC, TREK METALS, INC.,             :
ENERGEY PIPE & EQUIPMENT RENTALS, LLC,:
and KANA ENERGY SERVICES, INC.,                     :
                                                    :
            Consolidated-Plaintiffs,               :        Consol. Court No. 25-00182
                                                    :
      v.                                            :        PUBLIC  VERSION
                                                    :
UNITED STATES,                                      :
                                                    :
            Defendant,                              :
                                                    :
      and                                           :
                                                    :
U.S. OCTG MANUFACTURERS ASSOCIATION,               :
                                                    :
            Defendant-Intervenor.                  :
                                                    x
```

## CORRECTED MEMORANDUM OF LAW IN SUPPORT OF CONSOLIDATED PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Erik D. Smithweiss
Jordan C. Kahn*

707 Wilshire Boulevard
Suite 4150
Los Angeles, CA 90017-3720
(213) 452-0863
**
*1201 New York Ave., NW Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Consolidated Plaintiff
LE Commodities, LLC*

Dated: April 13, 2026

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 .................................................................................. 1

    A.   Administrative Decisions Under Appeal ........................................................ 1

    B.   Reasons For Contesting the Administrative Decision ...................................... 2

    C.   Issues Presented and Summary of Arguments ................................................. 2

STATEMENT OF FACTS ........................................................................................................ 2

  I.    AD/CVD Orders on OCTG from China ............................................................... 2

  II.   EAPA Proceeding .................................................................................................. 4

    A.   Initiation and Interim Measures .................................................................... 4

    B.   Submissions to CBP ....................................................................................... 6

    C.   TRLED Determination and Subsequent Administrative and Judicial Review ............. 10

  III.  Commerce's Circumvention Inquiry ................................................................. 13

    A.   Initiation and Preliminary Determination ..................................................... 13

    B.   Briefing and Final Circumvention Determination .......................................... 15

STANDARD OF REVIEW ....................................................................................................... 19

ARGUMENT ........................................................................................................................... 21

  I.    LE ENDORSES ALL ARGUMENTS OF CENTRIC PIPE ............................................. 21

  II.   CBP UNLAWFULLY DETERMINED THAT PET'S OCTG IS WITHIN THE SCOPE
    OF THE AD/CVD ORDERS .................................................................................. 22

    A.   OCTG Exported By PET Did Not Constitute Covered Merchandise .......................... 22

    B.   CBP Found Duty Evasion Upon Finding PET's OCTG Subject to AD/CVD ............. 27

    C.   CBP Committed Legal Errors In Finding LE Liable For Duty Evasion ...................... 28

  III.  CBP VIOLATED LE'S DUE PROCESS RIGHTS ....................................................... 33

CONCLUSION ......................................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Acme Furniture Indus., Inc. v. United States*, 36 CIT 1025 (2012) .............................................. 28

*Bell Supply Co. v. United States*, 393 F. Supp. 3d 1229 (CIT 2019) ................................... 3, 22, 23

*Bell Supply Co. v. United States*, 888 F.3d 1222 (Fed. Cir. 2018) ........................................... 3, 22

*Bowman Transp., Inc. v. Ark.-Best Freight System, Inc.*, 419 U.S. 281 (1974) ........................... 20

*Brock v. Roadway Express, Inc.*, 481 U.S. 252 (1987) .................................................................. 35

*Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312 (CIT 2016) .................................. 3

*Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) 19

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) .................................................. 33

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ................................................................. 20, 30

*D&L Supply Co. v. United States*, 22 CIT 539 (1998) .................................................................. 33

*Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324 (CIT 2021) .............. 31, 32, 33

*Dickinson v. Zurko*, 527 U.S. 150, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) .............................. 20

*Fedmet Res. Corp. v. United States*, 755 F.3d 912 (Fed. Cir. 2014) ........................................... 29

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ........................................................ 21

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) .......................................... 30

*Grannis v. Ordean*, 234 U.S. 385 (1914) ..................................................................................... 35

*King Supply Co. v. United States*, 674 F.3d 1343 (Fed. Cir. 2012) ............................................. 29

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .................................................................................. 34

*Meridian Products LLC v. United States*, 918 F.3d. 1375 (Fed. Cir. 2017) ................................ 29

*Mid Continent Nail Corp. v. United States*, 725 F.3d 1295 (Fed. Cir. 2013); ............................ 33

*Mitsubishi Elecs. Am., Inc. v. United States*, 44 F.3d 973 (Fed. Cir. 1994) ................................ 28

*Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............. 19, 20

*NEC Corp. v. United States*, 151 F.3d 1361 (Fed. Cir. 1998) ....................................................... 35

*O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940 (9th Cir. 1996)................ 20

*Royal Brush Mfg. v. United States*, 75 F.4th 1250 (Fed. Cir. 2023)............................................. 35

*Stein Indus. Inc. v. United States*, 365 F. Supp. 3d 1364 (CIT 2019)........................................... 30

*Superior Commercial Solutions, LLC v. United States*, 811 F. Supp. 3d 1363 (CIT 2025)... 35, 36

*Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487 (Fed. Cir. 2020)....................... 33

*Trans Texas Tire, LLC v. United States*, 519 F. Supp. 3d 1275 (CIT 2021) ................................ 33

*Trans Texas Tire, LLC v. United States*, 519 F. Supp. 3d 1289 (CIT 2021) ................................ 33

*Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41 (D.D.C. 2016)...................... 20

*WelCom Prods., Inc. v. United States*, 865 F. Supp. 2d 1340 (CIT 2012) .............................. 20, 29

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1369) ....................................... 20

**Regulations**

19 C.F.R. § 165.15 .......................................................................................................................... 35

19 C.F.R. § 351.225 ........................................................................................................................ 30

19 C.F.R. § 351.226.............................................................................................................18, 26, 33

19 C.F.R. § 351.227............................................................................................................................ 5

**Rules**

Fed. Rule Evid. 201 ........................................................................................................................... 3

**Statutes**

5 U.S.C. § 706.................................................................................................................................. 19

19 U.S.C. § 1517........................................................................................................................ passim

**Administrative Decisions**

*Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 3,203 (Jan. 20, 2010)...................................................................................................... passim

*Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 75 Fed. Reg. 28,551 (May 21, 2010) .............................................................................................. passim

*Oil Country Tubular Goods from the People's Republic of China: Initiation of Circumvention Inquiry on the Antidumping and Countervailing Duty Orders,* 89 Fed. Reg. 102,864 (Dec. 18, 2024) ..................................................................................................................... 14, 19, 32

*Oil Country Tubular Goods from the People's Republic of China: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders,* 90 Fed. Reg. 40,336 (Aug. 19, 2025) ............................................................................... 14, 15, 25

*Oil Country Tubular Goods from the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 91 Fed. Reg. 9311 (Feb. 27, 2026) ............................................................................................ 15

PUBLIC VERSION

Consolidated Plaintiff LE Commodities, LLC ("LE") submits this Memorandum of Law to support its Rule 56.2 Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO RULE 56.2

### A. Administrative Decisions Under Appeal

LE seeks judicial review of the following administrative decisions that U.S. Customs and Border Protection's ("Customs" or "CBP") issued in the underlying administrative proceeding, Enforce and Protect Act ("EAPA") Consolidated Case Number 7890: (1) Customs' Trade Remedy & Law Enforcement Directorate ("TRLED") Notice of Determination as to Evasion (Feb. 24, 2025), Confidential Record ("CR") Doc No. 374, Public Record ("PR") Doc. No. 522 ("TRLED Determination"), issued under 19 U.S.C. § 1517(f), including its initial determination issued under 19 U.S.C. § 1517(c)); and (2) CBP's subsequent affirmation of the TRLED Determination, issued on by CBP's Office of Trade, Regulations & Rulings ("RR"). Final Administrative Determination (July 2, 2025), CR Doc No. 395, PR Doc. No. 612, ("Administrative Review Determination").

The TRLED Determination found evasion of the antidumping duty ("ADD") and countervailing duty ("CVD") Orders on certain Oil Country Tubular Goods ("OCTG") from the People's Republic of China ("China" or "PRC"). *Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 3,203 (Jan. 20, 2010); *Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 75 Fed. Reg. 28,551 (May 21, 2010) ("AD/CVD Orders"). CBP determined that LE evaded the AD/CVD Orders when LE entered OCTG produced by Petroleum Equipment (Thailand) Co., Ltd. ("PET"), located in Thailand, as merchandise not covered by the AD/CVD Orders.

1

PUBLIC VERSION

**B. Reasons For Contesting the Administrative Decision**

LE's reasons for contesting the administrative decision are set forth in the Rule 56.2 Motion for Judgment on the Agency Record filed by Plaintiff Centric Pipe LLC, and LE submits this brief focusing on the issues of CBP unlawfully finding PET's exports of OCTG from Thailand subject to AD/CVD and depriving LE of its due process rights, set forth in the Summary of Arguments below, and in more detail in the Argument section of this Memorandum.

**C. Issues Presented and Summary of Arguments**

Whether CBP unlawfully determined that OCTG produced by PET in Thailand and imported commencing February 2023 was subject to the AD/CVD Orders on OCTG from China given that (1) CBP has only a ministerial role in collecting AD/CVD and is statutorily required to refer scope issues to the U.S Department of Commerce ("Commerce"); (2) CBP did not make a covered merchandise (scope) referral to Commerce in the EAPA investigation and (3) Commerce in March 2026 determined that PET's OCTG produced in Thailand using hollow steel billets from China was circumventing the AD/CVD Orders when that circumvention inquiry initiated in December 2024 – long after the EAPA investigation commenced in February 2024 and applied AD/CVD to entries of PET's OCTG a year earlier, back to February 2023.

Whether CBP deprived LE of its due process rights, when LE lacked the requisite fair warning that AD/CVD could retroactively apply to the OCTG that it imported from PET and CBP failed to give LE notice that it was being targeted in an EAPA investigation until months after it was initiated – as recently found by this Court when invalidating the EAPA regulation.

**STATEMENT OF FACTS**

**I.    AD/CVD Orders on OCTG from China**

In 2010, Commerce published the AD/CVD Orders on OCTG from China, with scope providing in relevant part:

2

PUBLIC VERSION

> The scope of this order consists of certain OCTG, which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute ("API") or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the order also covers OCTG coupling stock. Excluded from the scope of the order are casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

75 Fed. Reg. at 3205; 75 Fed. Reg. at 28,553. As a result of the AD/CVD Orders, unless otherwise specified, entries of OCTG from China are required to pay cash deposits equal to the 99.14% PRC-wide AD rate and the 13.41% "All Others" CVD rate, for a total AD/CVD cash deposit of 112.55%. 75 Fed. Reg. at 3,203-04; 75 Fed. Reg. at 28,552.

Commerce had determined that "green tube" from China processed into OCTG in a third country constitutes unfinished OCTG subject to AD/CVD. *Bell Supply Co. v. United States*, 393 F. Supp. 3d 1229, 1233 (CIT 2019); *Bell Supply Co. v. United States*, 888 F.3d 1222 (Fed. Cir. 2018). In *Bell Supply*, this Court in 2019 – after being reversed by the U.S. Court of Appeals for the Federal Circuit ("CAFC") – affirmed Commerce's finding that OCTG from Indonesia was subject merchandise because it was manufactured using green tube from China. *Id*. at 1233. The green (*i.e.*, unripe) tube at issue consisted of unfinished OCTG made to API specifications in China that was finished in Indonesia, where "**the finishing consists of heat treatment** by quenching and tempering, upsetting and threading (with integral joint), or threading and coupling." U.S. Department of Commerce Final Scope Ruling (Feb. 7, 2014) (Barcode 3179952),[1] at 1. Because green tube is specified in the scope, there would not have been any

---

[1]     Because Commerce documents on ACCESS "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," they can and are judicially noticed. Fed. Rule Evid. 201(b)(2); *Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1327 (CIT 2016).

PUBLIC VERSION

need for such protracted litigation had the scope clearly covered products from third countries –
which it does not, as the plain scope language omits any such reference. 75 Fed. Reg. at 3205; 75
Fed. Reg. at 28,553.

## II.    EAPA Proceeding

LE was found by CBP in 2025 through an EAPA investigation to have evaded AD/CVD
by importing into the United States OCTG that was produced and exported by PET in Thailand.
As set forth in turn below: (a) although the investigation commenced in February 2024 and
applied to entries a year earlier, LE first learned of this investigation following CBP's
announcement at the very end of May 2024; (b) both LE and PET provided CBP with extensive
information, establishing that the OCTG was manufactured in Thailand primarily using hollow
steel billets imported from China; and (c) CBP found duty evasion despite LE's arguments that
CBP lacked the authority to find PET's OCTG subject to AD/CVD, prompting this appeal.

### A.    Initiation and Interim Measures

In January 2024, the U.S. OCTG Manufacturers Association ("Alleger"), a trade
association of domestic OCTG producers, filed an EAPA allegation with CBP claiming, *inter
alia*, that that the OCTG imported by LE from PET was transshipped OCTG from China. OCTG
Allegation Letter (Jan. 18, 2024), CR Doc. No. 2, PR Doc. No. 2 ("Allegation"). According to
the Alleger, "PET is a company in Thailand that is transshipping Chinese OCTG to the United
States to evade payment of AD/CVD duties by claiming that it exports Thai OCTG." *Id*.

In February 2024, TRLED initiated an EAPA investigation upon finding that the
information submitted by the Alleger reasonably suggested that LE entered merchandise covered
by the scope of the AD/CVD Orders from China through evasion. TRLED Initiation Memo (Feb.
23, 2024), CR Doc. No. 21, PR Doc. No. 42. However, LE was not notified by CBP that it was
the target of an ongoing EAPA investigation or that the OCTG it continued to source was

4

potentially subject to AD/CVD. Instead, CBP in March 2024 issued a CF-28 to LE concerning the importation of OCTG from PET in Thailand. LE submitted its response to CBP in April 2024 and later re-submitted the CF-28 response in July 2024. LE CF-28 Response (July 22, 2024), CR Doc. No. 281, PR Doc. No. 360.

CBP on May 31, 2024, determined that there was reasonable suspicion that the OCTG imported from Thailand by LE and other importers had been Chinese origin OCTG transshipped through Thailand. Notice of Initiation of Investigation and Interim Measures (May 31, 2024), CR Doc. No. 33, PR Doc. No. 90 ("Notice of Initiation"), at 1-28. CBP, when initiating the EAPA investigation, did so based on "**allegations . . . that the Importers are entering OCTG that was transshipped** through" PET, *inter alia*. *Id*. at 3 (emphasis added). Interim measures were imposed requiring AD/CVD cash deposits on entries of OCTG from PET and potentially on entries during the period of investigation ("POI") that commenced on February 1, 2023 – one year prior to the date on which CBP acknowledged receipt of the duty evasion allegation. *Id*. at 2, 11. This Notice of Initiation was the first time that LE received notice that the OCTG it had imported since February 2023 was potentially subject to AD/CVD.

At no point during the EAPA investigation did CBP refer to Commerce the question of whether OCTG produced in Thailand from Chinese billets constitutes "covered merchandise," which is defined as "merchandise . . . subject to— (A) an {ADD} order . . . ; or a {CVD} order." 19 U.S.C. § 1517(a)(3). By statute:

> If the Commissioner receives an allegation . . . and is unable to determine whether the merchandise at issue is covered merchandise, the Commissioner shall—
> (i)    refer the matter . . . to determine whether the merchandise is covered merchandise . . . ; and
> (ii)   (ii) notify the party that filed the allegation, and any other interested party participating in the investigation, of the referral."

*Id*. § 1517(b)(4)(A); *see* 19 C.F.R. § 351.227 (process for EAPA referrals).

**B.      Submissions to CBP**

LE responded to CBP's initial request for information ("RFI") in July 2024 and supplemental RFI in September 2024, concerning OCTG that it imported during the POI that was produced by PET. LE RFI Response (July 9, 2024), CR Doc. No. 239, PR Doc. No. 318 ("LE RFI"); LE Supplemental RFI Response (September 20, 2024), CR Doc. No. 313, PR Doc. No. 435 ("LE Supp. RFI"). LE provided evidence relating to transactions involving the sale of the OCTG produced by PET, including extensive evidence demonstrating that the imported OCTG was properly declared as products of Thailand under applicable U.S. law. Specifically, LE's Taiwanese supplier, [                                                    ], confirmed that the OCTG produced by PET is country of origin Thailand. LE RFI at 14-15. LE also submitted quality certificates from PET, including quality certificates issued by [

], [                                    ], and the [    ]. *Id.* at 14-15, Exhibit V-5. The quality certificates reflected that PET produced the OCTG that LE imported from Thailand. *Id*. Each certificate identifies PET as a "manufacturer" of steel pipes. *Id*. LE also relied on the Certificates of Origin issued by the Thailand Ministry of Commerce to ensure that PET's merchandise was products of Thailand, as also verified against the port of embarkation on the bills of lading. *Id.* at 15.

PET, as the foreign producer, responded to two RFIs issued by CBP. PET RFI Response (July 9, 2024), CR Doc. Nos. 240-43, PR Doc. No. 319-323 ("PET RFI"); PET Supplemental RFI Response (September 10, 2024), CR Doc. No. 296, PR Doc. No. 407 (PET Supp. RFI). PET provided evidence demonstrating that PET had the necessary production capacity and produced the quantities of OCTG shipped to LE. PET RFI, at 20-26, Exhibits V-1, V-3; PET Supp. RFI, at 10, 14-15, Exhibits 18, 28.b, 29. PET demonstrated that it produced OCTG in Thailand using steel billet imported from China using two production processes starting from alternatively:

6

PUBLIC VERSION

hollow steel billet that constituted the vast majority of its OCTG; and solid steel billet for a very small portion. "PET's records indicated that its OCTG began with hollow steel billets from China [   ] percent of the time and began with round steel billets in the remaining instances. Thus, PET used hollow steel billets in the vast majority of the OCTG it exported to the United States." TRLED Determination at 28.

PET submitted sales documentation, including invoices and packing lists relating to the billets that PET purchased and used in production – both hollow and steel billets. *See* PET RFI, Exhibit VI-5.1, PET Supp. RFI at 14-15; PET Verification Exhibits (Nov. 10, 2024), CR Doc. No. 321, PR Doc. No. 452, Exhibit VE-12. PET established it imported hundreds of shipments of solid and hollow billets. PET RFI, CR Doc. No. 240, PR Doc. No. 320, at 274-293. PET provided photographs of the different types of steel billets that it uses to produce OCTG:

**<u>Hollow Steel Billet:</u>**

[                                                                              ]

7

PUBLIC VERSION

**Solid Steel Billet:**

[                                                                    ]

PET Supp. RFI Exhibit 39.

PET reported its using the same multi-step production process to produce OCTG regardless of whether it starts from solid steel billets or hollow steel billets. PET provided a detailed production flowchart of its [  ]-step production process, including pictures of the equipment used at each production stage. *Id.*, Exhibit 29; PET Verification Exhibits, Exhibit 3. Using the [  ]-step PET production process, the heat treatment at issue in *Bell Supply* occurred at step [     ] whereas the steel billet processing – whether solid or hollow steel billet – occurred four steps earlier, at step [     ]. PET Supp. RFI Exhibit 29; LE Written Arguments (Dec. 26, 2024), CR Doc. No. 363, PR Doc. No. 492 at 5-9. The following four additional steps are required to produce OCTG from steel billet – whether hollow or solid – as compared with green tube, before the production of OTCG from those distinct inputs converge at heat treatment:

8

[                                                                                    ]

PET Supp. RFI Exhibit 29.

On December 26, 2024, LE submitted written arguments. LE Written Arguments (Dec. 26, 2024), CR Doc. No. 363, PR Doc. No. 492. LE argued, *inter alia*, that substantial evidence on the record shows that the OCTG that PET supplied was produced by PET in Thailand from hollow or solid billets and thus was not merchandise covered by the AD/CVD Orders. *Id*. at 1-3. LE stated that "{t}o produce the OCTG pipe, PET imported China-origin hollow and solid steel

9

billets. Documents on the record clearly show that during the period of investigation PET imported hundreds of shipments of solid and hollow billets. These billets were then entered into production at PET, where they underwent extensive processing to produce OCTG." *Id*. at 4 (footnote omitted). LE detailed PET's production process, identifying the numerous operations performed on both hollow and steel billets to produce the OCTG, including hot sizing, straightening, cutting, E.M.I. flaw detection inspection, upsetting, heat treating, and testing, among others. *Id*. at 4-9.

### C.     TRLED Determination and Subsequent Administrative and Judicial Review

In February 2025, CBP's TRLED found that LE when importing OCTG from PET "entered merchandise covered by {AD/CVD Orders} . . . through evasion." TRLED Determination at 2. Central to TRLED's determination was CBP's finding that the OCTG produced by PET in Thailand from hollow billet constituted covered merchandise:

> PET stated that its OCTG production in Thailand began from either hollow steel billets from China or from solid round billets (also known as solid billets, round steel billets, or [                    ]). PET stated that it also used solid round billets to produce hollow steel billets in Thailand and that the solid round billets and hollow steel billets have the same chemical composition. Numerous record documents, such as [                                                            ], corroborate that **PET purchased and imported hollow steel billets from China.**
>
> The physical characteristics of PET's hollow steel billets from China place them firmly within the scope of the *AD/CVD Orders*. As noted in the name, hollow steel billets are a steel product. CBP officials' observations of hollow steel billets and the pictures PET provided of them confirm that they are of circular cross-section and are hollow in the middle. **Because PET's hollow steel billets from China are essentially tubes or casing that were [       ] and PET did not [       ] them in Thailand, that indicates that PET's hollow steel billets from China were [       ] in China.** Thus, because the [                                  ], PET's hollow steel billets were [       ] when it imported them. Finally, **nothing on the record indicates that these hollow steel billets met any of the *AD/CVD Order*'s exclusions**. Nowhere on the record are they claimed to be drill pipes, unattached couplings, unattached thread protectors, or to contain 10.5 percent or more weight of chromium. Thus, the physical characteristics of the hollow steel pipes demonstrate that they are Chinese-origin OCTG covered by the *AD/CVD Orders*.

> **The physical characteristics of hollow steel pipes indicate that they are covered by the *AD/CVD Orders*.** Further, the record indicates that PET's purported production in Thailand did not change the country of origin of the merchandise covered by the scope of the *AD/CVD Orders*. . . .
>
> The scope of the *AD/CVD Orders* state that "{t}he written description of the scope of this order is dispositive." . . . {S}ubstantial evidence on the record – including invoice descriptions, . . . PET's physical descriptions, and photographic evidence – indicate that the physical characteristics of the hollow steel billets . . . are covered by the plain language of the scope of the *AD/CVD Orders*. Thus, because the physical characteristics of the hollow steel billets . . . match the written description of the *AD/CVD Orders*, they are covered merchandise regardless of whether they are called hollow steel billets, mother pipe, green tubes, or any other appellation. Furthermore, because the hollow steel billets . . . match the written description of the *AD/CVD Orders*, Commerce does not need to make a scope determination.

*Id*. at 21-22, 50.

In April 2025, LE and other importers each timely submitted requests for administrative review. LE Request for Admin. Review (April 7, 2025), CR Doc. No. 382, PR Doc. No. 547. In its request for administrative review, LE established that record evidence demonstrated that the OCTG produced by PET in Thailand was not subject to the AD/CVD Orders:

> Substantial evidence on the record of this investigation shows that the OCTG was produced by PET in Thailand from hollow or solid billets. **The Chinese origin inputs such as solid and hollow billets are not OCTG subject to the AD/CVD Orders and thus are not covered merchandise under the plain scope. Similarly, the finished OCTG produced by PET in Thailand is not covered merchandise because it was produced in Thailand.** The AD/CVD Orders do not extend to OCTG produced in Thailand.

*Id*. at 6 (emphasis added).

On July 2, 2025, RR issued its decision affirming the TRLED Determination under 19 U.S.C. § 1517(c). Administrative Review Determination at 28. CBP found that there was substantial evidence that the importers imported OCTG from China into the United States by undervaluation, misclassification, and transshipment through Thailand by evasion. Central to this conclusion was the RR finding that PET's OCTG was subject to the AD/CVD Orders:

The scope language of the AD/CVD Orders clearly defines OCTG as "hollow steel products of circular cross-section," corresponding to PET's description of "hollow steel billets":

> *The scope of this order consists of {OCTG}, which are hollow steel products of circular cross-section, including oil well casing and tubing*, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.*, whether or not plain end, threaded, or threaded and coupled) whether or not conforming to {API} or non-API specifications, *whether finished* (including limited service OCTG products) *or unfinished* (including green tubes and limited service OCTG products), whether or not thread protectors are attached.

Very importantly, the scope language of the AD/CVD Orders clearly states that "hollow steel products of circular cross-section," whether finished or unfinished, are subject merchandise under the scope of the AD/CVD Orders. . . . **Based on the plain scope language, which includes unfinished merchandise, the AD/CVD Orders cover Chinese "hollow steel billets" that are finished in a third country, such as Thailand. PET's alleged finishing of in-scope Chinese "hollow steel billets" in Thailand to manufacture finished OCTG does not remove these "hollow steel billets" from the scope of the AD/CVD Orders**. . . .

Here, the plain language of the AD/CVD Orders clearly states that hollow steel products of circular cross-section, whether finished or unfinished, are covered, and remain covered, where the merchandise is subsequently finished in a third country such as Thailand.

Therefore, RR concludes that **there is substantial evidence that the "hollow steel billets" from China that PET used to manufacture finished OCTG in Thailand are covered by the scope** of the AD/CVD Orders.

*Id*. at 19-20 (emphases added) (footnotes omitted).

On August 13, 2025, LE appealed to this Court challenging CBP's final affirmative determination of evasion of the AD/CVD Orders on OCTG from China in the TRLED Determination and the subsequent Administrative Review Determination. *LE Commodities, LLC v. United States*, Court No. 25-00181, Summons (Aug. 13, 2025), ECF 1, Complaint (Aug. 13, 2025), ECF 2. LE thereafter amended its Complaint. ECF 35; Order (Feb. 4, 2025), ECF 42; *LE*

12

*Commodities, LLC v. United States*, Court No. 25-00181, LE Amended Complaint (Feb. 4, 2026). LE alleged, *inter alia*, that:

- CBP's EAPA decision finding evasion is not based on substantial evidence on the record, which demonstrates that the OCTG was produced in Thailand and is therefore outside the scope of the AD/CVD Orders;

- Commerce has never issued a scope ruling finding that OCTG produced in a third country from hollow steel billets from China are within the scope of the AD/CVD Orders and CBP does not have statutory or regulatory authority to interpret the scope of the Orders. CBP's determination that hollow steel billets, or OCTG produced in Thailand from hollow steel billets, are within the scope of the Orders was contrary to law because it exceeded CBP's statutory authority and was not supported by substantial evidence on the record;

- LE did not make any materially false statements or omissions by entering the OCTG as products of Thailand. Substantial record evidence establishes that the OCTG imported by Plaintiff was a product of Thailand, and therefore Plaintiff's entries declaring the imported OCTG as a product of Thailand were not false; and

- CBP violated LE's due process rights.

LE Amended Complaint ¶¶ 37-55, 72-78.

In September 2025, this Court entered an order granting a preliminary injunction to enjoin the liquidation of LE's entries that were subject to CBP's EAPA investigation pending resolution of a final court decision. *LE Commodities, LLC v. United States*, Court No. 25-181, Order (Sept. 19, 2025). In November, this Court entered an order to consolidate LE's appeal with those of other importers challenging CBP's EAPA determination, under that of Centric Pipe. Order (Nov. 24, 2025), ECF 30.

### III.    Commerce's Circumvention Inquiry

#### A.    Initiation and Preliminary Determination

On December 18, 2024, Commerce initiated a circumvention inquiry to determine whether imports of seamless OCTG completed in Thailand using steel billets manufactured in China are circumventing the AD/CVD Orders. *Oil Country Tubular Goods from the People's*

13

PUBLIC VERSION

*Republic of China: Initiation of Circumvention Inquiry on the Antidumping and Countervailing Duty Orders,* 89 Fed. Reg. 102,864 (Dec. 18, 2024) ("*Circumvention Initiation*"). This initiation was in response to a request filed by the Committee on Pipe and Tube Imports - Subcommittee for OCTG, and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Domestic Interested Parties" or "DIPs"). *Id*. at 102,864 n.1.

Commerce in February 2025 selected PET as a mandatory respondent to be individually examined in this circumvention inquiry. *Oil Country Tubular Goods from the People's Republic of China: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders,* 90 Fed. Reg. 40,336 (Aug. 19, 2025) ("*Preliminary Circumvention Determination*"), accompanying Preliminary Decision Memorandum ("PDM") at 2. In April and May 2025, PET submitted questionnaire responses to Commerce concerning its production of OCTG in Thailand from hollow and solid steel billets in Thailand. *Id*.

On August 19, 2025, Commerce published in the Federal Register its preliminary determination that imports of OCTG completed in Thailand using steel billets produced in China are circumventing the AD/CVD Orders. *Preliminary Circumvention,* 90 Fed. Reg. 40,336, accompanying Preliminary Decision Memorandum ("PDM"). Commerce preliminarily found that OCTG produced and/or exported by PET in Thailand using steel billets from China and exported from Thailand to the United States is circumventing the *Orders* on OCTG from China. PDM at 1, 16. Commerce reiterated that the inquiry merchandise is "OCTG products completed in Thailand using China-origin steel billets"; Commerce did not distinguish between hollow and solid steel billets and simply referred to the material that PET used in production as "steel billets." PDM at 7-8.

As recounted by Commerce, PET "reported that {it} produced and exported to the United States seamless OCTG products completed in Thailand using China-origin steel billets and subsequently exported from Thailand to the United States." *Id*. at 7. Commerce also noted that PET reported that it "used only Chinese-origin steel billets in the production of seamless OCTG" during the 2023 POI and "provided information regarding all of its steel billet purchases from China during the POI." *Id*. at 7. Because PET was fully cooperating in the circumvention inquiry, it became authorized to export OCTG without AD/CVD if accompanied by certifications attesting to its OCTG not using China-origin steel billets. *Preliminary Circumvention Determination*, 90 Fed. Reg. at 40,337-40.

**B.      Briefing and Final Circumvention Determination**

Following issuance of the Commerce's *Preliminary Determination*, the domestic interested parties, (collectively, "DIPs") argued that, in its final determination, Commerce should reverse course and limit its finding to only PET's OCTG produced from solid steel billets. *Oil Country Tubular Goods from the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 91 Fed. Reg. 9311 (Feb. 27, 2026) ("*Circumvention Determination*"), accompanying Issues and Decision Memorandum ("IDM"), Comment 1. DIPs urged Commerce to find that the hollow steel billet used by PET was itself subject merchandise:

> Commerce should not include in its circumvention analysis the exports made by {PET} of OCTG completed "hollow billets," because these hollow billets are unfinished OCTG from {China} that are already covered by the scope of the {*Orders*} on {OCTG} from China. . . . In fact, the scope of the *Orders* specifically includes this type of unfinished OCTG. As Commerce has found in previous scope inquiries on the *Orders* – and th{is Court} has upheld – this includes unfinished OCTG which undergoes further processing in third countries. Moreover, Commerce has recognized in other proceedings that it is unnecessary to conduct a circumvention inquiry with respect to merchandise that is already covered by the scope of the AD/CVD *Orders* at issue. Additionally, Domestic Interested Parties' initial request for a circumvention inquiry into the *Orders*

15

> made clear that its circumvention inquiry request was for OCTG made from solid steel billets rather than already-hollowed tubes.

*Id.* at 4 (quoting DIP Case Brief (Apr. 10, 2025) (ACCESS Barcode 4823044)).

PET in rebuttal challenged DIPs' claims that the AD/CVD scope includes OCTG made from hollow billets:

> {DIPs} requested a circumvention inquiry to determine whether imports of OCTG from China produced in Thailand using steel billets from China are circumventing the AD/CVD Orders on OCTG from China. Mandatory respondent PET reported that it produces OCTG primarily from hollow steel billets from China, but also using solid steel billet. PET provided extensive information concerning its OCTG produced from hollow steel billets, and further detailed the minor deviation in its production process when alternatively sourcing these inputs. PET produces OCTG in Thailand using hollow and solid steel billet using the same multi-step production process to produce OCTG regardless of whether it starts from solid or hollow steel billets, with both inputs undergoing the same machinery and processing to ensure that the OCTG meets API standards.
>
> **There is no merit to DIPs' claim that OCTG produced in third countries using hollow steel billet from China is subject merchandise**. DIPs misplace reliance on inapplicable precedent that either does not involve third country processing or is otherwise completely distinguishable. *Bell Supply* is limited to OCTG produced using green tube from China that–unlike PET's OCTG made from hollow steel billets–only requires heat treatment. When using hollow steel billets, the critical diameter and concentric shape, as well as the straightness of the tube, are not fixed until after the billets are heated and pass through machines. PET's OCTG production using hollow steel billet undergoes four additional steps before such heat treatment. The Department has not conducted any scope inquiry for OCTG produced in third countries using hollow steel billets from China, and inapplicable precedent cannot credibly be stretched without the Department first conducting its substantial transformation analysis required by law.
>
> **DIPs' other bases are . . . devoid of merit in terms of allegedly showing that the Department has found OCTG made in third countries using hollow billet from China to be subject merchandise**. Harmonized Tariff Schedule subheadings cannot be relied upon, as it is axiomatic in AD/CVD law that such subheadings are not dispositive. DIPs advance the incorrect, revisionist theory that their requested circumvention inquiry was limited to OCTG produced in Thailand from solid steel billets. DIPs in fact only requested such an inquiry on steel billet, without specifying type, in July 2024–after they had knowledge of PET's hollow billet usage from the EAPA investigation initiated in May 2024. DIPs tellingly forewent multiple opportunities to limit their circumvention inquiry to hollow billets before initiation in December 2024. Finally, DIPs incorrectly

16

claim that CBP made a scope determination concerning PET's OCTG using hollow steel billets in the EAPA investigation. It is well-established that CBP's role is ministerial to merely carry out Department AD/CVD instructions. **The Department cannot credibly accept a scope determination made by CBP, which inverts the legal procedure through which the Department instructs CBP concerning scope coverage**.

*Id*. at 4 (quoting PET Rebuttal Brief (Sept. 22, 2025) (ACCESS Barcode 4883905), at 9) (emphases added). Commerce conducted a public hearing in December 2025, at which time DIPs made an impassioned plea that PET's hollow billet OCTG be found to constitute subject merchandise. Hearing Transcript (Dec. 2, 2025) (ACCESS Barcode 4853132).

Commerce in February 2026 issued its *Circumvention Determination* (that agreed with PET and rejected DIPs' arguments) finding that the scope of the AD/CVD Orders does not include OCTG produced from hollow billets in third countries:

> **Commerce disagrees with {DIPs} regarding whether it should find the hollow steel billets used by PET in its production of seamless OCTG to be within the scope of the *Orders*.** . . . {DIPs} assert that Commerce should limit the analysis for this final determination to solely the OCTG produced by PET from solid steel billets. {DIPs} argue that the "hollow billets" reported on the record of this proceeding by PET as an input in its production of seamless OCTG are, in fact, hollow steel products of circular cross-section purchased for end use in oil and gas wells, and are thus considered unfinished OCTG within the scope of the *Orders*. . . .
>
> **{T}here is no evidence on the record that the scope of the *Orders* specifically includes OCTG produced in third countries from hollow billets from China**. We also note that no party requested a scope determination for hollow steel billets further processed into OCTG. . . . **{W}e continue to base our analysis and findings on OCTG produced from *all* steel billets that are used by PET**. . . . {W}e again emphasize PET's record information demonstrating that it produces seamless OCTG in Thailand in the same manner "regardless of whether it starts from solid steel billets or hollow steel billets." . . .
>
> We therefore find the argument that hollow billets used as inputs by PET are conclusively covered by the scope of the *Orders* based on HTSUS subheadings to be unavailing. Further, **we cannot determine that hollow billets further processed into OCTG in a third country are within the scope of the *Orders* without doing a substantial transformation and country-of-origin analysis** under 19 CFR 351.225(j) . . . .

> {W}e recognize PET's argument that the domestic interested parties did not explicitly limit their circumvention request to focus on strictly solid steel billets.

IDM at 6-7 (emphasis added) (emphases added) (footnotes omitted). Commerce concluded that, consistent with the *Preliminary Determination,* "**all imports of seamless OCTG completed by PET in Thailand using steel billets produced in China are circumventing the *Orders*.**" *Id.* at 8 (emphasis added).

Commerce's *Circumvention Determination* did not make any of the findings required for its AD/CVD assessment to apply before the December 18, 2024, date of initiation. IDM at 1-13; PDM at 1-16. By Commerce regulation, an affirmative circumvention determination will apply prospectively from the date of initiation unless there is a specific argument supported by evidence establishing the propriety of an earlier date, or there has been an EAPA referral:

> (A) *In general.* Subject to paragraph (l)(2)(iii)(B) of this section, **if the Secretary determines that it is appropriate to do so, the Secretary may direct U.S. Customs and Border Protection to begin the suspension of liquidation and require a cash deposit of estimated duties**, at the applicable rate, for each unliquidated entry of the product not yet suspended, entered, or withdrawn from warehouse, for consumption **prior to the date of publication of the notice of initiation of the inquiry**. The Secretary may take action under this provision at the timely request of an interested party or at the Secretary's discretion. **In response to a timely request from an interested party, the Secretary will only consider an alternative date based on a specific argument supported by evidence establishing the appropriateness of that alternative date.**
>
> (B) *Exception.* If the Secretary has determined to address **a covered merchandise referral** (*see* § 351.227) in a circumvention inquiry under § 351.226, the rules of § 351.227(l)(2)(iii) will apply.

19 C.F.R. § 351.226(l)(2)(ii) (emphases added).

None of these regulatory exceptions apply to Commerce's circumvention inquiry for OCTG from Thailand. DIPs at no point requested that AD/CVD apply to a date other than the regulatory default date of initiation, and Commerce did not make any findings that would

18

PUBLIC VERSION

support such retroactive AD/CVD assessment. *See* IDM at 1-13; PDM at 1-16. Nor did

Commerce conduct its circumvention inquiry in the context of a covered merchandise referral, as

CBP declined to make any such referral during its EAPA investigation. *See Circumvention*

*Initiation*, 89 Fed. Reg. 102,864-86; IDM at 1-13; PDM at 1-16. Accordingly, by operation of

Commerce regulation, the OCTG that PET produced in Thailand that Commerce found to be

circumventing the AD/CVD Orders on OCTG from China due to its China-origin steel billet

input should have become prospectively subject to AD/CVD commencing on the date when that

inquiry was initiated – i.e., **December 18, 2024**.

**STANDARD OF REVIEW**

The standard of judicial review for EAPA determinations is set forth in 19 U.S.C.

§1517(g)(2). The Court reviews CBP's evasion determination for compliance with all procedures

under 19 U.S.C. §§ 1517(c) and (f) and will hold unlawful "any determination, finding, or

conclusion {that} is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." 19 U.S.C. §1517(g)(2). Federal courts have recognized that the standard of review for

international trade cases also encompasses the standards established under the Administrative

Procedures Act, 5 U.S.C. § 706(2). *Changzhou Wujin Fine Chemical Factory Co. v. United*

*States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) ("We review Commerce's decision under the

Administrative Procedure Act and any other applicable law.") (citing *SKF USA, Inc. v. United*

*States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001)).

Although a "court is not to substitute its judgment for that of an agency, the agency

nevertheless must examine the relevant data and articulate a satisfactory explanation for its

action." *Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).

In its review of an agency's explanation, the "court must consider whether the decision was

based on a consideration of the relevant factors and whether there was a clear error of judgment."

19

*Id.* The relevant factors that a court will consider in setting aside agency decisions are whether the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. at 43; *O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996). "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represent an unreasonable judgment in weighing relevant factors . . . ." *WelCom Prods., Inc. v. United States*, 865 F. Supp. 2d 1340, 1344 (CIT 2012) (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

"{C}ourts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1369). Commerce, as any agency, must "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfgrs.* 463 U.S. at 48. Commerce is obligated to "articulate a rational connection between the facts found and the choice made." *Bowman Transp., Inc. v. Ark.-Best Freight System, Inc.*, 419 U.S. 281, 285-86 (1974).

"Moreover, when review of an agency's action is 'bound up with a record-based factual conclusion,' the reviewing court must determine whether that conclusion 'is supported by substantial evidence.'" *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 63 (D.D.C. 2016) (quoting *Dickinson v. Zurko*, 527 U.S. 150, 164, 119 S. Ct. 1816 (1999)). When a

20

reviewing court is "tasked with reviewing a decision based on an agency record, and that record does not support the contested decision, the court must remand for further proceedings." *Royal Brush Manufacturing Inc. v. United States*, 483 F. Supp. 3d 1294, 1304 (CIT 2020). As recognized by the U.S. Supreme Court decades ago:

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

## **ARGUMENT**

## I.      **LE ENDORSES ALL ARGUMENTS OF CENTRIC PIPE**

LE fully supports and incorporates herein by reference all arguments made by Centric Pipe in its Rule 56.2 Motion and accompanying Memorandum of Law. Like LE, Centric Pipe imported OCTG that was produced by PET in Thailand and exported to the United States. Notice of Initiation at 8, 11. The arguments and evidence advanced by Centric Pipe are therefore directly applicable to LE, with which it shares common claims and the same set of operative facts. *Id.* at 7-11, 17-26. *Compare* LE Amended Complaint at 1-17 *with* Centric Pipe Amended Complaint, ECF 43, at 1-18. LE respectfully requests that this Court grant the relief requested by Centric Pipe, and apply that relief towards LE by remanding this EAPA investigation to CBP for reconsideration of the findings that LE and Centric Pipe committed duty evasion by importing OCTG from PET in Thailand. LE submits this separate brief to emphasize the unlawfulness of CBP making an *ultra vires* scope determination, particularly given Commerce's findings as to PET in its *Circumvention Determination*. Section II, *infra*.

21

## II.    CBP UNLAWFULLY DETERMINED THAT PET'S OCTG IS WITHIN THE SCOPE OF THE AD/CVD ORDERS

CBP's determination in its EAPA investigation that LE had committed duty evasion was unlawful and not supported by substantial evidence because, as set forth in turn below: (a) the OCTG exported by PET did not constitute covered merchandise during the EAPA POI; (b) CBP improperly made specific findings in the EAPA investigation that the PET OCTG was subject to the AD/CVD orders; and (c) CBP committed a series of legal errors in finding that LE has evaded AD/CVD on the OCTG imported from PET in Thailand.

### A.    OCTG Exported By PET Did Not Constitute Covered Merchandise

The scope of the AD/CVD Orders on OCTG from China in relevant part "consists of certain OCTG, which are hollow steel products of circular cross-section, . . .  whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products)." 75 Fed. Reg. at 3205; 75 Fed. Reg. at 28,553. Because the scope does not address third country processing, for the OCTG exported by PET from Thailand to be subject to AD/CVD, the steel billet inputs from China used to manufacture such OCTG in Thailand must itself constitutes OCTG from China that is "unfinished (including green tubes and limited service OCTG products)." *Id*. There is no factual or legal basis to support finding that the steel billet imported by PET constituted unfinished OCTG.

The AD/CVD status of PET's OCTG is unaffected by Commerce's prior finding that green tubes from China processed into finished OCTG in Indonesia was subject merchandise. *Bell Supply*, 393 F. Supp. 3d at 1233; *Bell Supply*, 888 F.3d at 1228-31. Such precedent is limited to the specific product on which domestic parties requested the scope ruling. That product in *Bell Supply* was unfinished OCTG (including green tubes) where "the **finishing consists of heat treatment** by quenching and tempering, upsetting and threading (with integral

22

joint), or threading and coupling." *Bell Supply* Remand, at 32 (emphasis added). Moreover, green tube is expressly identified in the scope as an exemplar of unfinished OCTG. 75 Fed. Reg. at 3205; 75 Fed. Reg. at 28,553.

At issue in *Bell Supply* was Commerce's analysis concluding that no substantial transformation of the green tube from China occurred when processed into OCTG in Indonesia. While finding that "Commerce fails to reasonably explain how its findings on . . . class or kind of merchandise{} contribute to its conclusion that no substantial transformation has occurred," this Court nonetheless found that "Commerce's redetermination reasonably explains how the nature and sophistication of the third-country processing inform its substantial transformation determination." *Bell Supply*, 393 F. Supp. 3d at 1233. This Court further found that "Commerce supported its finding that the heat treatment process is common and uses standard equipment" as well as "its conclusion that the basic physical properties remain unchanged." *Id*. at 1241. Finally, Commerce reexamined the cost of production/value added but determined that this factor "may weigh toward a finding of substantial transformation." *Id*. at 1243 (citing *Bell Supply* Remand at 29). Importantly, **Commerce's findings with respect to the nature and sophistication of the third-country processing factor related only to heat treatment**. *See id*. at 1240-42.

The OCTG at issue in *Bell Supply* produced in Indonesia using green tube from China, that only requires heat treatment, is completely distinguishable from PET's OCTG produced in Thailand using hollow steel billets from China. Prior to the type of heat treatment at issue in *Bell Supply*, the hollow steel billets used by PET must first go **through the [**

**] machines. When using hollow steel billets, the critical diameter and concentric shape, and straightness of the tube, is not fixed** until after the billets are heated and pass through the [                                      ] machines. Therefore, PET's hollow steel billets

23

PUBLIC VERSION

are not comparable to unfinished OCTG (including green tubes) until after they pass through the

[                                        ] machines. Using the [   ]-step PET production process, the heat

treatment at issue in *Bell Supply* occurred at step [     ] whereas the steel billet processing –

whether solid or hollow steel billet – occurred four steps earlier, at step [     ]. PET Supp. RFI

Exhibit 29; LE Written Arguments at 5-9. The following four additional steps are required to

produce OCTG from steel billet – whether hollow or solid – as compared with green tube, before

the production of OTCG from those distinct inputs converge at heat treatment:

[

24

]

PET Supp. RFI Exhibit 29.

Indeed, Commerce itself recently confirmed that the OCTG produced in Thailand by PET was not subject to the scope of the AD/CVD orders, as it otherwise would not have been able to find such products circumventing; by definition, in-scope merchandise cannot be circumventing. Commerce in August 2025 preliminarily found all PET OCTG products circumventing based on the China-origin steel billets – both the hollow steel billets that used in the vast majority of its production and the solid steel billets used in a small fraction of its production. *Preliminary Circumvention,* 90 Fed. Reg. 40,336. Commerce preliminarily found that OCTG produced and/or exported by PET in Thailand using steel billets from China and exported from Thailand to the United States is circumventing the *Orders* on OCTG from China. PDM at 1, 16. Commerce reiterated that the inquiry merchandise is "OCTG products completed in Thailand using China-origin still billets"; Commerce did not distinguish between hollow and solid steel billets and simply referred to the material that PET used in production as "steel billets." PDM at 7-8.

DIPs, perhaps recognizing the resulting invalidation of CBP's EAPA determination, zealously advocated for Commerce to reverse itself and limit its circumvention inquiry to only OCTG in Thailand produced from solid steel billet from China. DIP Case Brief, ACCESS

25

PUBLIC VERSION

Barcode 4823044; Hearing Transcript, ACCESS Barcode 4853132; IDM Comment 1. Yet these arguments were expressly rejected. IDM Comment 1. Commerce could not have been clearer that both types of PET's OCTG constituted circumvention inquiry merchandise, and there had not been a standalone scope inquiry that would be necessary to assess whether OCTG made in Thailand from China-origin hollow steel billet was subject to AD/CVD:

> **Commerce disagrees with {DIPs} regarding whether it should find the hollow steel billets used by PET in its production of seamless OCTG to be within the scope of the _Orders_.** . . .

> **{T}here is no evidence on the record that the scope of the _Orders_ specifically includes OCTG produced in third countries from hollow billets from China.** We also note that no party requested a scope determination for hollow steel billets further processed into OCTG. . . .

> **{W}e cannot determine that hollow billets further processed into OCTG in a third country are within the scope of the _Orders_ without doing a substantial transformation and country-of-origin analysis** under 19 CFR 351.225(j) . . . .

IDM at 6-7 (emphases added).

This Commerce analysis confirmed that PET's OCTG did not, during the EAPA investigation, constitute "covered merchandise" that is defined as "merchandise . . . subject to— (A) an {ADD} order . . . ; or a {CVD} order." 19 U.S.C. § 1517(a)(3). Commerce only imposed AD/CVD on this circumvention inquiry merchandise commencing on the December 18, 2024, date of initiation, but did not make any findings as would be required by regulation to retroactively apply the determination to merchandise imported before that date. Commerce reached this decision despite CBP attempting to impose AD/CVD retroactively back to entries in the EAPA POI reaching back to February 1, 2023. _See_ 19 C.F.R. § 351.226(l)(2)(ii); IDM at 1-13; PDM at 1-16; Initiation Notice at 2.

26

PUBLIC VERSION

**B.      CBP Found Duty Evasion Upon Finding PET's OCTG Subject to AD/CVD**

CBP, through both TRELD in its initial determination and RR on administrative review,

found that PET's OCTG was subject to AD/CVD. First, TRLED found that:

> The physical characteristics of PET's hollow steel billets from China place them
> firmly within the scope of the *AD/CVD Orders*. . . . CBP officials' observations of
> hollow steel billets and the pictures PET provided of them confirm that they are of
> circular cross-section and are hollow in the middle. **Because PET's hollow steel
> billets from China are essentially tubes or casing that were [          ] and
> PET did not [        ] them in Thailand, that indicates that PET's hollow
> steel billets from China were [          ] in China.** Thus, because the [
>                                              ], PET's hollow steel billets
> were [          ] when it imported them. Finally, **nothing on the record
> indicates that these hollow steel billets met any of the *AD/CVD Order*'s
> exclusions**. . . .
>
> **The physical characteristics of hollow steel pipes indicate that they are
> covered by the *AD/CVD Orders.*** Further, the record indicates that PET's
> purported production in Thailand did not change the country of origin of the
> merchandise covered by the scope of the *AD/CVD Orders*. . . .
>
> The scope of the *AD/CVD Orders* state that "{t}he written description of the
> scope of this order is dispositive." . . . {S}ubstantial evidence on the record –
> including invoice descriptions, . . . PET's physical descriptions, and photographic
> evidence – indicate that the physical characteristics of the hollow steel billets . . .
> are covered by the plain language of the scope of the *AD/CVD Orders*. . . .
> {B}ecause the hollow steel billets . . . match the written description of the
> *AD/CVD Orders*, Commerce does not need to make a scope determination.

TRLED Determination at 21-22, 50.

RR subsequently affirmed this TRELD finding as follows:

> **Based on the plain scope language, which includes unfinished merchandise,
> the AD/CVD Orders cover Chinese "hollow steel billets" that are finished in
> a third country, such as Thailand. PET's alleged finishing of in-scope
> Chinese "hollow steel billets" in Thailand to manufacture finished OCTG
> does not remove these "hollow steel billets" from the scope of the AD/CVD
> Orders**. . . .
>
> Here, the plain language of the AD/CVD Orders clearly states that hollow steel
> products of circular cross-section, whether finished or unfinished, are covered,
> and remain covered, where the merchandise is subsequently finished in a third
> country such as Thailand.

PUBLIC VERSION

Therefore, RR concludes that **there is substantial evidence that the "hollow steel billets" from China that PET used to manufacture finished OCTG in Thailand are covered by the scope** of the AD/CVD Orders.

Administrative Review Determination at 19-20 (emphases added).

This CBP findings cannot be reconciled with the contradictory subsequent Commerce circumvention inquiry finding that such products did not constitute subject merchandise and that a scope inquiry would in fact be necessary to reach such conclusion:

> {T}**here is no evidence on the record that the scope of the** *Orders* **specifically includes OCTG produced in third countries from hollow billets from China**. We also note that no party requested a scope determination for hollow steel billets further processed into OCTG. . . .

> {W}**e cannot determine that hollow billets further processed into OCTG in a third country are within the scope of the** *Orders* **without doing a substantial transformation and country-of-origin analysis** under 19 CFR 351.225(j) . . . .

IDM Comment 1 (emphases added).

CBP therefore based its EAPA duty evasion determination on its understanding that PET's OCTG constituted subject merchandise, which was subsequently disputed by Commerce. By finding duty evasion based on its interpretation of the AD/CVD Orders' scope, CBP in its EAPA investigation committed a series of legal errors set forth below. Section II.C, *infra*.

### C.    CBP Committed Legal Errors In Finding LE Liable For Duty Evasion

"It is well-established that CBP's role . . . is ministerial; in other words, it merely carries out the instructions of Commerce." *Acme Furniture Indus., Inc. v. United States*, 36 CIT 1025, 1029 (2012) (emphasis added) (citing *Mitsubishi Elecs. Am., Inc. v. United States*, 44 F.3d 973, 977 (Fed. Cir. 1994)). It is not CBP's role to evaluate AD/CVD scope coverage and make substantive determinations as to scope application. CBP committed legal error by making a substantive determination that OCTG produced by PET was subject to the AD/CVD Orders. This legal error was confirmed by Commerce itself making the contradictory finding that such OCTG

28

was not within scope, at least without a scope inquiry that had yet to be requested. *Compare*

TRLED Determination at 21-22, 50; Administrative Review Determination at 19-20 *with* IDM

Comment 1. CBP could not have been merely following Commerce instructions in a ministerial

fashion by interpreting the scope in a diametrically opposite manner as did Commerce in its

circumvention inquiry, which specifically rejected the interpretation upon which CBP found duty

evasion.

Relatedly, CBP's apparent scope determination "is based on an erroneous interpretation

of the law, on factual findings that are not supported by substantial evidence, {and} represent{s}

an unreasonable judgment." *WelCom Prods*, 865 F. Supp. 2d at 1344 (CIT 2012). The scope

covers "certain OCTG" and not steel inputs such as hollow steel billet; the scope covering

OCTG that is "unfinished (including green tubes)" does not cover inputs such as hollow steel

billets merely because they are "are hollow steel products of circular cross-section" made of

"steel." 75 Fed. Reg. at 3205; 75 Fed. Reg. at 28,553. CBP misreads the scope by disregarding

the most prominent requirement that the product in fact be "OCTG." *Id*. Scope language is

judicially recognized as "paramount" and if "unambiguous, it controls." *King Supply Co. v.*

*United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012); *Fedmet Res. Corp. v. United States*, 755

F.3d 912, 918 (Fed. Cir. 2014); *Meridian Products LLC v. United States*, 918 F.3d. 1375, 1379-

1384 (Fed. Cir. 2017). RR therefore incorrectly found PET's OCTG to constitute subject merchandise

based on "the plain scope language." Administrative Review Determination at 19.

CBP, beyond being unauthorized to make substantive scope determination, misconstrued

that undertaking. For example, CBP emphasizes that "**nothing on the record indicates that**

**these hollow steel billets met any of the *AD/CVD Order*'s exclusions**. Nowhere on the record

are they claimed to be drill pipes, unattached couplings, unattached thread protectors, or to

29

contain 10.5 percent or more weight of chromium." TRLED Determination at 20 (emphasis added). It is axiomatic that there must first be an affirmative finding that the imported product is covered by the description of the scope before "proceed{ing} to consider whether the scope contained exclusionary language." *Stein Indus. Inc. v. United States*, 365 F. Supp. 3d 1364, 1371-73 (CIT 2019). An assessment of whether products are subject merchandise may not first "incorrectly assume{} that . . . products met the description of subject merchandise." *Id*. at 1371. Likewise, in its scope analysis emphasized the "physical characteristics" of hollow steel billet. TRLED Determination at 21-22, 50. Yet the "physical characteristics" criterion is by regulation only relevant "if the language of the scope" is "not dispositive." 19 C.F.R. § 351.225(k)(1)-(2)(i)(A). Here, there is no basis to consider physical characteristics because, by covering OCTG proper and not its inputs, "the language of the scope is dispositive." 19 C.F.R. § 351.225(k)(1).

CBP's scope interpretation is further unsupported by substantial evidence. PET demonstrated that under its [  ]-step PET production process, green tube production occurred at step [    ] whereas the steel billet processing – whether solid or hollow steel billet – occurred four steps earlier, at step [    ]. PET Supp. RFI Exhibit 29; LE Written Arguments at 5-9. Without considering evidence that these four additional steps are required to produce OCTG from steel billet – whether hollow or solid – as compared with green tube, CBP found duty evasion "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). CBP's determination that PET exported OCTG subject to the AD/CVD order is accordingly not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 229.

30

CBP further violated its statutory obligation to issue a covered merchandise referral. By statute, if CBP "is unable to determine whether the merchandise at issue is covered merchandise, the Commissioner shall—(i) refer the matter . . . to determine whether the merchandise is covered." 19 U.S.C. § 1517(b)(4)(A). With Commerce itself being unable to find that PET's OCTG was subject merchandise without conducting a scope inquiry, IDM Comment 1, CBP could not possibly "determine whether the merchandise at issue is covered merchandise." 19 U.S.C. § 1517(b)(4)(A). Yet, as identified above, at no point during the EAPA investigation did CBP refer the question of whether OCTG produced from hollow billets is within the scope of the AD/CVD Orders to Commerce for a scope ruling. Statement of Facts II.A, *supra*. By declining to issue a covered merchandise referral, which was enacted for this precise purpose, CBP acted contrary to law and usurped Commerce's exclusive scope interpretation authority.

Beyond the procedural violation by failing to refer, CBP committed a substantive violation of the EAPA statute by finding LE liable for duty evasion. Under the EAPA statute:

> a determination of evasion requires a finding that covered merchandise has entered the United States by "means of any document or electronically transmitted data or information, written or oral statement, or act that is material and *false*, or any *omission* that is material." 19 U.S.C. § 1517(a)(5)(A) (emphasis supplied). "False" is defined as: " "Untrue . . . Deceitful . . . Not genuine; inauthentic . . .  What is false can be so by intent, by accident, or by mistake ... Wrong; erroneous . . . ." *False,* BLACK'S LAW DICTIONARY (11th ed. 2019). An "omission" is defined as: "A failure to do something; esp., a neglect of *duty* ... [ ]he act of leaving something out ... {t}he state of having been left out or of not having been done . . . {s}omething that is left out, left undone, or otherwise *neglected.*" *Omission*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis supplied).

*Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1353 (CIT 2021).

When entering OCTG from Thailand produced by PET as not subject to AD/CVD, LE did not undertake an "act that is material and *false*, or any *omission* that is material." 19 U.S.C. § 1517(a)(5)(A). The plain language of the scope covers OCTG and not hollow steel billets that

31

require substantial additional processing before they become OCTG. 75 Fed. Reg. at 3205; 75 Fed. Reg. at 28,553. Indeed, Commerce has confirmed that PET's hollow steel billet has not been found to constitute subject merchandise. IDM Comment 1. By properly entering the PET OCTG as not subject to AD/CVD, it cannot be said that LE's actions were: "Untrue"; "Deceitful"; "Wrong; erroneous"; or otherwise constituted "a neglect of *duty*." *Diamond Tools*, 545 F. Supp. 3d at 1353 (citations omitted) (emphasis in original).

This Court's ruling in *Diamond Tools* is instructive on this point. That case challenged an affirmative EAPA determination as to Diamond Tools Technology LLC ("DTT") for importing diamond sawblades imported from Thailand using China-origin cores and segments. *Id*. at 1328-31. That EAPA investigation featured a referral to Commerce that resulted in an affirmative circumvention determination. *Id*. This Court invalidated CBP's EAPA determination based on the lack of the requisite "act that is material and false, or any omission that is material." *Id*. at 1352-56; 19 U.S.C. § 1517(a)(5)(A). CBP committed legal error because:

> Customs in its Final Determination and Final Administrative Decision failed to reference any authority that would create an obligation on DTT USA to seek a scope determination from Commerce or to seek a clarification from Customs . . . . Accordingly, . . . Customs has failed to demonstrate how, if at all, DTT USA's actions constitute a material and false statement or act, or a material omission.

*Diamond Tools*, 545 F. Supp. 3d at 1354-55. Likewise here, given that the OCTG from PET was not subject to AD/CVD, as confirmed by Commerce, CBP "failed to reference any authority that would create an obligation on {LE} to seek a scope determination from Commerce or to seek a clarification from Customs." *Id*.

CBP also unlawfully assessed AD/CVD on LE's entries of OCTG from PET in Thailand before December 18, 2024, when Commerce initiated its circumvention inquiry. *Circumvention Initiation*, 89 Fed. Reg. 102,864. As Commerce did not make the requisite findings to deviate

32

PUBLIC VERSION

from this regulatory default, there is no legal basis to extend AD/CVD liability retroactively to February 2023. Notice of Initiation at 2. LE recognizes that this Court in *Diamond Tools* found that "Customs' . . . covered merchandise determination is not bound by Commerce's circumvention timeline." *Diamond Tools*, 545 F. Supp. 3d at 1349-51. Yet this aspect of *Diamond Tools*, with which LE disagrees, is not binding. *D&L Supply Co. v. United States*, 22 CIT 539, 540 (1998) ("the Court . . . is not bound by a decision of another judge of the same court"). Moreover, *Diamond Tools* is entirely distinguishable from this EAPA investigation because there CBP followed its statutory mandate by issuing a referral to Commerce. 545 F. Supp. 3d at 1330-31. This referral factored prominently in this Court's determination to find AD/CVD could be assessed retroactively before the date the Commerce initiated its circumvention inquiry. *Id*. at 1344-47. Indeed, Commerce has codified EAPA referrals as an express regulatory exception to the date of initiation being the default cutoff for AD/CVD liability. 19 C.F.R. § 351.226(l)(2)(ii)(B). CBP's failure to issue a referral concerning PET's OCTG therefore precludes it from assessing AD/CVD before December 18, 2024.

## III.    CBP VIOLATED LE'S DUE PROCESS RIGHTS

CBP violated LE's due process rights. The CAFC has confirmed that due process requires fair warning before assessment of ADD/CVD liability, recognizing: "the broader due-process principle that before an agency may enforce an order or regulation by means of a penalty or monetary sanction, it must 'provide regulated parties **fair warning** of the conduct {the order or regulation} prohibits or requires.'" *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487, 495 (Fed. Cir. 2020) (emphasis added) (quoting *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300-01 (Fed. Cir. 2013); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012)); *see Trans Texas Tire, LLC v. United States*, 519 F. Supp. 3d 1275, 1287-88 (CIT 2021); *Trans Texas Tire, LLC v. United States*, 519 F. Supp. 3d 1289, 1304-05 (CIT 2021).

LE did not have fair warning that the OCTG that it imported from PET in Thailand would be retroactively subject to AD/CVD. This conclusion results from the fact that such OCTG was not subject to the AD/CVD Order, as confirmed by Commerce and detailed above. IDM Comment 1; Section II, *supra*. Moreover, LE in its submissions to CBP demonstrated that the OCTG produced by PET was properly declared as product of Thailand under applicable U.S. law. LE's Taiwanese supplier, [       ], confirmed that the OCTG produced by PET is country of origin Thailand. LE RFI at 14-15. LE also submitted quality certificates from PET, including quality certificates issued by [                                                    ], [

                ], and the [   ]. *Id.* at 14-15, Exhibit V-5. The quality certificates reflected that PET produced the OCTG that LE imported from Thailand. *Id*. Each certificate identifies PET as a "manufacturer" of steel pipes. *Id*. LE also relied on the Certificates of Origin issued by the Thailand Ministry of Commerce to ensure that PET's merchandise was products of Thailand, as also verified against the port of embarkation on the bills of lading. *Id.* at 15. Given this evidentiary record and the inability of Commerce to find that PET's OCTG produced in Thailand constitutes subject merchandise, LE lacked the requisite fair warning that such OCTG would be subject to the AD/CVD Orders on OCTG from China.

The earliest that LE could have received warning of AD/CVD applicability was when it received the Notice of Initiation that CBP issued on the last day of May 2024, extending AD/CVD retroactively back to February 1, 2023. Notice of Initiation at 1-2. By delaying such notice, CBP violated the Fifth Amendment to the Constitution that "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The CAFC has repeatedly recognized that importers are entitled to procedural due process rights under the Fifth Amendment in AD/CVD proceedings

that include EAPA investigations. *See Royal Brush Mfg. v. United States*, 75 F.4th 1250, 1257 (Fed. Cir. 2023); *NEC Corp. v. United States*, 151 F.3d 1361, 1370-71 (Fed. Cir. 1998). "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). "{T}he constitutional requirement of a meaningful opportunity to respond before a temporary deprivation may take effect entails, at a minimum, the right to be informed not only of the nature of the charges but also of the substance of the relevant supporting evidence." *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 264-65 (1987).

LE was denied notice that it had been targeted in the EAPA investigation initiated February 2024 with liability extending back to February 2023, until months later when it received the Notice of Initiation issued on the last day of May 2024. Only then did LE have "a meaningful opportunity to respond." *Id*. Before that time, AD/CVD continued to be assessed on entries of OCTG from PET without importers neither knowing nor having an ability to minimize that exposure. The due process violation results from CBP compliance with its regulation that creates a secret process to trap importers:

> CBP will issue a notice of its decision to initiate an investigation to all parties to the investigation no later than five business days after day 90 of the investigation, and the actual date of initiation of the investigation will be specified therein. In cases where interim measures are taken pursuant to § 165.24, notice to all parties to the investigation will occur no later than five business days after day 90 of the investigation.

19 C.F.R. § 165.15(d)(1).

Indeed, this Court recently invalidated this EAPA regulation for denying an importer's constitutional due process rights protections as recognized by the U.S. Supreme Court decades ago in *Brock*. *Superior Commercial Solutions, LLC v. United States*, 811 F. Supp. 3d 1363, 1376-77 (CIT 2025). As this Court explained in ruling in favor the plaintiff who had like LE had found out after-the-fact that it was being targeted in an ongoing EAPA investigation:

35

> Plaintiff argues that a "meaningful opportunity to be heard" means *before* the imposition of interim measures, citing the Supreme Court's opinion in *Brock . . .* , which noted "the constitutional requirement of a meaningful opportunity to respond before a temporary deprivation may take effect entails, at a minimum, the right to be informed not only of the nature of the charges but also of the substance of the relevant supporting evidence." *Brock . . .* , 481 U.S. 252, 264–65. . . .
>
> The Court agrees with Plaintiff's argument that **a meaningful opportunity to respond should happen before a temporary deprivation takes effect, not afterwards**. *Id.*; *see also Royal Brush Mfg.*, 75 F.4th at 1257 (citing *PSC VSMPO-Avisma Corp.*{ *v. United States*}, 688 F.3d {751,} 761–62 {Fed. Cir. 2021} (requiring the procedural due process right to "notice and a meaningful opportunity to be heard" in an antidumping proceeding)). Here, Superior was notified of the investigation at the time that interim measures were imposed, which assessed a combined AD/CVD cash deposit rate of 371.47% retroactively on all entries that were unliquidated. **It was only when the 371.47% interim penalty was imposed that Plaintiff was made aware of the allegations. Plaintiff was not provided with an opportunity to offer evidence and make administrative arguments prior to the imposition** of 371.47% interim penalties on all unliquidated entries.

811 F. Supp. 3d 1363, 1376-77 (CIT 2025) (emphases added).

CBP violated LE's due process rights in precisely the same way as was found by this

Court in *Superior Commercial Solutions:*

> {LE} was notified of the investigation at the time that interim measures were imposed, which assessed a combined AD/CVD cash deposit rate of {112.55}%} retroactively on all entries that were unliquidated. **It was only when the {112.55}%} interim penalty was imposed that {Consolidated} Plaintiff was made aware of the allegations. {Consolidated} Plaintiff was not provided with an opportunity to offer evidence and make administrative arguments prior to the imposition** of {112.55}%} interim penalties on all unliquidated entries.

*Id.* (emphases added). This Court should accordingly find that CBP likewise acted unlawfully by

failing to give the requisite notice and opportunity before the "deprivation takes effect, not

afterwards." *Id.* at 1376.

## CONCLUSION

LE respectfully requests that this Court find CBP's TRLED Determination and

Administrative Review Determination unsupported by substantial evidence and otherwise not in

PUBLIC VERSION

accordance with law, and accordingly remand the EAPA investigation to CBP with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP


*/s/ Jordan C. Kahn*
Erik D. Smithweiss
Jordan C. Kahn*

707 Wilshire Boulevard
Suite 4150
Los Angeles, CA 90017-3720
(213) 452-0863
                    **
*1201 New York Ave., NW Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Consolidated Plaintiff*
*LE Commodities, LLC.*

Dated: April 13, 2026

37

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Consolidated Plaintiffs' Corrected Memorandum of Law In Support of its Motion for Judgment on the Agency Record, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 11,469 words, less than the 14,000 word limit.

*/s/ Jordan C. Kahn*
Jordan Kahn

*Counsel for Consolidated Plaintiff*
*LE Commodities, LLC.*

Dated: April 13, 2026