**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | |
|---|---|
| CENTRIC PIPE LLC,<br><br>Plaintiff,<br><br>LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, and KANA ENERGY SERVICES, INC.<br><br>Consolidated-Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>U.S. OCTG MANUFACTURERS ASSOCIATION,<br><br>Defendant-Intervenor. | Consol. Court No. 25-00182 |

**DEFENDANT'S RESPONSE IN OPPOSITION TO CONSOLIDATED PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

NICOLAS A. MORALES
Attorney
Office of Chief Counsel
U.S. Customs and Border Protection

MARGARET J. JANTZEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone:(202) 353-7994
Email: Margaret.j.jantzen@usdoj.gov

Attorneys for Defendant

August 21, 2026

**TABLE OF CONTENTS**

**PAGE**

STATEMENT PURSUANT TO RULE 56.2 .... 2

I. Administrative Determination Under Review .... 2

STATEMENT OF FACTS .... 2

I. Enforce And Protect Act .... 2

II. The Investigation .... 4

A. The Pertinent Antidumping And Countervailing Duty Orders .... 4

B. Investigation of Importers and Final Determination .... 4

C. Review Determination .... 6

SUMMARY OF THE ARGUMENT .... 7

ARGUMENT .... 8

I. Standard Of Review .... 8

II. Legal Arguments .... 9

A. The 15-Day Initiation Deadline Does Not Limit Customs' Enforcement Power .... 9

1. The Statutory Deadline Does Not Deprive CBP of its Power to Enforce the Statute .... 9

2. This Court May Not Fashion its Own Remedy and Plaintiffs Do Not Demonstrate Substantial Prejudice .... 18

B. No Due Process Attaches to the Initiation of an Investigation or the Imposition of Interim Measures .... 24

1. Importers Identify No Protected Property Interest .... 26

2. Importers Received all the Process They Were Due .... 28

III. The Court Should Sustain CBP's Determination Of Evasion .... 30

A. Initiation was Lawfully Based Upon Allegations that Reasonably Suggested Evasion .... 30

B. A Finding of Evasion Does Not Require Intent .... 33

C. CBP's Covered Merchandise Determination is Not Arbitrary or Capricious ........ 38

1. CBP Has Independent Authority to Make Covered Merchandise Determinations ........ 38

2. Plaintiffs Do Not Demonstrate that CBP's Covered Merchandise Determination Was Arbitrary and Capricious ........ 42

a. CBP's Determination That PET's Exported OCTG is Covered Merchandise is not Arbitrary or Capricious ........ 42

b. CBP's Determination That TOP's Exported OCTG is Covered Merchandise is not Arbitrary or Capricious ........ 43

D. CBP's Application of Adverse Inferences Was Not Arbitrary or Capricious ........ 45

1. The Application of Adverse Inferences May Have Collateral Consequences on Cooperating Parties ........ 45

2. Energy Pipe and Trek ........ 46

3. Kana ........ 47

CONCLUSION ........ 48

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Ad Hoc Shrimp Enforcement Committee v. United States*,
632 F. Supp. 3d 1369 (Ct. Int'l Trade 2023) ........ 43

*Aireko Constr., LLC v. United States*,
425 F. Supp. 1307 (Ct. Int'l trade 2020) ........ 39

*Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*,
751 F.2d 1239 (Fed. Cir. 1985) ........ 24, 27

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) ........ 24

*Am. Pac. Plywood, Inc. v. United States*,
No. 20-03914, 2023 WL 4288346 (Ct. Int'l Trade June 22, 2023) ........ 27

*Aspects Furniture Int'l, Inc. v. United States*,
607 F. Supp. 3d 1246 (Ct Int'l Trade 2022) ........ 26, 27

*Barnhart v. Peabody Coal Co.*,
537 U.S. 149 (2003) ........ passim

*Board of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) ........ 24, 25, 26

*Brock v. Pierce County*,
476 U.S. 253 (1986) ........ passim

*Canadian Fur Trappers Corp., v. United States*,
884 F.2d 561 (Fed. Cir. 1989) ........ 16

*CEK Grp. LLC v. United States*,
633 F.Supp.3d 1369 (Ct. Int'l Trade 2023) ........ 31, 44, 45, 46

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ........ 35

*Dep't of Com. v. New York*,
139 S. Ct. 2551 (2019) ........ 8

*Diamond Tools Tech. LLC v. United States*,
545 F.Supp.3d 1324 (Ct. Int'l Trade 2021) ........ passim

*Diamond Tools Tech. LLC v. United States*,
609 F. Supp. 3d 1378 (Ct. Int'l Trade 2022) .......... 34

*Dixon Ticonderoga Co. v. United States*,
468 F.3d 1353 (Fed. Cir. 2006).......... 20, 21

*Dolan v. United States*,
560 U.S. 605 (2010).......... passim

*Ewing v. Mytinger & Casselberry*,
339 U.S. 594 (1950).......... 26

*Gilda Indus., Inc. v. United States*,
622 F.3d 1358 (Fed. Cir. 2010).......... 11, 14, 18, 19

*Hannah v. Larche*,
363 U.S. 420 (1960).......... 24

*Hendrickson v. FDIC*,
113 F.3d 98 (7th Cir. 1997) .......... 12

*Hitachi Home Electronics, Inc. v. United States*,
661 F.3d 1343 (Fed. Cir. 2011).......... 17

*ICON EV LLC v. United States,*
No. 26-2759 (Ct. Int'l Trade Apr. 24, 2026) .......... 27

*Ikadan Sys. USA, Inc. v. United States*,
639 F.Supp.3d 1339 (Ct. Int'l Trade, 2023) .......... passim

*Intercargo Ins. Co. v. United States*,
83 F.3d 391 (Fed. Cir. 1996).......... 21, 22

*Int'l Custom Prods., Inc. v United States* ,
791 F.3d 1329 (Fed. Cir. 2015).......... 25

*Kemira Fibres Oy v. United States*,
61 F.3d 866 (Fed. Cir. 1995).......... 23

*Leco Supply, Inc. v. United States*,
619 F. Supp. 3d 1287 (Ct. Int'l Trade 2023) .......... 31, 33

*Liesegang v. Secretary of VA*,
312 F.3d 1368 (Fed. Cir. 2002).......... 12

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024). .......... 35

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 24, 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 8

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) .......... 36

*PAM, S.p.A. v. United States*,
463 F.3d 1345 (Fed. Cir. 2006) .......... 20

*Phoenix Metal Co. v. United States*,
No. 23-00048, 2024 WL 2891503 (Ct. Int'l Trade June 10, 2024) .......... 26, 27, 29, 44

*Purdue Pharma LP v. Collegium Pharmaceuticals, Inc.*,
86 F.4th 1338 (Fed. Cir. 2023) .......... passim

*Royal Brush Mfg. v. United States*,
75 F.4th 1250 (Fed. Cir. 2023) .......... 24, 25

*Rubin v. Islamic Republic of Iran*,
138 S. Ct. 816 (2018). .......... 37

*Russello v. United States*,
464 U.S. 16 (1983) .......... 36

*Skyview Cabinet USA, Inc., v. United States*,
No. 22-80, 2023 WL 4073781 (Ct. Int'l Trade June 20, 2023) .......... 44

*Star Fruits S.N.C. v. United States*,
393 F.3d 1277 (Fed. Cir. 2005) .......... 8

*SunEdison, Inc. v. United States*,
179 F.Supp.3d 1309 (Ct. Int'l Trade 2016) .......... 38, 39

*Tabacos de Wilson, Inc. v. United States*,
324 F. Supp. 3d 1304 (Ct. Int'l Trade 2018) .......... 19

*U.K. Carbon and Graphite Co., Ltd. v. United States*,
931 F.Supp.2d 1322 (Ct. Int'l Trade 2013) .......... 39

*United States v. Montalvo-Murillo*,
495 U.S. 711 (1990) ........ 10, 18

*Untied States v. James Daniel Good Real Property*,
510 U.S. 43 (1993) ........ 10, 12, 18

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v United States*,
716 F.3d 1370 (Fed. Cir. 2013) ........ 31, 32, 33

**STATUTES**

19 U.S.C. § 1238 ........ 16
19 U.S.C. § 1304 ........ 39
19 U.S.C. § 1504(d) ........ 16, 17
19 U.S.C. § 1515 ........ 17
19 U.S.C. § 1515(a) ........ 17
19 U.S.C. § 1515(b) ........ 17, 18
19 U.S.C. § 1517 ........ 2, 38
19 U.S.C. § 1517(a)(3) ........ 37
19 U.S.C. § 1517(a)(5)(A) ........ 35
19 U.S.C. § 1517(a)(5)(B) ........ 36
19 U.S.C. § 1517(b)(1) ........ passim
19 U.S.C. § 1517(b)(2) ........ 19
19 U.S.C. § 1517(b)(2)(B) ........ 33, 34
19 U.S.C. § 1517(c) ........ 2, 6, 30
19 U.S.C. § 1517(c)(1)(A) ........ 3, 37
19 U.S.C. § 1517(c)(1)(B) ........ 3
19 U.S.C. § 1517(c)(2) ........ 3
19 U.S.C. § 1517(c)(3) ........ 44
19 U.S.C. § 1517(c)(3)(B) ........ 44
19 U.S.C. § 1517(d) ........ 29
19 U.S.C. § 1517(e) ........ 3, 23, 26
19 U.S.C. § 1517(f) ........ 3, 7, 30
19 U.S.C. § 1517(g) ........ 43
19 U.S.C. § 1517(g)(1) ........ 3
19 U.S.C. § 1517(g)(2) ........ 8, 42
19 U.S.C. § 1517(g)(2)(B) ........ 40
19 U.S.C. § 1571(b)(1) ........ 38
19 U.S.C. § 1592 ........ 37
19 U.S.C. § 1677(j) ........ 39
19 U.S.C. § 1677(7)(F)(ii) ........ 31
19 U.S.C. § 2417(c)(2) ........ 19

**REGULATIONS**

19 C.F.R. § 24.36 .................................................................................................... 29
19 C.F.R. § 165 ........................................................................................................ 22
19 C.F.R. § 165.12 ............................................................................................. 19, 23
19 C.F.R. § 165.12(a)................................................................................................ 2, 5
19 C.F.R. § 165.15(d)(1)........................................................................... 3, 20, 22, 23
19 C.F.R. § 165.23 ......................................................................................... 3, 29, 30
19 C.F.R. § 165.24 ..................................................................................................... 5, 6
19 C.F.R. § 165.24(c)..................................................................................................... 3
19 C.F.R. § 165.26 ...................................................................................................... 3, 30
19 C.F.R. § 165.27(c).................................................................................................. 29
19 C.F.R. § 165.41 ...................................................................................................... 30
19 C.F.R. § 165.42 ...................................................................................................... 30
19 C.F.R. § 165.45 ...................................................................................................... 43
19 C.F.R. § 171 .......................................................................................................... 37
19 C.F.R. § 351.22(k) ................................................................................................. 40
19 C.F.R. § 351.225 .................................................................................................... 38

**OTHER AUTHORITIES**

*Oil Country Tubular Goods (OCTG)from the Peoples Republic of China (China). Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,*

75 Fed. Reg. 3,203–04 (Jan. 20, 2010) .......................................................................... 4

*Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order,*
75 Fed. Reg. 28,551 (May 21, 2010) ............................................................................ 4

*Oil Country Tubular Goods From the People's Republic of China,*
91 Fed. Reg. 9,811 (Dep't Commerce Feb 27, 2026)........................................................ 39

H.R. Rep. No. 114-114 (2015)................................................................................... passim

S. Rep. No. 114-45 (2015) .......................................................................................... 13

3 Charles H. Koch, Jr. & Richard Murphy,
Administrative Law and Practice §§ 9.24, 9.25 (3d. 2023) ............................................. 40

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | | |
|---|---|---|
| CENTRIC PIPE LLC, | ) | |
| Plaintiff, | ) | |
| LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, and KANA ENERGY SERVICES, INC. | ) | |
| Consolidated-Plaintiffs, | ) | |
| v. | ) | Consol. Court No. 25-00182 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| U.S. OCTG MANUFACTURERS ASSOCIATION, | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO CONSOLIDATE PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response in opposition to the motions for judgment on the agency record filed by consolidated plaintiffs, Centric Pipe LLC (Centric); Energy Pipe & Equipment Rentals LLC (Energy Pipe); Kana Energy Services Inc. (Kana); LE Commodities, LLC (LE Commodities); and Trek Metals Inc. (Trek Metals) (plaintiffs or importers). As demonstrated below, U.S. Customs and Border Protection (CBP) lawfully initiated and conducted its investigation, and the affirmative evasion determination is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

Accordingly, we respectfully request that the Court deny plaintiffs' motions and sustain CBP's evasion determination.

## STATEMENT PURSUANT TO RULE 56.2

### I. Administrative Determination Under Review

Plaintiffs challenge CBP's administrative review of the final determination as to evasion by CBP's Office of Trade, Regulations & Rulings Directorate (RR) in Enforce and Protect Act (EAPA) Case Number 7890 (July 2, 2025), CR 395, PR 612 (Review Det.), which affirmed the determination of evasion under 19 U.S.C. § 1517(c) by CBP's Trade Remedy & Law Enforcement Directorate (TRLED), Notice of Determination as to Evasion (Feb. 4, 2025), CR 374, PR 522 (Final Det.).

## STATEMENT OF FACTS

### I. Enforce And Protect Act

Congress, concerned with the evasion of antidumping and countervailing duties, passed the Enforce and Protect Act of 2015 (EAPA) and established a new administrative framework for CBP to investigate and remediate allegations that importers were evading antidumping and countervailing-duty orders. *See generally* 19 U.S.C. § 1517. Interested parties may submit allegations to CBP that merchandise covered by an antidumping or countervailing duty order has entered the United States through evasion. The statute requires CBP to initiate a formal investigation upon receiving an allegation and CBP regulations establish additional deadlines and procedures governing the investigation.

An investigation begins when an interested party submits an allegation of evasion. "Not later 15 business days after receiving an allegation . . . [Customs] shall initiate an investigation if [Customs] determines that the information provided in the allegation . . . reasonably suggests that

covered merchandise has been entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(b)(1). Regulations define the "date of receipt" of an allegation as "the date on which CBP provides an acknowledgement of receipt of an allegation containing all the [requisite] information and certifications." 19 C.F.R. § 165.12(a). Following initiation, Customs has 90 days to make an initial determination of reasonable suspicion of evasion and issue interim measures, which may include the suspension and extension of unliquidated entries. 19 U.S.C. § 1517(e). The statute is silent as to when CBP must provide notice of initiation or interim measures, but Customs' regulations provide that "CBP will issue notification of its decision to initiate an investigation to all parties to the investigation no later than 95 calendar days after the decision has been made," and "no later than five business days after interim measures are taken." 19 C.F.R. § 165.15(d)(1); 19 C.F.R. § 165.24(c).

CBP generally has 300 days[1], from the date of initiation, to make an evasion determination based on substantial evidence. 19 U.S.C. § 1517(c)(1)(A). Within this time, Customs has broad discretion to determine the scope and means of the investigation, including authority to collect and verify any information it deems necessary to make a determination. *Id.* § 1517(c)(2). Regulations set forth additional procedures and timing to allow the parties to make factual and legal submissions. *See* 19 C.F.R §§ 165.23, 165.26. A person determined to have entered covered merchandise through evasion, or an interested party who file an allegation that resulted in the initiation of an investigation, may request an administrative review of an evasion determination, and CBP must review that determination *de novo* and issue a final administrative

[1] Section 1517(c)(1)(B) provides enumerated situations in which Customs may extend the time by up to 60 days to make a determination of evasion.

determination no later than 60 days after such a request. 19 U.S.C. § 1517(f). The statute permits judicial review in the Court of International Trade of CBP's initial and final determination. *Id.* § 1517(g)(1).

## II. The Investigation

### A. The Pertinent Antidumping And Countervailing Duty Orders

On January 20, 2010, and May 21, 2010, the Department of Commerce (Commerce) issued antidumping and countervailing duty orders on *Oil Country Tubular Goods (OCTG)from the Peoples Republic of China (China). See Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,* 75 Fed. Reg. 3,203–04 (Dep't of Commerce Jan. 20, 2010)*; Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order,* 75 Fed. Reg. 28,551 (Dep't of Commerce May 21, 2010).

### B. Investigation of Importers and Final Determination

On January 18, 2024, and February 1, 2024, the U.S. OCTG Manufacturers Association (USOMA), a trade association of domestic producers of OCTG, filed EAPA allegations against 10 importers of OCTG – five of whom are plaintiffs in this case.[2] USOMA alleged that the importers were importing OCTG from China into the United States that had been transshipped through Thailand by Petroleum Equipment (Thailand) Co., Ltd. (PET) and Thai Oil Pipe Co., Ltd. (TOP). *Id.* The USOMA further alleged that the importers entered OCTG into the United

[2] "CR __" refers to the document number in the Confidential Administrative Record; "PR __" refers to the document number in the Public Administrative Record. Citations to specific pages are to the confidential version unless only a public version exists.

States without declaring the goods as OCTG from China and, subject to antidumping and countervailing duty orders under Case Nos. A-570-943 and C-570-944 (the AD/CVD Orders). *Id*.

On February 1, 2024, CBP acknowledged receipt of the allegations. Official Receipt. Checklist (February 1, 2024), PR 11; Official Receipt Email (February 1, 2024), PR 12-21; see § 19 C.F.R. 165.12(a). Within 15 business days, on February 23, 2024, TRLED initiated a formal investigation, finding that the information in the allegation reasonably suggested that the importers had engaged in evasion of the AD/CVD Orders. Initiation of Investigation for EAPA Case 7890 (Feb. 24, 2025) at CR 21, PR 42.

On March 6 and 7, 2024, TRLED issued CBP Form CF-28 ("CF-28") Requests for Information to each of the importers on certain entries of OCTG, requesting production documentation including manufacturer information, raw material documentation, mill certificates, purchase orders, commercial invoices, transportation documentation, and proof of payment. Final Det. at 3. Energy Pipe, Kana, and Trek Metals provided responses regarding OCTG manufactured by TOP; however, only Trek Metals provided all of the requested information. Final Det. at 3 n.8 & n.9.

After evaluating the information on the record, CBP determined that reasonable suspicion existed that the importers imported Chinese-origin OCTG into the United States that had been transshipped through Thailand. Final Det. at 4. On May 31, 2024, in accordance with 19 C.F.R. § 165.24, CBP issued a Notice of Initiation of Investigation and Interim Measures to all parties to the investigation. *Id*. Notice of Investigation and Interim Measures (May 31, 2024), CR 33, PR 66. The notice stated that the investigation began on February 1, 2024, and that CBP was taking interim measures based upon a reasonable suspicion of evasion. *Id*. The entries subject to the

investigation are those unliquidated entries of covered merchandise entered from February 1, 2023, through the pendency of the investigation (hereinafter, the period of investigation or "POI"). *Id*.

TRLED issued Request for Information ("RFI") questionnaires to the importers, PET, and TOP on May 31, August 16, August 23, and August 26, 2024. Final Det., CR 395 at 4-5. TRLED conducted on-site verifications at PET's facility in Thailand between October 28, and November 8, 2024. Final Det. 6.

In its February 24, 2025 final determination of evasion, TRLED determined that substantial evidence established that plaintiffs imported OCTG from China into the United States by undervaluation, misclassification, and transshipment through Thailand. Final Det. at 66. TRLED also applied adverse inferences to TOP, PET, and Kana finding that each company failed to cooperate and comply to the best of its ability with CBP's requests for information. *Id*.

### C. Review Determination

On July 2, 2025, upon *de novo* review of the administrative record, including the administrative review requests and response thereto, RR affirmed TRLED's February 24, 2025 Determination of evasion under 19 U.S.C. § 1517(c). Review Det. at 28.

RR determined that substantial evidence demonstrated that OCTG imported by the importers constituted covered merchandise subject to the Orders. As to merchandise exported by PET, RR concluded that the Chinese-origin hollow steel billets used to manufacture finished OCTG were themselves subject merchandise under the plain language of the Orders, and the subsequent processing in Thailand did not remove them from the Orders' scope. Review Det. 21. RR further found that substantial evidence established that PET lacked the production capability

and capacity to manufacturer all of the OCTG it claims to have produced in Thailand and therefore transshipped finished Chinese-origin OCTG through Thailand. Review Det. 26.

With respect to merchandise exported by TOP, RR determined that substantial evidence demonstrated that TOP used Chinese-origin billets and "mother pipe" to manufacturer the OCTG imported by their importers. Review Det. 22. RR concluded that these products also constituted covered merchandise under the plain language of the Orders and rejected arguments that CBP was required to conduct an entry-by-entry tracing analysis before finding evasion. Review Det. 23.

RR further determined that substantial evidence demonstrated that each importer entered covered merchandise through material false statements and omissions, including by entering covered merchandise as Type 01 consumption entries rather than Type 03 AD/CDV entries and by failing to declare the applicable AD/CDV case numbers. Review Det. at 18.

Finally, RR determined that, although not necessary for its finding of evasion, TRLED's application of an adverse inference was warranted because PET and TOP failed to cooperate to the best of their abilities by, among other things, refusing to provide requested information and preventing CBP from verifying key information placed on the record. Review Det. at 27. RR further rejected the importers' arguments that the adverse inferences were improperly applied and affirmed TRLED's application of adverse inferences. *Id*.

This action followed.

## SUMMARY OF THE ARGUMENT

CBP lawfully initiated this EAPA investigation pursuant to 19 U.S.C. § 1517(b), and its regulations, within 15 business days of acknowledging receipt of the allegations. Plaintiffs received all the procedural protections of EAPA throughout the investigation and administrative

review and fail to demonstrate that any more process was due. They do not identify a protectable property interest that would entitle them to notice and opportunity to be heard before CBP may initiate an investigation or impose interim measures on importers who are reasonably suspected to be engaged in evasion. CBP also reasonably determined that the merchandise imported by plaintiffs was covered merchandise under the authority granted to CBP by EAPA . CBP also reasonably applied adverse inferences to the foreign producers who failed to cooperate to the best of their ability in the investigation. The collateral consequences of these adverse inferences permissibly flowed to plaintiffs who owe the duties on merchandise that has entered the United States through evasion.

## ARGUMENT

### I. Standard Of Review

In reviewing CBP's evasion determinations, this Court determines whether CBP complied with procedures under the EAPA statute and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2).

The scope of the "arbitrary and capricious" standard is narrow, and a court is not to substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court "determine{s} only whether the {agency} examined 'the relevant data' and articulated 'a satisfactory explanation' for {its} decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019) (quoting *Motor Vehicle*, 463 U.S. at 43). "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an

unreasonable judgment in weighing relevant factors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).

## II. Legal Arguments

Importers all raise two legal challenges to the final evasion determination. Relying on the Court's non-final decision in *Superior Commercial Solutions, LLC v. United States,* No. 2 (Ct. Int'l Trade Nov. 26, 2025) (*Superior*),[3] plaintiffs argue that CBP failed to meet the 15-day statutory deadline by which it was to initiate an EAPA investigation following the receipt of allegations. Plaintiffs also challenge the imposition of interim measures without notice and an opportunity to be heard as violative of due process.

### A. The 15-Day Initiation Deadline Does Not Limit Customs' Enforcement Power

The statute provides that "[n]ot later than 15 business days after receiving an allegation," Customs "shall initiate an investigation" if "the information provided in the allegation . . . reasonably suggests that covered merchandise has been entered into the custom territory of the United States through evasion." 19 U.S.C. § 1517(b)(1). Pursuant to its regulations, CBP initiated the investigation here within 15 business days of when it acknowledged receipt of the allegations. 19 C.F.R. § 165.12(a). Plaintiffs argue that Customs failed to initiate its investigation within 15 days of USOMA's submission, on January 18, 2023, and as a result, Centric Pipe and LE Commodities argue that the final determination should be reversed. Plaintiffs ignore ample precedent establishing that an agency does not lose its power to act when

---

[3] The United States is appealing the final decision in *Superior* which is currently pending at the Federal Circuit. *See Superior Comm. Sols., v. United States,* No. 26-1373 (Fed. Cir.)

it fails to comply with a statutory timing directive that does not specify the consequences of non-compliance. And in the absence of such consequences, this Court is not free to fashion its own equitable remedies and impose coercive sanctions.

### 1. The Statutory Deadline Does Not Deprive CBP of its Power to Enforce the Statute

The 15-day initiation deadline in § 1517(b)(1) seeks speed by creating a time-related directive that is legally enforceable but does not deprive Customs of the power to investigate evasion and take enforcement measures if the deadline is missed. *See Dolan v. United States,* 560 U.S. 605, 611 (2010). Several features of the statute support this conclusion. But the Supreme Court's decision in *Dolan* identifies specific factors, which the EAPA statute shares, that control the outcome here.

In *Dolan,* the Supreme Court considered a sentencing court's failure to meet the deadline by which the court was to determine the amount of restitution owed to a victim under the Mandatory Restitution Act. 560 U.S. at 607-08. It was undisputed that the deadline was missed and there was no excuse for failing to do so. *Id.* at 609. The question before the Supreme Court concerned "the consequences of the missed deadline where, as here, the statute does not specify them." *Id.* at 610. The Supreme Court considered several factors that led to the conclusion that the failure to meet the deadline did not deprive the court of the power to order restitution at a later date. Those same factors, and the Court's analysis, apply to § 1517(b)(1)'s 15-day initiation deadline and compel the same result.

First, the *Dolan* court explained that "where, as here, a statute 'does not specify a consequence for noncompliance with' its 'timing provisions,' 'federal courts will not in the ordinary course impose their own coercive sanction.'" *Id.* at 611(citing *Untied States v. James*

*Daniel Good Real Property,* 510 U.S. 43, 63 (1993); *see also United States v. Montalvo-Murillo,* 495 U.S. 711, 717-720 (1990). Section 1517(b)(1) indisputably contains no consequence for Customs' failure to meet the 15-day deadline. Where Congress has not specified a consequence for noncompliance with a timing requirement, courts imply only that "Congress intended the responsible officials administering the Act to have discretion to determine what disciplinary measures are appropriate when their subordinates fail to discharge their statutory duties." *James Daniel Good,* 510 U.S at 64-65. The Federal Circuit has explained that "[t]he lack of a specific consequence is not an interpretive gap to fill," but instead indicates congressional intent to allow the administering agency to determine appropriate measures. *Gilda Indus., Inc. v. United States,* 622 F.3d 1358, 1364 (Fed. Cir. 2010); *see also Purdue Pharma LP v. Collegium Pharmaceutical, Inc.,* 86 F.4th 1338, 1342 (Fed. Cir. 2023) (following the Supreme Court's rule, the board has authority to act after the statutory deadline passed).

Plaintiffs ignore this well-established rule and rely instead on the word "shall" in § 1517(b)(1) for the unremarkable (and undisputed) proposition that "shall" is a mandatory statutory obligation that requires compliance. *See, e.g.,* Centric Pipe Br. 16; Energy Pipe Br. 28; Trek Br. 12 (all citing to *Superior* ("'shall' means 'shall', and 'shall' is a mandatory statutory obligation.")). But ample precedent from the Supreme Court and the Federal Circuit holds that use of the word "shall" in a statutory timing directive is not enough to limit agency action. *See, e.g., Dolan,* 560 U.S. at 611-12 ("use of [the] word [shall] alone," does not necessarily bar the agency from taking the action to which a missed statutory deadline refers); *Brock v. Pierce County,* 476 U.S. 253, 262 (1986) (*Brock*), *Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 158-163 (2003) (*Barnhart*); *see also Purdue Pharma LP v. Collegium Pharmaceuticals, Inc.,* 86 F.4th 1338, 1344 (Fed. Cir. 2023). Indeed, importers "[m]iss[] the point" in relying on the fact that the

deadline was "'mandatory' . . . because of course it was." *Barnhart*, 537 U.S. at 157 (considering whether missing a statutory deadline limited the authority of the agency to act after that deadline). The "real question . . . is what the consequences of tardiness should be." *Id.* And the courts will not readily infer congressional intent to limit an agency's power to get a mandatory job done merely from a specification to act by a certain time. *Id.* at 153. The Federal Circuit has "clearly stated" that when a statute does not specify consequences, "use of the word 'shall' in connection with statutory timing does not overcome the presumption that such a deadline implies no sanction for an agency's failure to meet it." *Liesegang v. Secretary of VA,* 312 F.3d 1368, 1376 (Fed. Cir. 2002) *citing Hendrickson v. FDIC,* 113 F.3d 98, 101(7th Cir. 1997); *see also Purdue Pharma,* 86 F.4th at 1342 (holding that use of the word "shall" does not "requir[e]" depriving the board of authority to act passed the deadline).

Centric Pipe is the only plaintiff who engages with this body of law by attempting to distinguish this Court's decision in *Diamond Tools Tech. LLC v. United States,* 545 F. Supp. 3d 1324, 1333 (Ct. Int'l Trade 2021) which similarly held that "shall" alone does not limit agency power. *See* Centric Pipe Br. 17. Centric Pipe argues that the distinction between *Diamond Tools* and this case lies in the fact that the Court in *Diamond Tools* was interpreting a different *section* of the EAPA statute. *Id.* This is a distinction without a difference. Although the statutory provisions are different, the nature of the "shall" language in each is identical. In addition, this Court relied on the same body of law that we do here for identical propositions – notably, *Barnhart,* 537 U.S. at 160 ("direct[ing] that a statute 'needs more than a mandatory shall before the grant of power can sensibly be read to expire when the job is supposed to be done.'"); *Brock,* 476 U.S. at 262 (holding that "the mere use of the word 'shall' … standing alone, is not enough to remove the [agency's] power to act") and *James Daniel Good,* 510 U.S. at 63 (holding that "if

a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction."). *Diamond Tools,* 545 F. Supp. 3d at 1333-34.

Having found that mandatory "shall" language was insufficient to forfeit the action to which the missed deadline refers, the *Dolan* Court considered the statute's text and determined its "substantive purpose." *Dolan,* 560 U.S. at 612. The Court found that the statute was primarily concerned with ensuring that victims of a crime receive full restitution by imposing restitution upon those convicted of the crime. *Id.* at 612 (finding that restitution is ordered in the full amount regardless of the economic circumstances of the defendant.) The Supreme Court also considered the importance of the timing requirement: "To be sure speed is important." *Id.* But "the [Mandatory Restitution Act] seeks speed primarily to help the victims of crime and only secondarily to help the defendant." *Id.* at 613. In other words, the intended beneficiary of the timing requirement was the victim, not the defendant.

The Enforce and Protect Act was enacted to detect and deter the evasion of antidumping and countervailing duty orders by foreign producers and their importers. Congress explained that "[f]or too long, CBP gave insufficient priority to addressing evasion and taking action in response to outside allegations of evasion." H.R. Rep. No. 114-114, pt.1 at 80 (2015). CBP also "has considerable difficulty in collecting the actual amount of duties owed." S. Rep. No. 114-45, at 12 (2015). The duty shortfall that results from failing to enforce duty orders harms the domestic industry, which will not receive the full protection of the duties and may continue to be injured by anti-competitive practices of the foreign supplier even after antidumping and countervailing duty orders have been imposed. *Id.* Congress also found that duty shortfalls impact U.S. revenue, which was estimated to have lost approximately $1 billion between 2001

and 2010 in uncollected antidumping and countervailing duties. *Id.* at 12-13. In short, the investigative framework created by EAPA is clearly aimed at protecting U.S. producers and U.S. revenue.

The 15-day initiation deadline imposed by § 1517(b)(1) serves the purpose of mitigating duty shortfalls by requiring Customs to move quickly in identifying and remediating evasion. The first step is responding to an allegation of evasion by an interested party. Congress explained that "prior efforts to require Customs to enforce" allegations "failed by not requiring Customs to act on a petition within a fixed period of time." H.R. Rep. No. 114-114 at 381. "The longer Customs takes, the more entries are liquidated . . . and any additional duties owing are foregone." *Id.* This further harms the domestic industry and revenue collection. As the Supreme Court has described it, this statutory timing requirement is "clearly designed to spur [Customs] to action, not to limit the scope of [its] authority." *Brock,* 476 U.S. at 265; *Barnhart,* 537 U.S. at 172 (holding that "the way to reach the congressional objective" is to read the statutory deadline as "a spur to prompt action, not as a bar to tardy completion"); *Gilda Indus.,* 622 F.3d at 1365 ("The absence of a consequence indicates … that it is a directory provision … likely meant to spur the [agency] to action."). It would be odd indeed if EAPA were read to infer that Congress intended to limit Customs' power to investigate evasion, impose penalties and collect duties from an importer engaging in evasion because Customs missed the 15-day initiation deadline, when the entirety of the statutory scheme is designed to enable all those powers.

Centric Pipe also points to the legislative history of EAPA, claiming that "Congress emphasized that a 'timely collection of [duties] owed on evading imports is as important or even more important than having the parties involved in evasion subject to penalties or criminal

liability.'" *See* Centric Pipe Br. 17. And "strict deadlines" in EAPA procedures would limit the delay in collecting duties on evading imports. *Id.* citing H.R. Rep. No. 114-114 at 85. Centric Pipe mis-attributes the quote concerning the importance of the timely collection of duties to Congress when, in fact, it was "concerned domestic industries" from which "[t]he Committee has often heard" that provided this input. H.R. Rep. 114-114 at 85. And Centric Pipe's conclusion that this legislative history demonstrates that the 15-day deadline is mandatory "[m]isses the point," "because of course it was." *Barnhart*, 537 U.S. at 157. That is not the end of the inquiry. Centric Pipe also cites to *Brock* to support the use of legislative history in determining whether "a statute's use of 'shall' divested an agency of its authority to act beyond a statutory timeframe." Centric Pipe Br. 17. But the answer in *Brock* was decidedly "no." *Brock,* 476 U.S. at 266 (holding that the statutory use of "shall" "does not, standing alone, divest the [agency] of jurisdiction to act after that time."). The Court explained that there is "simply no indication in the statute or its legislative history that Congress intended to remove the [agency's] enforcement powers" by a failure to act within the statutory deadline. *Id.*

Under a statute providing for investigation into allegations of misspent Federal funds, the Supreme Court in *Brock* explained that the 120-day deadline for the Secretary to complete an investigation was intended to assure program participants a prompt resolution of their grievances, but "not that it would convey rights upon . . . those responsible for the misuse of funds." 476 U.S. at 264. And there was "no indication" that Congress was concerned that those responsible for the funds were treated too harshly – "indeed, the opposite." *Id.* at 265.

So too here. Neither the statutory text or the legislative history indicates that EAPA's initiation deadline was intended to convey rights or protect the interests of foreign producers or importers who enter goods into the United States by means of evasion. Indeed, the legislative

history makes clear that Congress believed that foreign producers and importers like were getting away with evasion, creating duty shortfalls, and escaping Customs' traditional enforcement mechanisms. H.R. Rep. No. 114-114, at 79-81. Plaintiffs are not the intended beneficiary of the 15-day deadline – the domestic industry is. It would be incongruous and counterintuitive if Congress intended to *benefit* such foreign producers and importers by Customs' failure to initiate an investigation within 15 days of receiving an allegation. *See Barnhart,* 537 U.S. at 158; *Brock,* 476 U.S. at 258; *see also Purdue Pharma,* 86 F.4th at 1344 (statute providing an expeditious and less costly alternative to litigation would not bar an administrative board from issuing a final determination after the deadline to do so had passed since forfeiting the board's authority to act after a missed deadline would force the parties to pursue litigation in district court – the exact opposite of the statutory purpose); *see also Dolan,* 560 U.S at 613, 614 (considering that the impact of prohibiting the sentencing court to act beyond the statutory deadline would harm the victims of crime who bear no responsibility for the missed deadline and whom the statute seeks to protect and benefit "provides a strong indication that Congress did not intend a missed deadline to work a forfeiture.").

Centric Pipe argues that in *Diamond Tools,* this Court incorrectly interpreted the legislative history to say that EAPA's "strict deadlines" reflect a congressional interest in facilitating trade "on behalf of U.S. companies" but not in "avoid[ing] prejudice[e] [to] importers with drawn-out investigations." Centric Pipe Br. 18 (citing *Diamond Tools,* 545 F.Supp.3d at 1336). Centric Pipe points out that it is a U.S. company with an interest in "timely guidance to ensure that the underlying goal" of EAPA is accomplished. Centric Pipe Br. 18. This argument misses the point. It is domestic *production* of subject merchandise that EAPA, and trade laws in general, are designed to protect. Antidumping and countervailing duties protect domestically-

produced goods that must compete in the domestic marketplace with dumped or subsidized foreign goods.

In *Dolan,* the Supreme Court also considered its own precedent that interpreted similar statutes similarly. 560 U.S. at 614. The Federal Circuit has considered statutory deadlines that apply to Customs actions under the Tariff Act of 1930, 19 U.S.C. §§ 1238, *et seq.*, and interpreted them consistently. In *Canadian Fur Trappers Corp., v. United States,* 884 F.2d 561, 566 (Fed. Cir. 1989), importers challenged the liquidation of their goods under 19 U.S.C. § 1504(d), which directed Customs to liquidate entries within 90 days following the lifting of the suspension of liquidation. Although Custom failed to liquidate the entries within 90 days, the Court held that the lack of consequential language in § 1504(d) meant that Congress intended the timeline to be only directory, pointing out that it "may be impossible" to complete liquidation in that time because of "the sheer number of entries to be liquidated after a long-continued suspension." *Id.*

In another trade case, the Federal Circuit interpreted the statutory deadline under § 1515(a) by which Customs was to allow or deny a tariff protest. *Hitachi Home Electronics, Inc. v. United States,* 661 F.3d 1343,1345 (Fed. Cir. 2011). Customs' failure to act on a protest within the statutorily required two-year period did not result in a deemed allowance. *Id.* Relying on "ample guidance from the Supreme Court," the Court held that use of the word "shall" is not enough to impose a specific penalty for Customs' noncompliance. *Id* at 1348.

This reading of the statutory deadline was supported by other statutory language. Another provision of the statute, § 1515(b), which provides that a protest will be deemed denied if CBP fails to act within 30 days of a request for an accelerated disposition, identifies a time limit within which Customs was to act, along with a specific consequence for its failure to do so.

*Id.* at 1349. Customs need not guess how Congress would have written an express consequence into § 1515 because that is exactly what Congress did. *Id.* at 1349; *see also Purdue Pharma,* 86 F.4th at 1344 ("Congress plainly knew how to deprive the agency of power had it intended to do so.") The absence of consequential language in one statutory deadline, alongside another deadline that specifies a consequence, demonstrates that Congress did not intend the same result from each statutory deadline.

As in *Hitachi* and *Canadian Fur Trappers*, § 1517(b)(1) contains no consequential language for Customs' failure to meet the initiation deadline. Congress clearly knew how to write an express consequence for Customs' failure to act within statutory deadlines, as it did in § 1515(b). The absence of an express consequence did not create an "interpretive gap [for the trial court] to fill," *Gilda Indus.,* 622 F.3d at 11364, but demonstrates that Congress did not intend to bar Customs from initiating an evasion investigation beyond the 15-day deadline.

**2. This Court May Not Fashion its Own Remedy and Plaintiffs Do Not Demonstrate Substantial Prejudice**

Courts are not free to impose their own coercive sanction if a statute does not specify a consequence for noncompliance with statutory timing provisions. *See, e.g., James Daniel Good Real Property,* 510 U.S. 43, 64 (1993) (courts may not "invent a remedy to satisfy some perceived need to coerce the courts and the Government into complying with the statutory time limits") (*citing Montalvo-Murillo,* 495 U.S. at 721; *Brock,* 476 U.S. at 265-66). Centric Pipe argues that the appropriate remedy for Custom's failure to initiate an investigation within 15 days is to reverse the determination of evasion. Centric Pipe Br. 18. This is not supported by law or the record evidence.

In seeking to reverse the evasion determination on this procedural basis, only Centric Pipe acknowledges the ample precedent that broadly forbids a forfeiture of agency action for failing to comply with a statutory timing provision. Centric Pipe Br. 19-20. Pointing to the Supreme Court's decisions in *Brock* and *Barnhart,* Centric Pipe attempts to distinguish the "circumstances surrounding the remedial remedies in [*Brock*] and *Barnhart.*" *Id.* 19. Centric Pipe argues that, in *Brock,* there were less drastic remedies available to address the agency's delay, which are not available here. *Id.* But the less drastic remedy discussed in *Brock* was the availability of suit in district court under the Administrative Procedure Act (APA). 476 U.S. at 260 n7. The Supreme Court explained that an aggrieved party may have standing to bring an action under the APA to "compel agency action unlawfully withheld or unreasonably delayed." *See id.* Centric Pipe fails to explain how this remedy is no less available here. If, as the Court in *Brock* pointed out, plaintiffs are not "within the zone of interests protected by [the statute]," there is "no need to provide [plaintiffs] with any remedy at all – much less the drastic remedy [of divesting the agency of jurisdiction to act]" that is sought for failure to meet a statutory deadline. 476 U.S. at 260 n7. The Supreme Court and the Federal Circuit have also held that a statutory deadline could be compelled by a court through the remedy of mandamus. *See Purdue Pharma,* 86 F.4th at 1344-45; *Dolan,* 560 U.S. at 615-16. In the international trade context, in particular, this Court and the Federal Circuit have held that an APA action may be a suitable remedy for a failure of the agency to act. *See Gilda Indus.,* 622 F.3d at 1365 (addressing the failure to provide notice under 19 U.S.C. § 2417(c)(2); *Tabacos de Wilson, Inc. v. United States,* 324 F. Supp. 3d 1304, 1315-16 (Ct. Int'l Trade 2018) (plaintiff stated an APA claim that Government unlawfully withheld implementing new regulations within the 2-year statutory deadline.)

Centric Pipe points to language in *Barnhart* where the Supreme Court held that "the federal court will not in the *ordinary course* impose their own coercive sanction" and argues that this case is "outside of the 'ordinary course' such that a corrective sanction is appropriate." Centric Pipe Br. 19-20 (emphasis supplied by Centric Pipe). Following the "ordinary course" language in *Barnhart,* the Court considered "mandatory 'shall'" language and "structural clues" in the statute suggesting that there is no prohibition to act outside the statutory period. *Id.* at 160-61. All of this led the Court to conclude that "if Congress had meant to set a counterintuitive limit on authority to act, it would have said more than it did." *Barnhart,* 573 U.S. at 160-163. Centric Pipe does not compare any of those factors with what is presented by § 1517(b)(2). Instead, Centric Pipe points to comments, received by Customs in promulgating 19 C.F.R. § 165.12, that the regulation "provided too much flexibility" in defining the "date of receipt" of an allegation as "the date on which CBP provides an acknowledgment of receipt." Centric Pipe Br. 20. There is nothing unusual about an agency receiving negative feedback from interested parties during notice and comment rulemaking. There is also nothing unique about an agency rejecting some of those comments in the final rule. Centric Pipe does not explain how the CBP's rejection of *these* comments submitted during rulemaking render the statute outside the "ordinary course."

Centric Pipe also argues that it will "continue to be substantially prejudiced" by untimely initiations, because Customs continues to initiate investigations beyond the 15-day window and has taken the position that it has the authority to do so. Centric Pipe Br. 20. Parties seeking to overturn an administrative determination on procedural grounds must establish *actual substantial prejudice* from the alleged procedural error. *See Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353, 1355 (Fed. Cir. 2006) (requiring domestic producer to establish that it was

substantially prejudiced by Customs' failure to issue timely notice under its regulations); *PAM, S.p.A. v. United States*, 463 F.3d 1345, 1349 (Fed. Cir. 2006). None of the importers here identify actual substantial prejudice from CBP's initiation after the 15-day deadline.

First, only Centric Pipe and Kana purport to identify prejudice. Centric Pipe argues that the delay in initiation in turn delayed the notice to importers of the decision to initiate under 19 C.F.R. § 165.15(d)(1). Centric Pipe Br. 19. Not so. Customs initiated the investigation on February 23, 2024, and provided notice to the importers of the investigation on May 31, 2024 – within five business days after day 90 of the investigation, as required by § 165.15(d)(1). CR 21; CR 33. Had Customs initiated within 15 days of January 18, 2024 (when allegations were submitted) there is no indication that Customs would have provided notice any earlier than five business days after day 90 of the investigation. The later-in-time initiation date did not *delay* notice, it simply shifted *in time* when notice was provided. There is simply no support for Kana's claim that "delay in initiation cascaded through the investigation, compressing the timeline for Kana's responses and CBP's review." Kana Br. 22. And Kana does not provide any record evidence of compressed timelines, or that any importer sought extensions for response deadlines that they were not granted.

Centric Pipe references "legal and economic obligations" resulting from an investigation and being able to mitigate potential risks. Centric Pipe Br. 19. But Centric Pipe does not identify what specific legal or economic obligations it incurred because of the delay in initiation or what actual risks it was unable to mitigate as a result. This does not constitute actual substantial prejudice sufficient to overturn Customs' evasion determination. *See Dixon Ticonderoga,* 468 F.3d at 1356.

Both Kana and Centric Pipe seem to identify the imposition of interim measures – which extends to entries made from February 1, 2024 (the date that Customs acknowledged receipt of allegations) through the pendency of the investigation – as prejudice. Centric Pipe Br. 19 (arguing that timely initiation was required "to dictate its shipments"); Kana Br. 22 (arguing that the "universe of covered entries would have been different" with timely initiation); C.R. 33. But interim measures and an evading importer's ability to avoid them does not constitute substantial prejudice arising from a delay in initiating an investigation.

It is CBP's decision to impose interim measures that created the impact to importers' entries, not a delay in initiation. In this setting, "[p]rejudice . . . means injury to an interest that the statute, regulation, or rule in question was designed to protect." *Intercargo Ins. Co. v. United States,* 83 F.3d 391, 396 (Fed. Cir. 1996) (citations omitted). In *Intercargo*, Customs issued a defective notice to an importer's surety, which then challenged the resulting duties that were assessed against the importer. *Id.* at 393. The Court was unable to discern any prejudice suffered as a result of the defect in the extension notices. *Id.* at 396. Instead, the only real prejudice "flowing from this circumstance is the ultimate prejudice—the wrongful imposition of customs duty." *Id*. But the fact that a party "may be forced, at the end of this litigation, to pay additional duties," does not establish prejudice of the pertinent kind. *Id*. Here, plaintiffs have not demonstrated any injury from CBP's *delay* in initiating the investigation and whether any such injury is to an interest that the statutory deadline was designed to protect.

In order to "dictate its shipments," an importer must first be notified of the investigation. Centric Pipe Br. 19. Had Customs initiated an investigation within the 15-day deadline – by February 2, 2024 – there is no indication that importers would have been made aware of the investigation any earlier than five business days after day 90 of the investigation, as provided by

regulation. 19 C.F.R. § 165.15(d)(1). And that "the universe of covered entries would have been different" with a later-in-time initiation date does not demonstrate prejudice. Kana Br. 22. Indeed, here, "the universe of covered entries" was *smaller* because of the later initiation. The period of investigation runs from one year prior to the date on which CBP acknowledges receipt of an allegation – here, February 1, 2023. *See* 19 C.F.R. § 165.2. But between January 18, 2023 (when the allegation was submitted and plaintiffs believe the POI should have begun) and February 1, 2023 (when CBP acknowledged receipt of the allegation), Energy Pipe made two entries and Kana made five. Because CBP evaluated the allegation at the later date, those entries were not subject to the investigation.

Even so, a violating importer does "not become immune from the antidumping laws because Commerce missed [a procedural] deadline. The national interest in the regulation of importation should not fall victim to an oversight by Commerce." *Kemira Fibres Oy v. United States,* 61 F.3d 866, 873 (Fed. Cir. 1995). Put another way, a lawbreaker who ceases its violations once it becomes aware that those violations have been detected is not entitled to immunity for its lawbreaking between detection and notification. Plaintiffs essentially argue here that they are entitled to a timely initiation so that they might minimize the consequences of their evasive behavior. CBP's ability to detect suspected evasion cannot be the source of prejudice against an importer who seeks to evade lawful duties.

Finally, Centric Pipe obliquely references a due process right in a timely initiation by describing "its protected interest to be promptly informed of an ongoing government investigation." Br. 19. But Centric Pipe confuses initiation with notification. A "timely" initiation of an investigation occurs within 15 days of a properly received allegation. *See* 19 U.S.C. § 1517(b)(1); 19 C.F.R. § 165.12. But an importer is not notified of that investigation

until five business days after day 90 of the investigation. 19 U.S.C. § 1517(e); 19 C.F.R. § 165.15(d)(1). Initiation after the 15-day deadline would only shift the date for notification commensurate with the date of initiation. It does not extend the period between initiation and notification.

Importers cannot demonstrate actual substantial prejudice from Customs' delay in initiating the investigation.

### B. No Due Process Attaches to the Initiation of an Investigation or the Imposition of Interim Measures

Plaintiffs all raise a due process challenge to the imposition of interim measures during the pendency of the EAPA investigation. Centric Pipe additionally argues that due process rights are implicated even earlier in time – notably, that CBP's initiation of an investigation without an opportunity to respond to the allegations against it, violates due process. No plaintiff identifies a constitutionally cognizable property interest in implicated by the initiation of an EAPA investigation or the imposition of interim measures.

In every due process challenge, the first inquiry "is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted). "A protectable interest must be more than a unilateral expectation." *Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1250 (Fed. Cir. 1985) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 571 (1972)). Without a constitutionally cognizable interest in either "liberty" or "property," the due process inquiry ends. *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 59. However, if a protected interest exists, the court then determines what "procedural protections [] the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citation omitted). And the Supreme Court has

explained that "'[d]ue process' is an elusive concept," with its "exact boundaries" and "content var[ying] according to specific factual contexts." *Hannah v. Larche,* 363 U.S. 420, 442 (1960).

Instead of engaging in this required analysis, plaintiffs simply cite to the Federal Circuit's decision in *Royal Brush Mfg. v. United States,* 75 F.4th 1250 (Fed. Cir. 2023), for the general proposition that importers in evasion proceedings enjoy due process rights. *See, e.g.,* Centric Pipe Br. 11; Kana Br. 23. In *Royal Brush,* the Court considered the second part of the due process inquiry – what procedural protections are owed to an importer before CBP issues a final determination of evasion. *Id.* at 1257-1262. It was undisputed in *Royal Brush* that importers have a protectable property interest in a final determination of evasion against them – which could result in additional duties or other penalties. *Id.* at 1257, n5, n6. The issue before the Court was instead the *extent* of the process that was owed before a final determination was rendered. *Id.* at 1257-62. Specifically, the Court considered whether the importer was entitled to confidential business information that CBP relied on to support its determination that Royal Brush was evading duties. *Id.* at 1257-62.

But plaintiffs due process claims here are entirely different. Importers do not claim that they were denied a meaningful opportunity to be heard before CBP issued its final determination of evasion that resulted in a duty rate or penalty on their merchandise. They claim instead that they were entitled to notice and a meaningful opportunity to be heard *before* the EAPA investigation was initiated (Centric Pipe Br. 13), and also *before* interim measures were imposed (*see, e.g.,* Kana Br. 23, Trek Br. 14). Neither of these claims embrace the due process challenge raised in *Royal Brush.* And *Royal Brush* does not establish that a legitimate property interest exists at the time CBP initiates the investigation, or when it imposes interim measures. Plaintiffs must first demonstrate that they have a protectable property interest in those actions. Because

plaintiffs do not identify a constitutionally cognizable interest in the initiation of an investigation or in the imposition of interim measures, their due process claim fails.

**1. Importers Identify No Protected Property Interest**

The first inquiry in every due process challenge is whether plaintiff has been deprived of a protected interest in property or liberty. *Int'l Custom Prods.,* 791 F.3d at 1337. The Constitution's "procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Int'l Custom Prods., Inc. v United States,* 791 F.3d 1329, 1337 (Fed. Cir. 2015) (citing *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 576 (1972)). Those benefits may take many forms but for a benefit to warrant the procedural protections of due process, a person must have a legitimate claim of entitlement to it. *Id.*

As to initiation, Centric Pipe identifies a "significant interest in the disclosure of [information in the allegation]" to allow an opportunity to respond before initiation and before interim measures. Br. 13. Centric Pipe points out that "initiation of an EAPA investigation imposes a hardship on importers as they are required to participate in a costly investigation that harms their business reputation." *Id.* But it has never been held that "the hand of government must be stayed until the courts have an opportunity to determine whether the government is justified in *instituting* suit." *Ewing v. Mytinger & Casselberry,* 339 U.S. 594, 596 (1950) (preliminary hearing is not required for an administrative agency to determine whether a judicial proceeding should be instituted). And business reputation is not a protected property interest. *Aspects Furniture Int'l, Inc. v. United States,* 607 F. Supp. 3d 1246, 1271 (Ct Int'l Trade 2022) (finding no liberty interest in reputation, good will and lost business opportunities from the stigma of a notice of investigation and interim measures).

Plaintiffs similarly fail to identify a property interest in the imposition of interim

measures – a statutorily-required enforcement tool used to secure the United States' duty revenue during the pendency of an EAPA investigation where Customs has reasonable suspicion that the merchandise is being entered through evasion, and no duties would otherwise be collected. *See* 19 U.S.C. § 1517(e). Only Centric Pipe and Kana purport to identify a protectable property interest; they allege financial hardship in having to maintain collateral on their bonds and pay the cash deposits. Centric Pipe Br. 13; Kana Br. 24. But plaintiffs fail to explain how being required to pay duties on merchandise for which there is at least reasonable suspicion that duties are owed implicates a protectable property interest.

This Court has rejected the imposition of interim measures as implicating due process because plaintiffs could not establish a protected interest arising from the imposition of interim measures. *See Phoenix Metal Co. v. United States*, No. 23-00048, 2024 WL 2891503, at *9 (Ct. Int'l Trade June 10, 2024), *appeal dismissed*, No. 2024-2222, 2024 WL 4534014 (Fed. Cir. Oct. 21, 2024); *Am. Pac. Plywood, Inc. v. United States,* No. 20-03914, 2023 WL 4288346, at *7-8 (Ct. Int'l Trade June 22, 2023); *Aspects Furniture Int'l, Inc. v. United States*, 607 F. Supp. 3d 1246, 1271 (Ct. Int'l Trade 2022); *Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1341-42 (Ct. Int'l Trade 2021).

This Court has also articulated the possibility that a private interest may be compelling "on account of the specific interim measures imposed and the sudden imposition of [a very high] cash-deposit rate." *ICON EV LLC v. United States,* No. 26-2759, 2026 WL 1122468 at 12 (Ct. Int'l Trade Apr. 24, 2026); *Phoenix Metal Co. v. United States,* 2024 WL 2891503, at *9 (Ct. Int'l Trade June 10, 2024) ("[i]t is possible to imagine a scenario under which a plaintiff might allege specific harm coming from this economic burden for a serious due process issue to be raised.") In *ICON*, interim measures were not just temporary deprivations until the EAPA

investigation concludes. *ICON,* 2026 WL 1122468 at 12. They were "of such immediacy and magnitude" that they would cause ICON to go out of business before it could contest the determination. *Id.* But none of the plaintiffs identify such a harm here.

In any event, plaintiffs cannot maintain a protected interest in entering merchandise into the country, that Customs reasonably suspects has been entered through evasion, and be free paying the duties that are owed on that merchandise . *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States,* 751 F.2d 1239, 1250 (Fed. Cir. 1985) (citations omitted).

Having failed to identify a protected property interest, plaintiffs' due process claims fail.

**2. Importers Received all the Process They Were Due**

Even if plaintiffs establish a constitutionally cognizable property right arising from the imposition of interim measures, plaintiffs were not entitled to any procedural protections beyond those provided to an interested party in an EAPA investigation.

A due process analysis determines what "procedural protections [] the particular situation demands." *Mathews*, 424 U.S. at 334. The "specific dictates of due process generally requires consideration of three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

Interim measures are both time limited and fully reimbursable, meaning that "the probable value, if any, of additional or substitute procedural safeguards" is minimal. *Mathews v. Eldridge,* 424 U.S. 319 335 (1976) (what process is due prior to the deprivation). And the

availability of interim measures serves important governmental interests in preventing evasion and concealment of unfair trade practices.

The Government has a substantial interest in protecting the integrity of the investigation, the United States revenue, and the domestic industry. Investigating evasion is an "inherently difficult and time-consuming process." U.S. Gov't Accountability Off., GAO-12-551, Antidumping and Countervailing Duties: Management Enhancements Needed to Improve Efforts to Detect and Deter Duty Evasion at 19 (2012); H.R. Rep. No. 114-114 at 85. By the time CBP has verified an instance of evasion, the goods have typically already entered the United States and cannot be seized. *Id.* Unscrupulous importers can quickly adjust their tactics when they receive notice that they are under investigation or suspect they have been detected by Customs. GAO-12-551 at 1, 10-11, 17, 34. For example, companies may adopt new identities, change supply routes or misclassify goods to avoid a higher duty rate. *Id; see also Phoenix Metal Co.,* 2024 WL 2891503, at *4 (Describing a company's history of evasion by creating and dissolving shell companies to avoid detection and shifting operations from one company to another when CBP issued notices of initiation and imposed interim measures). The continuing evasion, "leav[es] antidumping and countervailing duties uncollected and U.S. industries denied an effective remedy from unfair trade." H.R. REP. NO. 114-114, at 80, 85.

Congress understood that it was vital to identify and act on evasion before or at the time imports reach the U.S border, rather than after those imports have entered the marketplace and have already undermined the ADD/CVD orders to which they are subject. H.R. Rep. No. 114-114 at 80. Interim measures, therefore, give CBP enforcement power early, ensure that the government protects its revenue by preventing duty losses during investigations, and level the playing field for domestic producers harmed by unfair trade.

Plaintiffs' interest in receiving notice and an opportunity to be heard before interim measures are imposed are limited. Interim measures are temporary. CBP can extend them only upon a final determination of evasion. *Diamond Tools*, 545 F. Supp. 3d at 1341 (citing 19 U.S.C. § 1517(d)). If CBP finds "that no evasion exists, any measures taken in the interim, such as suspension of liquidation or collection of cash deposits, will be lifted and any additional duties or cash deposits paid will be reimbursed to the importer with interest." *Id.* (citing 9 C.F.R. § 165.27(c); 19 C.F.R. § 24.36). Further, between the time CBP imposes interim measures and reaches its final determination, EAPA regulations provide parties to the investigation with several opportunities to submit information and arguments. *See* 19 C.F.R. § 165.23 (procedures for voluntary submission of information); 19 C.F.R. § 165.26 (procedures for submission of written arguments). And after CBP makes a determination of evasion under 19 U.S.C. § 1517(c), the statute and regulations allow a party who is not satisfied to request a *de novo* administrative review and allow other interested parties to respond. 19 U.S.C. § 1517(f); 19 C.F.R. §§ 165.41, 165.42. These procedures, combined with the availability of a refund of all monies paid with interest if CBP reaches a negative evasion determination, provide all the process that Superior is due.

## III. The Court Should Sustain CBP's Determination Of Evasion

### A. Initiation was Lawfully Based Upon Allegations that Reasonably Suggested Evasion

Centric Pipe challenges Customs' decision to initiate the EAPA investigation on the basis that the information submitted in the allegation did not "reasonably suggest" evasion. Centric Pipe Br. 34. Centric Pipe identifies four sets of information that CBP based its initiation decision upon and challenges each individually and collectively. *Id.* at 35.

Much of Centric Pipe's challenge amounts to an argument that if Centric Pipe had the

opportunity to respond to the allegations before Customs initiated the investigation, it could have demonstrated that the allegations were false. This of course presumes that due process rights attach to initiation and provide Centric Pipe with notice and an opportunity to be heard before an initiation decision is made. For the reasons discussed above, they do not. Indeed, this is the very purpose of the procedural protections provided by 19 C.F.R. §§ 165.23, 165.26 that allow interested parties to respond to questions by CBP, voluntarily submit factual information and to rebut any new factual information that is placed on the record.

But the standard for initiation is low. *See CEK Grp. LLC v. United States,* 633 F.Supp.3d 1369, 1375 (Ct. Int'l Trade 2023). And the Court determines whether CBP's decision to initiate was reasonable based upon an arbitrary and capricious standard. *Leco Supply, Inc. v. United States,* 619 F. Supp. 3d 1287, 1295-96 (Ct. Int'l Trade 2023). Centric Pipe argues that increased shipment data and PET's deactivated license can be explained by reasons other than evasion, and points to record evidence obtained throughout the investigation that supports Centric Pipe's position. Centric Pipe Br. 35-37. Initiation is a threshold issue and information in an allegation is subject to subsequent development – by factual investigation, review and input from all interested parties. If the initial information does not support a later evasion determination or fails to carry the weight initially ascribed to it, the subsequent development does not undue a reasonable suggestion of evasion at the initiation stage. An initiation determination can be "adequate[ly] support[ed]" by a change in shipment data, despite there being many possible explanations for that change. *See Leco,* 619 F.Supp.3d at 1296. As to PET's deactivated license, the allegation also contained information that despite having no active license, PET still exported large quantities of OCTG to the United States in 2023. Initiation Mem., C.R. 21 at 7.

Centric Pipe argues that statements in the declarations supporting the allegation are "mere

conjecture or supposition" and should be categorically rejected. Centric Pipe Br. 36-37. Centric Pipe relies on *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v United States,* 716 F.3d 1370 (Fed. Cir. 2013) for the proposition that an agency "may not base [a] determination 'on the basis of mere conjecture or supposition.'" *Id.* 36. In that case, however, the Federal Circuit was citing to 19 U.S.C. § 1677(7)(F)(ii) – which governs a determination of material injury in AD/CVD cases – and specific statutory language that Commerce could not base a determination of the threat of material injury by reason of imports on "mere conjecture or supposition." The language in § 1677 has nothing to do with the standard for initiating an EAPA investigation, which is governed by an entirely separate statutory scheme.

Centric Pipe points out that the statements in the declarations are "self-interested" as they come from competitors. Centric Pipe Br. 36. But so are allegations, generally. CBP relies on the domestic industry, which competes with the foreign industry, to bring allegations of possible evasion by foreign producers for CBP to investigate. Customs cannot discount all such information simply because it comes from a source that is self-interested. Furthermore, the [ ,] to whom Centric Pipe refers as offering "self-interested" statements in declarations also offered [ .] Initiation Mem., C.R. 21 at 10; Allegation, C.R. 1, Exhibit 8 at 1.

Finally, Centric Pipe argues that the information showing a business relationship between PET and Centric Pipe cannot plausibly suggest evasion. Br. 38. Centric Pipe mischaracterizes the information. It was not simply a business relationship between the parties that might suggest evasion, but that they are "affiliated companies." Initiation Mem., C.R. 21 at 8. In particular, PET's website described Centric Pipe's business practices "in some depth" and another OCTG distributor in Texas, where Centric Pipe is located, stated that Centric is a subsidiary. *Id.*

Finally, Centric Pipe ignores shipment data indicating that it imported several shipments from PET with merchandise described as "seamless steel casing" or "seamless steel tubing" and classified under HTSUS 7304.29. *Id.* The AD/CVD orders describe the covered merchandise as including "oil well casing and tubing, of iron … or steel … whether seamless or welded" and lists 38 HTSUS numbers beginning with 7304.29. *Id.* Accordingly, some of Centric Pipe's shipments from PET appeared to contain OCTG. *Id.*

Centric Pipe also argues that, on a collective basis, the information in the allegation does not reasonably suggest evasion. Centric Pipe Br. 39. Centric Pipe points to the absence of documentation from the manufacturer under investigation and any photographic evidence of the alleged production site. *Id.* In *Leco,* this Court found adequate support for initiation without either of those elements. 619 F.Supp.3d at 1296. Information indicating that the producer did not have enough employees or machinery to produce the amount of goods that it was responsible for shipping, together with a sudden change in shipping data following the imposition of AD/CVD orders reasonably suggested evasion. *Id.* At least as much information is provided here. There is no requirement that an allegation includes documentation from the manufacturer; indeed, such a requirement would be impossible to meet in most circumstances. And allegers need only provide information that is reasonably available to them. *See* 19 U.S.C. § 1517(b)(2)(B).

**B. A Finding of Evasion Does Not Require Intent**

Kana argues that CBP has not established that Kana made entry by a material false statement or omission because, essentially, it exercised reasonable care in determining that its OCTG was a product of Thailand. Kana Br. 14-18. EAPA is a strict liability statute and does not excuse evasion based upon an importer's good faith or reasonable conduct.

First, Kana argues that RR erred by determining that Kana made a "material false statement" by entering merchandise classified on type "01" consumption entries instead of on type "03" AD/CVD entries. Kana Br. 15. Kana claims that this analysis is insufficient to establish that Kana made a "false" statement but does not explain what else is required. Instead, Kana points to this Court's decision in *Diamond Tools* to support the proposition that something more is required. *Id*.

As this Court has explained, *Diamond Tools* does not establish that some level of scienter is required for a finding of evasion. *See Ikadan Sys. USA, Inc. v. United States,* 639 F.Supp.3d 1339, 1348 (Ct. Int'l Trade, 2023) ("*Diamond Tools* does not resolve the legal question of statutory interpretation presented in this action" of whether the definition of evasion requires a culpability finding). In *Diamond Tools,* this Court concluded that CBP had failed to justify its finding that the importer had entered covered merchandise "by means of a material and false statement." 545 F. Supp. 3d at 1351 (*Diamond Tools I*); *Diamond Tools Tech. LLC v. United States,* 609 F. Supp. 3d 1378, 1387-88 (Ct. Int'l Trade 2022) (*Diamond Tools II*). The relevant antidumping duty order that plaintiff evaded covered diamond sawblades and parts thereof from China. *Diamond Tools I,* 545 F. Supp. 3d at 1328. Plaintiff had reported the country of origin of its subject imports as Thailand rather than China, based upon express statements by Commerce permitting importers to label their merchandise as originating from the country where its component parts were assembled. *Diamond Tools II,* 609 F. Supp, 3d at 1387-88. Commerce later changed its position on the scope of the relevant AD order and determined that plaintiff's merchandise was covered by the order based on the Chinese origin of its component parts. *Diamond Tools I,* 545 F. Supp. 3d at 1330. CBP concluded that the new scope applied to all of plaintiff's entries covered by the EAPA investigation, including those made prior to Commerce's

change in position. *Id.* 1331. The Court disagreed and found – twice – that CBP failed to show what false statement or omission the plaintiff had made as to the country or origin of merchandise when, at the time of entry, the relevant AD order expressly permitted the way in which plaintiff labeled its imports. *Id.* 1354.

Kana fails to explain how similar circumstances apply here and would render Kana's classification of merchandise anything other than "false." Kana points to no other order in effect at the time of entry, or contradictory guidance from either CBP or Commerce as to the application of the Orders, that would apply to Kana's merchandise.

Instead, Kana argues that it is excused from an evasion determination against it because Kana exercised reasonable care in determining that its OCTG was a product of Thailand. Kana Br. 16; *and see* Centric Pipe Br. 26-27 (arguing that it exercised "reasonable care in importing [their merchandise] without paying duties." ). This Court has rejected arguments seeking to impose a scienter requirement on evasion because, read as a whole, EAPA "supports CBP's strict liability interpretation of the definition of evasion." *Ikadan,* 639 F.Supp.3d at 1343-49.

*Ikadan* rejected reading an intent or culpability requirement in the EAPA statute. *Id*. We understand that the Court in *Ikadan* performed a *Chevron* step two analysis in reaching its determination, and in *Loper Bright* the Supreme Court overturned the second step of the *Chevron* analysis. *See id.* at 1349 (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *Loper Bright,* 144 S. Ct. at 2266. The Supreme Court made clear, however, that overruling *Chevron* did not overrule other cases, even if they relied on *Chevron*. *Loper Bright,* 144 S. Ct. at 2273 (citations omitted). Kana does not contend that *Ikadan* is no longer good law, only that the Court owes no deference to CBP's interpretation of the statute.

But sound principes of statutory construction support *Ikadan's* holding. The plain language of the definition of "evasion" in EAPA contains no intent or culpability requirement. 19 U.S.C. § 1517(a)(5)(A). Moreover, there is an explicit exception for clerical errors that provides that "'evasion' does not include entering covered merchandise . . . by means of {documents or statements that are false or omissive} as a result of a clerical error" unless "the clerical error is part of a pattern of negligent conduct." *Ikadan*, 639 F. Supp. 3d at 1349 (quoting 19 U.S.C. § 1517(a)(5)(B)). "{W}here Congress includes particular language in one section of a statute but omits it in another . . ., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Further, reading an intent requirement into the EAPA statute would violate principles of law applicable to all AD/CVD proceedings. Both this Court and the Federal Circuit have declined to read an intent requirement into AD/CVD law for a simple reason: in the limited time CBP and Commerce are required to conduct their investigations they do not possess the ability or resources to conduct a full-scale criminal-like investigation into alleged wrongdoing by an importer and comb through what would be large volumes of information to identify evidence of scienter. *See, e.g., Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003) ("While intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element … {t}he statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent"). As a result, the agencies must rely on the limited information that is provided by importers and, in some instances, gathered at verification. Given Commerce's and CBP's reliance on what a foreign producer

chooses to provide, it is unclear how—absent a concession or error on the part of an importer—any finding of intent could ever be made. And when Congress intends for the motivations behind a party's actions to impact the penalty for improper importation, it says as much in the statutory language: maximum penalties under 19 U.S.C. § 1592 shift depending on whether an act was taken by "fraud, gross negligence, or negligence," or the extent to which a party was aware of its illegal behavior.[4] *Cf. Rubin*, 138 S. Ct. at 826 (if Congress intended a statute to have certain effect, it "knew how to say so"). It did not do so in the EAPA statute.

LE Commodities' argument that it did not make a "false" statement in entering covered merchandise because it does not believe that its merchandise was, in fact, covered by the scope of the Orders, likewise fails. Br. 31-32. A "good faith disagreement" with CBP about the scope of the Orders does not excuse evasion or make an otherwise false statement less false. *Ikadan.* 639 F.Supp.3d at 1350. This argument seeks to apply the importers' preferred interpretation of evasion —that non-culpable conduct (good faith) cannot be found to constitute evasion. And is not consistent with statutory language. *Id.*

### C. CBP's Covered Merchandise Determination is Not Arbitrary or Capricious

#### 1. CBP Has Independent Authority to Make Covered Merchandise Determinations

The EAPA statute directs CBP to make a covered merchandise determination as the first element of evasion. 19 U.S.C. § 1517(b)(1) (Commissioner must determine whether an allegation reasonably suggests that covered merchandise has been entered by evasion); §

---

[4] *See* Appendix B to 19 C.F.R. § 171 for CBP's definitions of "Degrees of Culpability Under Section 592."

1517(c)(1)(A) (requiring Commissioner to make a determination whether covered merchandise was entered into the United States through evasion); § 1517 (a)(3) (defining "covered merchandise"). By reaching a conclusion that plaintiffs' merchandise is covered by the Orders, CBP does not make a "scope determination" in Commerce's stead; it acts pursuant to EAPA's directive to initiate an investigation based on CBP's determination that information in the allegation "reasonably suggests that covered merchandise has been entered into the … United States through evasion." *Ikadan,* 636 F.Supp.3d at 1352 (the text and structure of EAPA requires CBP to determine what is 'covered merchandise'); *and see* 19 U.S.C. § 1571(b)(1).

LE Commodities argues that CBP committed legal error by making a substantive determination that the imported merchandise was subject to the AD/CVD orders because CBP's is not "[]authorized to make substantive scope determinations[s]." Br. 28-29. This is plainly inconsistent with CBP's authority under the statute. Customs does not make a substantive scope determination, as LE Commodities suggests; it makes a covered merchandise determination pursuant it its congressional grant of authority under 19 U.S.C. § 1517. CBP's determination is not controlled by nor does it not depend upon or rely on Commerce's scope rulings or the regulations governing those proceedings. *See* LE Commodities Br. 30; *see also* 19 C.F.R. §§ 351.225, et., seq.

Nor is CBP *required* to make a referral to Commerce under 19 U.S.C. § 1517(b)(4)(A)(i), as Centric Pipe and LE Commodities suggest. *See* Centric Pipe Br. 27; LE Commodities Br. 31. The statute directs CBP to refer the matter to Commerce to determine whether merchandise is covered only if CBP "is unable to determine whether the merchandise at issue covered merchandise." 19 U.S.C. § 1517(b)(4)(A). LE Commodities argues that CBP "could not possibly" determine whether the OCTG at issue here is covered merchandise. Br. 31. But LE

Commodities provides no support for that contention and, in fact, CBP made such a determination here by reviewing and interpreting the scope language, analyzing the record evidence and considering the parties' arguments. *See, e.g.,* Final Det., CR 374 at 7-11. There is no indication that CBP was "unable" to make this determination. Rather, LE Commodities and Centric Pipe simply disagree with CBP's determination. The statute does not require a referral to Commerce anytime an importer challenges a covered merchandise determination. And CBP's subsequent covered merchandise referral in a separate investigation, to which Centric Pipe points, does not alter the reasonableness of CBP's determination here. CBP confronts different records, different procedural postures, and evolving factual circumstances in separate proceedings. The relevant inquiry is whether CBP reasonably explained its determination based on the record before it in this investigation.

Plaintiffs make a number of arguments seeking to impose Commerce determinations regarding scope, anticircumvention and substantial transformation onto CBP's covered merchandise determination here. *See, e.g.,* LE Commodities Br. 30; Centric Pipe Br. 24-26, 29-34 (arguing that CBP failed to consider evidence of substantial transformation); Energy Pipe Br. 13-17. CBP and Commerce make determinations on imported merchandise pursuant to different Congressional authority and for different purposes. *See SunEdison, Inc. v. United States,* 179 F. Supp. 3d 1309, 1323 (Ct. Int'l Trade 2016) (rejecting plaintiffs' analogy to CBP's country of origin analysis in a challenge to Commerce's scope ruling). These determinations are separate and distinct inquiries for this Court and are governed by the controlling regulations and statutory framework for each. Plaintiffs' attempt to graft these determinations, and their governing standards, onto CBP's covered merchandise determination is misplaced and inapposite to the issue presented here. *See Aireko Constr., LLC v. United States,* 425 F. Supp. 3d 1307, 1312 n7

(Ct. Int'l trade 2020) (rejecting that there was an "inconsistency" between Commerce's and CBP's country of origin determinations because CBP makes country of origin determinations under a different authority than that by which Commerce determines country of origin for purposes of applying AD/CVD duties) (citing 19 U.S.C. § 1304, *and SunEdison,* 179 F. Supp.3d at 1323.)

This Court has repeatedly upheld Commerce's explanation that imported products may be determined by different agencies to have different origins for different statutory purposes. *See Aireko,* 425 F. Supp.3d at 1312 n7; *SunEdison,* 179 F. Supp. 3d at 1323. In particular, "[Customs] decisions regarding substantial transformation and customs regulations … are not binding on [Commerce] because we make these decisions with different aims in mind (*e.g.,* anticircumvention)."). *SunEdison,* 179 F.Supp.3d at 1323, n78. The explanation applies with equal force here. CBP's covered merchandise determination is made pursuant to and in furtherance of an entirely different grant of authority than that which governs Commerce's scope rulings, circumvention inquiries, or other determinations. And the argument that Commerce's anticircumvention decision in *Oil Country Tubular Goods From the People's Republic of China,* 91 Fed. Reg. 9,811 (Dep't of Commerce Feb 27, 2026) controls CBP's determination of covered merchandise here is particularly misplaced. *See* Centric Pipe Br. 24-26; LE Commodities Br. 25-28, 32-33; Energy Pipe Br. 13. A circumvention inquiry is a special subset of scope rulings and is governed by a specific statutory scheme. *See* 19 U.S.C. § 1677(j); *U.K. Carbon and Graphite Co., Ltd. v. United States,* 931 F.Supp.2d 1322, 1328 (Ct. Int'l Trade 2013). This Court has held that in reviewing an anticircumvention inquiry, any discussion of the scope factors under 19 C.F.R. § 351.22(k) is "extraneous" and would be "disregarded." *Id.* A covered merchandise determination under EAPA is further removed still.

Analogies to Commerce determinations in this EAPA review are also inapposite because this Court's review of CBP's covered merchandise determination is limited to whether the determination is arbitrary, capricious, or not in accordance with the law – a different standard than how this Court would review a determination by Commerce. *See* 19 U.S.C. § 1517(g)(2)(B) ("[this Court] shall examine –(B) whether any determination, finding, or conclusion made by CBP in its initial determination and in the administrative review is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."); *see also Ikadan,* 639 F. Supp.3d at 1351. This Court has explained the difference between the "arbitrariness" standard under which EAPA determinations are reviewed, and the "substantial evidence" review to which Commerce determinations are subject. *Id.* (citing 3 Charles H. Koch, Jr. & Richard Murphy, *Administrative Law and Practice* §§ 9.24, 9.25 (3d. 2023). While a "reasonableness review 'requires the court to reach the *positive* conclusion that the agency's decision is reasonable before it may accept that decision,' [the] arbitrariness review 'requires only that the court reach the *negative* conclusion that the agency's decision is not arbitrary in order to accept that decision.'" *Id.* (rejecting plaintiff's argument that the Court review CBP's covered merchandise determination under a substantial evidence standard.) The difference renders consideration of Commerce's determinations inapplicable to CBP's covered merchandise inquiry.

**2. Plaintiffs Do Not Demonstrate that CBP's Covered Merchandise Determination Was Arbitrary and Capricious**

The AD/CVD Orders that are implicated by this evasion determination include the following scope language:

> The scope of this order consists of certain oil country tubular goods ("OCTG"), which are hollow steel products of circular

> cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plan end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached.

**a. CBP's Determination That PET's Exported OCTG is Covered Merchandise is not Arbitrary or Capricious**

PET described the "hollow steel billets" it used to produce finished OCTG as "round billets that are hollow." Review Det., CR 374 at 19. Based on record evidence, CBP confirmed this physical description and from PET's explanation of the production process, TRLED concluded that "hollow steel billets" that PET used to manufacture finished OCTG "are essentially tubes or casing that were [ ]" in China. *Id.* The scope language clearly defines OCTG as "hollow steel products of circular cross-section," whether finished or unfinished. Based on the plain scope language, TRLED concluded that the Orders cover Chinese hollow steel billets what are finished in a third country, such as Thailand. Review Det., CR at 19

Centric Pipe argues that "steel billets (either hollow or solid) do not fall within the scope of the Orders" and cannot therefore constitute covered merchandise. Br. 22. This argument presumes that steel billets, themselves, were found to be covered merchandise. They were not. Rather, CBP determined that *OCTG* that was imported into the United States was covered merchandise, and that the processing performed in Thailand did not alter the country of origin of that merchandise. Final Det., CR 394 at 22. In other words, CBP examined PET's production process, the nature of the inputs used in Thailand, and the extent of processing there to determine that the resulting OCTG that was imported to the U.S. was covered merchandise.

Centric Pipe also wrongly reads the scope language as requiring covered merchandise to be "casing" or "tubing." Br. 23 (arguing that hollow steel billets are not tubes or casing but are instead a raw material of steel that can be further processed.) In fact, the scope language allows that OCTG *may* include those physical characteristics but does not require them. Review Det., CR 374 at 19.

LE Commodities argues that OCTG exported by PET is not covered merchandise because there is no legal or factual basis to support [sic] finding that steel billets imported by PET were unfinished OCTG. Br. 22. It is unclear what "finding" LE Commodities is referring to and LE Commodities does not explain this further or point to any record evidence. It appears that the argument assumes that Chinese-origin hollow steel billets are subject merchandise. But this, too, oversimplifies CBP's determination and the scope language.

Accordingly, neither importer has demonstrated that CBP's covered merchandise determination is arbitrary or capricious or otherwise contrary to law.

**b. CBP's Determination That TOP's Exported OCTG is Covered Merchandise is not Arbitrary or Capricious**

TOP used "mother pipe" from China to produce OCTG in Thailand. Review Det., CR 374 at 22. Mother pipe is described by TOP as "hollow pipe of various steel grades." *Id.* Record evidence demonstrates that mother pipe imported from China "was OCTG in all but name and had the [ ] outer diameter, wall thickness, and length as the OCTG it exported to the importers." *Id.* citing Final Det., CR 374 at 7-8. CBP therefore determined that finished OCTG containing Chinese mother pipe is covered merchandise.

Plaintiffs Energy Pipe, Kana and Trek do not attempt to show that CBP's covered merchandise determination is arbitrary and capricious. *Ikadan,* 639 F. Supp. 3d at 1351; §

1571(g)(2). Energy Pipe's entire argument on the covered merchandise determination is based upon Commerce's subsequent circumvention finding, which is misplaced for all the reasons discussed above.

Kana argues that there is no direct evidence linking any specific Kana purchase to Chinese-origin mother pipe and CBP should have individually traced each of Kana's entries to determine whether they contained mother pipe. Br. 9-13. An entry-by-entry review is "not the proper subject of an EAPA investigation." *Ikadan,* 639 F.Supp.3d at 1354. The Court cannot reach Kana's individual entries because § 1517(g) only permits judicial review of CBP's determination that evasion occurred – not the final duty rates applied to a particular entry. *Id.* And evasion is determined by looking at the record as a whole. 19 C.F.R. § 165.45. Kana does not dispute that, on this record, evasion occurred. This distinguishes the appeal from the situation in *Ad Hoc Shrimp Enforcement Committee v. United States,* 632 F. Supp. 3d 1369, 1379 (Ct. Int'l Trade 2023), where the Court found that "the determination *of evasion* is not reasonable on this record." (emphasis supplied).

Trek similarly argues that CBP should have individually reviewed its five entries of OCTG to determine evasion. Br. 22-23. Trek speculates that had CBP not consolidated the investigation with other importers, it would have reviewed all of Trek's entries. *Id.* at 23. There is no support for that position and, in any event, consolidation allows CBP to investigate, as it did here, ten importers who imported merchandise, subject to the same AD/CVD Orders, from the two foreign companies. Speculating about what may have occurred in the absence of consolidation does not disturb CBP's finding.

### D. CBP's Application of Adverse Inferences Was Not Arbitrary or Capricious

CBP drew adverse inferences against producers TOP and PET and importer Kana for failing to cooperate and comply to the best of their ability with CBP's requests for information. Final Det., CR 374 at 35. As against the producers, CBP applied an inference that all the OCTG exported by TOP and PET into the United States was Chinese-origin OCTG. *Id.* at 43. CBP also drew the inference that all the OCTG that Kana imported into the United States from TOP was Chinese-origin OCTG. *Id.* at 40.

#### 1. The Application of Adverse Inferences May Have Collateral Consequences on Cooperating Parties

Under § 1517(c)(3)(B), adverse inferences may be used "without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought … such as import or export documentation." *See, e.g., Skyview Cabinet USA, Inc., v. United States,* No. 22-80, 2023 WL 4073781, at *9 (Ct. Int'l Trade June 20, 2023)

Energy Pipe argues that the adverse inference provision of § 1517(c)(3) is a "person-specific mechanism" designed to ensure that "persons provide requested information" to CBP and that it should not apply here to a cooperating importer. Br. 19 (citing legislative history). This is inconsistent with the plain language of the statue, which has been affirmed by this Court. *See, e.g. Phoenix*, 2024 WL 2891503, at *7; *CEK Grp.*, 633 F. Supp. 3d at 1379. Energy Pipe argues that any deterrent purpose is defeated when the consequences of an adverse inference is borne entirely by a cooperating importer. But the importer – not a foreign manufacturer – is the subject of an EAPA investigation and the party who owes duties. CBP requests information from foreign manufacturers and conducts verifications at their facilities to determine whether the *importer* engaged in evasion. Adverse inferences under the statute would be meaningless if they could not be used to determine whether evasion occurred.

**2. Energy Pipe and Trek**

Energy Pipe argues that substantial contradictory evidence undermines CBP's evasion finding as to Energy Pipe and "clearly showed" that OCTG imported by Energy Pipe was produced in Thailand using [ ] billets and not mother pipe. Br. 17, 22. Energy Pipe asks the Court to reweigh evidence and substitute the judgment of CBP. Energy Pipe points to evidence that TOP had the ability to produce OCTG from [ ] billets in a [ ] step process. *Id.* at 22-25; *see also* Trek Br. 18 (citing to on-site photographs from verification). As TRLED explained, demonstrating some production capacity does not negate the substantial evidence that TOP also imported mother pipe, made minor modifications to it and then exported it as OCTG. Final Det. at 53, CR 374. And TOP explained that it used mother pipe to speed up production and had a financial incentive to do so. *Id.* Energy Pipe also points to documents in the record that demonstrate traceability between [ ] and the OCTG that Energy Pipe imported. But, as TRLED explained, much of the raw material documents showing [ ] billets are not reliable on account of TOP's inaccurate and false statements. Final Det., CR 374 at 57. For example, TRLED identified [ ] that appeared to cover the same heat numbers but were generated by two different companies in China. TRLED found it likely that TOP created one or both sets of [ ] *Id.* at 12. Although the [ ] were only between Trek and TOP, TRLED found that they called into question the reliability of TOP's [ ]. *Id.* at 12-13. And CBP was drawing a reasonable conclusion about the manufacturer's general reliability and truthfulness which is not tied to a particular importer.

Trek also argues that as to its five entries that were the subject of the investigation, there was no evidence that mother pipe was used to produce the OCTG, and the list of invoices and

associated bills of lading for purchases from Energy Pipe provided by TOP demonstrate that Trek only imported OCTG produced from [ ] billets. Br. 17-18. But TOP's several false statements "cast doubt on the reliability of its raw materials documents." Final Det., CR 374 at 57. The [ ] further reflects that TOP's documents are not reliable. *Id.*

Finally, Energy Pipe argues that even if TOP did not provide documents for each of the [ ] step production process by which OCTG is produced from [ ] billets, the "essential documents were produced that clearly linked" Energy Pipe's entries to [ ] billet. Br. 27. But, as RR explained, the production documents correspond to only a handful of those steps and contain numerous discrepancies. Review Det., CR 374 at 23. The missing documents were critical because they demonstrated whether [ ] occurred, the essential feature of whether the pipes were made from [ ] billets or mother pipe. *Id.*

**3. Kana**

Kana challenges the adverse inference applied against it for providing "materially false statements concerning its ownership structure, management, and affiliation." Br. 18-19; Final Det., CR 374 at 37. Kana argues that CBP's conclusion was based on "uncorroborated" and "outdated public information" and that the discrepancies in Kana's tax returns represented an "inadvertent accounting error." Kana Br. 18-19. Kana does not demonstrate that CBP acted arbitrarily and capriciously in reaching its determination. Instead, Kana asks this Court to reweigh the record evidence in its favor. The "internal stock ledger" that Kana submitted as an official document substantiating its ownership did not, in fact, reflect an official document but "appeared to have originated as a Word document that just repeated Kana's claims." Final Det., CR 374 at 39. Multiple items of evidence pointed to material false statements by Kana about its corporate ownership. *Id.*

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motion for judgment on the agency record, sustain CBP's evasion determination, and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

s/Margaret J. Jantzen
MARGARET J. JANTZEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:(202) 353-7994
Email: Margaret.j.jantzen@usdoj.gov

*Attorneys for Defendant*

OF COUNSEL:

NICOLAS A. MORALES
Attorney
Office of Chief Counsel
U.S. Customs and Border
Protection

August 21, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | | |
|---|---|---|
| CENTRIC PIPE LLC, | ) | |
| Plaintiff, | ) | |
| LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, and KANA ENERGY SERVICES, INC. | ) | |
| Consolidated-Plaintiffs, | ) | |
| v. | ) | Consol. Court No. 25-00182 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| U.S. OCTG MANUFACTURERS ASSOCIATION, | ) | |
| Defendant-Intervenor. | ) | |

ORDER

Upon consideration of plaintiffs' motions for judgment on the agency record, defendant's response, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are denied, and it is further

ORDERED that the final determination of the U.S. Customs and Border Protection is sustained in its entirety, and it is further

ORDERED that judgment is entered in favor of the United States.

Dated ____________________ ______________________________

New York, N.Y. Judge

**CERTIFICATE OF COMPLIANCE**

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this brief contains 14439 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

*s/Margaret J. Jantzen*

MARGARET J. JANTZEN