**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

CENTRIC PIPE LLC,

*Plaintiff,*

*and*

LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, *and* KANA ENERGY SERVICES, INC.,

*Consolidated Plaintiffs,*

v.

UNITED STATES,

*Defendant,*

*and*

U.S. OCTG MANUFACTURERS ASSOCIATION,

*Defendant-Intervenor.*

**Consol. Court No. 25-00182**

**PUBLIC VERSION**

**RESPONSE OF DEFENDANT-INTERVENOR IN OPPOSITION TO CONSOLIDATED PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE RECORD**

September 21, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

RULE 56.2 STATEMENT .......... 2

FACTUAL BACKGROUND .......... 3

STANDARD OF REVIEW .......... 7

ARGUMENT .......... 9

I. Plaintiffs Show No Actionable Error in Customs' Initiation Timeline .......... 9

*A. Any error was harmless to Plaintiffs .......... 11*

*B. Plaintiffs also lack prudential standing .......... 15*

II. Plaintiffs' Due Process Arguments Are Without Merit and Contradicted by Binding Precedent .......... 18

*A. Plaintiffs fail to identify any constitutionally protected interest required to trigger due process protections .......... 23*

*B. Even if Plaintiffs had a protected interest, they must still satisfy the Supreme Court's Mathews balancing test .......... 26*

*1. The private interest affected .......... 26*

*2. The risk of erroneous deprivation and procedures used .......... 27*

*3. The Government's interest and the burdens of additional procedures .......... 32*

III. Customs' Determination of Evasion Is Overwhelmingly Supported by Substantial Evidence .......... 35

*A. Customs' initiation of the investigations was supported and was not arbitrary .......... 36*

*B. Substantial evidence supports Customs' determination of evasion .......... 39*

IV. Plaintiffs' Claims That Customs Improperly Decided Not to Refer the Scope Question to Commerce Ignore the Facts and Law .......... 44

*A. Customs has the authority to make a decision on scope coverage, even where that question is ambiguous .......... 46*

*B. The Court should reject LE Commodities' new arguments that were not presented to the agency .......... 52*

V. Customs' Application of Adverse Inferences Was Supported by Substantial Evidence .......... 53

CONCLUSION .......... 55

**PUBLIC VERSION**

TABLE OF AUTHORITIES

**CASES**

*ABB Inc. v. United States*, 190 F. Supp. 3d 1159 (Ct. Int'l Trade 2016) .............. 9, 53

*All One God Faith, Inc. v. United States*, 129 F.4th 1350 (Fed. Cir. 2025) ........................................................................ 8, 26, 38, 39, 40, 46, 54

*Am. Ass'n of Exp. & Imp.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239 (Fed. Cir. 1985) ....................................................................... 23

*Am. Kitchen Cabinet All. v. United States*, 745 F. Supp. 3d 1270 (Ct. Int'l Trade 2024)........................................................................................ 35

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999)........................................................................................ 20

*Am. Pac. Plywood, Inc. & LB Wood Cambodia Co., Ltd.*, No. 20-03914, 2023 WL 4288346, Slip Op. 23-93 (Ct. Int'l Trade June 22, 2023) ...... 20, 24, 37, 38

*Aspects Furniture Int'l, Inc. v. United States*, 510 F. Supp. 3d 1353 (Ct. Int'l Trade 2021), *aff'd*, 42 F.4th 1366 (Fed. Cir. 2022) .......................................... 12

*Bell Supply Co., LLC v. United States*, 888 F.3d 1222 (Fed. Cir. 2018)............. 48, 52

*Blue Pipe Steel Ctr. Co. v. United States*, 803 F. Supp. 3d 1258 (Ct. Int'l Trade 2025)....................................................................................................... 51

*Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 107 S. Ct. 1740, 95 L. Ed. 2d 239 (1987) ........................................................................................... 29, 30

*Cafeteria Workers v. McElroy*, 367 U.S. 886 (1961)................................................ 19

*CEK Grp. LLC v. United States*, 633 F. Supp. 3d 1369 (Ct. Int'l Trade 2023) ............................................................................................................ 37, 38

*Cheatham v. United States*, 92 U.S. 85, 23 L. Ed. 561 (1875).................................. 27

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) ....................................................... 17

*Columbia Aluminum Prods., LLC v. United States*, 701 F. Supp. 3d 1363 (Ct. Int'l Trade 2024)....................................................................................... 26

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ..................................................... 8

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ................................................... 8

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ............................ 53

*Cummins Engine Co. v. United States*, 83 F. Supp. 3d 1366 (Ct. Int'l Trade 1999)....................................................................................................... 12

*Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324 (Ct. Int'l Trade 2021)..................................................................................... 14, 20

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) .................................. 53

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) ........................................................................................................ 35

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004) ...................................... 16

*Ellwood City Forge Co. v. United States*, 582 F. Supp. 3d 1259 (Ct. Int'l Trade 2022)........................................................................................................ 36

*Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 70 S. Ct. 870, 94 L. Ed. 1088 (1950) ........................................................................................... 21, 34

*Gilbert v. Homar*, 520 U.S. 924 (1997)......................................................... 21, 26, 27

*Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979)...................................... 16

*Haixing Jingmei Chem. Prods. Sales Co. v. United States*, 335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018)................................................................................. 40

*Hannah v. Larche*, 363 U.S. 420 80 S. Ct. 1502, 4 L. Ed. 2d 1307 (1960)................. 34

*Icon EV LLC v. United States,* No. 26-02759, 2026 WL 1122468, Slip Op. 26-42 (Ct. Int'l Trade Apr. 24, 2026) ................................................................ 25

*INS v. Elias-Zacarias*, 502 U.S. 478 (1992) ................................................................... 9

*Int'l Custom Prod., Inc. v. United States*, 791 F.3d 1329 (Fed. Cir. 2015) .... 20, 24, 26

*Intercargo Ins. Co. v. United States*, 83 F.3d 391 (Fed. Cir. 1996) .......... 11, 12, 13, 14

*Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019)................................................................................................ 16

*Jiangsu Changbao Steel Tube Co. v. United States*, 36 C.I.T. 1431 (2012) ............................................................................................................... 54

*Kowalski v. Tesmer*, 543 U.S. 125 (2004)................................................................... 16

*Leco Supply, Inc. v. United States*, 619 F. Supp. 3d 1287 (Ct. Int'l Trade 2023)........................................................................................... 19, 37, 38

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ........................................................................................................ 16, 17

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007).............................................................. 16

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984) .............................................................................................................. 9, 14

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................................... 19

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) ......................................................................................................... 8

*N. Am. Interpipe, Inc. v. United States*, 519 F. Supp. 3d 1313 (Ct. Int'l Trade 2021), *aff'd sub nom. California Steel Indus., Inc. v. United States*, 48 F.4th 1336 (Fed. Cir. 2022) .......... 16, 17

*NEC Corp. v. United States*, 151 F.3d 1361 (Fed. Cir. 1998) .......... 28

*Neimenggu Fufeng Biotechnologies Co. v. United States*, 816 F. Supp. 3d 1356 (Ct. Int'l Trade 2026) .......... 11

*Newtrend USA Co. v. United States*, 791 F. Supp. 3d 1313 (Ct. Int'l Trade 2025) .......... 41, 44

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) .......... 40

*Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 53 S. Ct. 350, 77 L. Ed. 796 (1933) .......... 34

*Petroleum Exploration, Inc. v. Public Service Comm'n*, 304 U.S. 209, 58 S.Ct. 834, 82 L.Ed. 1294 (1938) .......... 14

*Phoenix Metal Co. v. United States*, No. 23-00048, 2024 WL 2891503, Slip Op. 24-68 (Ct. Int'l Trade June 10, 2024) . 15, 20, 22, 23, 24, 25, 27, 31, 32, 33, 41, 42, 43, 54

*Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250 (Fed. Cir. 2023) ...... 15, 22, 23

*S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 104 S. Ct. 2720, 81 L. Ed. 2d 615 (1984) .......... 34

*Shinseki v. Sanders*, 556 U.S. 396, 409, 129 S. Ct. 1696, 173 L. Ed. 2d 532 (2009) .......... 12

*Star Fruits S.N.C. v. United States*, 393 F.3d 1277 (Fed. Cir. 2005) .......... 8

*Starr Int'l Co. v. United States*, 856 F.3d 953 (Fed. Cir. 2017) .......... 16

*Sunpreme Inc. v. United States*, 946 F.3d 1300 (Fed. Cir. 2020) .......... 49, 50, 52

*Superior Com. Sols., LLC v. United States*, 811 F. Supp. 3d 1363 (Ct. Int'l Trade 2025) .......... 20, 29

*The Abby Dodge v. United States*, 223 U.S. 166, 32 S.Ct. 310, 55 L.Ed. 390 (1912) .......... 24

*TR Int'l Trading Co., Inc. v. United States*, 4 F.4th 1363 (Fed. Cir. 2021) .......... 50

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .......... 8

*Vanguard Trading Co. LLC v. United States*, 788 F. Supp. 3d 1277 (Ct. Int'l Trade 2025) .......... 45

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) .......... 8

STATUTES

19 U.S.C. § 1517(b)(2) ........ 27

19 U.S.C. § 1517(b)(4)(A) ........ 51

19 U.S.C. § 1517(b)(4)(A)(ii) ........ 34

19 U.S.C. § 1517(c)(1)(A) ........ 28

19 U.S.C. § 1517(c)(3)(B) ........ 54

19 U.S.C. § 1517(c)(4) ........ 34

19 U.S.C. § 1517(e) ........ 28

19 U.S.C. § 1517(g)(2)(B) ........ 7

28 U.S.C. § 2637(d) ........ 53

5 U.S.C. § 706 ........ 11

ADMINISTRATIVE DETERMINATIONS

EAPA Cons. Case 8164, *Notice of Determination as to Evasion* (CBP Mar. 16, 2026) ........ 33

*Notice of Initiation of Investigation and Interim Measures - EAPA Case Numbers 8222-8223 and 8242-8244 (Consolidated Case 8222) - Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe* (CBP Feb. 25, 2026) ........ 33

*Oil Country Tubular Goods from the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 91 Fed. Reg. 9311 (Dep't Commerce Feb. 27, 2026) ........ 48

*Oil Country Tubular Goods From the People's Republic of China: Notice of Covered Merchandise Referral and Initiation of Covered Merchandise Inquiry*, 90 Fed. Reg. 61,375 (Dep't Commerce Dec. 31, 2025) ........ 47

REGULATIONS

165.27 ........ 28

19 C.F.R. § 165.11 ........ 27

19 C.F.R. § 165.24 ........ 28

19 C.F.R. § 165.24(c) ........ 31

19 C.F.R. § 165.26 ........ 28

19 C.F.R. § 165.27(c) ........ 26

19 C.F.R. § 46 .......... 28
19 C.F.R. §§ 165.41 .......... 28
19 U.S.C. § 1517(f)–(g) .......... 28

**PUBLIC VERSION**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | |
|---|---|
| CENTRIC PIPE LLC,<br><br>*Plaintiff,*<br><br>*and*<br><br>LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, *and* KANA ENERGY SERVICES, INC.,<br><br>*Consolidated Plaintiffs,*<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant,*<br><br>*and*<br><br>U.S. OCTG MANUFACTURERS ASSOCIATION,<br><br>*Defendant-Intervenor.* | **Consol. Court No. 25-00182** |

**RESPONSE OF DEFENDANT-INTERVENOR IN OPPOSITION TO CONSOLIDATED PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE RECORD**

Pursuant to USCIT Rule 56.2 and this Court's Orders of December 8, 2025 and August 7, 2026 (ECF 32 and 63), Defendant-Intervenor the U.S. OCTG Manufacturers Association ("USOMA" or "Defendant-Intervenor") respectfully submits its response in opposition to the motion for judgment on the agency record filed by consolidated Plaintiffs Centric Pipe LLC ("Centric Pipe") (ECF 47 and 48); Energy Pipe & Equipment Rentals, LLC ("Energy Pipe") (ECF 50 and 51); Kana

Energy Services, Inc. ("Kana") (ECF 55 and 56); LE Commodities, LLC ("LE Commodities") (ECF 57 and 58); and Trek Metals Inc. ("Trek") (ECF 46). In this response, we have endeavored to avoid unnecessarily repeating arguments already made in Defendant's response brief (ECF 67 and 68); we have also structured this brief to parallel the structure of Defendant's response brief for the Court's convenience.

## RULE 56.2 STATEMENT

1. In this action, consolidated Plaintiffs challenge the determination of evasion by U.S. Customs and Border Protection ("Customs" or "CBP") in Enforce and Protect Act ("EAPA") Consolidated Case No. 7890. *See* CR 374, PR 522 (TRLED's Final Det.)[1]; CR 395, PR 612 (ORR's Review Det. (affirming the Final Det.)).

2. <u>Issues Presented and Statement of the Argument</u>:

    1. *Can Plaintiffs challenge Customs' date of initiation of the investigations?*

    No. Plaintiffs identify no interest protected by the date-of-initiation rule. Any error in applying that rule therefore was harmless as to Plaintiffs, and Plaintiffs lack a legally cognizable interest sufficient to challenge it.

    2. *Did Customs' imposition of interim measures violate Plaintiffs' due process rights?*

    No. Plaintiffs identify no constitutionally protected interest sufficient to support a due process claim. Even assuming such an interest exists, the required

---

[1] Citations to documents on the confidential administrative record are denoted as "CR" in this brief and citations to the public administrative record are denoted as "PR." Citations to specific pages are to the confidential version unless the document is only in the public record.

balancing establishes that Plaintiffs were not entitled to the procedures they demand.

3. *Was Customs' affirmative determination of evasion arbitrary or unsupported by substantial evidence?*

No. At every stage of the investigations, Customs thoroughly considered the record, addressed contrary evidence, and explained how the evidence supported its conclusions.

4. *Was Customs' decision not to refer the question of scope arbitrary or capricious?*

No. Plaintiffs rely on statements made by the Department of Commerce ("Commerce") after Customs' EAPA decision to argue that the scope was ambiguous. However, binding U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") precedent establishes that Customs has independent authority to determine scope coverage in the first instance, even where the scope is ambiguous.

5. *Was Customs' use of adverse inferences arbitrary or capricious?*

No. The Federal Circuit has confirmed that Customs may apply adverse inferences against noncooperative parties in the manner it did here.

## FACTUAL BACKGROUND

Defendant sets out the basic facts in its response brief, including the procedural history and background on EAPA. We provide additional facts here that are critical to understanding Customs' determination of evasion but are glossed over or ignored in Plaintiffs' briefs.

The allegations that led to Customs' initiation of these investigations

provided multiple pieces of evidence indicating that two exporters and ostensible producers of oil country tubular goods ("OCTG") in Thailand—Petroleum Equipment (Thailand) Co., Ltd. ("PET") and Thai Oil Pipe Co., Ltd. ("TOP")—were in fact merely transshipping Chinese merchandise. *See* Final Det., CR 374, PR 522 at 2–3. That evidence included declarations from multiple individuals who had been [ ] that [ ] TOP and other Thai exporters were transshipping, who also provided specific production and shipment numbers that showed TOP was transshipping as well as disclosing that PET lacked [ ]. *See* Initiation Memo, CR 21, PR 42 at 3-4. Alleger supported that direct [ ] with additional evidence showing massive increases in volumes shipped by PET and TOP to the United States in a short time, TOP's links to Chinese OCTG producers, [ ] of a lack of production at PET, and that PET has lost its certification from the American Petroleum Institute ("API"). *Id.* at 3-4 and 6-7.

Customs initiated the investigations and immediately uncovered additional evidence of transshipment and efforts to conceal it. Before imposing interim measures, Customs issued CF-28 questionnaires to the various importers. In response, the importers submitted documents from PET that Customs determined were forged, including instances in which the same document had been altered to make it appear that it documented multiple production runs and shipments. *See* Notice of Initiation, CR 33, PR 90 at 26.

PET's claims of production fell apart when Customs later conducted a site

visit at PET's Thai facility. Customs found that the facility did not appear to have ever been used for production and showed no signs of industrial use—including the absence of signs that Customs observed *every time* PET attempted to demonstrate production on its machinery—despite PET's claim that it had produced a large batch of pipe only days earlier. *See* Verification Report, CR 352, PR 457 at 9–11. Customs also identified discrepancies in PET's claimed electricity consumption, language barriers between PET management and the workers presented for verification, and widespread missing, incomplete, and inaccurate records. *Id*. at 10–12, 16. When confronted with these issues, PET refused to provide explanations and ultimately refused to provide any further information to Customs. *Id*. at 13–14, 18. PET also directly interfered with Customs' ability to question workers during the verification. *Id*. at 11–12.

When Customs required PET to demonstrate the production capabilities that PET claimed, Customs first found that PET lacked inventory of the raw materials it purportedly used. *Id*. at 9. When PET attempted to demonstrate production using the limited scrap material of a different kind that it did have, PET struggled to operate its own production equipment. *Id*. Customs then asked PET to demonstrate that it could test the samples it had managed to produce to the industry strength standards PET claimed to meet. Every sample "exploded." *Id*. at 12.

Customs also noted that in a video submitted from PET claiming to show production [ ] prior to the site visit, Customs could observe that certain equipment, namely [ ], were [ ] PET's machinery—

[ ] that PET claimed to have [ ]. Final Det., CR 374, PR 522 at 25. Yet for the site visit, [ ]. *Id.* PET repeatedly refused to address the [ ] of that equipment. *Id.* at 25-26.

Customs likewise discovered that TOP was willing to "resort to deceptive practices" and submit fraudulent documentation to conceal its transshipment. Through the CF-28 responses, Customs discovered that multiple purported U.S. importers of TOP's merchandise and the trading companies used to route those sales were intertwined with one another and with TOP. *Id.* at 13–20. TOP denied any involvement with these entities despite clear evidence to the contrary, including that a manager of one trading company attended Customs' verification visit to TOP. *See id.* at 13–16. TOP also attempted to mislead Customs regarding the Chinese pipe factories with which TOP is affiliated. *Id.* at 16–17.

TOP apparently even confused itself with that web of corporate fronts it set up to disguise its transshipment. TOP provided documentation to importer Trek for a shipment purporting to show that the [ ]. *Id.* at 12. But TOP also provided directly to Customs in its own response [ ]. *Id.* Customs determined that "the only reason TOP would have to have "created [ ] {was} to give the appearance that it produced the OCTG from [ ] billets rather than mother pipe." *Id.* at 13.

While TOP admitted to producing [ ] of its OCTG from "mother pipe" in Thailand (a proportion that Customs found was [ ]), Customs noted that this "mother pipe" "had the [ ] outer diameter, wall thickness, and length" as the finished OCTG TOP claimed to have "produced." *Id.* at 7; Review Det., CR 395, PR 612 at 22. TOP was unable to provide documentation supporting many of the production steps it claimed to have performed on [ ], making it impossible for Customs to determine what merchandise was in fact produced from either input. Review Det., CR 395, PR 612 at 23.

Given the multiple examples of falsification, fraudulent claims, and deliberate noncooperation by PET, TOP, and multiple importers, Customs found that an application of adverse inferences was warranted and held that was sufficient to find evasion. *See* Final Det., CR 374, PR 522 at 40-43. Customs also held that, despite all the efforts to dissemble and disguise the transshipment, the evidence that was on the record was sufficient to support a determination of evasion as to all the importers under investigation. *See id.* at 43; Review Det., CR 395, PR 612 at 20-25.

## STANDARD OF REVIEW

The applicable standard of review for an EAPA determination is set forth in 19 U.S.C. § 1517(g)(2)(B), which directs the Court to examine whether Customs complied with the procedures set forth in subsections (c) and (f) of that section and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See also All One God Faith,*

*Inc. v. United States*, 129 F.4th 1350, 1357 (Fed. Cir. 2025) (reiterating that standard of review).

"An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005). In determining whether an agency has abused its discretion, "Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998). "{T}he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30, 103 S. Ct. 2856, 2860, 77 L. Ed. 2d 443 (1983).

A decision is supported by substantial evidence where there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

In applying the substantial evidence standard, the Court does not supplant the decision-making role of the agency to which Congress entrusted that role and so does not reweigh the evidence or consider what decision it would itself have made. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984). Instead, the agency's decision is entitled to deference and may be set aside only where "no reasonable factfinder" could have reached the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). "The fact that a plaintiff can point to evidence that detracts from the agency's conclusion or that there is a possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence." *ABB Inc. v. United States*, 190 F. Supp. 3d 1159, 1166-67 (Ct. Int'l Trade 2016).

## ARGUMENT

### I. Plaintiffs Show No Actionable Error in Customs' Initiation Timeline

As addressed in the factual background section above and further discussed below in Section III, the record developed by Customs during these investigations—including the multitudinous examples uncovered of PET and TOP actively seeking to defraud and mislead Customs—provides far more than is necessary to satisfy the substantial evidence standard. Indeed, in multiple determinations, this Court and the Federal Circuit have held that substantially less evidence was more than sufficient to support a finding of evasion. Faced with this overwhelming evidentiary record, Plaintiffs instead devote much of their argument to attacking the EAPA process, apparently hoping to avoid the consequences of the factual findings

Customs made.

This Court cannot allow Plaintiffs to so escape the consequences of their evasion of U.S. fair trade laws, even if their procedural claims had any merit. And those claims do not. Regarding Plaintiffs' attacks on the date Customs initiated these investigations, Defendant's brief sets out in detail that where, as here, Congress decided not to specify a consequence for an agency that fails to meet a deadline, the Court is not free to fashion its own remedy and block the very authority Congress specifically conferred that agency. Plaintiffs' theory—that Congress would establish a EAPA system that requires Customs to investigate and take action against the unlawful evasion of U.S. trade laws but simultaneously intended to prevent Customs from exercising that authority if it missed a single deadline—cannot be credited.

Indeed, Plaintiff Centric Pipe itself is forced to admit that the Supreme Court's directive is that federal courts will not normally fashion their own remedies for violations of agency deadlines. But, Centric Pipe argues, this Court should take such exceptional action here because Customs has missed deadlines in other, entirely unrelated cases. *See* Centric Pipe Br. at 19-20. Centric Pipe fails to point to any authority supporting the claim that it is ever appropriate for a court to so punish an agency based on agency actions in cases not before the court. Moreover,

the issue of the initiation deadline is nowhere near settled,[2] so there is no reason for this Court to take what even Centric Pipe admits would be a drastic and unprecedented step.

*A. Any error was harmless to Plaintiffs*

In addition to the well-settled principles set out in Defendant's brief regarding non-consequential statutory deadlines and substantial prejudice requirements (*see* ECF 67 at 9-25), additional principles likewise require the Court to reject Plaintiffs' claims that Customs should be sanctioned for allegedly failing to meet the deadline for initiating these investigations.

"It is well settled that principles of harmless error apply to the review of agency proceedings." *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996); *see also Neimenggu Fufeng Biotechnologies Co. v. United States*, 816 F. Supp. 3d 1356, 1365 (Ct. Int'l Trade 2026) ("The court has a freestanding obligation to consider whether an error is prejudicial before remanding on the basis of that error."). *See also* Def. Br. at 20-21 (noting the related principle of substantial prejudice). This requirement that a reviewing court apply the doctrine of harmless error is likewise recognized in the judicial review section of the Administrative Procedure Act ("APA"), which provides that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; *see also Intercargo*, 83 F.3d at 394 (the APA

[2] As noted further below, the single Court of International Trade ("CIT") case that has sought to impose its own corrective action on Customs on this issue has been appealed to the Federal Circuit.

"requires courts to apply conventional principles of harmless error when reviewing agency action"). A failure to properly apply the doctrine of harmless error constitutes reversible error on appeal. *See Intercargo*, 83 F.3d at 396 (reversing the CIT's grant of summary judgment for the plaintiff when the court was "unable to discern any prejudice" arising from Customs' defective notice of extension of liquidation).

The principle of harmless error requires the party challenging the agency action to demonstrate that it *was* harmed by the action. *Shinseki v. Sanders*, 556 U.S. 396, 409, 129 S. Ct. 1696, 173 L. Ed. 2d 532 (2009). However, an agency's mere violation of a procedural requirement is insufficient to show prejudice or harm.[3] As a prerequisite, in situations where "'neither the statute nor the regulation specifies the consequence of noncompliance' with a procedural requirement, the party seeking relief must demonstrate that it suffered substantial prejudice as a result of the contested action." *Aspects Furniture Int'l, Inc. v. United States*, 510 F. Supp. 3d 1353, 1375 (Ct. Int'l Trade 2021), *aff'd*, 42 F.4th 1366 (Fed. Cir. 2022) (quoting *Cummins Engine Co. v. United States*, 83 F. Supp. 3d 1366, 1378 (Ct. Int'l Trade 1999)). Thus, even assuming arguendo that Customs erred in initiating the investigations, Plaintiffs must establish that the alleged error was harmful to them

[3] "Prejudicial error," as used in the APA, is the same as harmless error. *See Shinseki*, 556 U.S. at 406, 129 S. Ct. 1696, 173 L. Ed. 2d 532 (citing the Attorney General's Manual on the Administrative Procedure Act for the proposition that "the APA's reference to 'prejudicial error' is intended to 'su{m} up in succinct fashion the 'harmless error' rule applied by the courts in the review of lower court decisions as well as administrative bodies'").

in a way the rule was intended to prevent before the Court may grant relief.

In *Intercargo*, the plaintiff argued that Customs's failure to fully comply with a notice regulation regarding the date of liquidation had prejudiced it because the plaintiff "may be forced, at the end of this litigation, to pay additional duties" and that "the prejudice flowing from this circumstance is the ultimate prejudice – the wrongful imposition of customs duty." *Intercargo*, 83 F.3d at 396. However, the court explained "that is not what is meant by prejudice as used in this context. A party is not 'prejudiced' by a technical defect simply because that party will lose its case if the defect is disregarded." *Id.* Rather, "{p}rejudice, as used in this setting, means *injury to an interest that the statute, regulation, or rule in question was designed to protect*." *Id.* (emphasis added). In other words, while a plaintiff may be able to develop a theory as to how an agency's procedural violation has harmed it, that alone is insufficient to avoid a finding of harmless error. The plaintiff must instead demonstrate that the alleged injury implicates an interest that the relevant statute, regulation, or rule was designed to protect.

Here, as detailed in Defendant's brief and so unnecessary to repeat here, where Plaintiffs even attempt to raise claims of any harm arising from the date that Customs initiated these investigations, those claims are illusory and unsupported by the record. *See* ECF 67 at 20-24. Moreover, the harms Plaintiffs do allege (*e.g.*, notice of the investigations, undefined obligations as importers, a change in the universe of entries covered by the investigation (*see id.*)) are certainly not "injury to an interest that the statute, regulation, or rule in question was designed to protect."

*Intercargo*, 83 F.3d at 396; *see also, e.g.*, *Petroleum Exploration, Inc. v. Public Service Comm'n*, 304 U.S. 209, 222, 58 S.Ct. 834, 841, 82 L.Ed. 1294 (1938) ("the expense and annoyance of litigation is part of the social burden of living under government;" quotation marks omitted); *Matsushita Elec. Indus. Co. v. United States*, 823 F.2d 505, 509 (Fed. Cir. 1987) ("The expenses and effort involved in the defense of litigation do not constitute 'irreparable injury'").

As noted by Defendant (ECF 67 at 13), the legislative history of EAPA confirms that the statute was intended to offer prompt protection to *domestic producers and industries* from fraudulently entered imports, and that purpose animated the 15-day initiation deadline. The stated purpose of the EAPA legislation was to "speed{} up the process" "to combat {} illegal trade practices" "and help{} companies like U.S. Steel respond to illegal dumping before it causes serious harm to the company and its workers." 161 Cong. Rec. 9526 (2015) (statement of Rep. Bost). Requirements such as the deadlines for initiation and for other steps in an EAPA investigation were put in place by Congress "so that delay in collecting antidumping and countervailing duties on evading imports is limited." *Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1336 (Ct. Int'l Trade 2021) (quoting H.R. Rep. No. 114-114, pt. 1, at 86 (2015)) (quotation marks removed). In *Diamond Tools*, this Court recognized that the intent of these requirements in the EAPA and the interests they were intended to protect should "be understood to mean on behalf of U.S. companies, and there is no specific indication that Congress aimed to avoid prejudicing importers with drawn-out investigations." *Id*. at 1336

(emphasis added). The 15-day initiation deadline thus cannot reasonably be construed as creating a windfall for importers engaged in evasion—particularly a windfall that would prevent Customs from enforcing the very trade laws EAPA was enacted to protect.

This Court has likewise declined to grant relief for procedural errors in EAPA determinations where the alleged error caused no continuing harm. In *Phoenix Metal*, this Court specifically recognized that the Federal Circuit had held in *Royal Brush* that EAPA respondents had a due process right to address any confidential evidence used against them prior to a final Customs determination. *Phoenix Metal Co. v. United States*, No. 23-00048, 2024 WL 2891503, Slip Op. 24-68 at *6 (Ct. Int'l Trade June 10, 2024) (noting *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250 (Fed. Cir. 2023)). However, although Customs had not provided the respondent access to the confidential record during the EAPA process at issue, this Court held that as that respondent "concede{d} that it no longer suffers any harm from this error, this issue is no longer appropriate for review" and so its complaints on that point were moot. *Id.* The absence of continuing harm thus foreclosed judicial relief notwithstanding the procedural error. That same principle forecloses Plaintiffs here from using an alleged error by Customs in setting the initiation date to void Customs' resulting investigation and the finding of evasion that investigation that investigation uncovered.

*B. Plaintiffs also lack prudential standing*

The requirement that courts apply, and plaintiffs satisfy, the harmless-error

doctrine follows from basic principles of standing and judicial review. "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance," encompassing both constitutional and prudential limitations on federal-court jurisdiction. *Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004). Thus, in addition to satisfying Article III's constitutional requirements, a plaintiff must satisfy prudential standing requirements, including the "zone of interests" test. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 498 (2007); *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1275 (Ct. Int'l Trade 2019).

The prudential standing doctrine includes the "general prohibition on a litigant's raising another person's legal rights." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 2 (2004); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014); *Starr Int'l Co. v. United States*, 856 F.3d 953, 964–65 (Fed. Cir. 2017). This limitation recognizes that the third-party right-holder may choose not to assert the claim and therefore "limits access to the federal courts to those litigants best suited to assert a particular claim." *Starr*, 856 F.3d at 965 (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979)); *see also Kowalski*, 543 U.S. at 129.

Accordingly, even where a litigant establishes constitutional standing through an injury in fact, the court may deny standing if the litigant seeks to vindicate another party's legal rights rather than its own. *N. Am. Interpipe, Inc. v. United States*, 519 F. Supp. 3d 1313, 1333 (Ct. Int'l Trade 2021), *aff'd sub nom. California Steel Indus., Inc. v. United States*, 48 F.4th 1336 (Fed. Cir. 2022).

The zone-of-interests test likewise asks whether the plaintiff's interests are among those protected by the statutory provision at issue. A plaintiff falls outside the zone of interests where its interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987); *see also Lexmark*, 572 U.S. at 130. The CIT therefore examines "the interests protected by the statutory provision at issue" and whether the plaintiff's interests implicated by the challenged agency action fall within those protected interests. *Seafood Exporters Ass'n of India v. United States*, 31 C.I.T. 366, 382–83 (2007).

As already shown, the interest the 15-day initiation rule was intended to protect is the interest of domestic producers in prompt and effective enforcement against evasion. Plaintiffs' claims of wishing to see timely initiation of an enforcement action in fact seek to "vindicate not {their} own legal right or interest, but instead the legal rights or interests of a third party." *N. Am. Interpipe*, 519 F. Supp. 3d at 1333. Even if such a plaintiff was able to show harm by the challenged error, "a court may nonetheless deny standing if the litigant seeks to vindicate not its own legal right or interest, but instead the legal rights or interests of a third party." *Id.* at 1332-33.

The Plaintiffs fall squarely outside the zone of interests protected by the 15-day rule. They seek instead to invoke the domestic producers' interest in prompt enforcement and turn that procedural rule against the very interests it was

intended to protect—using an alleged procedural defect to prevent enforcement of the underlying evasion determination, regardless of when the investigation was initiated. This Court cannot permit parties who have no cognizable interest protected by the rule and have suffered no cognizable harm from its alleged violation to invoke that rule to defeat the very enforcement interests the rule was designed to protect.

For all of these reasons, Plaintiffs identify no basis for relief based on the date Customs initiated these EAPA investigations. The statute provides no consequence for an alleged violation of the 15-day initiation deadline; Plaintiffs have not demonstrated substantial prejudice or any cognizable injury resulting from the alleged delay; and Plaintiffs' asserted interest in the deadline falls outside the zone of interests the provision was intended to protect. The Court therefore should reject Plaintiffs' challenge to the initiation date and decline their invitation to invalidate an otherwise supported finding of evasion based on an alleged procedural error that caused them no legally cognizable harm.

## II. Plaintiffs' Due Process Arguments Are Without Merit and Contradicted by Binding Precedent

As detailed in Defendant's brief, Plaintiffs likewise fail to allege the type of injury necessary to support their constitutional due process claims concerning Customs' imposition of interim measures before providing Plaintiffs notice of the investigations. *See* ECF 67 at 26–28. Centric Pipe goes even further, remarkably asserting that Customs violated its due process rights simply by initiating an investigation. *See* Centric Pipe Br. at 10. As Defendant explains, Plaintiffs' claims

fail to apply—and, in many instances, fail even to acknowledge— the test that has been set out by the Supreme Court for determining what due process is due, asserting instead that Customs violated their due process rights by even undertaking to investigate potential evasion. *See* ECF 67 at 24–25.

The Supreme Court has emphasized that due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, "{d}ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Accordingly, determining whether administrative procedures satisfy due process requires a balancing of the governmental and private interests affected. *Id.*

In *Mathews*, the Supreme Court established a three-part test for determining the procedural protections that due process requires in a particular case: (1) the private interest affected; (2) the risk of erroneous deprivation and the value of additional procedural safeguards; and (3) the Government's interest. *Id.*; *see also Leco Supply, Inc. v. United States*, 619 F. Supp. 3d 1287, 1302 (Ct. Int'l Trade 2023) (applying the *Mathews* test to EAPA due process claims).

Before applying the *Mathews* balancing test, however, the threshold question is whether the Government's action deprived Plaintiffs of any constitutionally protected interest. As the Federal Circuit has explained, "{t}he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected

interest in 'property' or 'liberty.'" *Int'l Custom Prod., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59, 119 S. Ct. 977, 989, 143 L. Ed. 2d 130 (1999)).

This Court has repeatedly rejected due process challenges to interim measures imposed during EAPA investigations where the plaintiff failed to identify a constitutionally protected interest affected by those temporary importation measures. *See, e.g.*, *Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1341 (Ct. Int'l Trade 2021); *Am. Pac. Plywood, Inc. & LB Wood Cambodia Co., Ltd.*, No. 20-03914, 2023 WL 4288346, Slip Op. 23-93 at *6-*8 (Ct. Int'l Trade June 22, 2023); *Phoenix Metal*, Slip Op. 24-68 at *9-*10.

Plaintiffs largely disregard this line of decisions and instead rely heavily on a single outlier, *Superior Com. Sols., LLC v. United States*, 811 F. Supp. 3d 1363 (Ct. Int'l Trade 2025), which is currently on appeal to the Federal Circuit. *Superior Commercial Solutions* is of limited persuasive value because it did not address the threshold question of whether a constitutionally protected interest was implicated and did not apply the *Mathews* balancing test directed by the Supreme Court. *See id.* at 1376. *Cf. Phoenix Metal*, Slip Op. 24-68 at *8–9 (recognizing and applying both the protected-interest threshold and *Mathews* test in analyzing a due process claim).

Contrary to Plaintiffs' assertion that due process requires a right to be heard and to review the evidence before preliminary or temporary measures are imposed, the Supreme Court has *repeatedly* held that reasonable interim measures may

satisfy due process where a full hearing is provided before a final decision. *See, e.g., Mathews*, 424 U.S. at 349 (holding that due process did not require a hearing before termination of disability benefits where the claimant received a hearing before a final decision and retained the right to judicial review). The Court has likewise "recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997); *see also Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 598, 70 S. Ct. 870, 872, 94 L. Ed. 1088 (1950) ("no hearing at the preliminary stage is required by due process so long as the requisite hearing is held before the final administrative order becomes effective").

In *Gilbert*, the Supreme Court held that the preliminary suspension of a university police officer without pay pending a termination hearing did not violate the officer's due process. The Court emphasized the strong governmental interest in the suspension, the limited private interest because the deprivation was temporary, and the safeguards against erroneous deprivation, including fact-finding conducted before the suspension. *Gilbert*, 520 U.S. at 933–34.

Plaintiffs largely fail to engage with the proper due process analysis. Instead, they make vague assertions concerning the protected interests allegedly affected by the interim measures and treat the identification of such an interest as the end of the inquiry. It is not. As set forth in Defendant's brief and reinforced by the Court's decisions rejecting similarly unsupported due process claims concerning EAPA

interim measures, Plaintiffs' claims fail under the constitutional framework required by *Mathews* and its progeny.

Additionally, as also explained by Defendant, Plaintiffs substantially overstate the Federal Circuit's holding in *Royal Brush*. *See* Def. Br. at 25; *cf.*, *e.g.*, Centric Pipe Br. at 11, 13 (claiming that *Royal Brush* "controls this appeal"). *Royal Brush* addressed a respondent's due process right to respond to confidential information before Customs issued a *final* EAPA determination. *See Royal Brush*, 75 F.4th at 1259. Nothing in *Royal Brush* requires disclosure before Customs imposes temporary measures to facilitate an investigation, much less before Customs may undertake the investigation itself. Plaintiffs do not claim—and could not credibly claim—that their counsel lacked access to the complete EAPA record under a protective order before the final determination. Customs therefore fully complied with *Royal Brush* in the EAPA investigations being challenged here.

Centric Pipe also inaccurately claims that CIT decisions rejecting due process challenges based on Customs' failure to disclose information earlier in the EAPA process—including challenges to interim measures—predated *Royal Brush* and therefore "are no longer valid law." Centric Pipe Br. at 11–12. That argument fails for at least two reasons. First, *Royal Brush* contains no holding that respondents possess a protected due process interest "with respect to the imposition of interim measures." *Id.* at 11. Second, the CIT has continued to reject due process challenges to interim EAPA measures after *Royal Brush*. *See, e.g.*, *Phoenix Metal*, Slip Op. 24-68 at *8 (rejecting due process challenge to interim measures under *Mathews* and

expressly recognizing *Royal Brush*).

*Royal Brush* held that certain due process protections attach to *final* EAPA determinations; it did not address temporary interim measures, much less the initiation of an EAPA investigation. Nothing in *Royal Brush* purports to overrule or in any way undermine the CIT decisions addressing interim measures. Centric Pipe's attempt to extend *Royal Brush* beyond the issue the Federal Circuit actually decided is therefore unsupported by the decision's holding and contradicted by CIT precedent.

*A. Plaintiffs fail to identify any constitutionally protected interest required to trigger due process protections*

As Defendant explains, Plaintiffs fail to identify any constitutionally protected interest that Customs' actions allegedly violated. Def. Br. at 26–27. Centric Pipe and Kana point only to the financial burden of having their entries treated as subject to the antidumping and countervailing duty ("AD/CVD") orders, while Centric Pipe additionally alleges unspecified business expenses and reputational harm from merely participating in an EAPA investigation. *See id.* These allegations do not establish a constitutionally protected interest, and this Court has repeatedly rejected similar claims in the context of EAPA interim measures. *Id.* at 27.

As this Court has recognized, a "protected interest is more than a 'unilateral expectation.'" *Phoenix Metal*, Slip Op. 24-68 at *9 (quoting *Am. Ass'n of Exp. & Imp.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1250 (Fed. Cir. 1985)). "The mere subjective expectation of a future business transaction does not rise to

the level of an interest worthy of constitutional protection." *Am. Ass'n of Exp. & Imp.-Textile & Apparel*, 751 F.2d at 1250.

Equally, "the Constitution does not provide a right to import merchandise under a particular classification or rate of duty, or even afford a protectable interest to engage in international trade." *Int'l Custom Prod.*, 791 F.3d at 1337; *see also, e.g.*, *The Abby Dodge v. United States*, 223 U.S. 166, 176–77, 32 S.Ct. 310, 313, 55 L.Ed. 390 (1912) ("so complete is the authority of Congress over the subject that no one can be said to have a vested right to carry on foreign commerce with the United States."); *Am. Pac. Plywood,* Slip Op. 23-93 at *5 (Ct. Int'l Trade June 22, 2023) ("An importer has no 'legitimate claim of entitlement' to the right to engage in international trade, to import merchandise under a specific tariff classification or rate of duty, or to rely on the maintenance of a particular duty rate.").

Accordingly, Plaintiffs' alleged injuries arising from their inability to continue importing at non-AD/CVD rates, or from Customs' interference with their unilateral expectations or business plans, cannot establish a constitutionally protected interest. Plaintiffs had no constitutional right to continue importing under prior bonding requirements or at an anticipated cash-deposit rate. *See Phoenix Metal*, Slip Op. 24-68 at *7 ("But those were future importations, so they had no protected interest in the rate of duty.").

Moreover, as this Court has held, an EAPA respondent has no protected property interest in avoiding higher duty rates where Customs properly determines that the respondent evaded U.S. AD/CVD orders and so applies the corresponding

duties through the EAPA process. *See id.* at *9 ("the duties from these goods are no longer at issue here, as the evasion determination has been upheld and so Phoenix owes the duties that CBP sought"). As discussed below in Section III.A, Customs' evasion determinations here were supported by substantial evidence and were not arbitrary, consistent with this Court's and the Federal Circuit's decisions upholding evasion determinations based on comparable evidence. Plaintiffs likewise have no constitutionally protected interest in avoiding the consequences of a lawful evasion determination. *See id.*

Plaintiffs' nebulous claims of injury from the interim measures stand in sharp contrast to the evidentiary showing this Court found sufficient in the only other case where this Court has found that a protected interest was adequately pleaded in a challenge to EAPA interim measures, *Icon EV*. There, the importer supported its claim with "supporting declarations and financial evidence" and "declarations from upstream and downstream partners" providing "a detailed account" of its financial circumstances and establishing that it faced "bankruptcy within the month" if the interim measures were imposed. *Icon EV LLC v. United States,* No. 26-02759, 2026 WL 1122468, Slip Op. 26-42 at *4–6 (Ct. Int'l Trade Apr. 24, 2026). Plaintiffs here offer nothing remotely comparable. They provide no financial evidence, declarations, or other substantiation demonstrating that the interim measures deprived them of *any* constitutionally protected interest.

*B. Even if Plaintiffs had a protected interest, they must still satisfy the Supreme Court's* Mathews *balancing test*

*1. The private interest affected*

As already explained, the interests claimed by Plaintiffs here are not constitutionally protected and therefore cannot support a due process claim or weigh in Plaintiffs' favor under *Mathews*. *See, e.g.*, *Int'l Custom Prods.,* 791 F.3d 1337 ("Absent a right to a duty rate and its sustained existence, {a plaintiff} cannot contest the adequacy of the process provided….").

Additionally, as the Supreme Court explained in *Gilbert*, "account must be taken of the *length* and *finality* of the deprivation." *Gilbert*, 520 U.S. at 932, 117 S. Ct. at 1813 (emphasis in the original, quotation marks omitted). Here, even if Plaintiffs had a constitutionally protected interest affected by Customs' interim measures, the measures are temporary by nature. As the Federal Circuit has pointed out, "interim suspensions dissolve once the Customs investigation terminates." *All One God Faith,* 129 F.4th at 1354.

Moreover, if Customs ultimately determined that Plaintiffs were not evading the orders, it would have terminated the suspension of liquidation and refund, with interest, any estimated AD/CVD duties deposited. *See,* 19 C.F.R. § 165.27(c) ("Negative determination"); *Columbia Aluminum Prods., LLC v. United States*, 701 F. Supp. 3d 1363, 1366 (Ct. Int'l Trade 2024) (a respondent in a negative EAPA determination receives "refund of all estimated antidumping or countervailing duties that were deposited, with interest as provided by law."). Requiring the prepayment of customs duties raises no due process concern. *Int'l Custom Prod.*, 791

F.3d at 1336; *see also Cheatham v. United States*, 92 U.S. 85, 89, 23 L. Ed. 561 (1875) ("{T}he general government has wisely made the payment of the tax claimed, whether of customs or of internal revenue, a condition precedent to a resort to the courts by the party against whom the tax is assessed.").

Thus, any deprivation resulting from the interim measures was temporary and fully remediable through the EAPA process. Under *Gilbert*, the temporary and nonfinal nature of that deprivation weighs heavily against finding a due process violation, while the availability of a full refund further supports the adequacy of the process provided.

*2. The risk of erroneous deprivation and procedures used*

Another element that the Court must consider in determining what process is due is "the risk of an erroneous deprivation" of the identified private interest and the value of additional procedural safeguards. *Mathews*, 424 U.S. at 334.

As this Court stated in *Phoenix Metal*, the risk of erroneous deprivation from temporary EAPA interim measures is "extremely low." *Phoenix Metal*, Slip Op. 24-68 at *10. The EAPA process, as set up by Congress and applied by Customs through its regulations, provides multiple, sequential safeguards to ensure that evidence is gathered and verified, reviewed by multiple bodies, and that this evidence supports the actions taken.

First, the statute and regulations require an EAPA allegation to contain specific, certified information demonstrating evasion. 19 U.S.C. § 1517(b)(2); 19 C.F.R. § 165.11. Customs must then determine whether the facts reasonably

suggest evasion before initiating an investigation. 19 U.S.C. § 1517(b)(1); 19 C.F.R. § 165.15(b). Before imposing interim measures, Customs must determine that the evidence developed to that point establishes a reasonable suspicion of evasion; otherwise, the investigation terminates. 19 U.S.C. § 1517(e); 19 C.F.R. § 165.24. Before issuing a final determination, Customs provides the parties access to the administrative record, permits factual and briefing submissions, and must support its decision with substantial evidence. *See* 19 U.S.C. § 1517(c)(1)(A); 19 C.F.R. §§ 165.26, 165.27.

The safeguards do not end with Customs' determination. A party may still seek administrative review by a different Customs office of the determination and underlying record, followed by judicial review in this Court. 19 U.S.C. § 1517(f)–(g); 19 C.F.R. §§ 165.41–.46.

The Federal Circuit has recognized that such multi-stage proceedings—including a preliminary determination, an opportunity for the parties to comment, agency review by officials not involved in the preliminary determination, and subsequent judicial review—"significantly lessen{} the risk" of a determination that violates due process. *NEC Corp. v. United States*, 151 F.3d 1361, 1374 (Fed. Cir. 1998) (considering whether Commerce's antidumping investigation procedures satisfied due process). The EAPA process contains each of these safeguards, together with progressively more demanding evidentiary standards and multiple levels of review. They therefore substantially reduce the already "extremely low" risk of erroneous deprivation and weigh strongly against requiring additional

procedures before interim measures are imposed.

Plaintiffs rely on a passage of dicta from the Supreme Court in *Brock v. Roadway* to argue that an EAPA respondent has a constitutional right to be informed of and comment on the evidence against it not only before interim measures are imposed, but even before Customs undertakes an investigation. Centric Pipe Br. at 12-13; Kana Br. at 23; Trek Br. at 15-16; *see also Superior Com.*, 811 F. Supp. 3d at 1377 (relying on the same passage).

But *Brock* in no way establishes the categorical rule Plaintiffs seek to impose. Rather, the Supreme Court there expressly applied the *Mathews* balancing test to the particular government action and private interest before it. The Court explained that the private party was "sufficiently protected by procedures that do not include an evidentiary hearing" prior to the temporary action (in that case, the forced temporary reinstalment of a trucking employee to an employer) "{s}o long as" the procedures in place "establish a reliable initial check against mistaken decisions" followed by "complete and expeditious review" after the initial action. *Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 263, 107 S. Ct. 1740, 1748, 95 L. Ed. 2d 239 (1987). Such procedural protection "fairly balances the competing interests of the Government, the employer, and the employee, and a prior evidentiary hearing is not otherwise constitutionally required." *Id.*

The official practice of the particular agency involved in *Brock*, however, included providing the employer with certain information prior to the reinstatement. *Id.*, 481 U.S. at 265, 107 S. Ct. at 1749. Because the agency failed to

follow that established practice in the case before the court, the court held that in *that* instance due process had been denied. *Id.* ("Given this circumstance…."). Nothing in *Brock* transformed those agency-specific procedures into constitutionally required procedures applicable to every agency action. Plaintiffs do not allege that Customs failed to follow its own procedures here.

Indeed, as the Supreme Court explained in *Brock*, the pre-deprivation process required in that case was limited to following the agency's established practice of providing the employer with certain information. The Court did not require an evidentiary hearing at which the employer could *respond* to that information before the temporary deprivation. Yet that is precisely the constraint Plaintiffs demand here. *Brock* provides no such categorical guarantee.

Indeed, *Brock* more appropriately stands for the proposition that due process is satisfied where procedures provide for a reliable initial check of the facts before temporary action is taken, *followed* by a full review and opportunity to respond. That is precisely what occurs in an EAPA investigation. Customs not only makes a preliminary determination whether the information in the allegation supports a reasonable suspicion of evasion, but also conducts a further investigation before imposing interim measures and thereafter provides the parties with an opportunity to review the record, submit factual and legal arguments, and obtain administrative and judicial review.

Additionally, Plaintiffs ignore that they *were* given an opportunity to submit evidence to Customs prior to the imposition of interim measures. Customs issued

CF-28 questionnaires to all importers, affording them an opportunity to substantiate their claims that the merchandise was manufactured in Thailand. *See* Notice of Initiation, CR 33, PR 90 at 1. Customs routinely uses CF-28s for this purpose in EAPA investigations. *See Phoenix Metal*, Slip Op. 24-68 at *8 ("CBP utilizes this form to gather additional information from the importer prior to deciding whether 'reasonable suspicion' exists and imposing interim measures.").[4] If a CF-28 response dispels the suspicion of evasion prior to the interim determination, Customs terminates the EAPA investigation.[5]

Here, however, the CF-28 responses did not dispel the suspicion of evasion; they provided additional evidence supporting it. *See, e.g.*, Notice of Initiation, CR 33, PR 90 at 26. Plaintiffs therefore cannot plausibly claim that Customs denied them an opportunity to present evidence before imposing interim measures when Customs solicited and considered their evidence before proceeding.

As this Court recognized in *Phoenix Metal*, even where a respondent may be unaware that a formal EAPA investigation is underway, the respondent may nevertheless have an opportunity to submit information to Customs before interim

[4] In *Phoenix Metal*, Customs had not issued the importer a CF-28. Phoenix Metal, Slip Op. 24-68 at *3. However, even then the Court did not find a violation of due process, as the importer's owner, who had been found in multiple prior EAPA investigations to committing evasion, would have been alerted to the new investigation if a CF-28 was issued, contrary to the government's interest in being able to effectively investigate the new evidence of evasion. *See id.* at *10.

[5] As pre-interim termination occurs before notification to the investigated parties occurs, Customs does not publish these terminations. *See* 19 C.F.R. § 165.24(c) (Customs notifies parties of initiation and interim measures only if it preliminary finds a reasonable suspicion of evasion).

measures are imposed. Accordingly, the risk of erroneous deprivation is "extremely low." *Phoenix Metal*, Slip Op. 24-68 at *10.

*3. The Government's interest and the burdens of additional procedures*

The next *Mathews* factor—and one that weighs particularly heavy here—is the Government's strong interest in effectively investigating evasion without first alerting those potentially engaged in it. Requiring advance notice could give parties suspected of evasion an opportunity to intensify efforts to conceal their conduct, alter or destroy evidence, or otherwise seek to frustrate the investigation. Congress recognized these concerns in structuring the EAPA process. *See* Def. Br. at 29 and sources therein.

These concerns are not simply theoretical, as this Court has recognized. *See Phoenix Metal*, Slip Op. 24-68 at *10 ("EAPA allows CBP to delay notifying an importer of the existence of allegation….Given {this respondent's} history of new company creation…if there were ever a case that presented the facts under which CBP might wish to delay notification of an allegation, it is this one. CBP's concern is, as {the} Government points out, borne out….").

The same concerns have *extensively* borne out here. Soon after conducting these EAPA investigations, Customs was again called on to investigate PET's continued actions to evade these and other AD/CVD orders in two more EAPA investigations. Customs found that, after its initial evasion tactics were uncovered, PET adopted new methods to disguise its conduct, including using new corporate identities and fraudulent paperwork, while even reusing documents uncovered in

these investigations to claim that pipe was produced in Malaysia and painting over the "Made in Thailand" markings. *See* EAPA Cons. Case 8164, *Notice of Determination as to Evasion* (CBP Mar. 16, 2026), *available at* https://www.cbp.gov/sites/default/files/2026-05/03-16-2026_-_trled_-_determination_508_complaint_-_8164_-_pv.pdf; s*ee also Notice of Initiation of Investigation and Interim Measures - EAPA Case Numbers 8222-8223 and 8242-8244 (Consolidated Case 8222) - Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe* (CBP Feb. 25, 2026) at 8-11 (PET's use of even more pseudonyms and fraudulent paperwork), a*vailable at* https://www.cbp.gov/sites/default/files/2026-05/02-25-2026_-_trled_-_noi_and_interim_measures_508_compliant_-_cons_8222_-_pv.pdf.

These subsequent investigations confirm the Government's substantial interest in avoiding premature disclosure. As *Phoenix Metal* recognized, "if there were ever a case that presented the facts under which CBP might wish to delay notification of an allegation, it is this one." Slip Op. 24-68 at *10. The repeated EAPA investigations in both cases show that, once their initial methods were uncovered, parties adopted increasingly sophisticated means of disguising their conduct. These cases confirm that the Government had a substantial interest in conducting preliminary investigations without simultaneously having to uncover and counteract new efforts to conceal the underlying evasion. The Supreme Court has held that such Government interests are properly considered in a due process analysis. *See S.E.C. v. Jerry T. O'Brien, Inc*., 467 U.S. 735, 750–51, 104 S. Ct. 2720,

2729–30, 81 L. Ed. 2d 615 (1984) (noting that early knowledge of an SEC investigation "would enable an unscrupulous target to destroy or alter documents, intimidate witnesses, or transfer securities or funds so that they could not be reached by the Government").

Congress likewise did not require Customs to provide notice before imposing interim measures. The EAPA statute requires notice within five days of a *final* determination. *See* 19 U.S.C. § 1517(c)(4); *see also* 19 U.S.C. § 1517(b)(4)(A)(ii) (requiring notification to EAPA parties when CBP makes a covered-merchandise referral). Congress thus specified when notice must be provided but did not require notice when an investigation is initiated or before interim measures are imposed. Had Congress intended to give investigated parties a right to be notified at either of those stages, it knew how to do so. *See, e.g., Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 306, 53 S. Ct. 350, 355, 77 L. Ed. 796 (1933) (explaining that Congress's omission of a statutory requirement "may have been unwise, but it certainly was not inadvertent").

Congress's deliberate choice is consistent with Supreme Court precedent recognizing that investigative proceedings generally warrant fewer procedural protections than final adjudicative proceedings. *See, e.g., Hannah v. Larche*, 363 U.S. 420, 442–44, 80 S. Ct. 1502, 1515, 4 L. Ed. 2d 1307 (1960) ("investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings"); *Ewing*, 339 U.S. at 598.

In sum, Plaintiffs' due process arguments fail at the threshold because they

identify no constitutionally protected interest. But even assuming arguendo such an interest existed, the Mathews factors independently foreclose their claims. The EAPA process provides multiple safeguards against erroneous deprivation, while the Government has a substantial interest in investigating evasion without prematurely alerting those engaged in it. The additional procedures Plaintiffs demand before interim measures would undermine that interest without materially reducing the already "extremely low" risk of erroneous deprivation. Plaintiffs therefore received all the process due.

## III. Customs' Determination of Evasion Is Overwhelmingly Supported by Substantial Evidence

Plaintiffs' arguments that Customs' affirmative determinations of evasion were arbitrary or capricious because, Plaintiffs claim, those determinations were not supported by substantial evidence on the record miss the mark and repeatedly disregard Customs' actual findings and reasoning. Instead of presenting meaningful claims regarding Customs' reasoning and views of the evidence, Plaintiffs repeatedly invite this Court to step into Customs' shoes and reweigh the evidence as a finder of fact.

But as this Court has had to habitually remind such plaintiffs, "{i}t is not the court's role to second-guess agency decision-making so long as the agency provides a reasoned analysis for its choices after considering the full gambit of record evidence…." *Am. Kitchen Cabinet All. v. United States*, 745 F. Supp. 3d 1270, 1283–84 (Ct. Int'l Trade 2024). *See also, e.g.*, *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1378 (Fed. Cir. 2015) (the court must decline {an} invitation

to reweigh the evidence in order to reject {an agency's} conclusions, which were well-supported and fully explained"); *Ellwood City Forge Co. v. United States*, 582 F. Supp. 3d 1259, 1285 (Ct. Int'l Trade 2022) ("The Court must not 'reweigh the evidence' and will not second-guess {the agency} on individual line-item decisions that pertain to its particular area of expertise.").

Here, the Court must once again reject the invitation that it substitute its own weighing of the evidence for that of Customs at any stage of the investigations. The proper question for the Court to address is whether Customs addressed that evidence, including any contradictory evidence, and provided a reasonable explanation of how that evidence supported the conclusions Customs reached. Customs did exactly that: extensively addressing the evidence, including evidence that Plaintiffs now characterize as contradictory, and explaining why the evidence supported its conclusions. Because Customs considered the relevant evidence and provided a reasoned explanation for its findings, there is no basis for the Court to second-guess those determinations.

*A. Customs' initiation of the investigations was supported and was not arbitrary*

As explained by Defendant, Centric Pipe's attacks on Customs' initiation of these investigations as unsupported by evidence that reasonably suggested evasion are without merit. *See* Def. Br. at 30-32. As Defendant notes, the standard for initiation in the statute is low: the evidence need only "reasonably suggest{}" evasion.

As this Court has explained, the EAPA statute requires an increasing

standard of proof at each stage of an EAPA investigation, with the standard of "reasonably suggests" for initiation being the lowest standard of all. *Am. Pac. Plywood,* Slip Op. 23-93 at *8 ("it is reasonable to conclude that Congress meant each ensuing standard to require something more than is needed at the earlier stage(s)—that is, 'reasonably suggests' is less demanding than 'reasonable suspicion,' which in turn is less demanding than 'substantial evidence.'").

And yet even the higher standard of "reasonable suspicion" needed to support Customs' imposition of interim measures in an EAPA investigation requires only a "very small amount" or "slight evidence." *Id.* at *9. So the evidence needed to support the even lower standard of "reasonably suggests" must be something *even less* than a "very small amount" or "slight evidence." *See id.*; *see also CEK Grp. LLC v. United States*, 633 F. Supp. 3d 1369, 1375 (Ct. Int'l Trade 2023) ("the standard for initiation of an EAPA investigation is low;" quotation marks omitted).

The evidence supporting the allegations here easily cleared that threshold. *See* the discussion of the evidence contained in the allegations in the factual background statement *supra*. Indeed, this Court has repeatedly upheld EAPA initiations based on evidence comparable to, and in some respects less substantial than, the evidence presented here. In *Leco Supply*, the EAPA allegation contained information that a third-country producer "did not have enough employees" or production machinery to produce the amount of merchandise it shipped and "contained trade data" showing exports of the merchandise from that country had increased significantly following the AD & CVD orders. *Leco Supply*, 619 F. Supp.

3d at 1296; *cf.* Initiation Memo, CR 21, PR 42 at 7 (no employees) and 3 (export volumes).

In *CEK Group*, an importer also argued that Customs illegally had accepted an allegation that failed to reasonably suggest evasion was occurring where the allegation also "noted a lack of employees at the alleged manufacturing factory as well as significant changes in imports from {the two countries} following an imposition of new AD/CVD Orders." *CEK Grp.*, 633 F. Supp. 3d at 1374; *cf.* Initiation Memo, CR 21, PR 42 at 3, 7. *See also All One God Faith*, 129 F.4th at 1359 (affirming Customs' reliance on import volumes as evidence supporting a determination of evasion).

Centric Pipe focuses its attacks on this evidence by trying to explain each point away in isolation, rather than addressing what the evidence as a whole reasonably suggested. *See* Centric Pipe Br. at 35-39. But as this Court has held, "it is inappropriate to flyspeck the evidence piece-by-piece to analyze what each item shows or does not show—the question is *what all the evidence* at the relevant stage of the investigation showed." *Am. Pac. Plywood*, Slip Op. 23-93 at *9 (emphasis added). Likewise, the Court in *CEK Group* also rejected attacks on points of evidence in an allegation in isolation, noting that Customs "need not assess the validity of every piece of evidence provided," but instead properly looked at what those various points of evidence "{t}aken together" suggested. *CEK Grp.*, 633 F. Supp. 3d at 1375-76.

The same reasoning applies here. As in *Leco Supply*, *CEK Grp.*, and *All One*

*God Faith*, the *body* of evidence before Customs at initiation was relevant and more than sufficient to support initiation of these investigations. Customs repeatedly addressed this evidence, including the evidence Centric Pipe points to as detracting from Customs' conclusion, and correctly determined that initiation was required. *See* Initiation Memo, CR 21, PR 42 at 3-11; Final Det., CR 374, PR 522 at 44-45 (specifically recognizing Centric Pipe's arguments); Review Det., CR 395, PR 612 at 25-26 (same). There was nothing arbitrary or capricious about Customs' decision to initiate these investigations, no matter how fervently Centric Pipe may wish Customs would have weighed that evidence differently.

*B. Substantial evidence supports Customs' determination of evasion*

As Centric Pipe repeatedly does in its arguments regarding the evidence supporting initiation, Plaintiffs also repeatedly disregard Customs' extensive review of the evidence developed throughout these investigations and the thorough explanations Customs provided linking that evidence to its determinations of evasion, as well as Customs' consideration of any contrary evidence. Plaintiffs' arguments that Customs failed to do so or was arbitrary or capricious in its determinations are entirely without merit. *See* Centric Pipe Br. at 40-44; Energy Pipe Br. at 22-26; Kana Br. at 10-13; Trek Br. at 17-20. Customs extensively addressed the specific evidentiary arguments that Plaintiffs made and showed why it did not agree with their views of the evidence. *See* Final Det., CR 374, PR 522 at 7-66; Review Det., CR 395, PR 612 at 18-25. Even if Plaintiffs legitimately disagree with Customs' weighing of the evidence, their attempts to have this Court

substitute those views for the views Customs adopted are in error: "{t}hat approach mistakes the function of the court, which is to determine whether the {agency's results} are supported by substantial evidence." *Haixing Jingmei Chem. Prods. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018).

Moreover, the evidence relied upon by Customs was more than sufficient to support its determinations of evasion, as demonstrated by multiple decisions affirming Customs' EAPA determinations on comparable records. For example, in *All One God Faith*, the Federal Circuit held that 1) information from the International Trade Commission indicating that the merchandise at issue was not produced in the country from which it was exported, 2) "large and rising volumes of imports" from China into that country, and 3) a "history of attempted circumvention" constituted "evidence {that} *far exceeds* the 'mere scintilla' of 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' needed to withstand substantial evidence review." *All One God Faith*, 129 F.4th at 1359 (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003); emphasis added). As set out in the factual background section above, the body of evidence Customs relied on in the current investigation provides considerably more proof of the evasion occurring here.

Plaintiffs make much of Customs' verification visits to PET's and TOP's facilities in Thailand (*see, e.g.*, Trek Br. at 18-19; Energy Pipe Br. at 22-23). But Customs has found increasingly in EAPA investigations that a factory it is told produced merchandise in a third country was set up only to provide plausible cover

for transshipment through that country. For example, in *Newtrend USA Co.*, Customs investigated a facility in Indonesia that purportedly produced glycine. *See Newtrend USA Co. v. United States*, 791 F. Supp. 3d 1313, 1326 (Ct. Int'l Trade 2025). When Customs visited the facility, however, it found that the facility was incapable of performing the claimed production processes, much as Customs found during its site visit to PET here. *See id.* ("Evidence Customs' officials gathered during their on-site verification raised serious doubts about PT Newtrend's ability to perform this process."). In that case as well, Customs found discrepancies in the company's representations concerning production inputs and its workforce. *Id.* at 1326-27. Customs rejected claims that the existence of a factory proved third-country production and explained how such evidence was outweighed by the other evidence of evasion on the record. *See id.* ("Customs did not find this evidence persuasive."). The Court affirmed Customs' determination, holding that "Customs' finding *easily surmounts* this {arbitrary or capricious} bar." *Id.* at 1328 (emphasis added). The Court also reiterated that "{u}nder the substantial evidence standard, an agency can make judgment calls without second-guessing from the Court." *Id.* at 1333.

Likewise, in *Phoenix Metal Co.*, this Court also affirmed Customs' determination of evasion even after Customs had been shown a factory in Cambodia capable of producing cast iron pipe and fittings. *See Phoenix Metal*, Slip Op. 24-68 at *4. As Plaintiffs here do, the importer in that case also argued that "because {Customs' verification} report demonstrated some ability to produce pipe, the rest of

{Customs'} Final Decision {is} unreasonable." *Id.* This Court rejected that argument, explaining that potential production capability was merely one piece of evidence and that Customs properly instead "relied on the record as a whole, drawing upon the facts Phoenix cites, and a host of information that Phoenix ignores." *Id.* at 5. The Court explained that "a demonstration of some production capacity, particularly during a period of production set up solely for the purposes of verification, does not prove that transshipment did not occur." *Id.*

Centric Pipe attempts to distinguish *Phoenix Metal* by claiming that PET's production observed by Customs was not set up solely for verification. *See* Centric Br. at 42. That distinction misses the point. Nothing in the Court's decision in *Phoenix Metal* suggests that the outcome turned on whether the production observed there was conducted solely for verification. Instead, the Court treated production capability as one piece of evidence to be weighed against the record as a whole. The potential for production of the merchandise is not dispositive of the question of evasion. *See Phoenix Metal*, Slip Op. 24-68 at *5. Moreover, here again Centric Pipe is wrong on the facts of this case. Customs' verification report specifically notes that PET claimed it was not in production at the time of Customs' visit and would "demonstrate their production process and produce an example" for Customs. Verification Report, CR 352, PR 457 at 7. PET's production for Customs *was* set up solely for verification.

So not only does *Phoenix Metal* generally support Customs' determination here that evidence of potential production capability does not outweigh other

substantial evidence of transshipment, *Phoenix Metal* involved a materially similar evidentiary dispute to what Customs addressed here. The Court in *Phoenix Metal* noted evidence of discrepancies in the purported producer's records—including records of electricity consumption—omissions in records provided to Customs, a refusal to provide all records to Customs and interference with Customs' verification attempts, concealment of corporate relationships, and unreliable raw materials records as substantial evidence to support a determination of evasion. *Phoenix Metal*, Slip Op. 24-68 at *5. As the Court here should, the Court in *Phoenix Metal* rejected plaintiff's attempts to disregard "the vast majority of evidence" and to instead attack only "a few bits of the evidence…and argue{} that that evidence should be given a different meaning." *Id.* at *6. Considering the complete record, the Court in *Phoenix Metal* had no trouble holding that Customs was not "arbitrary and capricious in deciding that substantial evidence supports evasion in this case." *Id.* The Court should not have any trouble reaching that same result here.

Centric Pipe also attempts to raise the existence of PET's API audit to an absolutely dispositive consideration in this case. *See* Centric Pipe Br. at 43-44. But Customs did expressly acknowledge that evidence once Centric Pipe actually raised it before the agency. *See* Review Det., CR 395, PR 612 at 8 (noting that "Centric Pipe also argues that the API audit reports for 2022 and 2023 are more reliable sources of information for PET's production capability than the verification…."). Customs simply found that its *own* observations that PET lacked actual production capability and would not have had the capacity to produce the volume of

merchandise it claimed in any case were the more substantial evidence. *See id.* at 21-22; *see also* Final Det., CR 374, PR 522 at 51-53 (discussing the evidence that lead Customs to reject arguments that PET had the production ability and capacity in the Final Determination). "Plaintiffs ask Customs agents to believe paperwork over their lying eyes. The law does not require such a result." *Newtrend*, 791 F. Supp. 3d at 1328 (affirming Customs' determination to give more weight to evidence collected through its own verification observations than conflicting documents). Customs did not ignore the evidence Centric Pipe relies on, "it simply found other evidence more compelling. That is an agency's prerogative as long as it explains itself, which was the case here." *Shrimp Comm. of the Vietnam Ass'n v. United States*, No. 25-00032, 2026 WL 2621275, Slip Op. 26-107 at *6 (Ct. Int'l Trade Sept. 4, 2026).

Because Customs fulfilled its statutory role to weigh the evidence before it, addressed contrary evidence, and thoroughly explained how the weight of that evidence supported its conclusions, Plaintiffs' disagreement with those evidentiary judgments does not establish that Customs acted arbitrarily or that its determinations lacked substantial evidentiary support. The Court therefore should reject Plaintiffs' invitation to reweigh the record and affirm Customs' determinations of evasion.

## IV. Plaintiffs' Claims That Customs Improperly Decided Not to Refer the Scope Question to Commerce Ignore the Facts and Law

Defendant explains in its brief why the various claims Plaintiffs make—that Customs improperly determined, or even lacked authority to determine, that the

merchandise under investigation was covered by the scope of the AD/CVD orders on OCTG from China—are incorrect as a matter of fact and law. *See* Def. Br. at 37-41.

As this Court has recognized, Customs clearly has the authority to make a determination of whether merchandise before it is covered by the scope of an AD/CVD order:

> Customs exercised its authority properly in determining on its own that plaintiff's merchandise was within the scope of the Orders. The statute does not place on Customs an obligation to refer the matter to Commerce wherever an interested party posits that merchandise subject to an EAPA investigation falls outside the scope of an existing AD or CVD order. To the contrary, the statute and Customs' regulations require that Customs refer a scope issue to Commerce only where Customs "is unable to determine whether the merchandise at issue is covered merchandise." 19 U.S.C. § 1517(b)(4)(A); 19 C.F.R. § 165.16(a) ("A referral is required if at any point after receipt of an allegation, CBP cannot determine whether the merchandise described in an allegation is properly within the scope of an antidumping or countervailing duty order."). The statute expressly grants Customs the authority to decide when Customs "is unable to determine whether the merchandise at issue is covered merchandise" and therefore whether it is appropriate to make a covered merchandise referral to Commerce. 19 U.S.C. § 1517(b)(4)(A).

*Vanguard Trading Co. LLC v. United States*, 788 F. Supp. 3d 1277, 1289 (Ct. Int'l Trade 2025).

Centric Pipe tries to distinguish *Vanguard*, arguing that it "merely" stands for the position that "the statute grants CBP with the authority to determine whether it is appropriate to make a covered merchandise referral to Commerce." Centric Pipe Br. at 27-28 (quoting *Vanguard*, 788 F. Supp. 3d at 1289). Centric Pipe

is correct on that point—and that proposition defeats its argument. The statute clearly grants Customs the authority to decide whether a referral is necessary, based on Customs' own decision whether it can determine whether the merchandise is covered merchandise itself.

Because Congress has granted Customs that authority, this Court has recognized that the question of whether Customs properly applied that authority or was required to seek a determination by Commerce is reviewed under the abuse-of-discretion standard. *See All One God Faith*, 589 F. Supp. 3d at 1250 ("Plaintiffs do not plausibly allege that CBP was obligated to refer the matter to Commerce such that its failure to do so was an abuse of discretion."). The question, therefore, is not whether Plaintiffs can identify some later development that might have justified a referral in a later proceeding, but whether Customs abused its discretion when it made the determination that it could resolve the scope issue before it without a referral.

*A. Customs has the authority to make a decision on scope coverage, even where that question is ambiguous*

Centric Pipe and LE Commodities further argue that Customs' decisions were arbitrary because Customs later referred the similar merchandise to Commerce in another EAPA determination and because Commerce subsequently issued a circumvention determination concerning OCTG produced from solid steel billet. These arguments either misconstrue or ignore material facts establishing that Customs' decisions were neither arbitrary nor an abuse of discretion.

Centric Pipe claims that Customs' later referral covered "the exact same

merchandise" as in these EAPA determinations and that Commerce's circumvention determination covered both hollow and solid steel billet. Centric Pipe Br. at 24-28. The facts do not support either characterization. Commerce's notifications of that later referral repeatedly described the merchandise that was referred to it as being produced from "steel billet {that} is a cylindrical steel bar that does not have a hole in it." *Oil Country Tubular Goods From the People's Republic of China: Notice of Covered Merchandise Referral and Initiation of Covered Merchandise Inquiry*, 90 Fed. Reg. 61,375, 61,375 fn.4 and 61,376 fn.6 (Dep't Commerce Dec. 31, 2025). In other words, the later referral concerned solid billet. It did not concern the "hollow billet" or "mother pipe" that Plaintiffs claimed was used to produce the merchandise at issue in these investigations. Here, Customs found that the Plaintiffs' claims of additional production from solid billet were unreliable, so there was no need for Customs to determine whether those unsupported claims presented a genuine scope question. *See, e.g.*, Final Det., CR 374, PR 522 at 28, [ ].

Regarding Commerce's circumvention determination, Plaintiffs rely on Commerce's discussion in that determination of whether that inquiry covered OCTG produced from either hollow or only from solid billet. *See* LE Commodities Br. at 26; Centric Pipe Br. at 24-26; *see also* Energy Pipe Br. at 13 (claiming that Commerce "unequivocally found…that hollow billets are not in-scope OCTG."). But Commerce did not make a determination on hollow billets. In that determination, Commerce stated that because it was not clear if the inquiry properly covered both hollow and solid billet, it was amending its analysis out of prudence to "focuse{} solely on *solid*

steel billets purchased from China." *Oil Country Tubular Goods from the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 91 Fed. Reg. 9311 (Dep't Commerce Feb. 27, 2026), Issues and Decision Memorandum at 8. Indeed, Centric Pipe is forced to admit that "Commerce did not make an explicit ruling on whether hollow steel billets fell within the scope of the Orders." Centric Pipe Br. at 25.

Centric Pipe and LE Commodities therefore rely on Commerce's statement that it would not be able to determine if OCTG produced from hollow billet was covered by the scope of the orders "without doing a substantial transformation and country-of-origin analysis," which it *did not* undertake because "no party made such a request in this proceeding." *Id.*; LE Commodities Br. at 28 (arguing that the scope issue "was subsequently disputed by Commerce"). But a substantial transformation decision by Commerce does not add a product to an order, it determines that it is covered by the *existing* order. *See, e.g.*, *Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 1229 (Fed. Cir. 2018). Thus, as even Plaintiffs are forced to recognize, Commerce only stated its view that the coverage of hollow billet pipe is not settled.

Thus, the issue here is not whether Commerce might later reach a different conclusion concerning the scope of the Orders. The issue is whether Customs acted arbitrarily or outside its authority by exercising its statutorily recognized power to make a decision on a scope question where the answer to the particular question is still ambiguous. The Federal Circuit has already answered that question.

In the 2020 decision in *Sunpreme*, the Federal Circuit addressed the

argument that Customs acted arbitrarily and without authority where it determined to treat certain merchandise as within the scope of certain AD and CVD orders where Commerce had not yet ruled if that merchandise was covered by the scope of those orders. *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1317 (Fed. Cir. 2020). There, Customs had treated certain merchandise as subject to the orders and then Commerce subsequently issued a ruling on the coverage question, and ultimately agreed with Customs. But the importer argued its entries were not subject to the AD/CVD duties until after the applicable date of Commerce's later scope determination and that Customs' actions preceding Commerce's decision were illegal. *Id.*

The Federal Circuit rejected that argument, noting that under U.S. law, "Customs is both empowered and obligated to determine in the first instance whether goods are subject to existing antidumping or countervailing duty orders." *Id.* The court specifically rejected the claim that Customs was only authorized to do so where the scope was clear, holding that nothing in the law "limits {Customs'} obligation to the circumstance in which the order is clear and unambiguous." *Id.* at 1317-18.

The court further explained that "Customs's yes-or-no answer to whether an order applies does not invade the interpretive province of Commerce" nor does it "impinge upon Commerce's authority to issue and set the scope of duty orders." *Id.* at 1318 and 1321. Limiting Customs' authority and obligation to only where Commerce has already ruled on a scope question would "significantly limit

Customs's ability to perform its statutory role and would encourage gamesmanship by importers," by creating "perverse incentives for importers" to attempt to block and delay Customs' ability to apply AD/CVD duties by raising often unmeritorious scope questions before Commerce. *Id.* at 1318 and 1321. This would run afoul of "the policy declared in the Tariff Act," which is for the government to "'provide, to the maximum extent practicable, for the protection of revenue.'" *Id.* at 1321.

Thus, even when "the order is order is ambiguous, **Customs is nonetheless called upon to answer the question**." *Id.* at 1320-21 (emphasis added). The Federal Circuit held specifically that "Customs has the authority to suspend liquidation of goods when it determines that the goods fall within the scope of an ambiguous antidumping or countervailing duty order." *Id.* at 1321. Accordingly, an ambiguity concerning the precise boundaries of an AD/CVD order does not deprive Customs of its authority to make an initial determination concerning whether merchandise before it falls within that order, nor does it require Customs to await a Commerce ruling before taking action. *See also, e.g.*, *TR Int'l Trading Co., Inc. v. United States*, 4 F.4th 1363, 1369 (Fed. Cir. 2021) ("under the *Sunpreme* framework, Customs makes initial determinations regarding whether goods are subject to an order, even if there is some ambiguity involved in the order's application").

Plaintiffs' arguments here impermissibly would turn *Sunpreme* on its head. They contend Customs lacked authority to make a determination on the applicability of the scope of the orders here because Commerce would at a later date

make a statement that the scope question was not clear. But *Sunpreme* expressly rejects the proposition that Customs must wait for Commerce to resolve an ambiguous scope question. The fact that Commerce may later conclude that a particular scope question warrants further analysis does not retroactively eliminate Customs' authority to make the initial determination Congress assigned to it, particular where Congress expressly granted Customs authority to make its own determination of whether the question is ambiguous. *See* 19 U.S.C. § 1517(b)(4)(A) (requiring referral only when Customs determines it "is unable to determine whether the merchandise at issue is covered merchandise."). Plaintiffs' interpretation would effectively replace that statutory standard with a different one—requiring referral whenever an importer raises a non-frivolous scope argument or whenever Commerce might conceivably reach the issue differently. The statute says no such thing.

Further, as this Court has recently held, Customs' authority is not tied to the date of Commerce's scope determination, even where there is actually a Commerce determination on point. *Blue Pipe Steel Ctr. Co. v. United States*, 803 F. Supp. 3d 1258, 1263 (Ct. Int'l Trade 2025) ("there is nothing in the statute that pegs the effective date of an evasion determination to the date of a scope ruling of Commerce…. Given this silence, the court concludes that Customs' decision to set the effective date at the beginning of the period of investigation for the evasion inquiry accords with the "best reading" of § 1517 as well as with congressional intent."). If Customs' authority is not even dependent upon the existence of or the

effective date of a Commerce scope ruling, it necessarily follows that Customs does not lose its authority merely because Commerce later addresses a related scope question in another proceeding.

Customs therefore had both the authority and the statutory responsibility to make the initial scope determination here. Plaintiffs' arguments that Customs was required to refer the issue to Commerce merely because Commerce would later address a related question are foreclosed by *Sunpreme* and inconsistent with the EAPA statute. Customs did not abuse its discretion by determining that the merchandise was covered by the Orders and proceeding with the EAPA investigations rather than awaiting a later Commerce ruling.

*B. The Court should reject LE Commodities' new arguments that were not presented to the agency*

In its brief before this Court, LE Commodities makes, for the first time, arguments attempting to distinguish PET's production from "hollow billet" from production from Chinese "green tube" that was affirmed to be within the scope in the *Bell Supply* cases. *See* LE Commodities Br. at 3-4, 22-25, and 30. LE Commodities did not make such arguments before Customs. There, LE Commodities' *only* mention of *Bell Supply* and of "green tube" at all was in a footnote to its written argument and in its request for review. *See* CR 363, PR 492 (Written Argument) at 3, fn.6; CR 387, PR 568 at 6, fn. 22 (Request for Review).

As this Court and the Federal Circuit have repeatedly held, passing reference to an argument in a footnote submitted to the agency is insufficient to satisfy a party's obligation to administratively exhaust that issue before bringing it before

this Court. *See, e.g.*, *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) ("rais{ing} the issue in a footnote in its rebuttal brief before Commerce and again during the ministerial comment period" was a "failure to raise its issue in its administrative case brief {and} constituted a failure to exhaust administrative remedies"); *ABB,* 190 F. Supp. 3d at 1180 ("insufficient for party to have raised an issue in a footnote…;" citing *Dorbest*).

As LE Commodities failed to present Customs with the factual and legal arguments it now advances so the agency could address them in the first instance and provide this Court with a full record and reasoning for its review, the Court should dismiss LE Commodities' arguments on this point. *See* 28 U.S.C. § 2637(d); *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) ("Although that statutory injunction is not absolute, it indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies.").

## V. Customs' Application of Adverse Inferences Was Supported by Substantial Evidence

Defendant explains in its brief why Plaintiffs' arguments that Customs could not apply adverse inferences in these investigations lack merit, particularly their claims that Customs cannot apply adverse inferences to noncooperative exporters in a manner than impacts otherwise cooperative importers. *See* Def. Br. at 45-48; *see also, e.g.*, Energy Pipe Br. at 17 (arguing that the statute "does not allow for a sweeping use of that adverse inference against cooperating importers.").

In addition to the authorities cited by Defendant, this issue has recently been

conclusively settled by the Federal Circuit. In the 2025 *All One God Faith* decision, the Federal Circuit held that 19 U.S.C. § 1517(c)(3)(B) permits Customs to apply an adverse inference against a noncooperative party regardless of the conduct of other interested parties. *All One God Faith*, 129 F.4th at 1358. The court therefore affirmed Customs' application of an adverse inference against noncooperative exporters and manufacturers even where it resulted in a determination of evasion against otherwise cooperative importers. *Id.* ("Customs properly applied an adverse inference against the manufacturer as authorized by statute, irrespective of the conduct of other interested parties like Appellants."). *See also, e.g., Phoenix Metal*, Slip Op. 24-68 at *7 (stating the same).

Trek separately argues that Customs' administrative review determination was contradictory because Customs stated that it was not relying on adverse inferences but nevertheless rejected TOP's claim that certain merchandise was produced from solid billet. *See* Trek Br. at 21. But rejecting an unsupported or unreliable claim is not the same as applying an adverse inference. *See*, *e.g.*, *Jiangsu Changbao Steel Tube Co. v. United States*, 36 C.I.T. 1431, 1448 (2012) (explaining that an agency finding a submission was unreliable and declining to rely on it on that account was not the same as rejecting it under the application of adverse facts available). Customs did not apply an adverse inference in its review determination, it specifically looked at the evidence on the record and found TOP's claims were unsupported and contradicted. Review Det., CR 395, PR 612 at 23 (noting missing documents for the claimed production from solid billet).

## CONCLUSION

For the reasons above as well as those set out in Defendant's response brief, this Court must reject the arguments presented by Plaintiffs. The Court should instead affirm Customs' determination of evasion as it is neither arbitrary nor capricious, but was supported by substantial evidence on the record and detailed reasoning. The Court should therefore affirm Customs' determinations in their entirety.

Respectfully submitted,

/s/ Roger Schagrin
Roger B. Schagrin
Nicholas J. Birch
**SCHAGRIN ASSOCIATES**
900 Seventh Street, N.W.,
Suite 500
Washington, D.C. 20001
*Counsel for USOMA*

Dated: September 21, 2026

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Schagrin Associates hereby certifies that the Response Brief of Defendant-Intervenor, dated September 21, 2026, complies with the word-count limitation set out in this Court's December 8, 2025 order (ECF No. 32), limiting response briefs to 14,000 words. This response brief contains 13,869 words according to the word count function of the word processing software used to prepare the brief.

Respectfully submitted,

/s/ Nicholas J. Birch
Roger B. Schagrin
Nicholas J. Birch
**SCHAGRIN ASSOCIATES**
900 Seventh Street, N.W.,
Suite 500
Washington, D.C. 20001
*Counsel for USOMA*

Dated: September 21, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

CENTRIC PIPE LLC,

*Plaintiff,*

*and*

LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, *and* KANA ENERGY SERVICES, INC.,

*Consolidated Plaintiffs,*

v.

UNITED STATES,

*Defendant,*

*and*

U.S. OCTG MANUFACTURERS ASSOCIATION,

*Defendant-Intervenor.*

**Consol. Court No. 25-00182**

**PROPOSED ORDER**

Upon consideration of the motions for judgment filed by the consolidated Plaintiffs in this action, Defendant's and Defendant-Intervenor's responses, and upon consideration of all other pertinent papers and proceedings herein, it is hereby

**ORDERED** that the plaintiffs' motions are **DENIED**; and it is further

**ORDERED** that the determination of U.S. Customs and Border Protection is affirmed.

**SO ORDERED.**

________________________________________

JOSEPH A. LAROSKI, JR., JUDGE

Dated: __________________, 2026
New York, New York