**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | |
|---|---|
| CENTRIC PIPE LLC,<br><br>Plaintiff,<br><br>LE COMMODITIES, LLC, TREK METALS, INC., ENERGY PIPE & EQUIPMENT RENTALS, LLC, and KANA ENERGY SERVICES, INC.,<br><br>Consolidated-Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>U.S. OCTG MANUFACTURERS ASSOCIATION,<br><br>Defendant-Intervenor. | Consol. Ct. No. 25-00182<br>Nonconfidential Version |

**REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFF CENTRIC PIPE LLC**

Bryan P. Cenko
Kristin H. Mowry
Kavita Mohan
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
trade@mowrygrimson.com
*Counsel to Centric Pipe LLC*

November 25, 2026

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

ARGUMENT .......... 1

I. CBP'S COVERED MERCHANDISE DETERMINATION WAS ARBITRARY, CAPRICIOUS AND CONTRARY TO LAW .......... 1

A. CBP's Authority to Make Covered Merchandise Determinations Does Not Resolve Its Failure to Refer This Specific Case Where CBP Unlawfully Expanded the Scope of the Orders .......... 1

B. CBP's Recent EAPA Determination Confirms That OCTG Manufactured in Thailand from Chinese Steel Billets Was Not Covered Merchandise Before December 2024 .......... 5

C. The Distinction Between Solid and Hollow Billets Does Not Cure CBP's Errors .......... 8

D. CBP's Disparate Treatment of EAPA 7890 and 8143 Is Arbitrary .......... 9

II. CBP VIOLATED CENTRIC PIPE'S DUE PROCESS RIGHTS .......... 11

A. Centric Pipe Had a Protected Property Interest .......... 11

B. CBP Provided Centric Pipe with Insufficient Due Process .......... 15

III. CBP UNLAWFULLY IGNORED EVIDENCE THAT DETRACTED FROM THE WEIGHT OF ITS AFFIRMATIVE DETERMINATION .......... 19

IV. CBP'S UNTIMELY INITIATION RENDERS ITS EVASION FINDING UNLAWFUL .......... 21

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

## Cases

Aspects Furniture Int'l, Inc. v. United States,
607 F. Supp. 3d 1246 (CIT 2022) ........ 2

Bell Supply Co. v. United States,
888 F.3d 1222 (Fed. Cir. 2018) ........ 9

Brock v. Roadway Express, Inc.,
481 U.S. 252 (1987) ........ 13, 16

Burlington Truck Lines, Inc. v. United States,
371 U.S. 156 (1962) ........ 9, 20

Connecticut v. Doehr,
501 U.S. 1 (1991) ........ 13

Ewing v. Mytinger & Casselberry,
339 U.S. 594 (1950) ........ 12

FCC v. Prometheus Radio Project,
592 U.S. 414 (2021) ........ 20

Fuentes v. Shevin,
407 U.S. 67 (1972) ........ 13

ICON EV LLC v. United States,
836 F. Supp. 3d 1361 (CIT 2026) ........ 12, 16

Mathews v. Eldridge,
424 U.S. 319 (1976) ........ 15

NEC Corp. v. United States,
151 F.3d 1361 (Fed. Cir. 1998) ........ 11

Newtrend USA Co. v. United States,
791 F. Supp. 3d 1313 (CIT 2025) ........ 19

Phx. Metal Co., Ltd. v. United States,
No. 23-00048, 2024 Ct. Intl. Trade LEXIS 69 (June 10, 2024) ........ 14, 18, 20

RHP Bearings v. United States,
288 F.3d 1334 (Fed. Cir. 2002) ........ 5

Royal Brush Mfg. v. United States,
75 F.4th 1250 (Fed. Cir. 2023)....................11

SunEdison, Inc. v. United States,
179 F. Supp. 3d 1309 (CIT 2016) .................... 2, 3

Sunpreme Inc. v. United States,
946 F.3d 1300 (Fed. Cir. 2020).................... 3, 4, 9

Superior Com. Sols., LLC v. United States,
811 F. Supp. 3d 1363 (CIT 2025) .................... 13

United States v. James Daniel Good Real Prop.,
510 U.S. 43 (1993).................... 15

United States v. Roses, Inc.,
706 F.2d 1563 (Fed. Cir. 1983).................... 14

**Statutes**

19 U.S.C. § 1517.................... passim

**Regulations**

19 C.F.R. § 113.13 .................... 14

19 C.F.R. § 165.12 .................... 21

19 C.F.R. § 165.15 ....................11

**Other Authorities**

H.R. Rep. No. 114-114 (2015).................... 22

Oil Country Tubular Goods From the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders,
91 Fed. Reg. 9,811 (Dep't of Commerce Feb. 27, 2026) .................... 8

Oil Country Tubular Goods From the People's Republic of China: Final Determination of Covered Merchandise Inquiry, 91 Fed. Reg. 22,493 (Dep't of Commerce Apr. 27, 2026)........ 6

Plaintiff Centric Pipe LLC ("Centric Pipe") replies to the response briefs of Defendant the United States (the "Government") and Defendant-Intervenor U.S. OCTG Manufacturers Association ("USOMA"). See Def.'s Resp. in Opp'n To Pls.' Mot. for J. on the Agency R. (Aug. 25, 2026), ECF No. 67 ("Gov. Br."); Resp. of Def.-Int. in Opp'n To Consolidated Pls.' Mot. for J. on the R. (Sept. 21, 2026), ECF No. 70 ("USOMA Br.").[1]

## ARGUMENT

### I. CBP's Covered Merchandise Determination Was Arbitrary, Capricious and Contrary to Law

#### A. CBP's Authority to Make Covered Merchandise Determinations Does Not Resolve Its Failure to Refer This Specific Case Where CBP Unlawfully Expanded the Scope of the Orders

Centric Pipe does not dispute the Government's and USOMA's contentions that U.S. Customs and Border Protection ("CBP") has authority under the Enforce and Protect Act ("EAPA") statute to make a covered merchandise determination. Nor is CBP "required to make a referral to Commerce under 19 U.S.C. § 1517(b)(4)(A)(i)" in all instances. Gov. Br. at 38-39 (emphasis in original). CBP's general authority to make covered-merchandise determinations, however, does not resolve whether CBP's exercise of that authority in this case was arbitrary, capricious and contrary to law. While CBP may have general authority to make a covered merchandise determination, it may not expand or redefine the scope, as it did here by finding that steel billets were covered by the scope of the antidumping ("AD") and countervailing duty ("CVD") orders on oil country tubular goods ("OCTG") from China (the "Orders").

The Government contends that CBP's covered-merchandise determinations are independent from Commerce's scope determinations and scope regulations such that it need not address Centric Pipe's substantive arguments that steel billets are outside the scope of the Orders

[1] All references to the parties' briefs are to the nonconfidential versions unless otherwise noted.

or were substantially transformed into OCTG in Thailand. See Gov. Br. at 39; see also Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. on the Agency R. of Pl. Centric Pipe LLC at 21-34 (Apr. 10, 2026), ECF No. 48 ("CP Br."). The Government's position that its covered merchandise determinations are "separate and distinct inquiries" disregards the purpose of the EAPA statute to determine whether imports have evaded applicable AD/CVD orders. Gov. Br. at 38-39. Indeed, the statute defines "covered merchandise" as "merchandise that is subject to" AD or CVD orders. 19 U.S.C. § 1517(a)(3).

While CBP has authority under the EAPA statute to make an initial covered merchandise determination, it may not expand the scope or determine coverage without considering whether the products fall within the orders. "The EAPA statute is clear that only merchandise covered by an antidumping order may be included in an EAPA investigation." Aspects Furniture Int'l, Inc. v. United States, 607 F. Supp. 3d 1246, 1267-69 (CIT 2022) (emphasis added) (holding that "Customs' inclusion of merchandise in the EAPA investigation that had been determined by Commerce to be outside the scope of the Order is contrary to law . . . ."). By finding that OCTG manufactured in Thailand from Chinese steel billets was covered merchandise without a referral to Commerce, CBP expanded the scope of the Orders to reach merchandise that, as Commerce's later circumvention finding confirms, was not covered by the Orders. CBP's error is not merely its failure to refer the question to Commerce, but its unlawful determination that steel billets were within the scope of the Orders. See infra Section B.

The Government relies on SunEdison, Inc. v. United States, 179 F. Supp. 3d 1309 (CIT 2016) to support its position that it is not required to address Plaintiff's substantive arguments relating to scope, anticircumvention and substantial transformation because "CBP and Commerce make determinations on imported merchandise pursuant to different Congressional authority and

for different purposes." Gov. Br. at 39. SunEdison, however, did not involve an EAPA proceeding and its reasoning is inapplicable here. There, plaintiff raised a challenge to a scope determination by Commerce, arguing that Commerce should have employed a country-of-origin analysis applied by "different agencies in contexts unrelated to antidumping." SunEdison, 179 F. Supp. 3d at 1323 (emphasis added). The plaintiff argued that Commerce should have applied country-of-origin tests used for customs marking or the U.S. Generalized System of Preferences, statutory schemes entirely unrelated to AD/CVD laws. See id. at 1323 n.77. Here, by contrast, CBP's authority under the EAPA statute is inextricably tied to Commerce's AD/CVD proceedings. See generally 19 U.S.C. § 1517 (requiring CBP to investigate allegations that an importer has evaded AD/CVD orders).

USOMA's reliance on Sunpreme Inc. v. United States, 946 F.3d 1300 (Fed. Cir. 2020) to argue that CBP may decide an ambiguous scope question is similarly misplaced and overstates the Federal Circuit's holding. See USOMA Br. at 48-52. Although Sunpreme held that CBP may determine whether merchandise is subject to an existing AD or CVD order even where the order "lacks perfect clarity," the Federal Circuit expressly limited that authority, noting that "Customs may not expand or alter the scope of such orders." Sunpreme, 946 F.3d at 1317. The Federal Circuit also distinguished CBP's permissible "individual product-by-product application decisions" from the "deference-deserving, boundary-defining authority reserved to Commerce when it interprets or clarifies an order during scope proceedings." Id. at 1320.

That distinction defeats USOMA's reliance on Sunpreme. There, CBP determined whether Chinese solar modules' physical characteristics satisfied the existing China orders. See id. at 1305-06. Here, the dispositive question is whether processing Chinese billets into OCTG in Thailand changed the OCTG's country of origin. This analysis involves the type of antecedent country-of-

origin question that determines the substantive boundaries of the order, an authority reserved to Commerce, rather than the factual determination at issue in Sunpreme ascertaining "what the merchandise is, and whether it is described in an order." Id. at 1317 (citations omitted).

Moreover, in Sunpreme, CBP sought Commerce's guidance, and Commerce issued the scope determination upheld by the Federal Circuit. Id. at 1305-15. Sunpreme, therefore, does not authorize CBP to supplant Commerce's ultimate authority in defining the boundaries of the order.

Centric Pipe does not contend, as USOMA suggests, that every ambiguity automatically requires referral. See USOMA Br. at 50. The relevant question is whether CBP arbitrarily concluded that it could resolve this covered merchandise question without Commerce. That conclusion is especially difficult to sustain when, confronted under the same OCTG orders and the same question of whether OCTG manufactured in Thailand from Chinese-origin steel billets constituted covered merchandise, CBP determined that it was "unable to determine" coverage from the scope language and referred the issue to Commerce under § 1517(b)(4)(A). See Letter from Jennifer L. Petelle, Director, ORR, OT, CBP re: EAPA Consol. Case Number 8143 at 5 (Nov. 5, 2026) (Public Version), https://www.cbp.gov/sites/default/files/2026-11/05_1126_eapa_8143_octg_fad_pv_pbrb_5761-1126.pdf ("EAPA 8143 ORR Determination"). CBP's final administrative determination in EAPA 8143 is consistent with Sunpreme's distinction between CBP's product-by-product application authority and the "boundary-defining authority reserved to Commerce," and underscores why CBP's contrary approach in this case cannot be justified by Sunpreme. 946 F.3d at 1320.

The other cases cited by Defendant and USOMA supporting their position regarding CBP's general authority do not resolve the issue presented here. Those cases do not involve comparable questions implicating Commerce's "boundary-defining authority," or a subsequent agency

determination demonstrating that CBP's resolution of that question in the challenged proceeding was arbitrary. CBP's general authority, therefore, does not establish that its exercise of that authority here was lawful.

### B. CBP's Recent EAPA Determination Confirms That OCTG Manufactured in Thailand from Chinese Steel Billets Was Not Covered Merchandise Before December 2024

CBP's Office of Trade, Regulations and Rulings ("ORR") recently issued its final administrative determination in EAPA 8143. ORR concluded in that case that OCTG manufactured in Thailand from Chinese steel billets was not covered merchandise under the Orders prior to December 18, 2024, the date on which Commerce "expanded the scope" of the Orders to include such merchandise. EAPA 8143 ORR Determination at 14. CBP's conduct in EAPA 8143 not only illustrates how CBP acted arbitrarily by not making a covered merchandise referral in this case, see CP Br. at 24-27, but ORR's final administrative determination also now confirms that CBP's affirmative evasion finding here was not in accordance with law because it unlawfully expanded the scope to include merchandise not subject to the Orders.

CBP acted arbitrarily because its treatment of the covered-merchandise question in this case is irreconcilable with its treatment of the same question in EAPA 8143. See id. at 28; see also RHP Bearings v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002) ({a}gency action "is arbitrary when the agency offers insufficient reasons for treating similar situations differently.").[2] Here, CBP concluded that it could independently resolve whether OCTG manufactured in Thailand from Chinese steel inputs remained merchandise subject to the China OCTG Orders. See CP Br. at 28.

---

[2] CBP made its covered merchandise referral in EAPA 8143 prior to Centric Pipe filing its opening brief. See CP Br. at 27-29. At that time, Commerce had not yet issued its determination in the referral proceeding. Id.

In EAPA 8143, however, CBP determined that it was "unable to determine" whether OCTG manufactured in Thailand from Chinese steel inputs was covered merchandise and referred the question to Commerce pursuant to 19 U.S.C. § 1517(b)(4)(A). Id. Neither the Government nor USOMA has justified the fundamental inconsistency between CBP's treatment of making a covered-merchandise referral in one proceeding but not the other. That unexplained inconsistency is arbitrary and capricious.

ORR's final administrative determination in EAPA 8143, issued after the Government and USOMA filed their response briefs in this case, further confirms that CBP acted arbitrarily by not making a referral in this case. See generally EAPA 8143 ORR Determination. ORR treated Commerce's covered merchandise determination as controlling in its final administrative determination. Id. at 15. In that covered merchandise determination, Commerce found that seamless OCTG produced in Thailand using Chinese steel billets is covered by the scope of the AD/CVD orders on OCTG from China. See Oil Country Tubular Goods From the People's Republic of China: Final Determination of Covered Merchandise Inquiry, 91 Fed. Reg. 22,493 (Dep't of Commerce Apr. 27, 2026) and accompanying Issues and Dec. Mem. at 4 (Apr. 21, 2026) (Public Document) ("CMI IDM"). Commerce reached this determination based on its separate affirmative circumvention finding for OCTG completed in Thailand using steel billets produced in China. Commerce did not apply the finding of its covered merchandise referral until the date of publication of the initiation of its circumvention inquiry. See id. at Cmt. 1; see also EAPA 8143 ORR Determination at 6. On this basis, "Commerce decided to apply 'the circumvention finding in the {covered merchandise referral} to the unliquidated entries at issue entered on or after December 18, 2024, the initiation date of the circumvention inquiry.'" EAPA 8143 ORR Determination at 6 (citing CMI IDM at Cmt. 1).

ORR explained in its final administrative determination in EAPA 8143 that Commerce limited its determination to OCTG produced in Thailand from Chinese-origin steel billets and entered on or after December 18, 2024, when Commerce "expanded the scope" of the Orders to cover such merchandise. Id. at 14. Accordingly, OCTG entered before that date was not "covered merchandise" under EAPA. See id. ORR further explained that "CBP does not have authority to disregard or overturn Commerce's scope determinations" and that permitting CBP to do so "would undermine the purpose of a covered merchandise referral under the EAPA statute." Id. at 15. ORR concluded that "CBP must follow Commerce's CMI Determination." Id. These findings defeat the Government's and USOMA's arguments that CBP's general authority to make covered-merchandise determinations under EAPA permitted CBP to independently resolve the covered-merchandise question presented here. Rather, in EAPA 8143, CBP itself recognized that its authority to make an initial covered-merchandise determination does not permit it to substitute its judgment for Commerce's determination concerning the scope of the Orders.

ORR's final administrative determination in EAPA 8143 also now confirms Centric Pipe's arguments from its opening brief that OCTG produced in Thailand from Chinese-origin steel billets was not subject to the scope of the Orders – and therefore not covered merchandise – prior to December 18, 2024. See id. at 14. Commerce's controlling circumvention determination applied only to merchandise entered on or after December 18, 2024, and ORR accordingly concluded that earlier entries were not covered merchandise and that CBP "must follow Commerce's CMI Determination." See id. at 6, 14-15. There is no reasoned basis for a different result here. By treating merchandise entered before that date as covered, CBP unlawfully expanded the Orders beyond the scope as defined by Commerce.

### C. The Distinction Between Solid and Hollow Billets Does Not Cure CBP's Errors

USOMA argues that Commerce's circumvention determination and CBP's referral to Commerce are not relevant here because EAPA 8143 involved solid billets, not hollow billets. See USOMA Br. at 46-48. This distinction does not cure CBP's errors.[3]

The underlying circumvention determination that Commerce relied upon in its covered merchandise determination, which was adopted by CBP in its final administrative determination in EAPA 8143, covered both hollow and solid steel billets. See Oil Country Tubular Goods From the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders, 91 Fed. Reg. 9,811 (Dep't of Commerce Feb. 27, 2026), and accompanying Issues and Dec. Mem. at Cmt. 1 ("Circ. IDM") (noting that it based its findings on "OCTG produced from all steel billets . . . used by PET" and that PET produces "OCTG in Thailand in the same manner 'regardless of whether it starts from solid steel billets or hollow steel billets.'"). Commerce stated it "disagree{d} with the domestic interested parties regarding whether it should find the hollow steel billets used by PET in its production of seamless OCTG to be within the scope of the Orders." Id. Instead, Commerce found that "there is no evidence on the record that the scope of the Orders specifically includes OCTG produced in third countries from hollow billets from China." Id. Commerce also rejected "the argument that hollow billets used as inputs by PET are conclusively covered by the scope of the Orders." Id. Commerce ultimately found that it "cannot determine that hollow billets further processed into OCTG in a third country are within the scope of the Orders without doing a substantial transformation and country-of-origin analysis . . . and . . . no party made such a request in this proceeding." Id.

---

[3] As noted in Centric Pipe's initial brief, CBP limited its scope analysis to hollow steel billets because it found an alleged lack of evidence distinguishing between PET's use of hollow or solid steel billets. See CP Br. at 21 n.4.

Furthermore, the relevant question is not whether the inputs were identical, but whether CBP alone could determine from the scope language that OCTG manufactured in Thailand from Chinese inputs remained Chinese-origin merchandise. Commerce itself recognized that determining whether hollow billets further processed into OCTG in a third country remained covered required a substantial transformation and country-of-origin analysis. See CP Br. at 24-26; Circ. IDM at Cmt. 1. "The 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred . . . . Circumvention can only occur if the articles are from a country not covered by the relevant AD or CVD orders." Bell Supply Co. v. United States, 888 F.3d 1222, 1229 (Fed. Cir. 2018). The scope language alone did not resolve the country-of-origin question, yet CBP purported to resolve it without referral, in a manner that was entirely inconsistent with Commerce's circumvention and covered merchandise determinations, upon which CBP itself relied in its final affirmative determination in EAPA 8143. See EAPA 8143 ORR Determination at 13-15. By resolving the country-of-origin question without referral to Commerce, CBP exercised precisely the "boundary-defining authority reserved to Commerce" that Sunpreme forbids. 946 F.3d at 1320.

**D. CBP's Disparate Treatment of EAPA 7890 and 8143 Is Arbitrary**

"{C}ourts may not accept . . . post hoc rationalizations for agency action" and "an agency's discretionary order {can only} be upheld, if at all, on the same basis articulated in the order by the agency itself." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) (citations omitted). The Government and USOMA have devised several arguments relating to CBP's authority to make covered merchandise determinations to justify disregarding Centric Pipe's arguments relating to scope, substantial transformation and relevant circumvention determinations. This Court must, however, consider the "basis articulated . . . by the agency itself"

and may not choose from counsel's newly articulated justifications for it. Id. at 169. In its determinations in this case, CBP did not articulate a specific legal standard that it applied to its covered merchandise analysis. It simply summarized the processing steps and concluded that the operations did not "somehow render the products to be out-of-scope." Letter from Alice A. Kipel re: EAPA Consol. Case Number 7890 at 20 (July 2, 2025) (Public Version) ("ORR Determination") (P.R. 612). CBP's failure to articulate or apply a legal standard here cannot be reconciled with its treatment of EAPA 8143, where it found that it was "unable to determine" whether Chinese-origin steel billets were substantially transformed into Thai-origin OCTG outside the scope of the Orders. CBP's unexplained disparate treatment of the same fundamental covered-merchandise question is arbitrary and cannot be sustained.

The Government also contends that CBP did not find the steel billets to be covered merchandise, but rather that the OCTG imported into the United States was covered merchandise. See Gov. Br. at 42. ORR, however, expressly concluded that "'hollow steel billets' from China that PET used to manufacture finished OCTG in Thailand are covered by the scope of the AD/CVD Orders." ORR Determination at 20 (emphasis added) (P.R. 612). The Trade Remedy & Law Enforcement Directorate ("TRLED") likewise found that "PET's hollow steel billets from China are Chinese-origin OCTG covered by the AD/CVD Orders." Letter from Victoria Cho re: Notice of Determination as to Evasion at 26 (February 24, 2025) (Public Version) ("Final Determination") (P.R. 522). Because the Government's characterization is contradicted by CBP's own reasoning, and CBP failed to articulate or apply a consistent legal standard, CBP's covered merchandise determination is arbitrary and cannot be sustained.

In short, CBP did more than decline to refer an unresolved question to Commerce: it exercised authority reserved to Commerce, expanded the Orders beyond their lawful scope, and

reached a covered-merchandise determination that cannot be reconciled with Commerce's subsequent determinations or CBP's own treatment of the same fundamental issue in EAPA 8143. For these reasons, CBP's covered-merchandise determination is arbitrary, capricious, and contrary to law and must be set aside.

## II. CBP VIOLATED CENTRIC PIPE'S DUE PROCESS RIGHTS

CBP's affirmative determination of evasion was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law because, under 19 C.F.R. § 165.15(d)(1), CBP denied Centric Pipe its due process rights by not allowing it to comment on the allegations of evasion prior to initiation and the imposition of interim measures. See CP Br. at 10-15.

### A. Centric Pipe Had a Protected Property Interest

Importers are entitled to procedural due process during an EAPA investigation. See Royal Brush Mfg. v. United States, 75 F.4th 1250, 1257 (Fed. Cir. 2023). The Government correctly acknowledges that "importers have a protectable property interest in a final {EAPA} determination against them{,}" but then wrongly claims that a property interest does not exist "at the time CBP initiates the investigation, or when it imposes interim measures." Gov. Br. at 25; see also USOMA Br. at 22. In Royal Brush, the Federal Circuit held that "in adjudicative proceedings, due process 'includes the right to know what evidence is being used against one.'" 75 F.4th at 1258 (citation omitted); see also NEC Corp. v. United States, 151 F.3d 1361, 1371 (Fed. Cir. 1998). The Federal Circuit applied this rule in Royal Brush to find that CBP violated an importer's due process rights by not disclosing certain proprietary information that CBP relied on in finding evasion. See 75 F.4th at 1259. Here too, CBP violated Centric Pipe's procedural due process rights by initiating its investigation without informing Centric Pipe of the information that it relied on to initiate the investigation or providing Centric Pipe with an opportunity to comment on that information.

Centric Pipe went a step further than required by Royal Brush by identifying a protected property interest. Specifically, CBP's initiation of the EAPA investigation forced Centric Pipe "to participate in a costly investigation that harms {its} business reputation." CP Br. at 13. The Government's and USOMA's reliance on Ewing v. Mytinger & Casselberry, 339 U.S. 594 (1950) for the proposition that a "preliminary hearing is not required for an administrative agency to determine whether a judicial proceeding should be instituted" is misplaced and irrelevant to this appeal. Gov. Br. at 26; see also USOMA Br. at 21. In Ewing, the statute provided that the government may seize misbranded articles "when the Administrator has probable cause to believe from facts found, without hearing, by him or any officer or employee of the Agency." 339 U.S. at 595 (quoting 21 U.S.C. § 334(a)) (emphasis added). In finding that there was no due process violation, the Supreme Court emphasized that the statute did not require a hearing. See id. at 600. Here, the statute provides no limitation on CBP holding a hearing prior to initiation. See 19 U.S.C. § 1517(b)(1). Nor does the harm alleged by Centric Pipe concern a "judicial proceeding" like in Ewing but rather whether CBP's investigation should have been initiated. The harm to Centric Pipe goes beyond participating in a costly investigation, cf. Gov. Br. at 26, and extends to the unlawful imposition of duties as CBP may never have initiated its investigation had Centric Pipe had an opportunity to comment on the allegation. See CP Br. at 15, 34-40.

Centric Pipe also had a protected property interest that was impacted by the imposition of interim measures. In granting a preliminary injunction, the Court held in ICON EV LLC v. United States that the plaintiff "will likely succeed on the merits of its due process claim" because "{i}t likely has a legitimate property interest in the proper assessment of imports which it did not receive due process before interim measures were imposed." 836 F. Supp. 3d 1361 at 1370-71 (CIT 2026)

(citing Superior Com. Sols., LLC v. United States, 811 F. Supp. 3d 1363 (CIT 2025)).[4] The Government relies on dicta in ICON to ignore this central holding. See Gov. Br. at 27. The Court in ICON found that the interim measures in that case were not just temporary measures because ICON would have to declare bankruptcy prior to contesting the final determination. See 836 F. Supp. 3d at 1371. The Court, however, relied on Superior Commercial in holding that the plaintiff had a legitimate property interest in the proper assessment of imports. See id. The Government ignores that the Court in Superior Commercial did not require that interim measures be more than temporary for a protected property interest to exist. See Superior Commercial, 811 F. Supp. 3d at 1377. Instead, the Court found that even a temporary deprivation requires "the right to be informed not only of the nature of the charges but also of the substance of the relevant supporting evidence." Id. at 1376 (quoting Brock v. Roadway Express, Inc., 481 U.S. 252, 264-65 (1987)). The holding in Superior Commercial is consistent with Supreme Court precedent that a deprivation can be temporary and still implicate due process. See Connecticut v. Doehr, 501 U.S. 1, 12 (1991) (holding that "temporary or partial impairments to property rights" implicate due process rights); see also Fuentes v. Shevin, 407 U.S. 67, 85 (1972). As a result of imposing interim measures, CBP retroactively required cash deposits on all Centric Pipe's unliquidated entries. Consistent with ICON and Superior Commercial, this Court should find that Centric Pipe had a protected property interest in the accurate assessment of imports that was impacted by the imposition of interim measures.

[4] Although Superior Commercial is currently on appeal at the Federal Circuit, see CAFC Ct. No. 2026-1376, this Court nonetheless should treat the holding and underlying reasoning in Superior Commercial as persuasive given the Court's application of Royal Brush and other Supreme Court precedent in that case. See Superior Commercial, 811 F. Supp. 3d at 1376 (relying on Royal Brush and Brock in finding that an importer has due process rights in EAPA proceedings).

Interim measures are also not just a "temporary measure" because an importer must maintain collateral on its bond while its entries remain suspended. See generally 19 C.F.R. § 113.13 (setting forth the amount of the bond). USOMA faults Centric Pipe for not providing evidence that it was injured by the imposition of interim measures. See USOMA Br. at 25. The concept of judicial notice, however, allows a court to recognize a fact in the absence of formal proof when the fact is "not subject to reasonable dispute" and when it is "generally known within the territorial jurisdiction." United States v. Roses, Inc., 706 F.2d 1563, 1569 (Fed. Cir. 1983). CBP's regulations require that an importer retain a bond at an amount that is partially determined by "{t}he value and nature of the merchandise involved in the transaction(s) to be secured." See 19 C.F.R. § 113.13(b)(3). It is "generally known" that collateral is required to secure a bond. The interim measures are the only reason Centric Pipe would have to retain collateral on its bond for these entries.

Finally, this Court should not be persuaded by the Government's and USOMA's arguments that the Court has previously rejected the imposition of interim measures as implicating due process. See Gov. Br. at 27; USOMA Br. at 23-24. The cases relied on by the Government and USOMA, except for Phx. Metal Co., Ltd. v. United States, No. 23-00048, 2024 Ct. Intl. Trade LEXIS 69 (June 10, 2024), appeal dismissed, No. 2024-2222, 2024 U.S. App. LEXIS 26499 (Fed. Cir. Oct. 21, 2024), were all decided prior to the Federal Circuit's holding in Royal Brush. See Royal Brush, 75 F.4th at 1250. In Phoenix Metal, the Court did not hold that importers lack a protected property interest implicating due process protections in an EAPA investigation but instead that the plaintiff failed to establish a "sufficient cognizable property interest" under the specific facts of that case. See No. 23-00048, 2024 Ct. Intl. Trade LEXIS 69, at *27. The Court found that "if {plaintiff} suffered business harm stemming directly from the lack of notice and

opportunity to be heard prior to the sudden imposition of interim measures on goods already imported, that might also be an interest that could trigger due process rights." Id. Here, Centric Pipe sufficiently established that it was directly harmed by having to participate in a costly investigation following the unlawful initiation of this inquiry and that harm extended beyond the collection of cash deposits to maintaining collateral on its bond.

In sum, this Court should find that Centric Pipe had a protected property interest that was directly implicated by CBP's initiation of this investigation and the imposition of interim measures.

### B. CBP Provided Centric Pipe with Insufficient Due Process

CBP failed to provide Centric Pipe with sufficient procedural due process because CBP's regulation does not provide importers with access to and an opportunity to comment on the information contained in the EAPA allegation prior to initiation and the imposition of interim measures. Determining whether the administrative procedures implemented by an agency are constitutionally sufficient requires the consideration of three factors: (1) "the private interest" impacted by the official action; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest . . ." Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

The Government's arguments primarily focus on the first Mathews factor – that "{i}nterim measures are both time limited and fully reimbursable." Gov. Br. at 28. The reimbursement of interim measures, however, "would not cure the temporary deprivation that an earlier hearing might have prevented." United States v. James Daniel Good Real Prop., 510 U.S. 43, 56 (1993) (quoting Doehr, 501 U.S. at 15). Further, the Government's argument ignores the fundamental harm – that CBP likely would have never initiated this investigation had Centric Pipe had an opportunity to comment as discussed in more detail below. The reimbursement of any interim

measures cannot turn back the clock. The only equitable remedy is for this Court to reverse CBP's affirmative finding of evasion against Centric Pipe. See CP Br. at 15.

The Government and USOMA maintain that the second Mathews factor weighs in CBP's favor because importers have "several opportunities to submit information and arguments" between the imposition of interim measures and CBP's final determination of evasion. See Gov. Br. at 30; USOMA Br. at 27-30.[5] These arguments skirt Centric Pipe's central contention that even if CBP had made a negative final determination of evasion, Centric Pipe was never made aware, or given an opportunity to comment on, the evidence contained in the allegation prior to initiation and imposition of interim measures. See Brock, 481 U.S. at 264 (holding that a party is entitled to due process even before a temporary deprivation). Like the Court found in ICON, the "risk of erroneous deprivation {was} very real" because CBP likely never would have initiated this investigation had Centric Pipe been provided with an opportunity to comment on the evidence that CBP found reasonably suggested evasion. 836 F. Supp. 3d at 1371. CBP primarily relied on mere "conjecture and supposition" contained in declarations to initiate its investigation. See CP Br. at 36. Specifically, [ ]. See Letter from Alleger to TRLED re: Request for an Investigation under EAPA at Ex. 8 (Jan. 18, 2024) (Business Confidential Document) ("Allegation") (C.R. 1). The Government suggests that "information in an allegation is subject to subsequent development." Gov. Br. at 31. Such a development occurred here and would have occurred earlier but for CBP's regulation not providing importers with a right to comment on information relied on by CBP to initiate an EAPA investigation and impose interim measures.

---

[5] USOMA argues that Centric Pipe had an opportunity to submit information in response to a CF-28 prior to the imposition of interim measures. See USOMA Br. at 30-31. This argument ignores that CBP issued the CF-28s after initiation. See Final Determination at 3 (P.R. 522).

Following initiation, Centric Pipe submitted an audit report conducted by the American Petroleum Institute ("API"). See CP Br. at 36-37 (citing Letter to TRLED re: EAPA Investigation #7890; Request for Information Response at Ex. V-3b(d) (July 9, 2024) (Business Confidential Document) ("Centric Pipe RFI") (C.R. 220)). API found that [

]. Id. at 37 (Confidential Version), ECF No. 47. The audit report rebuts statements in [ ]. Allegation at Ex. 8 (Business Confidential Document) (C.R. 1). The API audit report, therefore, directly contradicted the information relied on by CBP to initiate its investigation.

The Government fails to address this audit report. See Gov. Br. USOMA wrongly claims that CBP acknowledged this evidence and "simply found that its own observations" to constitute the more substantial evidence. USOMA Br. at 43-44. Contrary to USOMA's assertion, CBP did not explain why it found its own evidence from verification to be more probative. USOMA does not cite a single example of TRLED referring to this audit report. See id. at 43-44 (merely citing TRLED's findings regarding PET's alleged capacity where TRLED makes no mention of the API audit report). USOMA instead relies on ORR's summary of Centric Pipe's argument that "API audit reports for 2022 and 2023 are more reliable sources of information for PET's production capability than the verification due to timing of the verification, i.e., six months after Centric Pipe's last order." Id. at 43 (citing ORR Determination at 8 (P.R. 612)). ORR summarized Centric Pipe's argument but then failed to engage with this argument in its analysis. See ORR Determination at 20-22 (P.R. 612). ORR failed to provide an explanation for its finding that PET lacked an operating facility and the necessary production capacity to account for the quantities of OCTG that it shipped

to the United States when CBP failed to conduct any analysis that other evidence outweighed the information contained in the API audit report. Had CBP's regulations provided Centric Pipe with an opportunity to comment on the information contained in the allegation, then Centric Pipe could have submitted the API audit report earlier and likely prevented even the initiation of this case.

The high risk of erroneous deprivation in this case also distinguishes this appeal from Phoenix Metal. In that case, the Court found that the risk of erroneous deprivation "was extremely low" as Phoenix's owner "already had multiple companies go through EAPA investigations, and that evidence indicated that {Phoenix's owner} was actively evading Government's determinations in the earlier cases and potentially utilizing the CF-28s as a warning system." Phx. Metal, No. 23-00048, 2024 Ct. Intl. Trade LEXIS 69, at *27-28. No such allegation has been made against Centric Pipe. To the contrary, as Centric Pipe detailed in its request for an administrative review from ORR, even before initiation of this investigation, CBP reviewed the same types of documents from Centric Pipe as in this EAPA proceeding in an earlier Request for Information on one of its entries and found only that it was imported under an incorrect HTS code. See Letter from Centric Pipe to CBP re: Revised Request for Administrative Review at 24 (Apr. 14, 2025) (Public Version) (P.R. 583). If Centric Pipe had been circumventing the Orders, that review would have led to a different outcome than simply a classification correction and payment of duties. Unlike the plaintiff in Phoenix Metal, the CF-28 here did not serve as a warning system. Rather, the fact that CBP found no issues with its imports but for the mistaken classification led Centric Pipe to believe it had exercised reasonable care with respect to its imports of OCTG. The very initiation of this case, therefore, implicated Centric Pipe's due process rights.

On the third Mathews factor, the Government and USOMA assert that CBP has an interest in protecting the integrity of its investigations and its revenue through the imposition of interim

measures. See Gov. Br. at 29; USOMA Br. at 32. These concerns, however, must bend given the significant risk of erroneous deprivation. The U.S. Department of Commerce allows for comments prior to the initiation of its AD/CVD investigations. See CP Br. at 14 (citing 19 C.F.R. § 351.203). EAPA proceedings are designed to protect these underlying investigations by Commerce. It is unreasonable to presume that providing notice will not harm the underlying investigation but that similar notice could harm the enforcement action designed to protect Commerce's investigations.

In sum, CBP's affirmative evasion finding was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law because CBP violated Centric Pipe's due process rights. This Court should remand with instructions to CBP to reverse its affirmative finding of evasion against Centric Pipe.

## III. CBP Unlawfully Ignored Evidence that Detracted from the Weight of Its Affirmative Determination

CBP's determination of evasion was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law because CBP unlawfully ignored evidence submitted by Centric Pipe that detracted from its determination. See id. at 34-42.

Centric Pipe submitted significant evidence contradicting CBP's finding that PET lacked sufficient capacity to produce the OCTG that it exported to the United States. See id. at 41-42. In particular, Centric Pipe provided an API audit report which [ ]. See id. (Confidential Version), ECF No. 47.

USOMA relies on Newtrend USA Co. v. United States, 791 F. Supp. 3d 1313 (CIT 2025) and Phoenix Metal to argue that CBP can lawfully make judgment calls in weighing evidence on the record. See USOMA Br. at 40-43. In Newtrend, the Court explained that CBP considered the evidence that conflicted with CBP's determinations. See 791 F. Supp. 3d at 1322. Similarly, in

Phoenix Metal, the Court found that "{b}oth TRLED and ORR have addressed {plaintiff's} arguments" and the court rejected plaintiff's arguments "that evidence should be given a different meaning." No. 23-00048, 2024 Ct. Intl. Trade LEXIS 69, at *17. Unlike in Newtrend and Phoenix Metal, Centric Pipe does not ask this Court to reweigh the evidence relied on by CBP. Instead, Centric Pipe maintains that CBP had to consider the evidence contained in the API audit report in the first instance.

Both TRLED and ORR failed to consider the API report in making their affirmative determinations of evasion. Under the arbitrary and capricious standard, CBP must have "reasonably considered the relevant issues and reasonably explained the decision." FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021). The Government does not address the API audit report in its response brief, see Gov. Br., and nor could it as any analysis would be an unlawful post-hoc rationalization. See Burlington, 371 U.S. at 168-69. As explained above, ORR's summary of Centric Pipe's arguments concerning the information contained in the API audit reports fails to provide any analysis of why ORR valued that information in favor of CBP's findings at verification. See supra Section II.B. CBP failed to consider "the relevant issues" and "reasonably explain" its affirmative determination of evasion by not addressing information contained in the API audit report that detracted from the weight of its affirmative finding of evasion against Centric Pipe.

An explanation of why CBP weighed its observations at verification over the API report is particularly pertinent here where many of the discrepancies identified by CBP at verification could be explained by the fact that "{PET's} factory ha{d} not been receiving purchase orders since the initiation of the EAPA investigation so the factory is not under active production" and that PET merely set up "demonstrat{ion of} their production process" for the purposes of verification. On-

Site Verification Report at 6 (Dec. 5, 2024) (Public Version) (P.R. 457). Here, the API audit report [ ]. See Centric Pipe RFI at Ex. V-3b(d) (Business Confidential Document) (C.R. 220). The API audit report, therefore, represented [ ] given that PET's factory was no longer in active production by the time of verification.

TRLED's and ORR's failure to consider the evidence in the API audit report rendered CBP's affirmative determination of evasion as arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law. This Court should remand to CBP with, at a minimum, instructions to consider the evidence in the API audit report. Once properly considered, the only reasonable reading of the record is that PET had the capacity to produce the OCTG that it exported to the United States.

## IV. CBP's Untimely Initiation Renders Its Evasion Finding Unlawful

CBP's evasion finding against Centric Pipe was unlawful because CBP initiated its investigation later than 15 business days after receiving an allegation of evasion. See CP Br. at 15-20. The statute is clear that TRLED "shall" initiate an EAPA investigation "not later than" 15 business days after it receives an allegation. 19 U.S.C. § 1517(b)(1). Yet 19 C.F.R. § 165.12 allows TRLED to delay initiation indefinitely pending CBP's confirmation of receipt of an allegation. See id.

The Government argues that courts cannot enforce the timing provisions in a statute unless that statute specifies a consequence for non-compliance. See Gov. Br. at 10-12. The cases it relies on are not controlling here because the statute does specify such a consequence. Specifically, the initiation date is used as the trigger date for the suspension of entries following the imposition of interim measures and any final determination. See 19 U.S.C. §§ 1517(d)(1)(A)-(B); 1517(e)(1)-

(2). The statute provides a direct consequence if CBP does not timely initiate its investigation: CBP's suspension of entries begins at a later date than would otherwise occur.

This Court should also dismiss USOMA's arguments that the error by CBP was harmless and that Centric Pipe lacks prudential standing because the statute protects only domestic industries. See USOMA Br. at 9-18. Congress intended for CBP to conduct EAPA investigations under "strict deadlines." H.R. Rep. No. 114-114, at 85 (2015). Delayed initiation postpones notice to importers, depriving them of their protected interest to be promptly informed of investigations that could impose substantial legal and economic obligations, and to take actions to mitigate potential risks. For these reasons, CBP's evasion finding against Centric Pipe was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law as CBP untimely initiated its investigation.

## CONCLUSION

Centric Pipe respectfully requests that this Court grant its motion for judgment on the agency record and remand CBP's final determination of evasion consistent with Centric Pipe's initial brief, this reply brief and the reply briefs filed by the other Consolidated Plaintiffs, which Centric Pipe incorporates by reference to the extent they are consistent with the arguments presented in this reply brief.

Respectfully submitted,

Dated: November 25, 2026

/s/ Bryan P. Cenko

Bryan P. Cenko
Kristin H. Mowry
Kavita Mohan
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
bpc@mowrygrimson.com
*Counsel to Centric Pipe LLC*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Bryan P. Cenko, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures and Scheduling Order. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 6,938 words. This brief thus complies with the Standard Chambers Procedures and Scheduling Order, which permits briefs of 7,000 words or fewer.

Respectfully submitted,

Dated: November 25, 2026

/s/ Bryan P. Cenko
Bryan P. Cenko
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
bpc@mowrygrimson.com
*Counsel to Centric Pipe LLC*